# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| AIR PRODUCTS AND CHEMICALS, INC., and AIR PRODUCTS LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| GENERAL SERVICES ADMINISTRATION; ROBIN CARNAHAN, in her official capacity as Administrator of the General Services Administration; UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA HAALAND, in her official capacity as Secretary of the United States Department of the Interior; BUREAU OF LAND MANAGEMENT; and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:23-cv-00147 |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiffs Air Products and Chemicals, Inc., and Air Products LLC (collectively, "Air Products") file this Complaint against Defendants GENERAL SERVICES ADMINISTRATION ("GSA"); ROBIN CARNAHAN, in her official capacity as Administrator of the GSA; UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA HAALAND, in her official capacity as Secretary of the United States Department of the Interior; BUREAU OF LAND MANAGEMENT ("BLM"); and TRACY STONE-MANNING, in her official capacity as Director of the BLM (collectively, "Defendants").

## I.   INTRODUCTION

1.      This case is about a looming disruption in the nation's supply of helium.  That crisis is precipitated by Defendants' forthcoming sale to a private entity of the sprawling collection of equipment, land, and pipeline that constitutes the Federal Helium System ("System").  The System is a vital and unique federal asset that serves America's energy, military, industrial, and medical needs.  There is literally nothing like it in the country.  It is thus not the typical surplus government property auctioned off by GSA—say, extra staplers or an empty warehouse—yet that is how Defendants are approaching the sale of this critical and unique asset.  GSA, working with BLM, has failed to adopt reasonable safeguards to ensure that the next owner has the financial, technical, and operational experience, as well as the necessary property rights, to safely provide a stable helium supply to the many who depend on it, such as Plaintiffs and their customers.  And GSA has now retreated without explanation from its prior promise to deliver Plaintiffs' helium—which Plaintiffs bought from the Government and is stored in the System, with limitations on withdrawal rates that make Plaintiffs dependent on a smoothly functioning System to access this valuable commodity—*before* GSA sold the System to a new owner.  Grave public and private harms that can never be undone will result from the sale as presently planned by Defendants pursuant to the

1

challenged Invitation For Bid, and this Court's intervention is needed to avert the threat to the national helium supply.[1]

2.        Helium is used for much more than filling party balloons.  As a stable, nonreactive noble gas with the lowest boiling point of all known elements, helium is a critical component in military aircraft, weather monitoring, medical research, nuclear energy, refrigeration, and manufacturing.  The United States has used helium for national defense purposes for more than one hundred years; U.S. Customs and Border Protection uses it to fill blimp-like "aerostats" that provide continuous aerial surveillance of the border; the National Aeronautics and Space Administration uses it to push rocket fuel and pressurize ground and flight systems; hospitals use it to operate MRI machines and lasers; manufacturers use it in fiber-optic cables and semiconductor chips; the list goes on.  *See* J. Dianne Dotson, *Everyday Uses of Helium Gas*, Sciencing (Nov. 15, 2018), https://bit.ly/3vb84mP.  Along with several other major suppliers, Plaintiffs meet this demand by purchasing, refining, and delivering helium to public- and private-sector customers in the United States and across the globe.

3.        Helium is also rare, non-renewable, and difficult to produce, refine, and distribute. Generated deep underground through radioactive decay, helium rises through the Earth's crust and atmosphere and escapes into space unless trapped by chance in pockets of natural gas.  *See generally* S. Hr'g 112-540, *Hr'g before the Senate Committee on Energy and Natural Resources* at 13 (May 10, 2012) (prepared statement of Prof. Chan).  Fewer than twenty plants around the world have the capacity to produce major quantities of helium as a byproduct of natural gas extraction.  Many of the largest helium plants are located outside the U.S. in Russia, Qatar, and

---

[1]    Invitation For Bid No. BLM-R-2044 is attached as Exhibit A to this Complaint.  Copies of other documents cited in this Complaint are contained for the Court's reference in the forthcoming Appendix in Support of Plaintiffs' Motion for Preliminary Injunction.

Algeria, where long supply chains and geopolitical environments make it difficult to supply U.S. consumers, including federal agencies and critical private industries.  H.R. Rep. No. 113-42 at 10 (Apr. 18, 2013); Nicolas Rivero, *The world is facing helium shortage 4.0*, Quartz (July 20, 2022), https://bit.ly/3b8CS0L.

4.      Based just outside Amarillo, Texas, the Federal Helium System is a statutorily-defined bundle of property that includes an underground helium storage reservoir, government-owned helium stored in the reservoir, extraction wells and associated mineral rights, processing equipment, support buildings, and 423 miles of pipeline extending via easements and rights-of-way through private land to private refiners in Texas, Oklahoma, and Kansas.  The System currently fulfills about 20 percent of domestic demand for helium, contains our country's largest reserve of helium, and boasts the largest demonstrated helium storage capacity in the world.  *See* Intelligas Consulting, *Global Helium Report* at 20 (May 2023); GSA, *Federal Helium System* (Aug. 27, 2023), bit.ly/3BloNHZ.[2]

5.      While the Government owns most of the physical infrastructure comprising the System, the Crude Helium Enrichment Unit ("CHEU") is a privately-owned processing facility that has been operated by the Government pursuant to long-term leases for two decades.  The CHEU is indispensable to the System; without it, helium cannot be extracted from underground storage and distributed (via pipeline) for further processing and refining.

6.      The System's vast underground storage reservoir today holds a total of approximately 4 billion cubic feet of helium.  The Government owns just under half of the helium stored in the System's underground reservoir, and private parties own the remainder.  Plaintiffs,

---

[2]      The *Global Helium Report* is accessible within GSA's "data room" for the System.  *See* GSA *Data Room – Helium Market Report* (last visited August 27, 2023), https://disposal.gsa.gov/s/bush-dome-reservoir-data-set.  Any member of the public may register for free access to the data room.

which previously purchased 2 billion cubic feet of helium for about $250 million from the Government, currently own about 800 million cubic feet of helium that is stored at the System, and its value far exceeds the amount Air Products paid for it.

7.     The System's operations are closely tied to the helium market's health because helium is a scarce, non-renewable resource, and because the System is one of few places around the globe that can store significant amounts of helium underground.  Government helium sales have sometimes led to market disruptions.  In 2006–07, 2011–13, and 2018–20, unexpected supply gaps around the world due to planned and unplanned maintenance outages led to helium shortages and dramatically increased prices, jeopardizing scientific, technological, and national-defense projects.

8.     To address this problem, Congress enacted the Helium Stewardship Act of 2013 in order to "complete the privatization of the Federal helium reserve in a competitive market fashion that *ensures stability in the helium markets* while protecting the interests of American taxpayers." Pub. L. No. 113-40, 127 Stat. 534, 534 (Oct. 2, 2013) (emphasis added); *see also* H.R. Rep. No. 113-42 at 8–11 (explaining that the Act would "ensure a consistent supply of helium for U.S. manufacturers, consumers and researchers" by maintaining the System's "continued operation").

9.     To accomplish this goal, Congress directed the Secretary of the Interior to gradually sell off the Government's helium reserve according to statutorily-defined phases and limitations and, by September 30, 2021, to declare the System as excess property to be disposed of through sale.  *See* 50 U.S.C. § 167d(a)–(d).  After that date, the GSA—the agency tasked with selling unneeded federal property, from used office furniture to dilapidated warehouses—would auction off the System in its entirety to a private purchaser with help from the Secretary of the Interior and the BLM.  *Id.* § 167d(d)(1)–(2).  Congress set no deadline for the GSA to sell the property.

10.     True to Congress's instructions, the Secretary of the Interior (acting through the BLM) designated the System as excess property in September 2021.  But things unraveled from there.  Notwithstanding Defendants' clear statutory duty to act as "steward" of the System, Congress's admonition that the sale of the System must be conducted in a way that preserves helium market stability, and the vital importance of a stable helium supply to public- and private-sector buyers across various mission-critical fields, Defendants recklessly pressed ahead to sell and convey the System—no matter the consequences for supply and despite the lack of any operative deadline for the sale.

11.     This process culminated on July 26, 2023, when Defendants issued an Invitation For Bid soliciting offers to purchase the System.  The Invitation For Bid contains formal, binding conditions for the submission of bids, selection of a purchaser, and ultimate conveyance of the System to a new owner.  Defendants will close bids on November 15, 2023, and will sell and convey the System thereafter.  As alleged in greater detail below, the Invitation For Bid is contrary to the Helium Stewardship Act and arbitrary and capricious under the Administrative Procedure Act ("APA"), and thus unlawful, for multiple independent reasons.

12.     *First*, Defendants' sale conditions fail to ensure, and indeed virtually guarantee, that the System's purchaser will not be able to deliver helium after conveyance at all, much less safely and consistently.  To start, Defendants intentionally exclude from the sale the BLM's lease of the Crude Helium Enrichment Unit—despite the fact that the CHEU is part of the System as Congress defined it, and despite the reality that, without the CHEU, the purchaser will be unable to process and deliver stored helium.  Moreover, Defendants' sale conditions fail adequately to account for the System's compliance with the numerous safety, pipeline, and environmental regulations that will apply to the System's private owner, but from which the Government is

largely exempt.  Compliance problems may result in closure of the System when federal and state regulators bring these regulations to bear.  Further still, Defendants have admitted that the conveyance will not include complete documentation of the easements and rights-of-way across private land needed to operate the System's 423-mile helium pipeline across three states.  A number of parcels in Texas and Kansas, for example, either rely on deeds without warranty (meaning title conveys but without a warranty against problems with the title), or have no records available to support title at all.  Such incomplete documentation invites property disputes when the System is conveyed to a private party, and it takes only one bad right-of-way to shut down the entire pipeline.

13.     Defendants' failure to ensure continuity in operations throughout the sale and conveyance violates the Helium Stewardship Act's command that Defendants dispose of the System in a manner that maintains stability in the national helium supply.  Defendants' approach also contravenes established principles of agency decisionmaking, which require Defendants to implement the statutory mandate in a reasonable manner that accords with Congress's aims, the unique and special nature of the asset at issue, and the many vital public and private interests at stake.

14.     *Second*, Defendants' timing of the sale constitutes an unexplained change in position and fails to consider the reliance interests of the helium refiners, suppliers, and consumers who reasonably believed and relied upon Defendants' previous public representations.  Between 2020 and 2022, Defendants repeatedly told market participants that they would continue to operate the System "until such time as *all* privately owned helium is produced from the field" and delivered—helium that Air Products had already bought from the Government and paid for in full. BLM Press Release, *BLM Announces Disposal Process for Federal Helium System at Cliffside*

(Apr. 16, 2020) (emphasis added), on.doi.gov/3aZVmAO; *see also, e.g.*, BLM, Justification and Approval for Sole Source at 3–4 (May 5, 2022).  At the time, Defendants anticipated delivering all of Air Products' helium by 2023—a date which has since been delayed by at least three years because of unexpected System outages, as further alleged below.  Reasonably relying on Defendants' previous public statements, Air Products thought there would be enough time to get its purchased helium delivered *before* Defendants conveyed the System to a private buyer.  But Defendants have since arbitrarily accelerated the sale.  Defendants initially announced a sale date of September *2022*, before postponing that sale after an avalanche of concerns voiced by affected entities.  Now, without fully resolving those concerns, Defendants have launched the sale process again and set a bid closure date of *November 15, 2023*, with selection and conveyance to follow— and thereby guaranteed that Defendants will convey the System with Air Products' helium still in the System's underground reservoir, contrary to Defendants' previous representations.  Given longstanding capacity constraints on delivering helium from the System's underground reservoir to private refiners, Air Products cannot simply ask for its helium today and get all of it delivered tomorrow, next week, or even this year; it will take several years to deliver all of Air Products' helium.  Defendants' arbitrary new sale timeline thus frustrates Air Products' investment-backed expectations for its approximately 800 million cubic feet of undelivered helium.  Defendants' decision to speed up the timeline undermines those reliance interests at a time when lengthy unexpected shutdowns in the System and at alternative sources of supply have *already* triggered a severe helium supply disruption.

15.    *Finally*, Defendants' inadequate sale conditions demonstrate a failure to consider reasonable alternatives that would have mitigated the negative effects of the upcoming sale on refiners like Air Products and on the national helium supply.  Defendants could have: (a) refrained

from selling and conveying the System until Air Products is able to withdraw its bought-and-paid-for helium; (b) committed to make Air Products whole for the value of helium that it has already purchased from the Government but which the purchaser is unable to deliver in a timely manner; and (c) brought the System into compliance with all federal and state regulatory requirements so that the purchaser is in a position to achieve such compliance and to operate the facility immediately following conveyance.

16.     This action challenges and seeks declaratory and injunctive relief against this unreasoned, unreasonable, and inappropriate process for Defendants' forthcoming sale and conveyance of the System.

17.     The Invitation For Bid provides that Defendants will close the bidding period on November 15, 2023, select a winning bid soon thereafter, and convey the property within 120 calendar days of selection.  Ex. A at 2, 16.  This Court's immediate action is urgently needed to preserve the status quo by enjoining the sale, protecting Plaintiffs, their customers, and the public—all of whom benefit from a steady supply of helium—from irreparable harm.

## II.  PARTIES

18.     Plaintiff Air Products and Chemicals, Inc. is a Delaware corporation with its principal place of business in Pennsylvania that wholly owns Plaintiff Air Products LLC, a Delaware limited liability company with its principal place of business in Texas.

19.     Air Products provides essential industrial gases, including helium, to federal, state, and local agencies, as well as to customers in dozens of industries and sectors, including aerospace, refining, chemical, metals, electronics, manufacturing, and food and beverage industries.  Through Air Products LLC, Air Products purchased 2 billion cubic feet of helium from the Government in a series of auctions and sales held from 2014 through 2019, at a total cost of about $250 million.  Of that, about 800 million cubic feet of helium, the current value of which far exceeds what Air

Products paid for it, has yet to be delivered to Air Products as a result of technical limitations and unplanned shutdowns of the System's infrastructure.  The planned sale and conveyance of the System after November 2023 will, as explained herein, threaten Air Products' ability to take possession of its helium, threaten Air Products' ability to compete in the industrial gas industry, risk the loss of existing customers, harm the reputation and the goodwill required to secure future business, and threaten to deprive many of its customers of the refined helium used to deliver essential services to the public.

20.     Defendant GSA is a federal executive agency and has statutory responsibilities for the disposal of surplus government property.

21.     Defendant Robin Carnahan is Administrator of the GSA.  She is sued in her official capacity.

22.     Defendant United States Department of the Interior is a federal executive department and, through the BLM, operates and oversees the Federal Helium System.

23.     Defendant Debra Haaland is Secretary of the United States Department of the Interior.  She is sued in her official capacity.

24.     Defendant BLM is a federal agency within the Department of the Interior.

25.     Defendant Tracy Stone-Manning is Director of the BLM.  She is sued in her official capacity.

### III. JURISDICTION AND VENUE

26.     This action arises under the APA, 5 U.S.C. §§ 500 *et seq*., the Helium Stewardship Act, 50 U.S.C. §§ 167 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court thus has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

27.     The July 26, 2023, Invitation for Bid is final agency action subject to judicial review as provided by the APA.  5 U.S.C. § 704.

28.     Sovereign immunity is waived pursuant to the APA.  5 U.S.C. § 702.

29.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) because this is an action against agencies and officers of the United States and a "substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in this judicial district.  The principal components of the Federal Helium System, including the origination point of the multi-state pipeline system, are located in Cliffside, Texas, an unincorporated portion of Potter County near Amarillo, Texas.

## IV. ALLEGATIONS

### A.     Helium is a vitally important and scarce resource with a volatile supply chain.

30.     Helium is an inert gas widely recognized as the "most stable" element.  Bureau Land Mgmt., *About Helium* (last visited Aug. 27, 2023), https://on.doi.gov/3zrfYuU.  It is a non-renewable natural resource that is most commonly recovered from natural gas deposits that trap the helium before it can escape the Earth's crust and atmosphere.  *Id.*  As such, helium can be found in "only a few locations around the world, many of which are being depleted."  *Id.*  Texas is one of the most helium-rich areas on the planet.  *Id.*

31.     Helium may conjure images of party balloons and squeaky voices, but it has many important private- and public-sector uses.  It "is vital in a variety of industries," including the national defense, medical, technology, manufacturing, and scientific research sectors.  H.R. Rep. 113-42 at 9.  Helium is used in MRI machines, LCD screens, rocket launches, medical lasers, nuclear reactors, border-control aerial surveillance technology, and more.  *Id.*; *see also* U.S. Customs and Border Protection, *CBP to deploy aerostat in Nogales* (June 29, 2022), https://bit.ly/3vKZ0FE; Global Helium Report, *supra*, at 4–5.  For many of these uses, "there is no substitute for helium."  BLM, *About Helium*, *supra*; *see also* Global Helium Report, *supra*, at 19–20.

32.     For decades, the United States Government exercised significant control over domestic helium production, storage, and refining through the massive Federal Helium Reserve and other components of the Federal Helium System.  The System is the country's largest and most important source of helium production.

33.     Outside of the United States, the largest sources of helium production are in Russia, Qatar, and Algeria.  *See* H.R. Rep. No. 115-365 at 2 (Oct. 23, 2017).  As Congress has explained, "[g]iven the vast political, economic, and diplomatic uncertainty surrounding" these and other foreign suppliers of helium, "it would be imprudent to rely on these nations to fully satisfy global demand."  *Id.*  Recent world events have only further limited the reliability and availability of these sources to domestic public- and private-sector consumers.  *See* U.S. Int'l Trade Comm'n, *The Impact of Conflict on the Global Helium Shortage* at 2 (May 2022) (noting that the war in Ukraine has significantly reduced foreign sources of supply and "stressed the helium market," causing supply issues for scientific researchers and other helium users), www.usitc.gov/publications/332/executive_briefings/ebot_the_impact_of_conflict_on_the_global_helium_shortage.pdf.

34.     In 2006–07, 2011–13, and 2018–20, the combination of unreliable global production, suppressed domestic production, and increased demand brought on acute helium supply crises in the United States and around the world.  David Kramer, *Helium is again in short supply*, Physics Today (Apr. 4, 2022), https://bit.ly/3z5DXyn; *see* Global Helium Report, *supra*, at 17–18. These "[p]ast supply shortages [] had drastically negative effects on the price of" helium, and introduced "unpredictability into the future of helium" that "has the potential to destabilize the market."  H.R. Rep. No. 115-365 at 4.  Supply shortages have a "trickle down effect that impacts all players in the helium supply chain," with "price increases throughout the helium supply chain" and less available helium for "distributors and end-users."  Global Helium Report, *supra*, at 18.

35.     Today, the United States is once again facing a helium shortage, this time dubbed "Shortage 4.0."  It is "the longest helium shortage, to date."  Global Helium Report, *supra*, at 20. Global supply has been cut in half due to the total shutdown of helium plants in the United States, Russia, and Algeria.  The "constrained supply" caused "prices [to] dramatically increase[] 20-50%" in 2021 and 2022 with expected increases of "10-22% until 2025." *Id.* at 1, 16.  The supply crunch has also interfered with many industries' ability to operate normally.  As just one example, scientific researchers at universities across the country have shut down pieces of expensive technical equipment that rely on helium, such as nuclear magnetic resonance spectrometers at Oklahoma State University.  Kramer, *Helium is again in short supply*, *supra*.  As a Harvard Dean of Science put it, "[w]e are already in that worst-case scenario."  Juan Siliezar, *Global helium shortage slams brakes at Harvard labs*, Harvard Gazette (June 13, 2022), https://bit.ly/3orW0tO. Other federal agencies have similarly noted "concerns" about the helium shortage, which is "a threat to funded projects" across the scientific and research communities and is "driven" in part by changes in "national reserve policy."  Nat'l Sci. Found., *Dear Colleague Letter*, NSF No. 22-088 at 1 (May 24, 2022), https://bit.ly/3dcV6PE.

**B.     The Federal Helium System is a complex, integrated set of equipment and property.**

36.     The Federal Helium System is a unique collection of equipment, real property, and property interests dating back to the 1920s.  The System includes: 30 storage and production buildings on (and underneath) eight acres of land in Cliffside, near Amarillo, Texas; an underground reservoir that stores helium; 23 gas wells and equipment used to extract helium that is stored underground; and 423 miles of pipeline that carries helium from Cliffside Field to refiners in Texas, Kansas, and Oklahoma.  Altogether, the System today supplies more than 20 percent of domestic demand for helium.

37.     Specifically, by statute (50 U.S.C. § 167(4)), the System includes:

a.  The Cliffside Field (also referred to as the Bush Dome), which is an underground "helium storage reservoir" near Amarillo.  50 U.S.C. § 167(1).  The reservoir currently holds approximately 2 billion cubic feet of privately owned helium and just under 2 billion cubic feet of federally owned helium.  *See* Bureau Land Mgmt., *Federal Helium Operations* (last visited Sept. 7, 2023), https://on.doi.gov/3OtW3Ql.

b.  The Federal Helium Reserve, which means the "helium reserves owned by the United States" and stored in the Cliffside Field (Bush Dome) reservoir.  50 U.S.C. § 167(3).

c.  The Federal Helium Pipeline, which is a 423-mile pipeline system connecting Cliffside to private refineries in Texas, Oklahoma, and Kansas.  Hundreds of 50- to 60-foot-wide easements and rights-of-way acquired by the Government "through purchase and condemnation" allow the pipeline(s) to traverse private land.  GSA, *Performance Work Statement: Advisory and Consultant Services for the Privatization of the Federal Helium System at Cliffside* at 5–6 (Apr. 18, 2022), https://bit.ly/3Pacxh2.

d.  "[A]ll other infrastructure owned, leased, or managed under contract by the Secretary for the storage, transportation, withdrawal, enrichment, purification, or management of helium," 50 U.S.C. § 167(4)(D), a category including various wells, production equipment, and related equipment and real estate in the Cliffside area.

38.  Crucially, the "other infrastructure" category of the System is statutorily defined to include the Government's long-term lease of the Crude Helium Enrichment Unit.  The CHEU is a

helium processing facility that allows the operator of the System to extract and process stored helium; no helium can be brought up from the Bush Dome and sent off for delivery without it. The CHEU is privately owned by the Cliffside Refiners Limited Partnership, a partnership composed of four companies (including Air Products) that own facilities connected to the System's pipelines. The BLM has leased the CHEU from Cliffside Refiners Limited Partnership and operated the facility since its construction in 2002. *See* Sec'y of the Interior, *Annual Report to Congress—Fiscal Year 2017* at 7 (Jan. 2018) ("FY2017 Interior Report"), https://on.doi.gov/3zDXjuR. The BLM's lease for the CHEU was originally signed in March 2018; included a base period of one year and a series of one-year and six-month options extending through March 31, 2023; and gave the BLM the further right to unilaterally extend the lease by another six months through September 30, 2023. *See* USASpending.gov, *Contract to Cliffside Refiners No. 140L0618C006* (last visited Aug. 27, 2023), https://bit.ly/3z3xmET. In January 2022, BLM exercised two six-month options running through March 31, 2023. *See id.* In May and June 2023, BLM affirmatively modified the lease to create further option periods that could extend the lease through September 30, 2025—two years from now—and already exercised options that extend the lease through September 30, 2024. *See id.*

39. Thus, as depicted in the overview graphic below, delivering helium stored at the Federal Helium System to end users—scientists, NASA and other spaceflight operators, electronics manufacturers, medical equipment operators at hospitals, and more—requires these various parts of the System to work seamlessly together by: (1) extracting crude helium from the underground Bush Dome; (2) initial processing and enriching of that crude helium with Cliffside-area equipment, including the CHEU; (3) delivering helium by pipeline to private refiners in

Texas, Oklahoma, and Kansas; (4) refining the helium; and (5) ultimately delivering that refined helium to end users.  *See generally* GSA, *Federal Helium System at Cliffside*, *supra*.



40.     In the case of Air Products, the System delivers crude helium to the company's facility in Liberal, Kansas, through a System pipeline stretching across mostly private land in Texas, Oklahoma, and Kansas.  From there, Air Products purifies the crude helium, then transports and delivers the pure helium to its customers in dozens of industries, including aerospace, chemicals, electronics, metals, and manufacturing.

## C.     Congress enacts the Helium Stewardship Act of 2013.

41.     Congress enacted the Helium Stewardship Act of 2013 to avoid a repeat of the helium supply crises of the early 2000s while providing for the eventual, orderly privatization of the Federal Helium System.

42.     Congress recognized that the approach to privatization taken in the Helium Privatization Act of 1996 left much to be desired.  In that earlier legislation, Congress had directed

the BLM to sell helium based on the minimum price necessary to recoup federal debt, not the market price, and to cease delivering *any* helium after the debt was recouped.  That led to a situation in which the BLM was poised to stop delivering helium *before* it sold all of the helium in the Reserve, and an impending supply crisis: helium refiners and end users still needed the helium at Cliffside, but there would be "no way to access it."  H.R. Rep. No. 113-42 at 10.  If helium were left undelivered, "U.S. industries w[ould] be forced to look overseas to other helium supplying countries such as Algeria, Qatar, and Russia." *Id.*  As the relevant Committee explained in developing related legislation, an "increased reliance on foreign nations for helium could be of particular concern, considering the national security challenges that exist between the United States and the three largest foreign suppliers"—Algeria, Qatar, and Russia.  H.R. Rep. No. 115-365 at 3.

43.     Against the backdrop of these lessons learned, Congress enacted the Helium Stewardship Act of 2013.  This time, Congress focused on the need to "complete the privatization of the Federal helium reserve in a competitive market fashion *that ensures stability in the helium markets* while protecting the interests of American taxpayers."  Pub. L. No. 113-40, 127 Stat. at 534 (emphasis added).

44.     The Committee on Natural Resources, in approving the bill, likewise highlighted the need to ensure the "continued operation" of the System and a "consistent supply of helium for U.S. manufacturers, consumers and researchers."  H.R. Rep. No. 113-42 at 8, 11.  A "failure" to maintain helium production would "lead to disruption of the helium markets and additional unnecessary costs to helium users." *Id.* at 12.

45.     Congress thus created a four-phase approach to privatizing the Federal Helium System while ensuring the continued supply of helium: (A) a transition period for continuing

existing helium sales; (B) competitive helium auctions in addition to sales; (C) continued helium sales to federal agency users; and (D) the eventual disposal (*i.e.*, sale and conveyance) of the System.  50 U.S.C. § 167d.  Congress entrusted the Secretary of the Interior to implement the statute.  *See id.* §§ 167a (describing the Secretary's authority), 167(12) (defining "Secretary").

46.     In Phase A, sales continued much as they had before but subject the explicit requirement to sell helium "under such terms and conditions as the Secretary determines necessary to carry out this subsection with minimum market disruption."  50 U.S.C. § 167d(a)(1).  This phase ran from October 2013 to September 2014.  *Id.* § 167d(a)(3).

47.     During Phase B, the Secretary sold helium in two ways to private industry to draw down the amount of federally owned helium to 3 billion cubic feet.  50 U.S.C. § 167d(b)(4)(B).  First, the Secretary was authorized to, and did, *auction* helium from the Government's reserve, up to certain limits.  *Id.* § 167d(b)(2).  Second, "after completion of each auction," the Secretary was authorized to, and did, *sell* helium that was "not subject to auction."  *Id.* § 167d(b)(1).  The BLM conducted Phase B helium auctions and sales every year from 2014 to fiscal year 2019, and Air Products participated in each of those auctions and sales.  As in Phase A, helium that was purchased but not immediately delivered was stored in the Bush Dome.  Here again, Congress instructed the Secretary to auction and sell helium "with minimum market disruption," *id.* § 167d(b)(1)(E), and to "not cause a disruption in the supply of helium from the Reserve," *id.* § 167(b)(11)(A), (12)(A), consistent with the Helium Stewardship Act's overriding objective of ensuring the continued supply of helium.

48.     Phase B concluded on October 1, 2018, when sales and auctions of helium reduced the quantity of federally owned helium to below 3 billion cubic feet for the first time.  *See* 50

U.S.C. § 167d(b)(4)(B); Bureau of Land Mgmt., *The Federal Helium Program* (last visited Aug. 27, 2023), https://on.doi.gov/3S0XKrp.

49.     By that time, Air Products had purchased a total of about 2 billion cubic feet of helium purchased for about $250 million. *See* Bureau Land Mgmt., *Federal Helium Operations: Crude Helium Auctions and Sales – Helium Sales Results* (last visited Aug. 27, 2023), https://on.doi.gov/3OtW3Ql.   Air Products paid the Government in full at the time of the purchases.

50.     During Phase C, new purchases were limited to "Federal users" of helium (agencies and certain federal grant recipients), with private companies including Air Products purchasing from the Reserve and selling equal amounts to authorized end users.  50 U.S.C. §§ 167(5), 167d(c).

51.     Throughout Phases A through C, private purchasers (including Air Products) were able to, and did, withdraw the helium they had already purchased, subject to capacity restrictions and allocations among helium owners when withdrawal demand exceeded withdrawal capacity.

52.     Finally, Phase D governs the "disposal of assets."  50 U.S.C. § 167d(d).  The Act provides in relevant part that "not later than September 30, 2021, the Secretary [of the Interior] shall designate as excess property and dispose of all facilities, equipment, and other real and personal property, and all interests in the same, held by the United States in the Federal Helium System."  *Id.* § 167d(d)(1).  The "disposal of the property … shall be in accordance with subtitle I of title 40," which includes the GSA's statutory authority to manage the disposal of surplus government property.  *Id.* § 167d(d)(2); *see also* 40 U.S.C. § 541 (providing that the GSA Administrator "shall supervise and direct the disposition of surplus property").

53.      Title 40, Subtitle I, in turn, contains no applicable deadlines for the sale and conveyance of surplus property.  *See generally* 40 U.S.C. § 545 (procedures for disposal).  It does,

however, provide that "[t]he time, method, and terms and conditions of advertisement must permit full and free competition *consistent with the value and nature of the property involved.*" *Id.* § 545(a)(2) (emphasis added).  Moreover, the GSA must account for "the public interest" when deciding whether to accept or reject awards of publicly advertised contracts, *id.* § 545(a)(4), must dispose of real property in an economical manner "consistent with the best interests of the Government," 41 C.F.R. § 102-75.250(a), and must award sales only to a "responsible bidder" whose bid will "be most advantageous to the Government, price and other factors considered," *id.* § 102-75.935.

54.     Congress knew that long-term planning would be important in privatizing the System without disrupting the availability of helium.  Accordingly, Congress instructed the Secretary to "submit to Congress a report" providing: (1) a "20-year Federal strategy for securing access to helium"; and (2) a "determination of a date . . . for the implementation of Phase D . . . that minimizes any potential supply disruptions for Federal users."  50 U.S.C. § 167q(2), (3).[3]

**D.     Defendants recognize the importance of disposing of the Federal Helium System in a responsible and orderly manner.**

55.     In the past, Defendants have consistently acknowledged the various challenges inherent in disposing of the Federal Helium System—and the accompanying need to dispose of it

---

[3]     In 2015, the Secretary submitted the required report describing a purported 20-year strategy for securing access to helium for the government.  *See* 50 U.S.C. § 167q(2).  But the report is tellingly qualified. Primarily, the Secretary suggested that:  BLM "could" promulgate regulations and amend contracts to establish a "Royalty-in-Kind" system; a strategic sourcing initiative "could be explored"; and agencies "could" develop further research to allow more efficient helium extraction.  Sec'y of Interior, *Report to Congress on Items Required by Sec. 19 of the Helium Stewardship Act* at 6–7 (Sept. 2015).  But it does not appear that the Secretary has taken any of the steps tentatively suggested years ago.  *See* Compressed Gas Ass'n, *A Safe and Reliable Supply of Helium is Necessary for U.S. National Security* at 2 (June 30, 2022) ("[T]o the best of our knowledge this [20-year plan] was never completed . . . .").

in a responsible and orderly fashion, consistent with their duties as stewards of this precious and unique national asset.

56.     In the final year of Phase B auctions, and as the Phase D disposal process drew closer, Defendants recognized the "many issues" they needed to address as they "plan[ned] for disposal of" the System.  FY2017 Interior Report, *supra*, at 8.  Resolving those issues would, in their own words, "require deliberation and a path-forward strategy."  *Id.*  Several of those issues remain relevant today.

57.     *First*, Defendants recognized that the Crude Helium Enrichment Unit—the helium processing facility that is necessary to extract and deliver helium—was privately owned.  *Id.* at 7.  Accordingly, Defendants would need to sort out whether and how any eventual private purchaser of the System could use the CHEU.  *See id.*

58.     *Second*, Defendants recognized that the Government enjoyed certain advantages in operating the System compared to a private operator, such as power to "condemn[] rights of way" and "exemptions" from federal regulatory requirements governing pipelines.  *Id.* at 7.  As the agencies explained, these advantages were a function of "inherently government roles that may not be transferable to a third party."  *Id.*  Accordingly, a private purchaser of the System would have to deal with more regulatory requirements, and more onerous problems, than the Government faced as operator.

59.     *Third*, Defendants recognized that the United States had contractual "obligations to deliver helium that has been sold."  *Id.* at 8.  Air Products (and others) had already paid the United States sizable sums for helium bought at auctions, yet most of the helium had not been delivered yet due to System constraints.  Under storage contracts then in existence, the United States had "agree[d] to deliver" to purchasers "as much of the volume of helium owned by the Person and

stored by the United States in the Federal Helium System that Person requests."  Contract for the Storage and Delivery of Helium § 2.3 (2019), https://on.doi.gov/3OlzLjN.

60.     *Fourth* and finally, and relatedly, Defendants acknowledged that "a major concern regarding the disposal is the need to sell the Federal Helium System as a *fully functioning system*."  FY2017 Interior Report, *supra*, at 8 (emphasis added).  If the Federal Helium System were sold with "privately owned helium that the BLM has not yet delivered," then the System "will need to maintain functionality in order to deliver the remaining privately owned helium."  *Id.*

61.     Air Products has consistently advocated that any disposal of the Federal Helium System must be done responsibly to ensure a continued supply of helium.  For example, in 2017, one of its executives testified to Congress that the BLM should "dispose of the assets in a fashion that preserves its unique storage and redelivery capabilities for the United States," and "recommend[ed] that BLM require any future owner of the system to maintain the unique helium storage and redelivery capabilities that the reservoir provides today."  Testimony of Walter L. Nelson before the House Subcommittee on Energy and Mineral Resources at 4 (June 21, 2017).  Accordingly, "[s]election of a competent entity capable of operating and maintaining such a system should be a key aspect of the BLM's disposal strategy."  *Id.*

**E.      The BLM declares the Federal Helium System surplus property, repeatedly represents that all private helium will be delivered before the System is sold and conveyed, and enters into a new storage contract with Air Products.**

62.     Throughout 2020 and 2021, Defendants repeatedly represented to Air Products and the public that the Federal Helium System would not be sold and conveyed until Defendants had delivered all of Air Products' helium stored in the System to Air Products.  At the time, Defendants predicted it would take until at least 2023 to fulfill that commitment.

63.     On April 16, 2020, the BLM issued a press release announcing the "process and timeline" for privatization of the System.  Bureau Land Mgmt. Press Release, *BLM Announces*

*Disposal Process for Federal Helium System* (Apr. 16, 2020), https://on.doi.gov/3aZVmAO.  The

BLM viewed the September 30, 2021, statutory deadline, *see* 50 U.S.C. § 167d(d)(1), as governing

*only* the declaration of surplus property and the transfer of that property to the GSA—*not* the

ultimate sale or transfer of the property to a private purchaser.  Reflecting that view, the BLM

announced that it "will no longer manage the Federal Helium System (including the Federal

Helium Reserve) as of Sept. 30, 2021," and that "[a]ny excess helium and helium assets remaining

on that date will be transferred to the General Services Administration (GSA), which will follow

its statutory disposal process."  BLM, *BLM Announces Disposal Process*, *supra*.

64.    The BLM further represented that "while the GSA completes their disposal

process," the "BLM [will] continue operations *until such time as all privately owned helium is

produced from the field* (about 2023)."  *Id.* (emphasis added).  The BLM could continue operating

the System until all privately owned helium was produced only if the GSA did not sell and convey

the System before 2023 (at least), *and* production continued at close to maximum capacity until

that time.  As alleged below, however, the System *did not* continue production at close to

maximum capacity.

65.    The next year, in November 2021, the Secretary of the Interior updated Congress

on the status of the disposal process.  The Secretary confirmed that "[o]n September 24, 2021, the

BLM declared the Federal Helium System, including federal reserve helium, as excess [property]

in accordance with the Helium Stewardship Act of 2013, which required the declaration of excess

by September 30, 2021."  Dep't of Interior, *Agency Financial Report 2021* at 70 (Nov. 15, 2021),

https://on.doi.gov/3I12wAE.  The Secretary further explained that the "GSA will now work to

complete its disposal process, which is estimated to take one to two years," *i.e.*, through November

*2023*.  *Id.*  The Secretary finally confirmed that the BLM "will continue to deliver privately owned

helium also stored in the Federal Helium System until the final disposal of the Federal Helium System." *Id.*

66.     On September 27, 2021, Air Products LLC and the United States (acting through the BLM) entered into an amended Contract For the Storage and Delivery of Helium ("Storage Contract").  The new Storage Contract provided terms for the storage and delivery of helium previously purchased by Air Products but still stored in the System due to the limitations in the System's production capacity.  As of this filing, Air Products has approximately 800 million cubic feet of such helium stored in the Federal Helium System currently worth more than the hundreds of millions that Air Products initially paid for it.

67.     Consistent with the Department of the Interior's and the BLM's repeated official statements regarding the timeline for disposal (including sale and conveyance), *see supra* ¶¶ 63–65, Air Products' 2017-2022 Storage Contract reaffirmed that the System would not be sold and conveyed until at least 2023.  Article II of the Contract contemplates the conveyance will *not* occur by September 30, 2022, providing specifically that the Government (and not a future private purchaser) will accept *deposits* of helium by Air Products "[a]fter September 30, 2022 and *prior to the Conveyance*" should Air Products so desire.  A related provision similarly contemplates the delivery of helium by the Government "after October 1, 2022 and *prior* to the Conveyance."

68.     After the conveyance of the System, the obligation to store and deliver any remaining Primary Private Helium, subject to capacity restraints, passes to the purchaser of the System.  The Storage Contract provides that "if the United States sells or transfers ownership of the Federal Helium System" to a private party, the Government will "require as a condition of sale or transfer" that the purchaser will take the System subject to Air Products' ownership interest in its Primary Private Helium; the purchaser will "assume the obligations" of the Government to

"deliver" Primary Private Helium to Air Products; and the purchaser will allow Air Products to withdraw all Primary Private Helium.

69.     Ten other companies also hold Primary Private Helium in the reserve and had signed materially identical storage contracts.

70.     Finally, the BLM brought its representations full circle in 2022.  When the BLM certified why it was contracting a private party to operate the CHEU, the BLM reiterated the statement in its 2020 press release that the BLM would "continue operations *until such time as all privately owned helium is produced* from the field (about 2023)."  BLM, *Justification and Approval for Sole Source* at 3–4 (May 5, 2022) (emphasis added), https://bit.ly/3BWZ9tw.

71.     Based on these consistent and repeated representations, Air Products and the industry understood that the System's sale and conveyance would not occur until Defendants delivered all privately owned helium.

## F.     Despite operational problems at the Federal Helium System, the agencies press on with the proposed sale and accelerate the timeline for conveyance.

72.     Multi-month shutdowns and concerning workplace-safety findings hobbled the Federal Helium System in the run-up to the proposed sale and conveyance.

73.     In July 2021, the BLM was forced to shut down the System for four months due to safety issues that prompted an investigation by OSHA.  *See* Dep't of Interior, Financial Report FY 2022 at 165 (Nov. 15, 2022), https://tinyurl.com/3tn5y4xy; Phil Kornbluth, *Helium markets now experiencing 'Helium Shortage 4.0'*, Gasworld (Feb. 8, 2022), https://bit.ly/3ODS57H.  Other than the first three weeks of the shutdown, helium withdrawals were not allowed "until the plant restart[ed]" in October 2021.  Phil Kornbluth, *Helium markets tighten up due to unplanned outages*, Gasworld (July 27, 2021), https://bit.ly/3BRVQno.

74.     Then in January 2022, a leak caused an unplanned shutdown of helium production. *See* Kramer, *Helium is again in short supply*, *supra*.  The CHEU did not resume operations for six months, until June 6, 2022.  *See* BLM, *Cliffside Gas Plant Status Report* (June 6, 2022), https://on.doi.gov/3b8FsnP;  BLM, *Cliffside Gas Plant Status Report* (June 1, 2022), https://on.doi.gov/3vq8RAP; BLM, *Cliffside Gas Plant Status Report* (May 31, 2022) (noting "continue[d] efforts to startup the Plant" after a "longer than anticipated shutdown time"), https://on.doi.gov/3IPmUoV.

75.     Because of these shutdowns, Air Products and the other private rightsholders were unable to secure delivery of helium stored in the Bush Dome for eight months across 2021 and 2022.

76.     The System's problems extended beyond mere shutdowns.  In January 2022, OSHA concluded its six-month inspection of System facilities by issuing "21 notices of unsafe working conditions," including six "willful safety violations" for unsafe handling of chemical materials at the CHEU.  OSHA News Release, *US Department of Labor finds federal helium enrichment unit failed to follow safe chemical handling procedures in Amarillo, Texas* (Jan. 13, 2022), https://bit.ly/3p2JSj8.  The penalties for these violations—from which the Government was exempt—would have cost a private operator of the System more than $1 million, *id.*, not to mention further expenses associated with remediation.

77.     Because of these violations at the CHEU and the importance of the CHEU to moving helium through the System, the BLM decided to contract out operations of the CHEU to a private party in March 2022.  BLM, *Justification and Approval for Sole Source* (May 5, 2022).  The BLM recognized, however, that it was "not possible" for a private party to operate the CHEU if that party did "not already have agreements, understanding, and access to" the facility and its

equipment.  *Id.* at 3.  And "[e]ven if a new contractor could obtain agreements" to use, "learn to operate," and "get access" to the CHEU, "the time to accomplish these tasks would cause serious financial harm."  *Id.*  Interruptions to the CHEU's operation costs the Government "$335,000 per day" and "caus[e] serious financial harm" to "small businesses in the helium industry" who are "unable to get helium."  *Id.* at 4.  Accordingly, the BLM selected Messer, Inc.—one of the CHEU's owners—to take over CHEU operations.  *Id.*  Messer's contract runs through March 31, 2024, and can be extended through September 30, 2025.  *See* USASpending.gov, *Contract Summary No. 140L06220012* (last visited Aug. 30, 2023), https://bit.ly/3voOZha.

78.    Since about June 2022, plant operations have been stable and the System is producing crude helium at maximum rates.  Instead of leaving well enough alone, however, Defendants suddenly and inexplicably *accelerated* their plans to sell and convey the System.  On May 12, 2022, the GSA issued an "FAQ" document announcing that the Federal Helium System was "being sold as is . . . in August 2022."[4]  The GSA did not even acknowledge Defendants' previous representations that the sale and conveyance would occur only after Defendants delivered all of Air Products' helium to it—which Defendants predicted would take at least until 2023 (and which, because of recent System shutdowns and delays, would take at least another three years from today).  Because of the System's technical limitations, the approximately 2 billion cubic feet of privately owned helium in the System—including about 800 million cubic feet that Air Products purchased from the Government and that is still in the ground—cannot be delivered in full before the new date for the sale.

---

[4]    The FAQ is accessible within GSA's "data room" for the System.  *See* GSA *Data Room – Libraries – ZIP Files – 1 of 4* (last visited July 19, 2022), https://disposal.gsa.gov/s/bush-dome-reservoir-data-set.

79.     The FAQ also set forth several pieces of important and concerning information regarding Defendants' plans for the sale and conveyance that contradicted some of its prior acknowledgements of the important issues to be dealt with before any final transfer of the property to a private purchaser.

80.     *First*, despite their prior recognitions of the need to think through how a private purchaser of the System could retain access to the CHEU, *see supra* ¶ 57, Defendants announced that neither the CHEU itself nor the BLM's current lease to operate the CHEU was "being sold as a part of the Federal Helium System." GSA *FAQs*, *supra*, at 1.  Even though the BLM had already exercised contractual options that extended the CHEU lease through March 2023 (which were later extended through September 2024), *see supra* ¶ 38, the release stated that the "BLM's contract to lease the CHEU terminates prior to the conveyance of the Federal Helium System to private ownership," so the CHEU is not "an interest held by the United States and there is no requirement to provide access to the CHEU to the purchaser of the Federal Helium System after the sale." GSA *FAQs*, *supra*, at 3.

81.     *Second*, Defendants announced that they could not verify all easements or rights-of-way permitting the System's pipeline network to function, contrary to their previous acknowledgment of the need to transfer a "fully functioning system."  *Supra* ¶ 60.  Instead, Defendants stated that a "Government contractor conducted a thorough search for all pipeline easements and if any are missing from the database, they cannot be located." GSA *FAQs*, *supra*, at 3.  Indeed, the GSA subsequently acknowledged that documentation of property rights for "10"

unspecified right-of-way segments for the pipeline "remain to be found." GSA, *Overview of Federal Real Property Disposal Process* at 3 (July 21, 2022).[5]

82.     *Third*, Defendants flatly asserted that any private purchaser would "be required to comply with" all regulatory requirements—including federal requirements for pipelines. *Id.* at 2. Defendants did not acknowledge that the BLM *had been exempt* from regulatory bodies' requirements while the Government operated the System, or that a new owner would likely face serious challenges complying with such requirements absent special resources and experience, as they had previously recognized. *See supra* ¶ 58.

83.     *Fourth* and finally, the GSA stated that after it sold the property, the government would be cutting all ties with the Federal Helium System: the United States "will no longer have any direct control over access to the helium markets"; will not "indemnify" any parties for damages suffered after the sale; will not "provide financing"; and will not "make federal funding available." GSA, *Overview of Federal Real Property Disposal Process*, *supra*, at 1, 3–4. Instead, the System would be "sold as one unit" to the private purchaser (albeit excluding any rights to operate the CHEU), who would then be free to "make its own business decisions" regarding how to operate the System. *Id.* at 3. This, even though it previously explained the responsibilities it had to deliver already-purchased helium. *See supra* ¶¶ 59–60.

84.     Soon after the GSA announced the accelerated plan to sell the System, another federal agency warned that "shifts in . . . national reserve policy" were driving "supply issues" and that, because helium is "essential, expensive and non-renewable, proper stewardship of this limited resource is critical." Nat'l Sci. Found., *Dear Colleague Letter*, NSF No. 22-088, *supra*, at 1.

---

[5]     The *Overview* is accessible within GSA's "data room" for the System. *See* GSA *Data Room – Libraries -- Presentations* (last visited Aug. 27, 2023), https://disposal.gsa.gov/s/bush-dome-reservoir-data-set.

85.     On June 21, 2022, the GSA made a further public announcement about the upcoming sale.  GSA Press Release, *GSA Announces Upcoming Sale of Cliffside Federal Helium Facility* (June 21, 2022), https://bit.ly/3zh29iz.  It confirmed that the "bid opening" was "expected in August [2022]," *id.*, with the "property conveyance" slated to take place in "September 2022," GSA, *Federal Helium System at Cliffside* (last visited Aug. 27, 2023), https://bit.ly/3vdUM9r.

**G.     Air Products, the helium industry, and members of Congress urge Defendants to delay the sale.**

86.     A month after Defendants' troubling FAQ, Air Products and eight of the other ten private companies that own helium stored in the Bush Dome jointly wrote to the GSA respectfully requesting that it "delay the disposal" of the Federal Helium System "to allow the Government sufficient time to address three critical issues and prevent significant harm to federal helium users, U.S. consumers, U.S. security, and the U.S. economy."  Contract Holders Letter to GSA at 1 (June 13, 2022).

87.     On June 30, 2022, Air Products wrote its own letter to the GSA, again requesting that the agency "delay the disposal" of the System because Defendants had not taken into account "critical issues" with their current plan.  Air Products Letter to GSA at 1, 10 (June 30, 2022).

88.     The letters, collectively and individually, explained that the GSA should not proceed with the sale and conveyance of the System because such action would virtually guarantee the disruption of the country's helium supply—contrary to the text, structure, and purpose of the Helium Stewardship Act and the reasoned decisionmaking required of all agencies by the APA.  The letters articulated several reasons why the planned sale would undermine Congress's purposes and chosen scheme.

89.     *First*, the Air Products and Contract Holders Letters explained that Defendants' decision to purportedly terminate the lease for the CHEU *before* the System's sale and conveyance

(notwithstanding the BLM's exercise of an option to extend the lease through March 2023) was irrational because it meant that the lease for integral facilities needed to release *any* helium from the System would not be transferred to the private purchaser.  If the purchaser does not receive Defendants' leasehold interests in the CHEU as part of the sale, then no helium can be delivered until the purchaser either enters into a new lease with the CHEU's owners or, alternatively, completes the years-long and expensive process of building a comparable facility of its own. Contract Holders Letter at 1; Air Products Letter at 5.

90.     *Second*, the Air Products and Contract Holders Letters expressed concern that documentation was lacking for a significant portion of the pipeline rights-of-way.  Contract Holders Letter at 2; Air Products Letter at 4.  If these missing 60-year-old easements were not properly addressed, a private operator would face lengthy and complicated delays to establish its right to lawfully operate the pipeline component of the System.

91.     *Third*, the Air Products and Contract Holders Letters explained that although the Government was exempt as operator from numerous federal and state regulatory requirements, a private operator would be subject to full regulatory enforcement by, among other agencies, OSHA, the Federal Energy Regulatory Commission, the Pipeline and Hazardous Materials Safety Administration (particularly as to pipelines), and the Railroad Commission of Texas (particularly as to Cliffside facilities).  Contract Holders Letter at 2; Air Products Letter at 4–5.  In addition, the Surface Transportation Board regulates rates charged by pipelines carrying products other than gas, oil, or water, which would appear to encompass the System's helium-transporting pipeline. 49 U.S.C. § 15301(a).  In light of the known "compliance issues" any private buyer is likely to face, the System may be forced into another shutdown until the buyer can "bring the System into compliance," if that is "even possible."  Contract Holders Letter at 2.  The seriousness of these

challenges is underscored by the multiple notices of unsafe working conditions issued by OSHA. *See* Air Products Letter at 4.

92.     *Fourth*, Air Products requested that Defendants—if they would not delay the sale—at least impose certain minimum conditions on prospective buyers to ensure that the winning bidder has the ability to safely deliver helium without interruption.  Air Products Letter at 9–10. Specifically, Air Products requested that:

> a.  the GSA should not sell the facility to an entity that itself produces or extracts helium from the facility, because if the owner of the Federal Helium System also owns helium that must be delivered from that system, the potential for conflicts of interest and self-interested actions would risk fair helium production and distribution;
>
> b.  the GSA should confirm that the United States will pay Air Products for helium that Air Products had already purchased from the Government if the new private owner of the Federal Helium System became insolvent or otherwise incapable of delivering that helium to Air Products;
>
> c.  the GSA should demonstrate that the Federal Helium System is in compliance with all regulatory requirements before conveying it to a private owner; and
>
> d.  the GSA should require that the purchaser of the Federal Helium System has either secured a new right to use the CHEU, or has built its own enrichment unit, before the conveyance takes effect.

93.     Defendants issued a terse response to the Contract Holders Letter on June 30, 2022, and to the Air Products Letter on July 19, 2022.  Defendants gave the back of the hand to concerns about the CHEU, saying only that the BLM is "unable to continue a contractual arrangement with the CRLP after the BLM disposes" of the System, without giving any explanation as to why the BLM could not include that lease—which the BLM had already extended through March 2023, went on to extend through September 2024, and can further extend through September 2025—in the conveyance of the System.  Defendants conclusorily stated that they had obtained all easement documents that they "can obtain" and dumped the "burden … on the bidder to determine, through

its own research and due diligence, the quality of the title." Moreover, Defendants said they could not provide "legal advice" regarding the numerous "compliance" issues raised in the aforementioned letters. Finally, Defendants said they would "consider" Air Products' "suggested minimum eligibility requirements for the bidding process" but provided no further details.

94.     Air Products and the eight other signatories to the Contract Holders Letter were not alone in asking Defendants to reconsider their plan for sale and conveyance. The Compressed Gas Association, which represents more than 130 companies in the U.S. industrial gas industry, similarly explained in a white paper that the GSA's failure to resolve a "number of issues that have come to light" with the planned disposal process means the "new purchaser will not be able [to] run the system" for "months or years." Compressed Gas Ass'n, *A safe and reliable supply of helium is necessary for U.S. national security* (July 15, 2022), https://bit.ly/3PdNbyJ. Accordingly, the Compressed Gas Association urged the GSA to "delay" to avoid "an interruption to th[e] supply" of helium. *Id.*

95.     Likewise, three senior members of the House Committee on Natural Resources "express[ed] concerns about the impending disposal process," based on "concerning feedback from a range of stakeholders," in a letter to Defendants. Committee Letter to Director Stone-Manning and Administrator Carnahan (July 21, 2022). The letter identified "high-priority" deficiencies in the disposal process, and—given the nation's reliance on an "uninterrupted supply of helium"—concluded that "moving forward with the auction … as planned … is not in the best interest of the American people or the federal government." *Id.*

96.     GSA temporarily paused the sale, but soon returned to their plan. On June 22, 2023—without fully resolving the concerns raised by Air Products, industry participants, or Congressional representatives, and after months of providing no concrete update on the sale

process—GSA announced that the sale would proceed, with a new kickoff date of July 12, 2023. GSA Press Release, *GSA Announces Sale of Cliffside Federal Helium System Assets - Updated* (June 22, 2023), https://tinyurl.com/5y2b94xx.

**H.   GSA releases the Invitation For Bid and brushes off renewed concerns about the sale and conveyance.**

97.   On July 26, 2023, GSA issued the challenged Invitation to Bid ("IFB").  Ex. A.

98.   The IFB stated that sealed bids would be accepted through November 15, 2023, after which GSA would open the bids and select a winner.  Ex. A at 20.  After a winning bidder is selected, the parties will close the sale within 120 calendar days.  Ex. A at 16.  As relevant here, the IFB failed adequately to resolve four critical topics that had been raised by Air Products and other industry participants.

99.   *First*, the IFB acknowledged that the CHEU—which is critical to the System's operation—"is integrated into the real property portions of the Federal Helium System" but "**NOT INCLUDED IN THIS SALE**."  Ex. A at 7.  Instead, "[a]ny future owner of the Federal Helium System will need to make their own arrangements regarding the CRLP owned machinery and equipment."  *Id.*  The IFB omits any mention of the possibility of assigning the Government's existing CHEU lease (which only months ago Defendants extended through September 2024 *and* affirmatively modified to allow for *further* extension through September 2025 at the Government's option) to the purchaser and provides no further instructions on how disputes regarding leasing and future operation of the CHEU would be resolved.

100.   *Second*, with respect to the approximately one billion cubic feet of privately owned helium still in the System, the IFB states that the existing 2022-2027 Storage and Delivery contracts will "be Assigned by the Government to the Purchaser," Ex. A at 2, and that "[a] condition precedent to final closing of this sale is that the Purchaser accepts and agrees to assume

all terms and conditions of the 11 Original Contracts for Storage and Delivery of Helium," *id.* at 11, 19.  Upon conveyance, the purchaser "agrees to release the United States from any and all performance obligations under the respective Helium Storage Delivery Contracts upon conveyance of title to the Purchaser." *Id.* at 30.

101.    *Third*, the IFB does not certify the System's compliance with various federal and state regulator requirements, ranging from the Surface Transportation Board (which regulates rates) to the Texas Railroad Commission (which regulates natural gas wells).  Instead, the IFB confirms that Defendants are putting up for sale the System "AS IS . . . without representation or warranty" while the purchaser bears the burden "to identify and fully comply with all applicable Federal, State, and local laws, rules and regulations covering the ownership, operation, and maintenance of the Helium Pipeline System."  Ex. A at 13, 31, 33.

102.    *Fourth*, the IFB provides incomplete documentation of the easements and rights-of-way required to operate the System's 423 miles of pipeline across Texas, Oklahoma, and Kansas.  Three parcels in the IFB include deeds without warranty and six parcels lack any record of an easement or other right-of-way.  *See* Ex. A at 11 & Attachments H, I, J.  These parcels could be subject to dispute when the System is conveyed to a private owner for the first time.  Notwithstanding these problems, the IFB disclaims responsibility entirely by providing that "***NO WARRANTY IS MADE AS TO QUALITY OF THE TITLE WHICH IS THE RESPONSIBILITY OF BIDDER to establish through their own due diligence***." *Id.* at 11.

103.    On August 25, 2023, GSA issued an updated FAQ document further explaining the agency's approach to the sale and conveyance.  GSA, *Frequently Asked Questions – Federal*

*Helium System* (Aug. 25, 2023).[6]   In the FAQ, the GSA confirmed that "[i]t is the sole responsibility of the Successful Bidder to ensure continued operation of the facility in accordance with its operational and financial certifications required by the IFB," *id.* at 3, but otherwise said nothing to address the concerns infecting the IFB.

104.   On August 28, 2023, Air Products again wrote to the GSA, urging it to delay the sale and conveyance because the Government had not addressed three major concerns Air Products had previously identified.

105.   *First*, Air Products explained that the IFB left unresolved the winning bidder's ability to operate the CHEU, because the IFB does not require the purchaser to secure a lease or other commercial agreement to use the CHEU before taking title to the System.  Air Products Second Letter at 2 (Aug. 28, 2023).  If the owner does not have an agreement in place to use the CHEU, the System will grind to a halt.

106.   *Second*, Air Products explained that the System still was not firmly in compliance with all regulatory requirements that may apply to a private operator.  Air Products Second Letter at 1.  For example, the Texas Railroad Commission issues permits for natural gas processing plants, but there is no guarantee that Commission would issue the requisite permits here.  *Id.*  Although a package for investors stated that the Commission had "advised [BLM]" that "there are no [applicable] regulatory compliance rules" because "helium wells" fall outside the Commission's jurisdiction, Edelgas Group, *Sale of Federal Helium System at Cliffside* at 15 (Aug. 2023),[7] Air Products explained that this appeared to be incorrect: the CHEU processes natural gas liquids each

---

[6]   The FAQ  is accessible within GSA's "data room" for the System.  *See* GSA *Data Room – Libraries - - FAQs* (last visited Aug. 27, 2023), https://disposal.gsa.gov/s/bush-dome-reservoir-data-set.

[7]   The Edelgas Group *Sale of Federal Helium System* presentation  is accessible within GSA's "data room" for the System.  *See* GSA *Data Room – Libraries – Investor Package* (last visited Aug. 27, 2023), https://disposal.gsa.gov/s/bush-dome-reservoir-data-set.

month, and the Commission *does* have jurisdiction over operations of "natural gas or natural gas liquids processing plants." Summary of Requirements and Responsibilities, Texas Railroad Commission (Aug. 25, 2023), www.rrc.texas.gov/oil-and-gas/requirements-and-responsibilities/summary-of-requirements.

107.    *Third*, Air Products explained that although a package for investors stated that "all pipeline easements have been verified by the GSA," Edelgas Group, *Sale of Federal Helium System*, *supra*, at 15, documents published by the GSA showed some parcels lacked any record of an easement or relied on deeds without warranty, *see* IFB Attachments H, I, J.  These unclear property rights open the door to property disputes.  Air Products Second Letter at 2–3.  Such disputes—or even the risk thereof, which could force the System owner to shut down the System until all necessary rights are fully secured—could consequently interrupt the supply of helium from the System.

108.    For any of these reasons, Air Products urged the GSA to "defer the sale of the System until it has delivered all of the helium that Air Products and others have already purchased and paid for," which will take until at least September 2026 (if the Government does not sell the System) or 2027 (if the Government sells the system).  Air Products Second Letter at 2; *see* Edelgas Group, *Sale of Federal Helium System*, *supra*, at 21.

109.    Air Products was not alone in expressing concerns about the IFB.  In July 2023, the Compressed Gas Association similarly explained that the IFB left "several issues unaddressed," including that (1) rights to use the CHEU were "not part of the GSA disposal process" and (2) a private owner would have to comply with various "regulatory requirements," including those of the Texas Railroad Commission, from which the government was exempt.  CGA, *Delaying the Sale of the Federal Helium Reserve is Necessary to Ensure Safe and Reliable Supply of U.S.*

*Helium* at 1–2 (July 2023).  These roadblocks, the Association noted, could require the System "to go offline" after the sale and conveyance until they are addressed.  *Id.* at 1.  The GSA's planned sale thus presents a "significant risk of disruption to the helium supply chain" and injects "needless uncertainty into critical industries" such as semiconductor manufacturing, space exploration, and medical research.  *Id.* at 2.  Accordingly, "[d]elaying the sale until September 2026 and providing ample time to address these lingering issues is in the best interest of all parties."  *Id.*

110.    GSA officials shrugged off these concerns with a curt response on September 6, 2023, that only underscored the IFB's problems.  GSA Second Response to Air Products (Sept. 6, 2023).  *First*, GSA backtracked from its previous representations that Texas Railroad Commission regulations posed no problems.  Instead, GSA now claimed it had been "advised" that the Texas Railroad Commission "is only willing to discuss possible regulatory consequences with the ultimate purchaser," not the Government.  *Id.* at 1.  GSA's letter thus confirmed that Defendants had erroneously jumped the gun in trying to assure the industry, and that Defendants have no authority to resolve the meaningful concerns that Plaintiffs and other industry members had raised.  *Second*, GSA confirmed that rights to use the CHEU will not be transferred to the private owner as part of a sale and conveyance.  Although GSA boasted that it had built in a four-month window for the purchaser to *try* to "come to an arrangement on the continued operation of the CHEU," GSA tacitly confirmed that it would not *condition* the sale and transfer on the winning bidder having an agreement in place before taking title.  *Id.* at 2.  The CHEU's post-sale status therefore remains up in the air, with no guarantee that the private owner will, in fact, be able to operate it.  *Third*, GSA cryptically stated that it had "verif[ied] 100% of th[e] documents" purporting to show the "title information" for the pipeline's easements and rights-of-way, but GSA did not deny that for several parcels, title information is missing from deed offices or court records—*i.e.*, the places

where title records make ownership rights official.  *Id.*  GSA leaned into the lingering uncertainty, confirming that the burden "is on the bidder to determine, through its own research and due diligence, the quality of the title" of pipeline rights-of-way.  *Id.*

111.    With the industry's concerns unheeded, GSA confirmed that Defendants "[c]urrently" plan to proceed with the System sale and conveyance.  GSA Second Response to Air Products at 2.  GSA even asserted that delaying the sale until the Government delivers Plaintiffs' helium would "conflict[t] with the BLM's declaration" that the System is surplus property and with "Congress's plan to privatize it."  *Id.*

112.    But importantly, there is "no legal obligation to sell the Federal Helium System now," and thus no need to rush a sale.  Air Products Letter at 7–8.  The Secretary of the Interior must "designate as excess property and dispose of" System interests by September *2021*, 50 U.S.C. § 167d(d)(1), but that deadline either does not apply to the *sale and conveyance* portion of the disposal process at all (as the agencies themselves stated in 2020 and 2021), or has already been missed.  There simply is no further deadline in the statute that the Government must rush to meet.

113.    Nor is there a fiscal reason to hurry the sale.  When the Congressional Budget Office analyzed the Helium Stewardship Act in 2013, it expected the Government to generate, from 2014 to 2022, about $500 million from helium and asset sales *combined*.  *See* CBO Estimate: Direct Spending Effects of H.R. 527 at 1 (Sept. 20, 2013), https://bit.ly/3b6sff6.  That turned out to be a massive underestimate.  Based on actual revenue figures, the Government generated more than $500 million from helium sales *alone*, without factoring in separate infrastructure asset sales.  *See* Bureau of Land Mgmt., *Federal Helium Operations: Crude Helium Auctions & Sales* (last visited Aug. 27, 2023), https://on.doi.gov/3BdOHxv.

114.     Indeed, a lengthy sale and disposal process of helium assets is not unprecedented, even when there is no need to consider ongoing production.  When Congress enacted the Helium Privatization Act of 1996, it directed the disposal of certain defunct helium-related assets in language very similar to that in the 2013 Act.  The 1996 Act directed the Secretary to "designate as excess property and dispose of all facilities, equipment, and other real and personal property, and all interests therein, held by the United States for the purpose of producing, refining and marketing refined helium," *other* than interests in the current Federal Helium System.  50 U.S.C. § 167b(c)(1), (5).  Congress set an April 2000 deadline for this designation and disposal process. *See id.* § 167b(b), (c)(1) (setting April 1998 deadline to cease certain operations and providing further 24 months for disposal).  But the Government was just putting two defunct helium facilities—the Amarillo and Exell plants—"on the block" in 2007 and 2010.  Mark Babineck, *Feds hope a buyer will rise up*, Chron (Aug. 4, 2007) (describing auction of Amarillo Helium Plant), https://bit.ly/3z51q2W; Kevin Welch, *Helium plant headed for private use*, Amarillo Globe-News (Nov. 18, 2010), https://bit.ly/3cuB0ji (describing auction of Exell Helium Plant).

115.     Despite Air Products' requests, the lack of a deadline, and precedent for a lengthy disposal process of helium-related assets, the GSA has firmly committed to its plan to proceed with the System's sale and conveyance.  Absent judicial relief, therefore, Defendants will open bids on November 15, 2023, select a winner shortly thereafter, and convey the System to a new owner.

### COUNT I
**(Contrary to Law)**
**(against all Defendants)**

116.     Plaintiffs incorporate the above allegations by reference.

117.     The Invitation For Bid constitutes final agency action.

118.     Plaintiffs are adversely affected and aggrieved by the challenged Invitation For Bid because Defendants' unlawful approach to selling the Federal Helium System, and the resulting shutdowns and disruptions to follow, will harm Air Products' property and contract rights in the helium stored in the Cliffside Field's Bush Dome reservoir and degrade the helium market in which Air Products is a long-time participant.  Specifically, Defendants' lawless actions will deprive Air Products of access to its stored helium and harm Air Products' business relationships, reputation, and goodwill by making it harder for refined helium suppliers to fulfill contracts.

119.     The Invitation For Bid violates the Helium Stewardship Act's requirement that any excess-property designation and sale and conveyance of the Federal Helium System must maintain stability in the helium markets and secure a continued supply of helium after sale and conveyance.

120.     A sale pursuant to the Invitation For Bid will create instability in the helium markets and disrupt the supply of helium for multiple independent reasons.  For example, and without limitation:

a.     *First*, property rights to use the Crude Helium Enrichment Unit will not be conveyed to the purchaser, even though: (a) lease rights to the CHEU are, under the Helium Stewardship Act's plain text, part of the System, which must operate as a seamless whole in order to deliver helium to end users; and (b) helium cannot be extracted if the purchaser cannot use the Enrichment Unit (or takes years to build the equivalent), thereby disrupting the continued supply of helium.  *See supra* ¶¶ 38–39, 57, 89, 99, 105, 110.

b.     *Second*, a private operator of the System will have to comply with numerous safety and other regulatory requirements—but Defendants have declined to

certify and ensure that the System meets those requirements.  *See supra* ¶¶ 58, 91, 101, 106, 110.

    c.   *Third*, Defendants have refused to secure all the necessary rights-of-way for the System's pipeline, some of which may be subject to dispute upon conveyance of the System, and a private purchaser thus will have to choose between risking legal violations, shutting down the System, or delaying operations while it spends time to obtain the necessary property rights.  *See supra* ¶¶ 81, 90, 102, 107, 110.

121.    Accordingly, the Invitation For Bid is not in accordance with law (the Helium Stewardship Act), in violation of 5 U.S.C. § 706(2)(A), and is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

## COUNT II
### (Arbitrary and Capricious)
### (against all Defendants)

122.    Plaintiffs incorporate the above allegations by reference.

123.    In three ways, the Invitation For Bid is arbitrary and capricious and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

124.    *First*, even if the Helium Stewardship Act did not independently prohibit Defendants from completing the planned sale and conveyance of the Federal Helium System, the Invitation For Bid reflects an unreasonable approach to implementing Congress's privatization process.  As "steward[s]" of the System, Defendants have an obligation to exercise reasoned decisionmaking and carry out the process in a responsible manner that avoids unreasonably disrupting the continued supply of helium.  But Defendants failed to consider and appreciate that (1) the omission of the CHEU from the sale and conveyance, (2) numerous regulatory compliance obstacles, and (3) the missing easements and rights-of-way will not ensure a consistent helium

supply and indeed will virtually *guarantee* instability in the helium markets.  *See supra* ¶¶ 99–102, 105–10.  Given the important nature of the property involved, and the vital national interest in avoiding a helium shortage, Defendants' casual and hasty approach is arbitrary and capricious and cannot be squared with settled principles of administrative law.

125.    *Second*, Defendants repeatedly represented that any sale and conveyance of the System would not occur until they delivered all of Air Products' helium to it—which Defendants predicted at the time would take until at least 2023, but in fact will now take until at least 2026. Air Products relied on these representations to structure its business operations, and reasonably believed that it had several additional years for the delivery of helium before the System would be conveyed to a private purchaser and that the helium it had purchased from the Government would be delivered before any sale and conveyance occurred.  Defendants' abrupt acceleration of that schedule (even in the face of unexpected shutdowns and other delays in receiving helium from the system), including the announcement of a new November 2023 deadline for beginning the process of conveying the Federal Helium System, ignored those reliance interests for no apparent reason.

126.    *Third*, Defendants failed to consider alternative, reasonable ways of achieving the transfer of the Federal Helium System into private hands.  As an initial matter, selling and conveying the System at a later date—one that provides Defendants enough time to sell the property responsibly—is an obvious alternative, and indeed, one that Defendants previously embraced.  In addition, there were alternatives to conveying the System "as-is."  As Air Products explained in its June 30, 2022 letter to the GSA, the Invitation For Bid could have: (a) excluded as eligible bidders any entity that itself produces or extracts helium from the System to avoid conflicts of interest and/or anti-competitive behavior; (b) confirmed that the United States would make whole Air Products for the value of helium that it has already purchased but is not delivered

by the eventual owner of the System; and (c) demonstrated that the System is in compliance with all regulatory requirements.  Each of these alternatives would have helped to secure the continued supply of helium following its conveyance, but Defendants' actions, as reflected in the Invitation For Bid, ignored these options.

127.    That is not a rational way to handle the sale and conveyance of a federal asset that serves vital public and private American interests, ranging from national defense to life-saving medical devices to nuclear energy.  Stewardship of this unique property requires more than a hasty rush to dump the Federal Helium System, whether fully (and safely) functional or not, on anybody that is willing to take it on, and then walking away from the consequences.

## V.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that this Court:

a.    Declare that the Invitation for Bid violates the APA; hold it invalid, contrary to law, arbitrary and capricious, and otherwise unlawful; and set it aside;

b.    Issue a declaratory judgment that the Invitation for Bid is unlawful;

c.    Issue an injunction prohibiting Defendants from implementing, administering, acting upon, or enforcing the Invitation For Bid until Defendants comply with their duties under the Helium Stewardship Act and the APA;

d.    Issue an injunction prohibiting Defendants from selling or conveying the Federal Helium System until Defendants have delivered to Air Products the helium it has already purchased;

e.    Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

f.    Grant Plaintiffs such further and other relief as this Court deems just and proper.

Dated:  September 7, 2023

Respectfully submitted,

*/s/ Andrew LeGrand*
Andrew LeGrand
   State Bar of Texas No. 24070132
   alegrand@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3405
Facsimile: (214) 571-2960

Helgi C. Walker (*pro hac vice* forthcoming)
   hwalker@gibsondunn.com
M. Kendall Day  (*pro hac vice* forthcoming)
   kday@gibsondunn.com
David Schnitzer  (*pro hac vice* forthcoming)
   dschnitzer@gibsondunn.com
Aaron Smith  (*pro hac vice* forthcoming)
   asmith3@gibsondunn.com
Nathaniel Tisa  (*pro hac vice* forthcoming)
   ntisa@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539