# EXHIBIT A

**U.S. General Services Administration**
**Invitation for Bids**

**SALE OF GOVERNMENT REAL PROPERTY AND IMPROVEMENTS**

# FEDERAL HELIUM SYSTEM
# REAL PROPERTY(multiple locations)

# and 800 Million Cubic Feet, more or less
# of Crude Helium

**Cliffside Gas Plant address: 13301 Brickplant Road, Amarillo, Texas 79124**

**Satanta Maintenance Station address: 2001 HH Rd, Satanta, Kansas, 67870**

**IFB Number BLM-R-2044**
**GSA Control No. 7-I-TX-1181-AB**
**Issued on July 26, 2023**

Sealed Bids, in duplicate, for the purchase of the Government-owned Property described in the Description of Respective Property Interest portion of this Invitation for Bids will be received <u>pursuant to 50 USC,167; et seq, as amended, and 40 USC 541; et, seq, as amended.</u>

| SURPLUS PROPERTY FOR SALE | |
|---|---|
| **GAS INTERESTS** | 38,254 acres, more or less, of helium and natural gas interests (no oil interests); including 13,914 acres of gas storage rights for the Bush Dome (for injection) including 60 acres, more or less, of oil and helium and natural gas interests (Potter County, Texas) and concurrent with a portion of the 38,254 acres of helium and natural gas interests. |
| **FEE LAND** | An improved 10.46 fee acre parcel of land, more or less, (Haskell County, Kansas). |
| **HELIUM PIPELINE EASEMENTS** | 423.24 miles, more or less of crude helium pipeline easements comprised of 184.54 miles, more or less of 8 inch pipeline and 166.9 miles, more or less of 4 inch pipeline easement, and 71.8 miles, more or less, of additional smaller diameter spurs that distributes helium to certain identified locations in Texas, Oklahoma and Kansas. |
| **ASSOCIATED PERSONAL PROPERTY** | 23 government natural gas wells (see Exhibit 4, List of Wells  and Exhibit 5, Map of Wells) which include four high purity helium injection wells, and two monitoring wells, together with other associated machinery, parts, and equipment to be transferred by Bill of Sale, all as more specifically set forth below. |

| ASSOCIATED CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM | All Contracts for the Storage and Delivery of Helium associated with the Federal Helium System (see Attachment N), as amended, to be Assigned by the Government to the Purchaser, as well as a separate 2023-2027 Contract for the Storage and Delivery of Helium (see Attachment P1) between the Government and the Purchaser of the Federally-Owned Crude Helium Only, Sale # BLM-R-2045 to be closed and conveyed prior to the closing of this sale as more specifically set forth below. |
| --- | --- |
| INJECTED HELIUM | This sale includes 800 million cubic feet (MMcf), more or less, of crude helium injected into the Cliffside Field by the Government and separate from the privately owned helium covered by the eleven FY 22-27 Contracts for the Storage and Delivery of Helium (also stated herein as "Original Storage Contracts" or "Contract(s) for the Storage and Delivery of Helium" or "2022-2027 Contract for the Storage and Delivery of Helium"). |
| NATIVE HELIUM | This sale includes any native helium that remains after the final delivery of the privately owned injected helium covered by the 11 FY 22-27 Contracts for the Storage and Delivery of Helium as well as final delivery of approximately one Billion cubic feet (1 Bcf) of the injected helium sold as Helium Lot #1 in the "Federally Owned Crude Helium Only" sale, in a separate IFB from this Real Property IFB. |
| NATIVE GASSES | This sale includes any native gasses other than helium subject to the terms, conditions, reservations, and restrictions contained in the four separate Gas Grants conveyed with this sale. |

| SALE SUMMARY | |
| --- | --- |
| Sale Type | Sealed Bid |
| Date & Time of Bid Opening | November 15, 2023; 2:00 P.M. Central |
| Place of Bid Opening | 819 Taylor St. 11th Floor<br>Fort Worth TX 76102 |
| Bidder Registration Due | November 13, 2023; 11:00 A.M. Central |
| Bidder Registration Deposit (refundable) | $5 Million |

**Sale Information**
William Rollings
817-978-4324
william.rollings@gsa.gov

**Sealed Bid Sale**
RealEstateSales.gov

**Registration**
See Instructions to Bidders on Page 20

**Property Disposal Web Page**
https://propertydisposal.gsa.gov

**Send Bid Form and Registration Deposit to:**
U.S. General Services Administration

Real Property Utilization and Disposal (7PZ)
819 Taylor Street, Room 11A30
Attn: William Rollings

**Inspection Opportunities:**
No one will be allowed access to the Property without the presence of a BLM employee or designee.

# **Table of Contents**

DESCRIPTION OF RESPECTIVE PROPERTY INTERESTS                                      5
Table 1 - Gas Grants                                                             5
Table 2 - Constructed Assets                                                     7
TERMS OF SALE                                                                   12
INSTRUCTIONS TO BIDDERS                                                         20
NOTICES, BIDDER AGREEMENTS, AND COVENANTS                                       28
BIDDER REGISTRATION AND BID FORM
FOR PURCHASE OF GOVERNMENT REAL PROPERTY                                        34
CERTIFICATE OF CORPORATE/ORGANIZATION BIDDER                                    34
Exhibit 1 - Map #1 of Improvements                                             36
Exhibit 2 - Map #2 of Improvements                                             37
Exhibit 3 - System Improvements Process                                        38
Exhibit 4 - Wells Included in the Sale                                         39
Exhibit 5 - Map of Wells                                                       40
Attachment A
SAMPLE QUITCLAIM DEED
(Satanta Facility)                                                             42
Attachment B
SAMPLE GAS GRANT WITHOUT WARRANTY - FUQUA                                      47
Attachment C
SAMPLE GAS GRANT WITHOUT WARRANTY - W BUSH                                     51
Attachment D
SAMPLE GAS GRANT WITHOUT WARRANTY - RG BUSH                                    55
Attachment E
SAMPLE GAS GRANT WITHOUT WARRANTY - BIVINS                                     59
Attachment F
SAMPLE BILL OF SALE OF CLIFFSIDE FIELD
PERSONAL PROPERTY
WITHOUT WARRANTY                                                               63
Attachment G
SAMPLE ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS
OF CLIFFSIDE FIELD REAL ESTATE LEASE WITHOUT WARRANTY                          65
Attachment H
Cliffside Helium Pipeline
Texas Legal Descriptions                                                       67
Attachment I
Cliffside Helium Pipeline
Oklahoma Legal Descriptions                                                    96
Attachment J
Cliffside Helium Pipeline
Kansas Legal Descriptions                                                      104
Attachment L                                                                   155
Attachment M
QUITCLAIM ASSIGNMENT OF KANSAS/OKLAHOMA
CRUDE HELIUM RIGHT-OF- WAY PIPELINE EASEMENTS                                  159

Attachment N
2022-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM BETWEEN
THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT                          162

Attachment N-1
Amendment No. 1 to CONTRACT NO. 2022-
 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM                             183

Attachment N-2                                                              185

Amendment No. 2 to CONTRACT NO. 2022-
CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM                             185

Attachment O
ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF
2022-2027 CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM
WITHOUT WARRANTY                                                            187

Attachment P
BILL OF SALE OF APPROXIMATELY ONE BILLION CUBIC FEET (1.0 Bcf), MORE OR LESS,
OF  GOVERNMENT-OWNED CRUDE HELIUM, WITHOUT WARRANTY                         190

Attachment P1
2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM                   191

Attachment P2
ASSIGNMENT AND ASSUMPTION OF OBLIGATION
OF ONE BILLION CUBIC FEET (1 Bcf), MORE OR LESS,
2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM WITHOUT WARRANTY  212

Attachment Q
REIMBURSABLE UTILITY AGREEMENT                                              215

Attachment S
Term Irrevocable License Agreement                                         225
    Exhibit A to Attachment S                                              228
    Exhibit B to Attachment S                                              229

Attachment T - Wired Funds Instructions                                    230
Attachment U - Electronic Funds Transfer (ETF) Enrollment Form             231

# DESCRIPTION OF RESPECTIVE PROPERTY INTERESTS

**1.    MAIN FACILITY AND HELIUM RESERVOIR LOCATION AND SETTING**

This Property is located at 13301 Brickplant Road, Amarillo, Texas 79124 and is a landlocked leasehold, surrounded by adjoining agricultural use lands.

Latitude: 35.353820; Longitude: -101.992748

**2.    MAIN FACILITY AND RESERVOIR SALE PARCEL DESCRIPTION**

This Property contains the following components: Gas Plant and associated improvements together with 23 producing gas wells (including four high concentration helium injection wells), and associated equipment.

    a.    **Fee Estate –** Satanta, KS, (Haskell County, recorded Book 39, Page 493). Fee estate comprises 10.46 acres, more or less, Haskell County, Kansas.  This property will be conveyed by quitclaim deed with legal description. A sample is found attached to IFB, below as Attachment A.  ***NO WARRANTY IS MADE AS TO QUALITY OF THE TITLE, WHICH IS THE SOLE RESPONSIBILITY OF BIDDER to establish through their own due diligence***.  Any Government conveyance of the identified grant will be made by Quitclaim Deed only.

    b.    **Cliffside Gas Grant and Other Mineral Rights Included in this Sale**

    The mineral rights comprises 38,254.03 acres, more or less, in Potter County, Texas. With the exception of one 60 acres parcel, the 38,254.03 acres of mineral rights do not contain any oil interests.  This property will be conveyed by four (4) separate Deeds Without Warranty with the Legal Descriptions identified in the spreadsheet below. Samples are attached to IFB, below.  ***NO WARRANTY IS MADE AS TO QUALITY OF THE TITLE, WHICH IS THE SOLE RESPONSIBILITY OF BIDDER to establish through their own due diligence***.  Any Government conveyance of the identified grant will be made by Deed Without Warranty Deed only.

**Table 1 - Gas Grants**

| Grantor | Instrument Type | Book / Page | Deed Date - File Date | Internal Deed List Acreage | Total Acreage From Deed | Conveyance Sample |
|---|---|---|---|---|---|---|
| Fuqua Land and Cattle Company to USA | Contract for Sale with Gas Grant | 205 / 321 | 4/17/1930  - 6/4/1930 | List 1 1,282.5 List 2 962.5 List 3 800.0 List 4 10,299.5 Total 13,344.5 | 13,344.5  Gas Only | Attachment B |

**Table 1 - Gas Grants**

| Grantor | Instrument Type | Book / Page | Deed Date - File Date | Internal Deed List Acreage | Total Acreage From Deed | Conveyance Sample |
|---|---|---|---|---|---|---|
| William H. Bush and Ruth G Bush to USA | Gas Grant | 209 / 469 | 7/19/1930 - 9/15/1930 | List 1 8,918.76 List 2 93.52 List 3 685.31 List 4 4,787.69 List 5 1,137.25 Total 15,622.53 | 15,622.53 Gas Only | Attachment C |
| Ruth G Bush, et al to USA NW1/4 excepted in 1930 deed, and not included in List total. | Gas Grant | 323 / 393 | 2/23/1942 - 6/18/1943 | SW¼ or 160 ac. Note that the section is described as having 645 acres elsewhere. (161.25 ac. ¼ Sections) | 160 Gas Only | Attachment D |
| Mary Elizabeth Bivins, et al to USA | Condemnation No.708 At Law | 793 / 415 | 10/23/1933 - 2/25/1958 | 9,067 Gas Only 60 Oil & Gas | 9,067 Gas Only 60 Oil & Gas | Attachment E |

c. **Cliffside Gas Storage Rights Included in this Sale**

13,914 acres, more or less, of gas storage rights for the Bush Dome (for injection of up to 52 Billion standard cubic feet), concurrent with a portion of the 38,254 acres of helium and natural gas interests within the lands described as (a) the N½ and SW¼ of Section 13, Section 14, the W½ and SE¼ of Section 15, the S½ of Section 17, and Sections 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, and 28 in Block 6, (b) the N½ of Section 85 and Sections 86, 119, and 120 in Block 9, and (c) Sections 1, 2, 3, and 4 in Block J.A.D. - all in the B.S.&F. Survey, Potter County, Texas (See map Exhibit 6).

d. **Assignable Surface Lease between Property Management, Inc. (Lessor) and United States of America (Lessee),** recorded Potter County May 8, 2019, Document No. 2019 OPR0005715 approximately 8.018 acres is landlocked and encompasses all areas inside the Cliffside gas plant fence. Attachment G ***NO WARRANTY IS MADE AS TO QUALITY OF THE TITLE WHICH IS THE SOLE RESPONSIBILITY OF BIDDER to establish through their own due diligence.*** Any Government conveyance of the identified lease will be made by Assignment of Land Lease Without Warranty only.

e. **IMPORTANT NOTICE: INTEGRATED MACHINERY AND EQUIPMENT EXCLUDED FROM THIS SALE**

Although the Crude Helium Enrichment Unit (CHEU) is integrated into the real property portions of the Federal Helium System for sale in this IFB, the CHEU is leased by the Government from the Cliffside Refiners Limited Partnership (CRLP) and is **NOT INCLUDED IN THIS SALE**. The CHEU consists of a nitrogen rejection unit, cold box, gas scrubbing equipment, flaring equipment, and the K100 Compressor and other compressors. See Exhibit 3 a diagram titled, "System Improvements Process."

Bidders are hereby notified that the CRLP is a private entity that has leased the CHEU to the Government and is otherwise unassociated with the Government. Any future owner of the Federal Helium System will need to make their own arrangements regarding the CRLP owned machinery and equipment.

f. **List of constructed improvements, including but not limited to, unless shown as "not for sale"**:

**BLM owned equipment for sale and part of the IFB that is necessary for the enrichment process that is for sale and part of this IFB, includes the booster compressor (Map I: V1/V2), the chiller skid (Map II: 18), the natural gas collection equipment (Map II: 1,2,9)**

| Table 2 - Constructed Assets | | | | |
|---|---|---|---|---|
| **Building Name** | **Building Number** | **Size (Sq. Ft.) (Gal)** | **Map I (Exhibit 1)** | **Map II (Exhibit 2)** |
| Admin Bldg Modular Office | BLDG H2 | 1904 | H2 | 13 |
| Analyzer Building | BLDG W1 | 64 | W1 | 22 |
| Analyzer Building | BLDG W2 | 64 | W2 | |
| Analyzer Building | BLDG W3 | 64 | W3 | |
| Analyzer Building | BLDG W4 | 64 | W4 | |
| CGF Air Compressor | BLDG P1 | 400 | P1 | 16 |
| CGF HQ Office | BLDG H | 3420 | H | 12 |
| CHEU RO System | BLDG R | 80 | R | |
| Chiller Skid | | | | 18 |
| Cliffside Auxiliary Bldg MCC | BLDG V2 | 2322 | V2 | 15 |
| Cliffside Central Comp Bldg | BLDG V1 | 3600 | V1 | 14 |
| Cliffside Field Lab | BLDG F | 2142 | F | 5 |

**Table 2 - Constructed Assets**

| Building Name | Building Number | Size<br>(Sq. Ft.)<br>(Gal) | Map I<br>(Exhibit 1) | Map II<br>(Exhibit 2) |
|---|---|---|---|---|
| Climate Controlled Lab Storage | BLDG D1 | 200 | D1 | 6 |
| Coalescers | | | | 10 |
| Control Room<br>(CHEU NOT FOR SALE) | | | K | |
| Cylinder Storage | BLDG N2 | 960 | N2 | 17 |
| Eye Wash/Shower Bldg<br>(CHEU NOT FOR SALE) | | | Y | |
| Diesel AST | | 1000 gal | 4 | |
| DGA (New) AST<br>(CHEU NOT FOR SALE) | | 1457 gal | 11 | |
| DGA (Recycled) AST<br>(CHEU NOT FOR SALE) | | 300 gal | 12 | |
| Drip/Saltwater tank AST (West) | | 5000 gal | 2 | 2 |
| Drip/Saltwater tank AST (East) | | 4300 gal | 1 | 11 |
| Employee Smoke Hut | BLDG X | 64 | X | |
| Fuel Pumps | | | | 4 |
| Hazardous Chemical Storage | BLDG D3 | 58 | D3 | |
| Heavy Equipment Bldg | BLDG Z | 2400 | Z | 7 |
| HEU Air/GN2 Compressor Bldg<br>(CHEU NOT FOR SALE) | | | T | |
| HEU Compressor Bldg<br>(CHEU NOT FOR SALE) | | | V | |

**Table 2 - Constructed Assets**

| Building Name | Building Number | Size<br>(Sq. Ft.)<br>(Gal) | Map I<br>(Exhibit 1) | Map II<br>(Exhibit 2) |
|---|---|---|---|---|
| Gasoline AST | | 1000 gal | 5 | |
| Janitor Storage Building | BLDG G | 112 | G | |
| Lab Air Compressor | BLDG P2 | 64 | P2 | |
| Lab Chemical Storage | BLDG D2 | 144 | D2 | |
| Lab Emergency Generator | BLDG O | 64 | O | |
| Lab Storage | BLDG L | 64 | L | |
| Meter House – Natural Gas | BLDG B | 1360 | B | 9 |
| Motor Control Center<br>(CHEU NOT FOR SALE) | | | U | |
| New Oil AST<br>(CHEU NOT FOR SALE) | | 300 gal | 8 | |
| New Oil AST<br>(CHEU NOT FOR SALE) | | 500 gal | 15 | |
| New Oil AST | | 500 gal | 18 | |
| NGL Off Loading Area | | | | 1 |
| NGL Tank AST | | 40,000 gal | 3 | 3 |
| Paint Storage | | | M | |
| Tool Storage | BLDG Q | 144 | Q | |
| Transformer<br>(CHEU NOT FOR SALE) | | 484 gal | 16 | |
| Transformer | | 248 gal | 17 | |

**Table 2 - Constructed Assets**

| Building Name | Building Number | Size (Sq. Ft.) (Gal) | Map I (Exhibit 1) | Map II (Exhibit 2) |
|---|---|---|---|---|
| Used Oil AST (CHEU NOT FOR SALE) | | 280 gal | 9 | |
| Used Oil AST (CHEU NOT FOR SALE) | | 500 gal | 10 | |
| Used Oil Vault (CHEU NOT FOR SALE) | | 280 gal | 13 | |
| Used Oil Vault | | 500 gal | 19 | |
| Used Oil Vault (CHEU NOT FOR SALE) | | 500 gal | 14 | |
| Waukesha Compressor Building (CHEU NOT FOR SALE) | | | S | |
| Warehouse | BLDG J | 3200 | J | 8 |
| Water Filter Building (Reverse Osmosis) | | | A2 | 19 |
| Water Pump House | | | A1 | |
| Welding Shop | | | H1 | |
| Electrical Storage Bldg | BLDG C | 128 | C | |
| Water Tanks | | | | 20 |
| Vehicle Maintenance Building | BLDG N1 | 1500 | N1 | |
| Water Pump House | BLDG A-1 | 120 | A1 | 21 |
| Satanta Metering Station | Main Office | 900 | N/A | |
| Satanta Admin Site | ADMIN | 8 | N/A | |

| Table 2 - Constructed Assets | | | | |
|---|---|---|---|---|
| **Building Name** | **Building Number** | **Size (Sq. Ft.) (Gal)** | **Map I (Exhibit 1)** | **Map II (Exhibit 2)** |
| Satanta Metering Station (Shop) | BLDG | 2800 | N/A | |

g. ***NO WARRANTY IS MADE, FOR THE ITEMS LISTED IN TABLE 2, AS TO QUALITY OF THE CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH IS THE SOLE RESPONSIBILITY OF BIDDER to establish through their own due diligence***. Conveyance of the following identified interests will be by Bill of Sale Without Warranty. Attachment F.

h. **Government Held Helium Pipeline Easements from Potter County, TX facility to certain points in Texas, Oklahoma and Kansas.** There are 423.24 miles, more or less of assignable helium pipeline easements, improved with a pipeline and appurtenances, crossing the states of Texas, Oklahoma, and Kansas.  The legal descriptions and easement recordation information may be found in Attachment H, Attachment I, and Attachment J, respectively.  ***NO WARRANTY IS MADE AS TO QUALITY OF THE TITLE WHICH IS THE RESPONSIBILITY OF BIDDER to establish through their own due diligence***. Any Government conveyance of the identified easements will be made by Quitclaim Assignment of Easements or Assignment of Easements Without Warranty only, as applicable under appropriate state law, and includes Government installed subsurface and above surface helium pipeline and appurtenances. See Attachment K and Attachment L, respectively.

i. **800 MMcf of Injected Crude Helium**

800 million cubic feet of crude helium, more or less, is included with the above.

j. **ASSIGNABLE 3ᴿᴰ PARTY HELIUM STORAGE AND DELIVERY CONTRACTS / REQUIREMENT FOR NEW CONTRACT FOR STORAGE AND DELIVERY OF HELIUM** –

A sample of the 11 Original Contracts for the Storage and Delivery of Helium is attached to this IFB, below in Attachment N. These terms are applicable to all eleven (11) Original Contracts for Storage and Delivery of Helium, with amendments in Attachment N-1 and Attachment N-2. Copies of the signed 11 Contracts will be provided to the Purchaser.

A sample of the 1 Bcf 2023-2027 Contract the Storage and Delivery of Helium (Sale # BLM-R-2045). See Attachment P1, below. A condition precedent to final closing of this sale is that the Purchaser accepts and agrees to assume all terms and conditions of the 11 Original Contracts for Storage and Delivery of Helium, Attachment N, as amended, as well as accept, execute, and agree to all terms and conditions of all the Contracts for Storage and Delivery of Helium.

## 3.   TAX PARCEL ID (OR ASSESSOR'S PARCEL NO.)

Parcel Number:  R-350-0230-1000.0 and R-350-0230-0001.0

Amarillo, Potter County, Texas

## 4. UTILITIES & SERVICE PROVIDERS

Procurement of utility and service shall be the responsibility of the Purchaser as of the date of conveyance. Bidders are urged to contact utility providers for the local service area.

# TERMS OF SALE

## 1. DEFINITIONS

### a. BACKUP BIDDER

The term "Backup Bidder" refers to the bidder, whose bid conforms to the terms and conditions of the IFB, is the second-highest dollar bid at the close of the auction and is determined by the Government to be the second most acceptable bid.

### b. BIDDER(S)

The term "Bidder" or "Bidders" as used herein refers to the offeror or offerors for the purchase of the subject Property, and is used interchangeably with "you."

### c. EARNEST MONEY

The term "Earnest Money" refers to the Bidder's deposit of money demonstrating the Purchaser's good faith offer to the Government to fully execute and comply with all terms, conditions, covenants and agreements contained in any contract resulting from the Government's acceptance of the Bidder's offered bid price. Once a bid is accepted by the Government for a contract, all prior deposits made by the Purchaser to register for the sale, subject to this Invitation for Bids, become Earnest Money to the benefit, custody, accountability and control of the Government.

### d. GENERAL SERVICES ADMINISTRATION

The term "General Services Administration" ("GSA") as used herein refers to the United States General Services Administration, a Federal agency conducting this sale in agreement with the United States Bureau of Land (BLM). ***Authority for this sale is pursuant to 50 USC,167; et.seq, as amended, and 40 USC 541; et.seq, as amended.*** BLM has full custody of and all accountability for all matters, known and unknown, concerning the physical, title, and environmental condition of the Property.

### e. GOVERNMENT

The term "Government" as used herein refers to the United States of America, and is used interchangeably with "Seller" and "Grantor."

### f. HIGH BIDDER

The term "High Bidder" refers to the bidder, whose bid conforms to the terms and conditions of the IFB, is the highest dollar bid at the close of the auction and is determined by the Government to be the most acceptable bid.

### g. INVITATION FOR BIDS

The term "Invitation for Bids" ("IFB") refers to this document and the following items that are attached hereto and incorporated herein: the Property Description; Terms of Sale; Instructions to Bidders; Notice and Covenants and/or Special Terms of Sale (if applicable); Bidder Registration and Bid Form for Purchase of Government Property; Exhibits and Additional Documents. Should the aforementioned documents be modified or supplemented by any addenda or amendments, or replaced by a new issue of the IFB, issued by the Government prior to the conclusion of the online auction, those modifications, addenda or amendments, shall be part of the reissued IFB.

### h. PROPERTY

The term "Property" refers to the property or properties described in the Property Description of this IFB.

### i. PURCHASER

The term "Purchaser" refers to the bidder whose bid the Government accepts and is used interchangeably with "Buyer" and "Grantee."

**j.   WEBSITE**

The GSA Auctions® website, GSAAuctions.gov, has been developed to allow the general public the opportunity to view a wide array of Federal assets, including real property. Additional information can also be found at disposal.gsa.gov/s.

## 2.   DESCRIPTION PROVIDED IN IFB

The description of the Property, and all other information provided with respect to the Property set forth in the IFB and related documents shared online through disposal.gsa.gov/s in an electronic Data Room are based on the best information available to GSA, Real Property Utilization and Disposal (7PZ) and are believed to be correct. Any error or omission, including but not limited to, the omission of any information available to the agency having custody over the Property and/or any other Federal agency, shall NOT constitute grounds or reason for nonperformance of the contract of sale, or claim by purchaser for allowance, refund or deduction from the purchase price. The IFB is made available at Realestatesales.gov and may be modified and amended by the Government at any time prior to the conclusion of the auction. . Bidder agrees and accepts that notices of any changes to the descriptions provided in this IFB are satisfactory when made available on either or both of GSA's real property disposal websites at RealEstateSales.gov and/or disposal.gsa.gov.

## 3.   INSPECTION

**No one will be allowed access to the Property without the presence of a BLM employee or designee**. Bidders are invited, urged, and cautioned to inspect the Property prior to submitting a bid. Photos provided by the Government may not represent the condition or existence of any improvements of the Property and are NOT to be relied upon in place of the Bidder's own inspection. Any maps, illustrations or other graphical images of the Property are provided for visual context and are NOT to be relied upon in place of the Bidder's own inspection. The failure of any bidder to inspect, or to be fully informed as to the condition of all or any portion of the Property, will not constitute grounds for any claim or demand for adjustment or withdrawal of a bid after the auction.

## 4.   CONTRACT

The IFB and the bid, when accepted by the Government shall constitute an agreement for sale ("Agreement") between the high bidder ("Purchaser") and the Government. Such Agreement shall constitute the whole contract to be succeeded only by the formal instrument(s) of transfer, unless modified in writing and signed by both parties. No oral statements or representations made by, or for, or on behalf of either party shall be a part of such contract. In addition, the Purchaser shall not transfer or assign the Agreement without the express written consent of the Government. Any assignment transaction without such consent shall be void.

## 5.   CONDITION OF PROPERTY

The Property is offered for sale **"AS IS" AND "WHERE IS"** without representation or warranty, expressed or implied. The Purchaser, and Purchaser's successors and assigns, or any party-in-possession of the Property, or any part thereof, further acknowledges that the Government makes no representations or warranty concerning the title, zoning, character, condition, size, quantity, quality and state of repair of the Property. The Government makes no other agreement or promise to alter, improve, adapt or repair the Property not otherwise contained herein. Purchaser shall rely solely on its own due diligence and examination of the Property. Purchaser acknowledges that there will be no claims or any allowances or deductions upon grounds that the Property is not in condition or fit to be used for any purpose intended by the Purchaser after the conclusion of the auction. An "As-Is, Where-Is" provision will be included in the conveyances without warranty described herein.

## 6.  ZONING

The Property is unzoned as unincorporated county land per the City of Amarillo, Texas Planning Department. Verification of the present zoning and determination of permitted uses, along with compliance of the Property for any proposed future use, shall be the responsibility of the bidder; and the Government makes no representation regarding zoning matters. Any inaccuracies or changes in the zoning information shall NOT be cause for adjustment or rescission of any contract resulting from this IFB.

For more information contact:     Amarillo Planning Division
                                  808 S. Buchanan St.
                                  P.O. Box 1971
                                  Amarillo, TX 79105-1971
                                  Phone: 806-378-5286

## 7.  POSSESSION

a. Constructive Possession: The Purchaser hereby agrees to assume constructive possession of the Property within 15 calendar days of written notice by the Government.  The Purchaser further agrees, covenants and declares their irrevocable intent to assume constructive possession commencing at 12:01 a.m. local time at the location of the property, on the 16th calendar day after such notice by the Government.   Although by assuming constructive possession, the Purchaser incurs certain responsibilities and obligations under this IFB, such possession does not confer any right to the Purchaser to make any alterations or improvements in or to the Property, nor to use it for any purpose of his own without first obtaining the written approval of the Government.

b. Additional Possessory Interest: Should the Purchaser request actual possession of the Property prior to the date of conveyance, the Government, at its sole option, may approve such request and require the Purchaser to enter into a lease, permit, license, or agreement prior to the conveyance of the Property. Any such approval may be conditioned on the Purchaser paying to the Government for the privileges granted, for the period from the date of the approval to the date of conveyance, an amount equal to $25,000.00 per day.

c. Purchaser's Liability:  The Purchaser further covenants and agrees to be fully responsible for all claims of any nature whatsoever concerning the Property, including, but not limited to any claims for personal injury and death, damage to the Property and/or its improvements, and attorney's fees incurred in connection therewith, arising either directly or indirectly from the Purchaser's possession (whether actual or constructive), control, or use of Property.

d. Applicability of Other Laws & Regulations: The Purchaser shall comply with all applicable federal, state and local laws, rules, and regulations, in its activities on the Property

e. Restoration: In the event Purchaser fails to complete the transaction and accept title to the Property for any reason whatsoever, the Purchaser further agrees to restore and return to its original location, condition, possession and custody of any Property of the United States of America, both real and personal, which was removed, destroyed or damaged while the Purchaser was in possession of the Property, at the sole cost and expense of the Purchaser, under the direction of the Government.

## 8.  INSURANCE

In the event a bid to purchase is accepted and possession of the Property is assumed by the Purchaser prior to the date of conveyance, the Purchaser shall procure and maintain insurance at bidder's expense, effective for the period from the date of assumption of possession (whether actual or constructive) to date of conveyance, for the benefit of the Government in such kinds and amounts as may be required by the Government.

Fire, extended coverage, vandalism and malicious mischief, casualty, and general liability insurance shall be maintained on the real and personal property covered by the bid, and such other property insurance as required to protect the Government's interest.  The policies shall be in amounts which, after taking into account the coinsurance provision, if any, will ensure payment of the unpaid balance of the purchase price.  All property insurance policies furnished in connection with this sale shall be written in the name of the bidder, but shall name the General Services Administration as loss payee under a Standard Mortgage Clause (non-contributing) for real property and as a loss payee for personal property.

Insurance required by the Government shall be from companies acceptable to the Government and shall include such terms and provisions as may be required to provide coverage satisfactory to the Government. The original insurance policies or binders of insurance for the required insurance shall be provided at least five (5) calendar days before the date of assumption of possession and all insurance policies or binders shall require that GSA be given a thirty (30) calendar day notice of cancellation.

Information concerning insurance requirements will be furnished by the GSA Real Property Utilization and Disposal Division.

## 9.  RISK OF LOSS

As of the date of assumption of possession of the Property or the date of conveyance, whichever occurs first, the Purchaser shall assume all responsibility for care and handling and all risks of loss or damage to the Property, including but not limited to all buildings and other improvements located thereon, and assume all obligations and liabilities of ownership and no claim for any allowance or deduction upon such grounds will be considered after the conclusion of an auction.

## 10. TAXES, ASSESSMENTS AND OTHER COSTS

As of the date of assumption of possession of the Property, or the date of conveyance, whichever occurs first, the Purchaser shall assume responsibility for all general and special real and personal property taxes or other assessments which have been or may be assessed on the Property, and for all sums due to be paid by the Government in lieu of taxes, which amount shall be prorated.

## 11. REVOCATION OF BID AND DEFAULT

Purchaser agrees that bids made to purchase the Property are binding offers and once accepted for contract by the Government, all deposits made by the Purchaser to register for the sale, subject to this Invitation for Bids, become Earnest Money to the benefit, custody and accountability of the Government.

In the event of (1) revocation of a bid after the conclusion of an auction, but prior to acceptance of the high bid by the Government, or (2) in the event of revocation of a bid after notice of acceptance, or (3) in the event of any default by the Purchaser in the performance of the contract of sale created by such acceptance, or (4) in the event of failure by the Purchaser to consummate the transaction, the Purchaser agrees that any Earnest Money and all deposits paid to the Government in any acceptable form, including credit card, together with any payments subsequently made on account, are subject to forfeit by the Purchaser to the Government at the option of the Government as damages for breach of contract, in which event the Purchaser shall be relieved from further liability. Purchaser agrees that all deposits made with credit cards are subject to forfeit upon Government determination of Purchaser's default and breach of contract. Purchaser shall not request retrieval, chargeback or any other cardholder refund.

Purchaser agrees and understands that a debt to the United States of America subject to claim or collection by applicable Federal law may be created if their Earnest Money is in any way made unavailable to the Government and that any party that knowingly participates in such retrieval or refund may be held fully accountable for interfering with a Government contract.

## 12. GOVERNMENT LIABILITY

If the Government accepts a bid for the purchase of the Property and (1) the Government fails for any reason to perform its obligations as set forth herein; or (2) title does not transfer or vest in the Purchaser for any reason, although Purchaser is ready, willing, and able to close; or (3) any other contractual claim or cause of action hereafter accrues in favor of Purchaser under the terms of this IFB, Government's liability to Purchaser shall be strictly limited to all amounts of money Purchaser has paid to Government without interest whereupon Government shall have no further liability to Purchaser.

## 13. TITLE EVIDENCE

Any bidder, at its sole cost and expense, may procure any title evidence that the said bidder desires. The Government will, however, cooperate with the Purchaser or their authorized agent in this transaction, and will permit examination and inspection of such deeds, abstracts, affidavits of title, judgments in condemnation proceedings, or other documents relating to the title of the premises and Property involved, as it may have

available. It is understood and agreed that the Government is not obligated to pay for any expense incurred in connection with title matters or survey of the Property.

## 14. TITLE

If a bid for the purchase of the Property is accepted, a quitclaim deed, deed without warranty, Oil & Gas Grant or Gas Grant, (whether quitclaim or without warranty), Assignment of Pipeline Easement or Right of Way (whether quitclaim or without warranty), and Bill of Sale (whether quitclaim or without warranty), as applicable, in conformity with local law and practice will convey the Government's interest.  The Government does not pay for or provide title insurance.

## 15. EASEMENTS, ENCROACHMENTS AND RESERVATIONS

The Property will be sold subject to any and all covenants, reservations, easements, restrictions, encroachments, and rights, recorded or unrecorded, for highways, roads, streets, power lines, telephone lines and equipment, pipelines, drainage, sewer and water mains and lines, public utilities, public roads, railroads and other rights-of-way, and any easements, reservations, rights and covenants reserved by the Grantor herein.

## 16. COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that he or she has not employed or retained any person or agency to solicit or secure this contract upon any agreement or understanding for commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract without liability or in its discretion to recover from the Purchaser the amount of such commission, percentage, brokerage, or contingent fee in addition to the consideration herewith set forth. This warranty shall not apply to commissions payable by the Purchaser upon the contract secured or made through bona fide established commercial agencies maintained by the Purchaser for the purpose of doing business. "Bona fide established commercial agencies" has been construed to include licensed real estate brokers engaged in the business generally.

## 17. CONTINUING OFFERS

Each bid received shall be deemed to be a continuing offer for one hundred thirty (130) calendar days after the date of bid opening until the bid is accepted or rejected by the Government.

If the Government desires to accept any bid after the expiration of the one hundred thirty (130) calendar days, the consent of the bidder shall be obtained prior to such acceptance.

## 18. TENDER OF PAYMENT AND DELIVERY OF INSTRUMENT OF CONVEYANCE

Prior to closing, the Purchaser or Purchaser's agent must open an escrow account with an independent, unaffiliated banking and escrow company ("Escrow Holder") to handle the closing. All closing costs, including escrow fees and document handling expenses, shall be borne solely by the Purchaser. As part of the closing, the Government will provide escrow instructions to the Escrow Holder regarding the recording, disposition of proceeds and related matters.

The closing date of the sale is one hundred twenty (120) calendar days after acceptance of the bid. Upon written agreement by the Government, the Purchaser may close the transaction prior to the one hundred twenty (120) calendar day period.

On the closing date, the Purchaser shall tender to the Government (or to the Purchaser's Escrow Holder) the balance of the purchase price in the form of an electronic wire transfer. Upon confirmation that Purchaser's wire transferred funds have been received by the Government, (the Purchaser's Escrow Holder shall record the instrument, or instruments, of conveyance and provide copies of the recorded instrument(s) to the parties) the Government shall deliver the instrument, or instruments, of conveyance to the Purchaser's Escrow Holder for recordation. Possession of the Property will be assumed by the Purchaser at the time of closing. The Government reserves the right to extend the closing date for a reasonable amount of time.

## 19. DELAYED CLOSING

Any change to the established closing date is subject to the written approval by the Government. The Government reserves the right to refuse a request for extension of closing. However, if the Government grants an extension, the Purchaser may be required to pay either: (i) a liquidated damages assessment of $200,000.00 per day; or (ii)

interest on the outstanding balance of the purchase price, whichever is greater, if the closing of the sale is delayed, and the delay is caused, directly or indirectly, by the Purchaser's action or inaction and not by any action on the part of the Government. The interest rate shall be computed based on the yield of 10-year United States Treasury maturities as reported by the Federal Reserve Board in "Federal Reserve Statistical Release H.15" plus 1-1/2% rounded to the nearest one-eighth percent (1/8%) as of the date of bid acceptance. The Government may impose additional terms and conditions to grant an extension.

## 20. CLOSING COSTS, DOCUMENTARY STAMPS AND COST OF RECORDING

All closing costs, including escrow and financing fees, shall be borne solely by the Purchaser. The Purchaser shall pay all taxes and fees imposed on this transaction and shall obtain at Purchaser's own expense and affix to all instruments of conveyance and security documents such revenue and documentary stamps as may be required by Federal, State and local law.

All instruments of conveyance and security documents shall be placed on record in the manner prescribed by local recording statutes at the Purchaser's expense.

Within five (5) business days from receipt of the executed deed, the Purchaser (or the Purchaser's Escrow Holder) shall record all the conveyance documents shown in the Attachments to this IFB, below, in the official records of the county. The Purchaser (or the Purchaser's Escrow Holder) shall provide GSA a conformed copy of all the recorded conveyance documents within five (5) business days of recording to the following address:

U.S. General Services Administration
Real Property Utilization and Disposal (7PZ)
819 Taylor Street, Room 11A30
Fort Worth, Texas 76102
Attn: William Rollings

## 21. OFFICIALS NOT TO BENEFIT

No member or delegate to the Congress, resident commissioner or Government official shall be admitted to any share or part of the contract of sale or to any benefit that may arise therefrom, but this provision shall not be construed to extend to the contract of sale if made with a corporation for its general benefit. GSA employees are prohibited from bidding on the Property offered in the IFB.

## 22. CAPACITY TO CONTRACT

Bidders must have the legal capacity to enter into a contract in order to bid and acquire the Property.

## 23. CORPORATE AUTHORIZATIONS

Bidders that are corporations duly registered under the laws of its jurisdiction and have the power to conduct its business as of the date of this sealed bid sale agree that:

a. Bidder and the person acting on behalf of the Bidder has obtained all corporate authorizations and all other governmental, statutory, regulatory or other consents, licenses and authorizations required to empower it to enter into a sale/purchase contract with the U.S. General Services Administration for the purchase of the property that is the subject of this Invitation for Bids, where failure to obtain the above mentioned authorizations would adversely affect, to a material extent, its ability to enter into and perform its obligations under the terms and conditions of this Invitation for Bids; and

b. Bidder attests to the validity and accuracy of all documents of assurances and intentions to bid to purchase the property that is the subject of this Invitation for Bids and that all authorizations required of the corporation to legally accept title of said property through documents prepared by the Government to which Bidder, as Purchaser, is or will be a party, will, when executed, constitute legal, valid and binding obligations of the Bidder/Purchaser in accordance with their terms.

## 24. COMPLIANCE WITH SECTION 889 PART B

By signature of the Bidder Registration and Bid Form, bidders hereby certify that their entity is in compliance with Section 889, Prohibition of Certain Telecommunications and Video Surveillance Services or Equipment of the

Fiscal Year 2019 National Defense Authorization Act (Pub. L. 115-232). The bidder represents that it does not use covered telecommunications equipment or services, or use any equipment, system or service that uses covered telecommunications equipment or services. The statute prohibits contracting with an entity that uses certain telecommunications equipment or services produced by the below entities, companies, affiliates or subsidiaries:

- Huawei Technologies Company
- ZTE Corporation
- Hytera Communications Corporation
- Hangzhou Hikvision Digital Technology Company
- Dahua Technology Company

The prohibition of use of these telecommunications equipment or services applies regardless of whether or not that usage is related to the terms and conditions of this IFB and the certification extends until closing of the transaction as specified herein.

## 25. ANTITRUST LAWS & RECISSION

The contract made by the acceptance of a bid by the Government may be transmitted to the Attorney General of the United States for advice as to whether the sale would tend to create or maintain a situation inconsistent with antitrust laws. The Government may rescind the acceptance of any bid, in case unfavorable advice is received from the Attorney General, without liability on the part of the Government other than to return any and all deposits held by the Government without interest.

*NOTICE - BIDDERS ARE RESPONSIBLE, IN THEIR OWN DUE DILIGENCE, TO MAKE THEIR OWN DETERMINATION AS TO THE IMPACT OF ALL APPLICABLE ANTITRUST AND OTHER APPLICABLE DIVESTITURE LAWS OR TO THEIR ABILITY TO ACQUIRE TITLE TO ALL PROPERTY AND OTHER INTERESTS DESCRIBED IN SECTION 1, ABOVE.*

## 26. CFIUS / FIRMMA NOTICE TO BIDDERS

The Committee on Foreign Investment in the United States (CFIUS) is an interagency committee chaired by the Secretary of the Treasury that is authorized to review certain transactions involving foreign investment in the United States to determine the effect of such transactions on the security of the United States. (See Foreign Investment Risk Review and Modernization Act of 2018 ("FIRRMA"). The focus of these national security concerns arise from certain foreign non-controlling investments and real estate transactions within the United States. Any entity found to be unable to comply with and/or be approved by the applicable federal agency under the requirements of FIRRMA, as amended, will be deemed unqualified for purposes of Bid acceptance by the United States.  Bidder is on notice of this federal statutory mandate and is responsible to complete its own due diligence, at its sole cost, to determine whether or not FIRRMA applies to its proposed acquisition. Any questions on this specific statutory mandate should be directed to the U.S. Department of the Treasury for response.

## 27. NOTICE OF FOREIGN OWNERSHIP RULES AND RESTRICTION COVERING THIS PROPERTY

Bidder is hereby on notice that once it acquires title to the Property, it shall be the sole responsibility of Bidder, its respective successors, assigns, transferees in title and possessors in interest in the Property, to identify and fully comply with all applicable Federal and State laws, rules, and regulations covering foreign investment and ownership of real estate within the United States of America and the applicable affected states.

## 28. ASSIGNMENT OF MEMORANDUM OF UNDERSTANDING AND REIMBURSABLE UTILITY AGREEMENT

Purchaser agrees, for themselves, their successors and assigns, to acknowledge and accept the terms of the Assignment of the Memorandum of Understanding and KDOT Reimbursable Utility Agreement for a highway improvement project on Highway No. US-50. (See Attachment Q and Attachment R). The BLM is the current owner of a crude helium pipeline located between Highway Stations 110+47 to 111+20 as shown on the Project Plans (Pipeline). The BLM's Pipeline needs to be protected (Utility Protection) so the Kansas Department of Transportation Secretary will protect the helium pipeline and guarantee continued use of the pipeline throughout construction. Additionally, KDOT and the BLM intend to enter into two similar Memorandums of Understanding

and Reimbursable Utility Agreements to protect the crude helium pipeline where it cross under Highway US-156 (near Jetmore, Kansas) and Highway US-83 (near Sublette, Kansas). These agreements stipulate that all work will be at no cost to the government or Purchaser. Also, the work will be done without requiring any depressurization of the helium pipeline and that any damage to the pipeline is the responsibility of the contractor and state. The BLM will provide the additional agreements as soon as they are completed. The BLM is also negotiating an agreement with the Texas Department of Transportation related to where the crude helium pipeline crosses under US-Highway 87 near Dumas, Texas. The BLM will pay for its portion (TBD) of the reimbursable utility agreement prior to the conveyance.

## 29. PURCHASER'S HELIUM DELIVERY ALLOCATION

1. **Allocation**. In event of a shortage, Purchaser's New Helium in Helium Lot #1 and Real Property Purchaser's Helium are together assigned a 20 percent (11 percent for Helium Lot #1 and 9 percent for Real Property Purchaser's Helium) delivery right that is independent from the allocation calculations under the Original Storage Contracts. As such, the total volume of Primary Private Helium under the Original Storage Contracts will not include the volumes of Helium Lot #1 and Real Property Purchaser's Helium. No special priority in allocation is given to Real Property Purchaser's Helium for purposes of allocation (all allocations and delivery rights have equal priority). For reference, please see original Contracts for the Storage and Delivery of Helium,  see Attachment N, as amended, and with the 2023-2027 Contract for the Storage and Delivery of Helium, see Attachment P1.

2. **Delivery**. As noted in the attachments to the IFB, the Real Property Purchaser must assume the obligations for management and delivery of privately owned helium stored in the reserve in accordance with the Original Contracts for the Storage and Delivery of Helium, see Attachment N, as amended, and with the 2023-2027 Contract for the Storage and Delivery of Helium, see Attachment P1.

3. **Secondary Private Helium**. The term means any net helium added via pipeline (not removed within the calendar month) to the Helium System after the Conveyance. Secondary Private helium will be excluded from these storage Contract terms and Person who added the net helium must negotiate a separate storage and delivery contract with Purchaser.

Please note that Real Property Purchaser is limited to their 9 percent Priority Delivery Rights in times of shortage and any new storage contract after the conveyance will not have Delivery Rights in times shortage as the System is already fully subscribed.

## 30. FEES IN THE CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM

Prior to the conveyance of the Federal Helium System, the government will collect the $18,000 Contract Administration Fee and any $20,000 Acceptance/Delivery Point Assessment Fees from each of the 11 parties that has a FY 2022-2027 Contract for the Storage and Delivery of Helium with the BLM. The government will prorate the amount of these fees owed to the Purchaser of the Real Property Portion of the Federal Helium System based on the date of the conveyance and will credit this amount against the purchase price for the Real Property Portion of the Federal Helium System.

## 31. POST CONVEYANCE GOVERNMENT ACCESS LICENSE TO THE PROPERTY

Purchaser accepts and agrees, for themselves and their successors and assigns, that the Government reserves a right of access to the Property, to remove certain Government owned personal property briefly described in Attachment S - Exhibit B of this Invitation for Bids, for a period not exceeding 45 days after successful execution of said Property's conveyance. Such access will be granted by the Purchaser through a License to the Government, see Sample License in Attachment S of this Invitation for Bids, to be executed as a condition precedent to the final conveyance of the Property by the Government to the Purchaser.

# INSTRUCTIONS TO BIDDERS

**1.  SEALED BID OPENING DATE & TIME**

Sealed bids will be opened on <u>November 15, 2023</u> at <u>2:00 P.M.</u> Local Time.

**2.  TYPE OF SALE**

a.  This sale will be a sealed bid sale.  Bids must be submitted in duplicate on the Bid Form accompanying this Invitation for Bids, and all information and certifications called for thereon must be furnished.  Bids submitted in any other manner or which fail to furnish all information or certifications required may be summarily rejected.  While digital or virtual bids will not be considered, unless specifically authorized in the Invitation for Bids, bids may be modified or withdrawn in writing delivered via mail, email or fax prior to the time fixed in this invitation for bids for the opening of bids.

b.  Bids shall be filled out legibly with all erasures, strikeovers, and corrections initialed by the person signing the bid and the bid must be manually signed in black or blue ink.

c.  Negligence on the part of the bidder in preparing the bid confers no right for withdrawal or modification of the bid after it has been opened.

d.  In submitting a bid, only return the Bid Form (in duplicate).  Retain all other documents, including one copy of the Bid Form, for your record.

e. **Financial and Operations, and Antitrust documentation,** and a copy of the Bid Deposit bank transfer receipt that confirms the wire transfer was made, **must be included in the Bid envelope**, described in Paragraph 4 of these Instructions to Bidders, with the bid. Failure to provide stated documents may result in your bid being determined non-responsive to the terms and conditions of this IFB.

**3.  BIDS AND TERMS OF SALE**

Bids to purchase must be ALL-CASH. Buyers are expected to arrange their own financing and to pay the balance in full by the closing date. No Government credit terms are available. GSA has no information on the availability of private financing or on the suitability of this Property for financing.

**4.  BID ENVELOPES**

Envelopes containing bids must be sealed and addressed to the bid receiving office stated in this Invitation for Bids.

a.  The name and address of the bidder must be shown in the upper left corner of the bid envelope; and

b.  the invitation number, the date and hour of bid opening and the phrase "Bid for Real Property" must be shown in the lower left corner of the envelope; and

c.  the Bidder's Company name, UEI - Unique Entity ID - SAM.gov, and CAGE - Commercial and Government Entity - code must be shown in the lower right corner of the envelope; and

d.  the Bidder's Lender's name, UEI - Unique Entity ID - SAM.gov, and CAGE - Commercial and Government Entity - code must be shown in the lower right corner of the envelope.

No responsibility will attach to any officer of the Government for the premature opening of or failure to open a bid not properly addressed and identified.

**5.  BID AND EARNEST MONEY DEPOSIT**

a.  <u>Complete online registration</u> to validate bidder identification per Paragraph 11 in these Instructions to Bidders.

b. <u>Complete Bid Form:</u>  Bidders must complete and submit the official Bid Form titled "Bid Form for Purchase of Government Real Property" accompanying this IFB.  All information and certification requested thereon must be provided.   Bids submitted which fail to furnish all information or certifications required may be summarily rejected.   The Bid Form should be filled out legibly with all erasures, strikeovers and corrections initialed by the person signing the bid.  The Bid Form must be signed and dated.  Additional bid forms are available upon request or you may photocopy the form in this IFB.

c. <u>Bid Deposit:</u>  A deposit in the amount of **$5,000,000 (Earnest Money)** delivered no less than 2 business days prior to the date and time of sealed bid opening.  Bid Deposits as provided in the Wire Transfer of Funds Instructions shown in [Attachment T](#). **A copy of the bank transfer receipt as confirmation shall be delivered to GSA by email to [Kristy.Daniells@gsa.gov](mailto:Kristy.Daniells@gsa.gov) and enclosed in the bid envelope with the Bid Form.**

   i.   Bid Deposits are deposited with the U.S. Treasury, in a non-interest bearing account.

   ii.  To assure timely refund of the bid deposit from unsuccessful bidders, an Electronic Funds Transfer (EFT) Enrollment Form must be completed and included with the Bid Form, attached to this IFB as [Attachment U](#) .

d. <u>Bidder's Financial Certification</u>: Per these Instructions to Bidders Paragraph 9. Bidder and Bidder's Financial Lender Certifications, b. such documentation that supports the Bidder's financial capability to fund its offer to close this sale shall be delivered to GSA in the bid envelope with the Bid Form.

e. <u>Bidder's Post-Conveyance Operation Certification</u>: Per these Instructions to Bidders Paragraph 10. Bidder and Bidder's Post-Award Performance Certification, such documentation that supports the Bidder's capability of fully operating the Property to the extent required to meet its acquired obligations under the Contracts for Storage and Delivery of Helium shall be delivered to GSA in the bid envelope with the Bid Form.

f. <u>DOJ Antitrust Review Documentation</u>: Per these Instructions to Bidders Paragraph 6. Bidder Documentation for Department of Justice Antitrust Review, such documentation that supports the Department of Justice's antitrust review of the purchaser and shall be delivered to GSA in the bid envelope with the Bid Form.

## 6.  BIDDER DOCUMENTATION FOR DEPARTMENT OF JUSTICE ANTITRUST REVIEW

Per the Terms of Sale paragraph 25. Antitrust & Rescission of this IFB, the following documents are to be included in the bid envelope with the Bid Form. If the information requested is not applicable or available to the bidder, a response statement of "not applicable" or "none" or "unknown", as appropriate, for an item or items listed below, is acceptable. Failure to provide a written response to the items listed below may result in a bid being determined to be non-responsive to this Invitation for Bids.

**a.  A cover sheet for the following information stating: "In response to Invitation # BLM-R-2044, for DOJ Antitrust Review"**
b.  Provide the company's actual and estimated sales of helium, in units and dollars for the current and preceding three years, any projections of future sales, and any estimated market shares in helium for the company and other significant competitors.
c.  For the company's current and anticipated agreements to procure or obtain helium (e.g., source contracts for helium), provide the location and company name of the source of the helium, quantity of helium committed, duration of the agreement, and pricing. Submit one copy of each such agreement.
d.  For the company's current and anticipated agreements to sell or provide helium to another company (including any back-to-back contracts), provide the name of customer, quantity of helium, pricing, duration of agreement, and whether it is a "back-to-back" contract and the source of the helium. Submit one copy of each "back-to-back" contract.
e.  Identify the quantity of helium owned by or committed to the company in the Cliffside Helium Reserve. Submit one copy of each agreement relating to such helium.
f.  Describe what, if any, stake the company has in Cliffside Refiners LP and/or in Cliffside Helium LLC.

g.  Identify any refining capacity owned or controlled by the company connected to the Cliffside Helium Reserve and related assets.

h.  Describe the company's assets and capabilities relating to helium infrastructure, including any transfill networks, containers to store and ship helium, and transportation equipment.

i.  Describe the company's activities and capabilities in the United States relating to the supply or sale of liquid oxygen, nitrogen, argon and carbon dioxide, including the company's sales in each (in units and dollars) and the company's capacity (e.g., the number and nameplate capacity of air separation units, volume committed under agreements for carbon dioxide).

j.  Describe how the acquisition will be financed, and provide relevant documentation, including loan commitment letters.

k.  Provide the company's complete financial statements for the current year, and preceding two years, including income statements, balance sheets, and statements of cash flow.

l.  Provide all studies, surveys, analyses and report which were prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets.

m.  Provide all studies, surveys, analyses and reports prepared by investment bankers, consultants or other third party advisors ("third party advisors") for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the bidder for the purpose of analyzing market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets that specifically relate to the acquisition of the assets.  This request requires only materials developed by third party advisors during an engagement or for the purpose of seeking an engagement.  Documents responsive to this request are limited to those produced up to one year before the date of filing.

n.  Provide all studies, survey analyses and reports evaluating or analyzing synergies and/or efficiencies prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) for the purpose of evaluating or analyzing the acquisition.  Financial models without stated assumptions need not be provided in response to this request.

## 7.   BIDS TO BE OPENED AT THE SPECIFIED TIME

It shall be the duty of each bidder to see that their bid is delivered at the time and place prescribed in this Invitation for Bids.  Bids (including modifications) received prior to the time fixed in this invitation for Bids for the opening of bids will be securely kept unopened.  No bid, modification or withdrawal, received after the time fixed in this Invitation for Bids for the opening of bids will be considered except as provided above.  After the time fixed for the opening of bids, their contents will be made public by announcement for the information of bidders and others properly interested who may be present either in person or by representative.

## 8.   LATE BIDS, MODIFICATION OF BIDS OR WITHDRAWAL OF BIDS

a.  Any bid received at the office designated in the solicitation after the exact time specified for receipt will not be considered responsive unless it is resolved before award is made and either:

  i.  It was sent by registered or certified mail not later than the fifth calendar day prior to the date specified for the receipt of bids (e.g. a bid submitted in response to a solicitation requiring receipt of bids by the 20th of the month must have been mailed by the 15th or earlier); or

  ii.  It was sent by mail (or digitally if authorized) and it is determined by the Government that the late receipt was due solely to mishandling by the Government after receipt at the Government installation.

  iii.  It was sent by courier or overnight delivery service supported by electronic delivery verification whereby the Government can verify delivery of a bid envelope to the premises of 819 Taylor St. Rm 11A30, Fort Worth, TX 76102 before the stated Bid Opening Date and Time.

b.  Any modification or withdrawal of a bid is subject to the same conditions as in a. above. A bid may also be withdrawn in person by a bidder or his authorized representative, provided his identity is made known and signs a receipt for the bid, but only if the withdrawal is made prior to the exact time set for receipt of bids.

c.  The only acceptable evidence to establish:

i. The date of mailing of a late bid, modification, or withdrawal sent either by registered or certified mail is the U.S. Postal Service postmark on the wrapper or on the original receipt from the U.S. Postal Service.  If neither postmark shows a legible date, the bid, modification, or withdrawal shall be deemed to have been mailed late.  (The term "postmark" means a printed, stamped, or otherwise placed impression that is readily identifiable without further action as having been supplied and affixed on the date of mailing by employees of the U.S. Postal Service).

ii. The time of receipt at the Government installation is the time-date stamp of such installation on the bid wrapper or other documentary evidence of receipt maintained by the installation.

iii. Electronic verification and validation that the late bid, modification, or withdrawal was delivered by a commercial parcel post company to the premises of GSA at the location of the Bid Opening at 819 Taylor St. Rm. 11A30, Fort Worth, TX 76102

d. Notwithstanding c. i) and c. ii) and c. iii) above, a late modification of an otherwise successful bid which makes its terms more favorable to the Government will be considered at any time it is received and may be accepted.

e. Bidders using certified or registered mail are cautioned to obtain a receipt showing a legible, dated postmark and to retain such receipt against the chance that it will be required as evidence that a late bid was timely made.

## 9.  BIDDER AND BIDDER'S FINANCIAL LENDER CERTIFICATIONS

a. Prohibited Entity Screening

i. To ensure that prohibited entities are unable to take part in GSA's real estate sales, GSA will determine a Bidder's as well as Bidder's Lenders eligibility for participation in the sale during registration and at prospective award. GSA will validate a prospective bidder's Lenders eligibility via the SAM.gov website. The System for Award Management (SAM.gov) is a Federal Government website that identifies entities that are in some way restricted from doing business with the Federal Government.

ii. GSA recommends that Bidders as well as Bidder's Lenders know or obtain a UEI number and CAGE Code  and  register with SAM.gov to facilitate refunds of bid deposits after the sale.

iii. Bidders as well as Bidder's Lenders will submit the following information to GSA printed on the lower right hand corner of their Sealed Bid Envelope:

1. Company name

2. UEI - Unique Entity ID - SAM.gov

3. CAGE - Commercial and Government Entity - code

iv. GSA will conduct a search of the bidder and Bidder's Lender via the SAM.gov website.

v. Cross-Check of SAM/SDN/OFAC Lists. In implementing the FHS sale, GSA will follow Executive Order 14065-mandated guidance to assure the US will not allow "the [US's] receipt of any contribution or provision of funds... from any such person" listed on the Specially Designated Nationals ("SDN") https://sanctionssearch.ofac.treas.gov/Details.aspx?id=35096, and Blocked Persons List of the Treasury Department's Office of Foreign Asset Control ("OFAC") https://sanctionssearch.ofac.treas.gov/.  GSA will validate this at minimum both (1) at bidder registration deposit or acceptance of down payment, and (2) before award. GSA intends to undertake this validation at the following levels: "Highest-level owner," " Immediate owner," and via "Unique entity identifier." See, eg, 48 C.F.R. 552.270–33.

vi. Upon completion of the process, GSA will notify bidders of their eligibility status.

b.  Financial Certification

    i.  Bidders must identify either their own financial wherewithal or an entity (Lender) capable of fully funding their purchase price of this property (a "Financial Partner"). The Financial Partner can be the same as the Bidder or a separate entity.

    The Financial Partner (or Bidder if the same) shall submit the following:

    **1.  A cover sheet for the following information stating: "In response to Invitation # BLM-R-2044, Financial Certification"**

    2.  An introduction briefly describing the firm and its location, organizational makeup, and noteworthy accomplishments.

    3.  Documentation evidencing an amount in liquid assets, not committed to other projects, and/or an in-place fund or credit facility with a minimum of the bid amount is available.

    4.  Affirmative representation stating a willingness to fund the full bid amount of the bid, within thirty (30) business days after award of the sale.

    5.  If the Bidder and Financial Partner are different firms, then a description of no more than two (2) pages of the proposed business terms of the relationship between the companies.

    6.  Describe the Financial Partner's experience working with the Bidder on funding their large projects and briefly describe the projects and the Financial Partner and the Bidder's roles in each one.

    7.  Financial Partners shall include two (2) references for each of the projects submitted. References shall be principals or officers of project owners and principals or officers of project lead clients, if such clients participated in 50% or more project execution and/or occupancy. The references must be able to provide first-hand information concerning the Financial Partner's role in the successful completion of the project.

## 10. BIDDER AND BIDDER'S POST-AWARD PERFORMANCE CERTIFICATION

a.  Bidders must identify an entity (Operation Partner) capable of fully operating the Property to the extent required to meet its acquired obligations under the Contracts for Storage and Delivery of Helium. The Operation Partner can be the same as the Bidder or a separate entity.

b.  The Operation Partner (or Bidder if the same) shall submit the following:

    **i.  A cover sheet for the following information stating: "In response to Invitation # BLM-R-2044, Post-Award Performance Certification"**

    ii.  An introduction briefly describing the firm and its location, organizational makeup, and industrial gas experience (preferably helium but not mandatory) including but not limited to, industrial gasses production, refining, and pipeline distribution.

    iii.  Affirmative representation stating a willingness to operate the Property to meet the Bidder's acquired obligations under the Contracts for Storage and Delivery of Helium, for the Bidder, after award of the sale to them.

    iv.  If the Bidder and Operation Partner are different firms, then a description of no more than two (2) pages of the proposed business terms of the relationship between the companies.

    v.  Describe the Operation Partner's experience working with the Bidder on other gas industry projects and briefly describe the projects and the Operation Partner and the Bidder's roles in each one.

    vi.  Operation Partners shall include two (2) references for each of the projects submitted. References shall be principals or officers of project owners and principals or officers of project lead beneficiaries, if such beneficiaries participated in 50% or more project execution and/or occupancy. The references must be able to provide first-hand information concerning the Operation Partner's role in the successful completion of the project.

## 11. BIDDER REGISTRATION AND DEPOSIT

a.  GSA is using its online Bidder registration to verify the identities of those who will be sending a sealed bid for this sale. Online Bidder registration is a three-step process:

1.  Complete Online Registration: Bidders must register online at RealEstateSales.gov. Click on "Register," establish a Username and Password and provide the requested account information including a valid email address. A Username and Password are used to register online for GSA's auction system and for this sale will be used to assure the sealed bids received are from the same persons who provided the Bid Deposit. The required password must be between six and fifteen characters. You will be asked to read and agree to the terms and conditions of the Website. GSA reserves the right to change the online terms and conditions. A previously registered bidder of GSAAuctions.gov can login using the established Username and Password. In the event you forget your Username or Password, or both, or are locked out from the system, it is your responsibility to obtain your Username and Password from RealEstateSales.gov. GSA staff cannot assist in retrieving a lost or forgotten Username or Password.

    GSAAuctions.gov has implemented Multi-Factor Authentication (MFA) for access to RealEstateSales.gov. Every user must register their User ID information if they have not yet set up their MFA. Once registered, you may log in using your email and password and a numeric verification code. This verification code is delivered to you by one of the delivery methods you chose during your registration process. For additional information on MFA, please review the GSAAuctions.gov FAQ page.

    You may register as either an individual or as a company and this information must be the same information provided on the Bidder Registration and Bid Form for Purchase of Government Real Property. Changes to title may be considered after bid acceptance at the discretion of the Government. If you wish to participate as an individual and a representative of a company, you must register separately for each and place bids accordingly.

    In accordance with Public Law No. 104-134, Section 31001, the Debt Collection Improvement Act of 1996, the Tax Identification Number (TIN) must be provided by anyone conducting business with the Federal Government, from which a debt to the Government may arise. Individuals cannot successfully register to bid on items without providing a TIN. A TIN is defined as an individual's Social Security Number (SSN) or business entity's Employer Identification Number (EIN). If you registered as an Individual, your SSN will be validated with your name and address. If you registered as a Company, your business identity's EIN will be validated with your company name and address. The use of an individual's SSN is subject to the Privacy Act of 1974 (5 U.S.C. Section 552a), and will be collected to verify the data submitted by the user.

    An authentication process will be conducted to confirm the identity of individuals and companies to prevent potential fraudulent bidding activity and to ensure that bidders are prepared to accept responsibility for their bidding activity and all submitted bids are valid. **The identity and credit card information you provide at registration is used strictly for authentication purposes. GSA Auctions® does not automatically charge credit cards on file.**

    For more information and assistance on the online registration process, please go to https://realestatesales.gov/html/static/faq.htm.

2.  Complete Bid Registration and Bid Form: Bidders must complete and submit the official Bid Form titled "Bidder Registration and Bid Form for Purchase of Government Real Property" accompanying this IFB. All information and certification requested thereon must be provided.  Bidder registration and bids submitted which fail to furnish all information or certifications required may be summarily rejected. The Bid Form should be filled out legibly with all erasures, strikeovers and corrections initialed by the person signing the bid. The Bid Form must be signed and dated. Additional bid forms are available upon request or you may photocopy the form in this IFB.

3.  Provide Registration Deposit:

    a. A deposit in the amount of **$5,000,000** (the "Registration Deposit") must accompany your Bidder Registration. Registration Deposits must be provided by wired funds per the Electronic Wired Funds Instructions ([Attachment T](#)) no later than 2 business days prior to the date of bid opening described in this IFB. **A copy of the bank transfer receipt as confirmation shall be delivered to GSA by email to [Kristy.Daniells@gsa.gov](mailto:Kristy.Daniells@gsa.gov) and enclosed in the bid envelope with the Bid Form.** Personal or company checks are NOT acceptable and will be returned to the sender.

    b. Only upon verification of your Registration Deposit, will your bid be considered responsive to this IFB. All Registration Deposits received will be deposited with the U.S. Treasury, in a non-interest bearing account, immediately upon receipt.

  4. <u>Delivery of Financial Certification Documentation</u>: Delivery of financial certification documentation of Bidder's access to liquid assets or available assets as proof of the Bidder's capability to purchase the property, under the terms of this IFB, Paragraph 9 of these Instructions to Bidders, must be provided with the Bid Form.

b. To complete the bidder registration process, please submit the completed Bidder Registration and Bid Form for Purchase of Government Real Property, along with the required Registration Deposit to:

    U.S. General Services Administration
    Real Property Utilization and Disposal (7PZ)
    819 Taylor Street, Room 11A30
    Fort Worth, Texas 76102
    Attn: William Rollings

c. It is the responsibility of the bidder to ensure that adequate time is available to complete the registration process as described above. The identity authentication process, if unsuccessful, may require a bidder to provide additional information by email for manual verification and may take several business days to complete. Bidders may receive a registration failure notice from registration@gsa.gov. Bidders will need to reply and provide the necessary documentation to be reviewed which may take up to 24-48 hours to validate and approve. The Government makes no representation or guarantee that any additional assistance or time will be provided to complete the registration process. No bidder will be allowed to participate in the sale until the entire registration process is complete.

d. Registration may occur any time prior to the conclusion of the auction. The Government, however, makes no representation or guarantee that your registration will be completed prior to the announced date and time for the receipt of final bids. Therefore, bidders are encouraged to register before the auction opens.

## 12. ACCEPTABLE BID

An acceptable bid is one received from a responsible bidder, whose bid, conforming to this IFB, will be most advantageous to the Government.

## 13. BID EXECUTED ON BEHALF OF BIDDER

A bid executed by an attorney or agent on behalf of the bidder shall be accompanied by an authenticated copy of their Power of Attorney or other evidence of their authority to act on behalf of the bidder.

If the bidder is a corporation, the Certificate of Corporate/Organization Bidder, included in this IFB, must be executed. The certificate must be executed under the corporate seal by some duly authorized officer of the corporation other than the officer signing the bid. In lieu of the Certificate of Corporate Bidder, there may be attached to the bid, copies of so much of the records of the corporation as will show the official character and authority of the officer signing, duly certified by the secretary or assistant secretary, under the corporate seal, to be true copies.

If the bidder is a partnership, and all partners sign the bid, with a notation that they are all general partners, the Government will not ordinarily require any further proof of the existence of the partnership. If all the partners do not sign the bid, then the names of all those except limited partners must be furnished on the bid form and the Government, in its discretion, may require evidence of the authority of the signer(s) to execute bids on behalf of

the partnership. The name(s) and signature(s) of the designated bidder(s) must be included on the Bidder Registration and Bid Form.

If the bidder is a limited liability company, a certificate of the LLC must be completed and executed by the manager and submitted with the Bidder Registration Form. The Certificate of Corporate/Organization Bidder form may be used for this purpose.

## 14. NOTICE OF ACCEPTANCE OR REJECTION

Notice by the Government of acceptance or rejection of the bid shall be deemed to have been sufficiently given when faxed, mailed or emailed to the bidder or their duly authorized representative at the fax number physical address or email address indicated on the Bid Form. The processing of a registration deposit by the Government shall not, in itself, constitute acceptance of the bidder's offer. The Government reserves the right to reject any or all bids or portions thereof for any reason.

## 15. AUCTION SUSPENSION OR CANCELLATION

The Government reserves the right to temporarily suspend or cancel the auction for any reason without accepting a bid and resume the auction or start a new auction at any time. In the event of a temporary suspension due to technical problems, or other bidding issues, the Government will determine the high bidder and the high bid amount; re-open bidding and allow the auction to proceed according to the bidding terms described herein. The Government reserves the right to cancel the sale at any time and Registration Deposits will be returned to bidders without interest or further obligation by the Government.

## 16. INCREASE OF EARNEST MONEY AND TRANSACTION CLOSING

Upon written acceptance of a bid, the Earnest Money shall be applied towards payment of the Purchaser's obligation to the Government. The full balance of the purchase price in the form of electronic wire transfer is payable within one hundred twenty (120) calendar days after acceptance of bid. At the time of closing, all monies paid by the Purchaser will be credited, without interest, toward the total purchase price.

**Within six (6) business days** of acceptance of a bid by the Government, the Purchaser agrees to deposit additional Earnest Money in the form of wired funds transfer, equal to at least **ten percent (10%) of the total bid** less any prior deposits, directly to GSA. Failure to provide these funds will result in a default and forfeiture of the Registration Deposit.

**Within thirty (30) business days** of acceptance of a bid by the Government, the Purchaser agrees to deposit additional Earnest Money in the form of wired funds transfer, equal to at least **twenty percent (20%) of the total bid** directly to GSA. Failure to provide these funds will result in a default and forfeiture of the Registration Deposit.

## 17. REFUND OF REGISTRATION DEPOSITS

Registration Deposits for their respective bids that are rejected will be refunded to bidders without interest. Refunds will only be processed to the same individual or entity identified on the Bidder Registration and Bid Form for Purchase of Government Real Property.

Registration Deposits received from the second highest bidder will be held as stipulated in Paragraph 18, Backup Bidder. All other Registration Deposits will be processed for refunds after the last day of the auction or upon written request to withdraw from the auction unless the bidder is the first or second highest bidder. Return of registration deposits by check will be processed in a timely manner but may require several days before the deposit is returned.

## 18. BACKUP BIDDER

The second-highest bidder will be the Backup Bidder. The bid of the Backup Bidder may be considered for acceptance for the duration of the Continuing Offer period described in Terms of Sale, Paragraph 17, Continuing Offers, if: 1) the original High Bidder is unable to fully complete the transaction according to the terms and conditions of the IFB; or 2) if the original High Bidder fails to provide the required 10% of the purchase price as Earnest Money. The Bidder identified as the Backup Bidder agrees that their Bid remains a bona fide offer with which their Registration Deposit may be retained without interest, until the High Bidder provides the 10% Earnest Money or completes the transaction or both, at the Government's discretion. During the Continuing Offer period, the Bidder identified as the Backup Bidder agrees that a debt to the United States of America may be created if

their deposits are in any way unavailable to the Government as provided in Terms of Sale, Paragraph 11 Revocation of Bid and Default. When the Backup Bidder is converted to the High Bidder, all terms, conditions and agreements described in the IFB are applicable to the successful bidder.

The Registration Deposit of the Backup Bidder will be returned as described in Paragraph 17, Refund of Registration Deposits, if the Backup Bidder is not converted to the High Bidder. In the event that the Government is unable to complete the transaction with the highest or backup bidder, the Government reserves the right to consider the remaining bid(s) and accept a bid that is in the best interest of the Government.

## 19. ADDITIONAL INFORMATION

GSA will provide additional copies of this IFB and make every effort to answer requests for additional information concerning the Property to facilitate preparation of bids. Each bid shall be deemed to have been made with full knowledge of all terms, conditions, and requirements contained in this IFB and any amendments made thereto prior to bid acceptance. Bidders may also review the information pertaining to the Property at https://propertydisposal.gsa.gov or RealEstateSales.gov.

## 20. WAIVER OF INFORMALITIES OR IRREGULARITIES

The Government may, at its election, waive any minor informality or irregularity in bids received.

# NOTICES, BIDDER AGREEMENTS, AND COVENANTS

Concerning the fee tracts described in 2(A) and (B), Description of Respective Property Interests, the following Notice and Covenants will be inserted in the Quitclaim Deed/Deed Without Warranty, as applicable.

## 1. HAZARDOUS SUBSTANCE NOTIFICATION

a. <u>Notice Regarding Hazardous Substance Activity.</u> Pursuant to 40 CFR 373.2 and Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA) (42 U.S.C. §9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States gives notice that no hazardous substances have been released or disposed of or stored for one year or more on the Property.

b. <u>CERCLA Covenant.</u> Grantor warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this conveyance. Grantor warrants that it shall take any additional response action found to be necessary after the date of this conveyance regarding hazardous substances located on the Property on the date of this conveyance.

   1) This covenant shall not apply:

      (a) in any case in which Grantee, its successor(s) or assign(s), or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this conveyance; OR

      (b) to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successor(s) or assign(s), or any party in possession after the date of this conveyance that:

         (i) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this conveyance; OR

         (ii) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which was known and identified to the applicable regulatory authority as of the date of this conveyance.

         (iii) in the case of a hazardous substance(s) previously unknown by Grantor and Grantee as of the date of this conveyance but which is hereafter discovered by Grantee, its successor(s) or assign(s), or any party in possession and where after such discovery, Grantee, its successor(s) or assign(s), or any party in possession thereafter causes or exacerbates a release or threatened release of such hazardous substance(s).

   2) In the event Grantee, its successor(s) or assign(s), seeks to have Grantor conduct any additional response action, and, as a condition precedent to Grantor incurring any additional cleanup obligation or related expenses, the Grantee, its successor(s) or assign(s), shall provide Grantor at least 45 days written notice of such a claim. In order for the 45-day period to commence, such notice must include credible evidence that:

      (a) the associated contamination existed prior to the date of this conveyance; and

      (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, its successor(s) or assign(s), or any party in possession.

c. <u>Access.</u> Grantor reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action. This reservation includes the right of access to and use of available utilities at reasonable cost to Grantor. These rights shall be exercisable in any case in which a remedial action, response action, or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property. Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors, and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related

to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities. Any such entry, including such activities, responses or remedial actions, shall be coordinated with the record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

d.   Non-Disturbance Clause.   Grantee covenants and agrees for itself, its heirs, successors and assigns and every successor in interest to the Property, or part thereof, that a party occupying any of the Property shall not interfere, hinder or prevent Grantor, the United States Government, and its officers, agents, employees, contractors and subcontractors, in conducting any required remedial investigations, response actions or oversight activities on the Property or adjoining property.

## 2.   HELIUM STORAGE AND DELIVERY CONTRACTS / ASSIGNMENT / INDEMNITY BY BIDDER

a.   **Identity of Helium Storage and Delivery Contracts.** The Government made and entered into eleven (11) separate Contracts for the Storage and Delivery of Helium with various parties prior to this Sale as well as a subsequent and separate 2023-2027 Contract for the Storage and Delivery of Helium to be executed prior to the closing of this sale, as more specifically set forth below, that directly impact this IFB and the Property, see Attachment N, as amended, below.

b.   **Assignment Duties of Bidder.** Bidder as Purchaser, for themselves and their successors, assigns, transferees in title, and possessors in interest in the Property, specifically understands, acknowledges, accepts, assumes, covenants, and agrees, that all terms, conditions, and agreements contained in each of the respective original and subsequent Contracts for the Storage and Delivery of Helium, are hereby fully incorporated into this IFB, and made part thereof.  In addition, Bidder's acceptance for itself, and its successors, assigns, transferees in title, and possessors in interest in the Property, of the terms, conditions, and agreements contained in each identified original and subsequent Contracts for the Storage and Delivery of Helium represents a part of the valuable consideration to be given for the benefit of the Government; Government's acceptance of Bidder's offer; and Government's Assignment of all the Contracts for the Storage and Delivery of Helium to Bidder.  Upon sale or transfer of ownership of the Federal Helium System to the Bidder, the respective original and subsequent Contracts for the Storage and Delivery of Helium will be assigned to the Bidder (see Attachment N, Attachment P1 and Attachment P2), as Purchaser, subject to the terms and conditions of the respective Contracts for the Storage and Delivery of Helium.

c.   **Assumption Duties of Bidder.** Bidder, for itself and its successors and assigns, and any transferee in title or possessor in interest in the Property, will:

   i.    take title to the Federal Helium System and accept assignment and assume the responsibilities and duties of the Government contained in the terms and conditions of the respective original and subsequent Contracts for the Storage and Delivery of Helium holders' ownership interest in their Helium stored in the Federal Helium System; and,

   ii.   allow the respective original and subsequent holders of Contracts for the Storage and Delivery of Helium to withdraw all of their Helium stored in the Federal Helium System subject to the terms and conditions of the respective Contracts for the Storage and Delivery of Helium.

   Upon sale or transfer of ownership of the Federal Helium System to Bidder, and assignment of the Government's duties and responsibilities contained in the respective Contracts for the Storage and Delivery of Helium, to the Bidder; Bidder, as Purchaser, for themselves, their successors and assigns, and any transferee in title or possessor in interest of the Property, agrees to release the United States from any and all performance obligations under the respective Helium Storage Delivery Contracts upon conveyance of title to the Purchaser.

d.   **Indemnity of the Government**.   The Bidder as Purchaser, for themselves and their successors and assigns, and any transferee in title or possessor in interest in the Property, agrees to indemnify and hold the Government harmless for any claim, dispute, lawsuit, or other judicial process in connection with the enforcement rights of the respective original and subsequent Contracts for the Storage and Delivery of

Helium that arise and are incurred after the date of the conveyance of title to the Property, and more specifically, are in any way connected with:

    i.    the Federal Helium System subject to the respective original and subsequent Contracts for the Storage and Delivery of Helium holders' ownership interest in their Helium stored in the Federal Helium System;

    ii.    the obligations assumed by Bidder, for themselves and their successors and assigns, and any transferee in title or possessor in interest, of the Property under the respective original and subsequent Contract for the Storage and Delivery of Helium to deliver their Helium stored in the Federal Helium System to the respective original and subsequent Contract for the Storage and Delivery of Helium holders; and

    iii.    Bidder, for themselves and their successors and assigns, any transferee in title, or possessor in interest of the Property, will allow the respective original and subsequent Contract for the Storage and Delivery of Helium holders to withdraw all of their Helium stored in the Federal Helium System subject to the terms and conditions of the respective Helium Storage and Delivery Contracts.

e.    **Survivability Clause**  The Bidder as Purchaser, for themselves and their successors and assigns, and any transferee in title or possessor in interest in the Property, agrees that all terms, conditions, covenants, and agreements contained in Section 2. c. and Section 2. d., above, shall survive the conveyance and transfer of title in the Property identified in this IFB for the terms called for under the respective Contracts for the Storage and Delivery of Helium assigned to the Purchaser by the Government.

## 3.  NOTICE OF DUTY TO COMPLY WITH GOVERNMENT REGULATIONS COVERING OWNERSHIP, USE AND MAINTENANCE OF HELIUM PIPELINE

a.    Bidder is hereby on notice that once it acquires title to the Property, it shall be the sole responsibility of Bidder, its respective successors, assigns, transferees in title and possessors in interest in the Property, to identify and fully comply with all applicable Federal, State, and local laws, rules and regulations covering the ownership, operation, and maintenance of the Helium Pipeline System.  This includes the transportation of helium and/or any other products, whether gaseous or liquid, that may flow through the pipeline to be conveyed by the Government to Bidder now, or at any time in the future.

## 4.  NOTICE OF FOREIGN OWNERSHIP RULES AND RESTRICTION COVERING THIS PROPERTY

a.    Bidder is hereby on notice that once it acquires title to the Property, it shall be the sole responsibility of Bidder, its respective successors, assigns, transferees in title and possessors in interest in the Property, to identify and fully comply with all applicable Federal and State laws, rules, and regulations covering foreign investment and ownership of real estate within the United States of America and the applicable affected states.

## 5.  <u>OTHER ENVIRONMENTAL NOTICES</u>

a.    <u>NOTICE OF THE PRESENCE OF ASBESTOS - WARNING!</u>

    1)    The Grantee is warned that the property contains asbestos-containing materials.  Unprotected or unregulated exposures to asbestos in product manufacturing, shipyard, and building construction workplaces have been associated with asbestos-related diseases.  Both the Occupational Safety and Health Administration (OSHA) and the Environmental Protection Agency (EPA) regulate asbestos because of the potential hazards associated with exposure to airborne asbestos fibers.  Both OSHA and EPA have determined that such exposure increases the risk of asbestos-related diseases, which include certain cancers and which can result in disability or death.

    2)    Grantee is invited, urged and cautioned to inspect the property as to its asbestos content and condition and any hazardous or environmental conditions relating thereto.  The disposal agency will assist Grantee in obtaining any authorization(s) which may be required in order to carry out any such

inspection(s). Grantee shall be deemed to have relied solely on their own judgment in assessing the overall condition of all or any portion of the property including, without limitation, any asbestos hazards or concerns.

3)  No warranties either express or implied are given with regard to the condition of the property including, without limitation, whether the property does or does not contain asbestos or is or is not safe for a particular purpose.

4)  The description of the property set forth in the Conveyance Document and any other information provided therein with respect to said property is based on the best information available to the disposal agency and is believed to be correct, but any error or omission, including but not limited to the omission of any information available to the agency having custody over the property and/or any other Federal agency, shall not constitute grounds for any claim by the Grantee against the Government.

5)  The Government assumes no liability for damages for personal injury, illness, disability or death, to the Grantee, or to the Grantee's successors, assigns, employees, invitees, or any other person subject to Grantee's control or direction, or to any other person, including members of the general public, arising from or incident to the purchase, transportation, removal, handling, use, disposition,  or other activity causing or leading to contact of any kind whatsoever with asbestos on the property which is the subject of this conveyance, whether the Grantee, its successors or assigns has or have properly warned or failed properly to warn the individual(s) injured. The Grantee further agrees that in its use and occupancy of the property it will comply with all Federal, State, and local laws relating to asbestos.

**b.  <u>Notice of Lead–Based Paint for Non-Residential Real Property Constructed Prior to 1978</u>**

Every purchaser of any interest in real property on which a building was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning.  Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory.  Lead poisoning also poses a particular risk to pregnant women.  The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards.  A risk assessment or inspection for possible lead-based paint hazards is recommended prior to converting the property to a residential dwelling.

**c.  <u>Notice of of Pesticide Application</u>**

The Grantee is notified that the Property may contain the presence of pesticides that have been applied in the management of the property.  The United States knows of no use of any registered pesticide in a manner inconsistent with its labeling and believes that all applications were made in accordance with the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA -- 7 U.S.C. Sec. 136, et seq.), its implementing regulations, and according to the labeling provided with such substances.  Furthermore, that in accordance with the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA -- 42 U.S.C. Sec. 9601, et seq.), the use of such substances is not a "release" (as defined in CERCLA, 42 U.S.C. Sec. 9601 (22)), but instead the use of a consumer product in consumer use (42 U.S.C. Sec. 9601(9)), and the application of a pesticide product registered under FIFRA for which recovery for response costs is not allowed (42 U.S.C. Sec. 9607(i)).

**d.  <u>Notice of PCB History</u>**

Grantee, for itself and its successors and assigns, covenants and agrees that in the use and occupancy of the Property, or any part thereof, they are responsible for compliance with all Federal, State and local laws relating to PCB and mercury; and that, by virtue of this deed, Grantor assumes no liability for damages for personal injury, illness, disability or death, to the Grantee or to Grantee's successors, assigns, employees, invitees, or to any other person subject to the control or direction of Grantee, its successors or assigns, or to any other person, including members of the general public, arising from or incident to the purchase, transportation, removal, handling, use, disposition, or other activity causing or leading to contact of any kind whatsoever with PCB and mercury on the Property described in this

deed, whether the  Grantee, its successors or assigns has or have properly warned or failed properly to warn the individual(s) injured.

**6.   AS-IS, WHERE-IS PROVISION**

a.   GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PROPERTY STRICTLY "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PROPERTY AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PROPERTY'S CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PROPERTY. EXCEPT AS SET FORTH IN SECTION c., BELOW, THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PROPERTY.

b.   NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PROPERTY, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE PROPERTY FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PROPERTY.

c.   NOTHING IN THIS "AS IS, WHERE IS" PROVISION WILL BE CONSTRUED TO MODIFY OR NEGATE THE GRANTOR'S OBLIGATION UNDER THE CERCLA COVENANT OR ANY OTHER STATUTORY OBLIGATIONS.

# BIDDER REGISTRATION AND BID FORM
# FOR PURCHASE OF GOVERNMENT REAL PROPERTY

**Federal Helium Facility and 800 MMcf of Crude Helium at Cliffside**
**13301 Brickplant Road, Amarillo, Texas**
**SALE # FTWOR722026001**
**IFB #:BLM-R-2044**
**REGISTRATION DEPOSIT: $5,000,000.00**

USERNAME: _____
(as established at RealEstateSales.gov)

UEI#:

CAGE Code:

---

**Bidder Information:** Please print or type legibly.

Name: _____

Address: _____

City: _____ State:_____ Zip _____

Phone: (_____)_____ Fax: (_____)_____

Email: _____

BIDDER REPRESENTS THAT HE/SHE OPERATES AS (check which applies) see Instructions to Bidders, Paragraph 12, Bid Executed on Behalf of Bidder for instructions:

☐ An individual _____

☐ A partnership consisting of _____

☐ A trustee, acting for _____

**THE FOLLOWING MUST PROVIDE THEIR CERTIFICATE OF CORPORATE/ORGANIZATION BIDDER – SEE NEXT PAGE**

☐ A limited liability partnership consisting of _____

☐ A corporation, incorporated in the State of _____

☐ A limited liability company_____

☐ Other _____

---

**Registration Deposit** (check one):

Five million dollars delivered by wire transfer of fund per instructions in Attachment U

---

**Certification and Authorization**

The undersigned bidder hereby offers and agrees to purchase the Property as described in the accompanying Invitation for Bids (IFB) for any bids placed by the undersigned and if any bid is accepted by the Government within one hundred (100) calendar days after the auction close date. This Bid Form is made subject to the terms of IFB No. BLM-R-2044 including the Property Description, Terms of Sale, Instructions to Bidders, Special Terms of Sale, Notices and Covenants, Bidder Registration and Bid Form For Purchase of Government Real Property, Lease, Historic Preservation Memorandum of Agreement, and any associated amendments to the IFB, all of which are incorporated herein and by reference made a part of any bid placed. B. Information collected herein is governed by the Privacy Act of 1974 (5 U.S.C. Section 552a) and is being collected to register a bidder for the sale of Government property.

Signature: _____   Date: _____

---

**Send Registration Form with Registration Deposit to:**

U.S. General Services Administration          FAX: 817-978-2063
Real Property Utilization and Disposal (7PZ)  EMAIL: william.rollings@gsa.gov
819 Taylor Street, Room 11A30
Attn: William Rollings

---

# CERTIFICATE OF CORPORATE/ORGANIZATION BIDDER

**(For use with Bidder Registration and Bid Form for Purchase of Government Real Property see Instructions to Bidders, Paragraph 12, Bid Executed On Behalf Of Bidder for instructions)**

**Federal Helium Facility**
**13301 Brickplant Road**
**Amarillo, Texas 79124**

## THIS FORM MUST BE SIGNED BY SOMEONE OTHER THAN THE BIDDER
### (UNLESS THE BIDDER IS THE SOLE AUTHORIZED REPRESENTATIVE OF THE CORPORATION/ORGANIZATION).

I, _____, certify that I am _____
(Secretary or Other Title)

of the Corporation/Organization named as bidder herein; that _____
(Name of Authorized Representative)

who signed this Bid Form for Purchase of Government Property on behalf of the bidder was then

_____ of said Corporation/Organization; that said bid was
(Official Title)

duly signed for and on behalf of said Corporation/Organization by authority of its governing body and is within the

scope of its corporate/organization powers.

_____
(Signature of Certifying Officer/Manager)

(Corporate Seal Here, if applicable)

# Exhibit 1 - Map #1 of Improvements



## Exhibit 2 - Map #2 of Improvements



## Exhibit 3 - System Improvements Process



## Exhibit 4 - Wells Included in the Sale

| Well Name | Extraction Only | Extraction and Injection |
|:---:|:---:|:---:|
| Bivins A-2 | X | |
| Bivins A-3 | | X |
| Bivins A-4 | X | |
| Bivins A-5 | X | |
| Bivins A-6 | | X |
| Bivins A-7 | X | |
| Bivins A-9 | X | |
| Bivins A-11 | X | |
| Bivins A-13 | | X |
| Bivins A-14 | | X |
| Bivins A-15 | X | |
| Bivins B-1 | X | |
| Bivins B-2 | X | |
| Bush A-2 | X | |
| Bush A-3 | X | |
| Bush A-4 | X | |
| Bush A-5 | X | |
| Bush A-8 | X | |
| Bush A-9 | X | |
| Bush A-11 | X | |
| Bush B-1 | X | |
| Fuqua A-1 | X | |
| Fuqua A-3 | X | |

## Exhibit 5 - Map of Wells



## Exhibit 6 - Map of Gas Storage Rights



# Attachment A
## SAMPLE QUITCLAIM DEED
## (Satanta Facility)

---

STATE OF TEXAS      )(
                      )(                            KNOW ALL BY THESE PRESENTS:
COUNTY OF POTTER    )(

THIS QUITCLAIM DEED (hereinafter collectively referred to as the "Quitclaim Deed")  is made this __ day of, _____, 2022, by and between the UNITED STATES OF AMERICA, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

I.   CONSIDERATION FOR THE QUITCLAIM DEED

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2. The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

       (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,
       (ii) the QUITCLAIM DEED (Satanta, Kansas); and,
       (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,
       (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,
       iv) the ASSIGNMENT OF CRUDE HELIUM PIPELINE RIGHT-OF-WAY EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,
       (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,
       (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,
       (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf , MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,
       3.  The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Quitclaim Deed.

II.  CONVEYANCE OF THE QUITCLAIM DEED

Grantor, for the valuable consideration described in Section I, above,  together with the Grantee's covenant and agreement that Grantee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications,  from any cause whatsoever, conditions and agreements hereinafter set forth in this Quitclaim Deed, does hereby quitclaims to the Grantee, its successors and assigns, under and subject to the reservations, restrictions, covenants, exceptions, notifications, conditions, and agreements hereinafter set forth, all right, title and interest in the following described property situated in  Haskell County, State of Kansas, more particularly described as follows:

    A tract of land containing 12.00 acres, more or less, located in the Southeast corner of Section 7, Township 30 South, Range 33 West of the Sixth Principal Meridian, Haskell County, Kansas, lying south of the right-of-way of U.S. Highway 56, being more particularly described as follows, to wit:Beginning at the Southeast corner of the aforesaid Section 7; THENCE Westerly along the South line of said Section 7 a distance of 556.67 feet to a point; THENCE Northerly parallel with the East line of said Section 7 a distance of 826.55 feet to a point on the existing Southeasterly right-of-way line of U.S. Highway 56;

THENCE Northeasterly along said existing Southeasterly right-of-way line of said U.S. Highway 56 a distance of 600.95 feet to a point on said East line of said Section 7 a distance of 1051.50 feet to the point of beginning;

LESS AND EXCEPT the following:A 1.38 acre tract of land, more or less, from the Southeast corner of Section 7, thence North 1051.50 feet for a point of beginning; THENCE South 67 degrees 52 minutes West along the Southeasterly line of the existing right-of-way of U.S. Highway 56 a distance of 600.95 feet; THENCE South a distance of 107.96 feet; THENCE North 67 degrees 52 minutes East a distance of 600.95 feet to a point in the East line of said Section 7; THENCE North a distance of 107.96 feet to the point of beginning;

(hereinafter referred to as the "Property")

TO HAVE AND TO HOLD the Property, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications, conditions, and agreements hereinafter set forth in this Quitclaim Deed, either in law or in equity, for the use, benefit and behalf of the Grantee, its successors and assigns forever.

II. CONVEYANCE OF QUITCLAIM DEED WITHOUT WARRANTY

As a material part of the Consideration for this Quitclaim Deed, Government and Grantee mutually covenant and agree that Grantee, for itself, and its successors and assign, accepts this Quitclaim Deed "WITHOUT WARRANTY" and "AS IS" with all latent and patent defects including, but not limited, that there is no warranties to the Property given by Government as to title, particular financial value or is fit for a particular purpose. Grantee, for itself, and its successors and assigns, acknowledges, and stipulates that Grantee, is not relying upon any representation, statement, or other assertion with respect to condition of the Property but is relying upon Grantee's own examination of the Property. Grantee, for itself, and its successors and assigns, takes the Property with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.

III.  SPECIAL AND GENERAL EXCEPTIONS AFFECTING THE PROPERTY

This Quitclaim Deed covering the Property is expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Property:

A.  All existing permits, servitudes, easements and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits and canals on, over and across said land., whether or not of record.

B.  All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditches, and reservoir rights, as well as all existing interests reserved or outstanding in third parties in and to oil, gas, and/or minerals, whether or not of record.

C.  All existing interests in third parties created by the Federal Helium Reserve System Storage and Delivery Contracts entered with Grantor  created prior to this Quitclaim Deed, whether or not of record.

D.  All other existing interests reserved by any grantor(s) in chain of title unto said grantor(s), their respective successors and assigns, which affect any portion of the Property interest(s) hereinabove described, whether or not of record.

E.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Property.

F.  Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules  and regulations and water conservancy district rules and regulations, filed of public record and affecting all or any portion of the subject property.

IV.  CERCLA NOTICES, COVENANTS AND RESERVATIONS

A.  Notice of Hazardous Substance Activity.  Pursuant to 40 CFR § 373.2 and Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA) (42 U.S.C. § 9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States of America gives notice that no hazardous substances have been released, or disposed of, or stored for one year or more on the Property.

B.  CERCLA Covenant.  Grantor warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this Quitclaim Deed Without Warranty.  Grantor warrants that it shall take any additional response action found to be necessary after the date of this Quitclaim Deed Without Warranty regarding hazardous substances located on the Property on the date of this Quitclaim Deed.

1.  This covenant shall not apply:

a.  in any case in which Grantee, its successor(s) or assign(s), or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this Quitclaim Deed; OR

b.  to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successor(s) or assign(s), or any party in possession after the date of this Quitclaim Deed that either:

(1) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this Quitclaim Deed; OR

(2) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which were known and identified to the applicable regulatory authority as of the date of this Quitclaim Deed; OR

(3) in the case of a hazardous substance(s) previously unknown by Grantor and Grantee as of the date of this conveyance but which is hereafter discovered by Grantee, its successor(s) or assign(s), or any party in possession and where after such discovery, Grantee, its successor(s) or assign(s), or any party in possession thereafter causes or exacerbates a release or threatened release of such hazardous substance(s).

2.  In the event Grantee, their heir(s), successor(s) or assign(s), seeks to have Grantor conduct or pay for any additional response action, and, as a condition precedent to Grantor incurring any additional cleanup obligation or related expenses, the Grantee, its heir(s), successor(s) or assign(s), shall provide Grantor at least 45 days written notice of such a claim and provide credible evidence that:  (a) the associated contamination existed prior to the date of this Quitclaim Deedy; and (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, their heir(s), successor(s) or assign(s), or any party in possession.

C.  Access.  Grantor reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action.  This reservation includes the right of access to and use of available utilities at reasonable cost to Grantor.  These rights shall be exercisable in any case in which a remedial action, response action or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property.  Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities.  Any such entry, including such activities, responses or remedial actions, shall be coordinated with the record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

D.  Non-Disturbance Clause.  Grantee covenants and agrees for themselves, their heirs, successors and assigns and every successor in interest to the Property, or part thereof, that a party occupying any of the Property shall not interfere, hinder or prevent Grantor, the United States Government, and its officers, agents, employees, contractors and subcontractors, in conducting any required remedial investigations, response actions or oversight activities on the Property or adjoining property.

V.   OTHER ENVIRONMENTAL COVENANTS

Grantee covenants for itself, its successors and assigns, or any party-in-possession of the Property, or any part thereof, that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the property hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to Grantee, its successors or assigns, or any party-in-possession of the Property, or any part thereof, to enforce any of the following covenants herein agreed.

A.  Notice of Lead–Based Paint for Non-Residential Real Property Constructed Prior to 1978.  Every purchaser of any interest in real property on which a building was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning.  Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory.  Lead poisoning also poses a particular risk to pregnant women.  The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards.  A risk assessment or inspection for possible lead-based paint hazards is recommended prior to converting the property to a residential dwelling.

B.  Notice of the Presence of Asbestos - Warning!

1.  The Grantee is warned that the Property contains asbestos-containing materials.  Unprotected or unregulated exposures to asbestos in product manufacturing, shipyard, and building construction workplaces have been associated with asbestos-related diseases.  Both the Occupational Safety and Health Administration (OSHA) and the Environmental Protection Agency (EPA) regulate asbestos because of the potential hazards associated with exposure to airborne asbestos fibers.  Both OSHA and EPA have determined that such exposure increases the risk of asbestos-related diseases, which include certain cancers and which can result in disability or death.

2.  Grantee is invited, urged and cautioned to inspect the Property as to its asbestos content and condition and any hazardous or environmental conditions relating thereto.  The disposal agency will assist Grantee in obtaining any authorization(s) which may be required in order to carry out any such inspection(s).  Grantee shall be deemed to have relied solely on its own judgment in assessing the overall condition of all or any portion of the Property including, without limitation, any asbestos hazards or concerns.

3.  No warranties either express or implied are given with regard to the condition of the Property including, without limitation, whether the property does or does not contain asbestos or is or is not safe for a particular purpose.

4.  The description of the property set forth in the Quitclaim Deed and any other information provided therein with respect to said property is based on the best information available to the disposal agency and is believed to be correct, but any error or omission, including but not limited to the omission of any information available to the agency having custody over the property and/or any other Federal agency, shall not constitute grounds for any claim by the Grantee against the Government.

5.  The Government assumes no liability for damages for personal injury, illness, disability or death, to the Grantee, or to the Grantee's successors, assigns, employees, invitees, or any other person subject to Grantee's control or direction, or to any other person, including members of the general public, arising from or incident to the purchase, transportation, removal, handling, use, disposition, or other activity causing or leading to contact of any kind whatsoever with asbestos on the property which is the subject of this conveyance, whether the Grantee, its successors or assigns has or have properly warned or failed properly to warn the individual(s) injured.

6.  The Grantee further agrees that in its use and occupancy of the Property it will comply with all Federal, State, and local laws relating to asbestos.

C.  Pesticides Disclosure.  The Grantee is notified that the Property may contain the presence of pesticides that have been applied in the management of the property.  The United States knows of no use of any registered pesticide in a manner inconsistent with its labeling, and believes that all applications were made in accordance with the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA -- 7 U.S.C. § 136, et seq.), its implementing regulations, and according to the labeling provided with such substances. Furthermore, that in accordance with the CERCLA (42 U.S.C. § 9601, et seq.), the use of such substances is not a "release" (as defined at 42 U.S.C. § 9601(22)), but instead the use of a consumer product in consumer use (42 U.S.C. § 9601(9)), and the application of a pesticide product registered under FIFRA for which recovery for response costs is not allowed (42 U.S.C. § 9607(i)).

VI.  MISCELLANEOUS NOTICES, TERMS, CONDITIONS, AGREEMENTS, AND COVENANTS

Except as otherwise provided by 42 U.S.C. § 9620(h)(3), Grantee covenants for themselves, their heirs, assigns and every successor in interest to the Property herein described or any part thereof that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the Property hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to any successor in title to this conveyance to enforce any of the following covenants herein agreed.

A.  AS-IS, WHERE-IS PROVISION

1.  EXCEPT AS PROVIDED BELOW, GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PROPERTY STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PROPERTY AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PROPERTY'S CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PROPERTY.  EXCEPT AS SET FORTH IN SECTION VI. A. 3., BELOW, THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY

OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PROPERTY.

2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PROPERTY, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PROPERTY FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PROPERTY.

3.  NOTHING IN THIS "AS IS, WHERE IS" PROVISION WILL BE CONSTRUED TO MODIFY OR NEGATE THE GRANTOR'S OBLIGATION UNDER THE CERCLA COVENANT OR ANY OTHER STATUTORY OBLIGATIONS.

IN WITNESS WHEREOF, the United States of America has caused these presents to be executed this _____ day of _____, 2022.

UNITED STATES OF AMERICA

> Acting by and through the
> Secretary of Department of Interior,
> Bureau of Land Management
> By: _____

## Attachment B
### SAMPLE GAS GRANT WITHOUT WARRANTY - FUQUA

STATE OF TEXAS       )(

                          )(                          KNOW ALL BY THESE PRESENTS:

COUNTY OF POTTER      )(

THIS GAS GRANT WITHOUT WARRANTY (hereinafter collectively referred to as the "Gas Grant") ") is made this __ day of, _____, 2022, by and between the UNITED STATES OF AMERICA, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties the ("Parties").

I.   CONSIDERATION FOR THE GAS GRANT

1. All good and valuable consideration in the amount of _____and no/100 Dollars ($____ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

       (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

       (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

       (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

       (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

       (v) the ASSIGNMENT OF CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

       (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

       (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

       (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

       3.  The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Gas Grant.

II.  CONVEYANCE OF THE GAS GRANT

Grantor, for the valuable consideration described in Section I, above, together with the Grantee's covenants and agreements that Grantee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, termination rights, reversion rights from any cause whatsoever, conditions and agreements hereinafter set forth in this Gas Grant, does hereby grants, convey, remise, nt to the Grantee, its successors and assigns, WITHOUT WARRANTY, under and subject to the reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, termination rights, reversion rights for any cause whatsoever, and agreements hereinafter set forth, hereby convey and grant all right, title and interest in the following described property situated in Potter County, State of Texas, more particularly described as follows:

    All gas in or under, or which may be hereafter be found in or under and produced from the Lands described as Lists 1 to 4, inclusive, situated on or adjacent to, the Cliffside Structure in Potter County, State of Texas, as more specifically described in that certain Contract of Sale and Form of Gas Grant entered into between Fuqua Land and Cattle Company, a Texas corporation, and the United States of America, dated April 17, 1930, filed for record June 4, 1930, and recorded June 11, 1930, in Deed Book 205, Pages 321-329, of the records of the Office of the Potter County Clerk, Texas which is attached hereto, marked "Attachment 1" ( the "Original Acquisition Gas Grant") and which is fully incorporated into this Gas Grant, and made a part hereof; RESERVING, HOWEVER, similar rights to the owners of oil and other minerals not hereby conveyed, and subject to the provisions of the original Gas Grant.

(the "Property").

TO HAVE AND TO HOLD the Property, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications,  third party oil owner rights, termination rights, reversion rights from any cause whatsoever conditions and agreements hereinafter set forth in this Gas Grant, either in law or in equity, for the use, benefit and behalf of the Grantee, its successors and assigns forever.

III. CONVEYANCE OF GAS GRANT WITHOUT WARRANTY

 As a material part of the Consideration for this Gas Grant, Government and Grantee mutually covenant and agree that Grantee, for itself, and its successors and assign, accepts this Gas Grant "WITHOUT WARRANTY" and "AS IS" and "WHERE IS" and with all latent and patent defects including, but not limited to the agreement of the Parties there is no warranty by Government that the Property to title, particular financial value or is fit for a particular purpose. Grantee, for itself, and its successors and assigns, acknowledges, and stipulates that Grantee, is not relying upon any representation, statement, or other assertion with respect to the condition of the Property but is relying upon Grantee's own examination of the Property. Grantee, for itself, and its successors and assigns, takes the Property with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.

IV.  SPECIAL AND GENERAL EXCEPTIONS AFFECTING THE PROPERTY

This Gas Grant covering the Property is expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Property:

A.  All existing permits, servitudes, easements and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits and canals on, over and across said land., whether or not of record.

B.  All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditches, and reservoir rights, as well as all existing interests reserved or outstanding in third parties in and to oil, gas, and/or minerals, whether or not of record.

C.  All existing interests in third parties created by the Federal Helium Reserve System  Storage and Delivery Contracts entered with Grantor as well as the Assignment and Assumption of Obligations of 2.2bfc, more or less, of Purchased Helium Storage Contract  prior to or simultaneously with this Gas Grant, whether or not of record.

D.  All other existing interests reserved by any grantor(s) in chain of title unto said grantor(s), their respective successors and assigns, which affect any portion of the Property interest(s) hereinabove described, whether or not of record.

E.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Property.

F.  Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules and regulations and water conservancy district rules and regulations, of public record and affecting all or any portion of the subject property.

V.  CERCLA NOTICES, COVENANTS AND RESERVATIONS

A.  Notice of Hazardous Substance Activity.  Pursuant to 40 CFR § 373.2 and Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA) (42 U.S.C. § 9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States of America gives notice that no hazardous substances have been released, or disposed of, or stored for one year or more on the Property.

B.  CERCLA Covenant.  Grantor warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this Gas Grant Without Warranty.  Grantor warrants that it shall take any additional response action found to be necessary after the date of this Gas Grant Without Warranty regarding hazardous substances located on the Property on the date of this Gas Grant.

1.  This covenant shall not apply:

a.  in any case in which Grantee, its successor(s) or assign(s), or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this Gas Grant Without Warranty; OR

b.  to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successor(s) or assign(s), or any party in possession after the date of this Gas Grant Without Warranty that either:

(1) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this Gas Grant Without Warranty; OR

(2) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which were known and identified to the applicable regulatory authority as of the date of this Gas Grant Without Warranty; OR

(3) in the case of a hazardous substance(s) previously unknown by Grantor and Grantee as of the date of this conveyance but which is hereafter discovered by Grantee, its successor(s) or assign(s), or any party in possession and where after such discovery, Grantee, its successor(s) or assign(s), or any party in possession thereafter causes or exacerbates a release or threatened release of such hazardous substance(s).

2. In the event Grantee, its heir(s), successor(s) or assign(s), seeks to have Grantor conduct or pay for any additional response action, and, as a condition precedent to Grantor incurring any additional cleanup obligation or related expenses, the Grantee, its heir(s), successor(s) or assign(s), shall provide Grantor at least 45 days written notice of such a claim and provide credible evidence that:  (a) the associated contamination existed prior to the date of this Gas Grant Without Warranty; and (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, its heir(s), successor(s) or assign(s), or any party in possession.

C. Access.  Grantor reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action.  This reservation includes the right of access to and use of available utilities at reasonable cost to the Grantor.  These rights shall be exercisable in any case in which a remedial action, response action or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property.  Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities.  Any such entry, including such activities, responses or remedial actions, shall be coordinated with the record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

D. Non-Disturbance Clause.  Grantee covenants and agrees for itself, its heirs, successors and assigns and every successor in interest to the Property, or part thereof, that a party occupying any of the Property shall not interfere, hinder or prevent Grantor, the United States Government, and its officers, agents, employees, contractors and subcontractors, in conducting any required remedial investigations, response actions or oversight activities on the Property or adjoining property.

VI.  MISCELLANEOUS NOTICES, TERMS, CONDITIONS, AGREEMENTS, AND COVENANTS

Except as otherwise provided by 42 U.S.C. § 9620(h)(3), Grantee covenants for itself, its heirs, assigns and every successor in interest to the Property herein described or any part thereof that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the Property hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to any successor in title to this conveyance to enforce any of the following covenants herein agreed.

A.  AS-IS, WHERE-IS PROVISION

1.  GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PROPERTY STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PROPERTY AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PROPERTY'S CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PROPERTY.  EXCEPT AS SET FORTH IN SECTION VI. A. 3., BELOW, THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE

MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PROPERTY.

2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PROPERTY, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PROPERTY FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PROPERTY.

3.  NOTHING IN THIS "AS IS, WHERE IS" PROVISION WILL BE CONSTRUED TO MODIFY OR NEGATE THE GRANTOR'S OBLIGATION UNDER THE CERCLA COVENANT OR ANY OTHER STATUTORY OBLIGATIONS.

IN WITNESS WHEREOF, the United States of America has caused these presents to be executed this _____ day of February, 2019.

UNITED STATES OF AMERICA

Acting by and through the
Secretary of the Department of Interior,
Bureau of Land Management
By: _____

ATTACHMENT 1 - ORIGINAL ACQUISITION GAS GRANT

# Attachment C
## SAMPLE GAS GRANT WITHOUT WARRANTY - W BUSH

STATE OF TEXAS                    )(
                                  )(                    KNOW ALL BY THESE PRESENTS:
COUNTY OF POTTER                  )(

THIS GAS GRANT WITHOUT WARRANTY (hereinafter collectively referred to as the "Gas Grant") is made this __ day of, _____, 2022, by and between the UNITED STATES OF AMERICA, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

I.   CONSIDERATION FOR THE GAS GRANT

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

      (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

      (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

      (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

      (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

      (v)  the ASSIGNMENT OF CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

      (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

      (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM; and,

      (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

      3.  The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Gas Grant.

II.  CONVEYANCE OF THE GAS GRANT

Grantor, for the valuable consideration described in Section I, above, together with the Grantee's covenant and agreement that Grantee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, termination rights, reversion rights from any cause whatsoever, conditions and agreements hereinafter set forth in this Gas Grant, does hereby grants, conveys , and remises to the Grantee, its successors and assigns, WITHOUT WARRANTY, under and subject to the reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, conditions, and agreements hereinafter set forth, all right, title and interest in the following described property situated in Potter County, State of Texas, more particularly described as follows:

      All gas in or under, or which may be hereafter be found in or under and produced from the Lands described as Lists 1 to 5, inclusive, situated under or adjacent to, the Cliffside Helium Enrichment Unit in Potter County, State of Texas, as more specifically described in that certain Gas Grant entered into between William H. Bush and Ruth G. Bush, Husband and Wife, and the United States of America, dated July 19, 1930, filed for record September 15, 1930, and recorded September 16, 193030, in Deed Book 209, Pages 469-477, of the records of the Office of the Potter County Clerk, Texas which is attached hereto, marked "ATTACHMENT 1" (the Original Acquisition Gas Grant), and which is fully incorporated into this Gas Grant, and made a part hereof; RESERVING, HOWEVER, similar rights to the owners of oil and other minerals not hereby conveyed, and subject to the provisions of the original Gas Grant (the "Property").

TO HAVE AND TO HOLD the Property, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications,  third party oil owner rights, conditions, and agreements hereinafter set forth in this Gas Grant, either in law or in equity, for the use, benefit and behalf of the Grantee, its successors and assigns forever.

II. CONVEYANCE OF GAS GRANT WITHOUT WARRANTY

 As a material part of the Consideration for this Gas Grant, Government and Grantee mutually covenant and agree that Grantee, for itself, and its successors and assign, accepts this Gas Grant "WITHOUT WARRANTY" and "AS IS"and "WHERE IS" with all latent and patent defects including, but not limited to the agreement of the Parties there is no warranty by Government that the Property to title, particular financial value or is fit for a particular purpose. Grantee, for itself, and its successors and assigns, acknowledges, and stipulates that Grantee, is not relying upon any representation, statement, or other assertion with respect to the condition of the Property but is relying upon Grantee's own examination of the Property. Grantee, for itself, and its successors and assigns, takes the Property with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.

III.  SPECIAL AND GENERAL EXCEPTIONS AFFECTING THE PROPERTY

This Gas Grant covering the Property is expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Property:

A.  All existing permits, servitudes, easements and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits and canals on, over and across said land, whether or not of record.

B.  All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditches, and reservoir rights, as well as all existing interests reserved or outstanding in third parties in and to oil, gas, and/or minerals, whether or not of record.

C.  All existing interests in third parties created by the Federal Helium Reserve System Storage and Delivery Contracts as well as the Assignment and Assumption of Obligations of 2.2bfc, more or less, of Purchased Helium Storage Contract Without Warranty entered with Grantor created prior to or simultaneous with this Gas Grant, whether or not of record.

D.  All other existing interests reserved by any grantor(s) in chain of title unto said grantor(s), their respective successors and assigns, which affect any portion of the Property interest(s) hereinabove described, whether or not of record.

E.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Property.

F.  Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules  and regulations and water conservancy district rules and regulations of public record and affecting all or any portion of the subject property.

IV.  CERCLA NOTICES, COVENANTS AND RESERVATIONS

A.  Notice of Hazardous Substance Activity.  Pursuant to 40 CFR § 373.2 and Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA) (42 U.S.C. § 9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States of America gives notice that no hazardous substances have been released, or disposed of, or stored for one year or more on the Property.

B.  CERCLA Covenant.  Grantor warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this Gas Grant Without Warranty.  Grantor warrants that it shall take any additional response action found to be necessary after the date of this Gas Grant Without Warranty regarding hazardous substances located on the Property on the date of this Gas Grant.

1.  This covenant shall not apply:

a.  in any case in which Grantee, its successor(s) or assign(s), or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this Gas Grant Without Warranty; OR

b.  to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successor(s) or assign(s), or any party in possession after the date of this Gas Grant Without Warranty that either:

(1) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this Gas Grant Without Warranty; OR

(2) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which were known and identified to the applicable regulatory authority as of the date of this Gas Grant Without Warranty; OR

(3) in the case of a hazardous substance(s) previously unknown by Grantor and Grantee as of the date of this conveyance but which is hereafter discovered by Grantee, its successor(s) or assign(s), or any party in

possession and where after such discovery, Grantee, its successor(s) or assign(s), or any party in possession thereafter causes or exacerbates a release or threatened release of such hazardous substance(s).

2.  In the event Grantee, its heir(s), successor(s) or assign(s), seeks to have Grantor conduct or pay for any additional response action, and, as a condition precedent to Grantor incurring any additional cleanup obligation or related expenses, the Grantee, its heir(s), successor(s) or assign(s), shall provide Grantor at least 45 days written notice of such a claim and provide credible evidence that:  (a) the associated contamination existed prior to the date of this Gas Grant Without Warranty; and (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, its heir(s), successor(s) or assign(s), or any party in possession.

C.  Access.  Grantor reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action.  This reservation includes the right of access to and use of available utilities at reasonable cost to Grantor.  These rights shall be exercisable in any case in which a remedial action, response action or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property.  Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities.  Any such entry, including such activities, responses or remedial actions, shall be coordinated with the record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

D.  Non-Disturbance Clause.  Grantee covenants and agrees for itself, its heirs, successors and assigns and every successor in interest to the Property, or part thereof, that a party occupying any of the Property shall not interfere, hinder or prevent Grantor, the United States Government, and its officers, agents, employees, contractors and subcontractors, in conducting any required remedial investigations, response actions or oversight activities on the Property or adjoining property.

V.  MISCELLANEOUS NOTICES, TERMS, CONDITIONS, AGREEMENTS, AND COVENANTS

Except as otherwise provided by 42 U.S.C. § 9620(h)(3), Grantee covenants for itself, its heirs, assigns and every successor in interest to the Property herein described or any part thereof that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the Property hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to any successor in title to this conveyance to enforce any of the following covenants herein agreed.

A.  AS-IS, WHERE-IS PROVISION

1.  GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PROPERTY STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PROPERTY AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PROPERTY'S CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PROPERTY.  EXCEPT AS SET FORTH IN SECTION V. A. 3., BELOW, THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PROPERTY.

2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PROPERTY, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PROPERTY FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PROPERTY.

3.  NOTHING IN THIS "AS IS, WHERE IS" PROVISION WILL BE CONSTRUED TO MODIFY OR NEGATE THE GRANTOR'S OBLIGATION UNDER THE CERCLA COVENANT OR ANY OTHER STATUTORY OBLIGATIONS.

IN WITNESS WHEREOF, the United States of America has caused these presents to be executed this _____ day of _____, 2022.

UNITED STATES OF AMERICA

Acting by and through the
Secretary of Department of Interior,
Bureau of Land Management

By: _____

ATTACHMENT 1 – ORIGINAL ACQUISITION GAS GRANT

# Attachment D
## SAMPLE GAS GRANT WITHOUT WARRANTY - RG BUSH

| | |
|---|---|
| **STATE OF TEXAS** )( | |
| )( | **KNOW ALL BY THESE PRESENTS:** |
| **COUNTY OF POTTER** )( | |

**THIS GAS GRANT WITHOUT WARRANTY** (hereinafter collectively referred to as the "Gas Grant") ") is made this __ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

## I.  CONSIDERATION FOR THE GAS GRANT

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2. The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

> (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,
> (ii) the QUITCLAIM DEED (Satanta, Kansas); and,
> (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,
> (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,
> (v) the ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,
> (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,
> (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,
> (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

3. The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Gas Grant.

## II.  CONVEYANCE OF THE GAS GRANT

Grantor, for the valuable consideration described in Section I, above,  together with the Grantee's covenant and agreement that Grantee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, termination rights, reversion rights from any cause whatsoever, conditions and agreements hereinafter set forth in this Gas Grant, does hereby grants, convey,  and remises to the Grantee, its successors and assigns, WITHOUT WARRANTY, under and subject to the reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, conditions, and agreements hereinafter set forth, all right, title and interest in the following described property situated in Potter County, State of Texas, more particularly described as follows:

> **All gas in or under, or which may be hereafter be found in or under and produced from the Southwest Quarter (SW4, Section 25, Block 6, BS&F Survey, Potter County Texas, as more specifically described in that certain Gas Grant entered into between Ruth G. Bush, a femme sole, et.al, to the United States of America, dated February 23, 1942, filed for record June 18, 1943, and recorded June 23, 11, 1943, in Deed Book 323, Pages 393-395, of the records of the Office of the Potter County Clerk, Texas which is attached hereto, marked "ATTACHMENT 1" (the Original Acquisition Gas Grant), and which is fully incorporated into this Gas Grant, and made a part hereof; RESERVING, HOWEVER, similar rights to the owners of oil and other minerals not hereby conveyed, and subject to the provisions of the original Gas Grant (the "Property").**

**TO HAVE AND TO HOLD** the Property, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications,  third party oil owner rights, conditions, and agreements hereinafter set forth in this Gas Grant, either in law or in equity, for the use, benefit and behalf of the Grantee, its successors and assigns forever.

III. <u>CONVEYANCE OF GAS GRANT WITHOUT WARRANTY</u>

 **As a material part of the Consideration for this Gas Grant, Government and Grantee mutually covenant and agree that Grantee, for itself, and its successors and assign, accepts this Gas Grant "WITHOUT WARRANTY" and "AS IS" and "WHERE IS" with all latent and patent defects including, but not limited to the agreement of the Parties there is no warranty by Government that the Property to title, any particular financial value nor is fit for a particular purpose. Grantee, for itself, and its successors and assigns, acknowledges, and stipulates that Grantee, is not relying upon any representation, statement, or other assertion with respect to condition of the Property but is relying upon Grantee's own examination of theProperty. Grantee, for itself, and its successors and assigns, takes the Property with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.**

IV. <u> SPECIAL AND GENERAL EXCEPTIONS AFFECTING THE PROPERTY</u>

This Gas Grant covering the Property is expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Property:

A.  All existing permits, servitudes, easements and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits and canals on, over and across said land., whether or not of record.

B**.**  All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditches and reservoir rights, as well as all existing interests reserved or outstanding in third parties in and to oil, gas, and/or minerals, whether or not of record.

C.  All existing interests in third parties created by the Federal Helium Reserve System Storage and Delivery Contracts entered with Grantor as well as the Assignment and Assumption of Obligations of 2.2bfc, more or less, of Purchased Helium Storage Contract Without
Warranty created prior to or simultaneously with this Gas Grant, whether or not of record.

D**.**  All other existing interests reserved by any grantor(s) in chain of title unto said grantor(s), their respective successors and assigns, which affect any portion of the Property interest(s) hereinabove described, whether or not of record.

E.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Property.

F**.**  Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules and regulations and water conservancy district rules and regulations of public record, and affecting all or any portion of the subject property.

V. <u>CERCLA NOTICES, COVENANTS AND RESERVATIONS</u>

A**.**  <u>Notice of Hazardous Substance Activity.</u>  Pursuant to 40 CFR § 373.2 and Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA) (42 U.S.C. § 9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States of America gives notice that no hazardous substances have been released, or disposed of, or stored for one year or more on the Property.

B**.**  <u>CERCLA Covenant.</u>  Grantor warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this Gas Grant Without Warranty.  Grantor warrants that it shall take any additional response action found to be necessary after the date of this Gas Grant Without Warranty regarding hazardous substances located on the Property on the date of this Gas Grant.

1.  This covenant shall not apply:

a.  in any case in which Grantee, its successor(s) or assign(s), or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this Gas Grant Without Warranty; **OR**

b.  to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successor(s) or assign(s), or any party in possession after the date of this Gas Grant Without Warranty that either:

(1) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this Gas Grant Without Warranty; **OR**

(2) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which were known and identified to the applicable regulatory authority as of the date of this Gas Grant Without Warranty; **OR**

(3) in the case of a hazardous substance(s) previously unknown by Grantor and Grantee as of the date of this conveyance but which is hereafter discovered by Grantee, its successor(s) or assign(s), or any party in

possession and where after such discovery, Grantee, its successor(s) or assign(s), or any party in possession thereafter causes or exacerbates a release or threatened release of such hazardous substance(s).

2. In the event Grantee, its heir(s), successor(s) or assign(s), seeks to have Grantor conduct or pay for any additional response action, and, as a condition precedent to Grantor incurring any additional cleanup obligation or related expenses, the Grantee, its heir(s), successor(s) or assign(s), shall provide Grantor at least 45 days written notice of such a claim and provide credible evidence that:  (a) the associated contamination existed prior to the date of this Gas Grant Without Warranty; and (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, its heir(s), successor(s) or assign(s), or any party in possession.

C.  **Access.**  Grantor reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action.  This reservation includes the right of access to and use of available utilities at reasonable cost to Grantor.  These rights shall be exercisable in any case in which a remedial action, response action or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property.  Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities.  Any such entry, including such activities, responses or remedial actions, shall be coordinated with record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

D.  **Non-Disturbance Clause**.  Grantee covenants and agrees for itself, its heirs, successors and assigns and every successor in interest to the Property, or part thereof, that a party occupying any of the Property shall not interfere, hinder or prevent Grantor, the United States Government, and its officers, agents, employees, contractors and subcontractors, in conducting any required remedial investigations, response actions or oversight activities on the Property or adjoining property.

## VI.  MISCELLANEOUS NOTICES, TERMS, CONDITIONS, AGREEMENTS, AND COVENANTS

Except as otherwise provided by 42 U.S.C. § 9620(h)(3), Grantee covenants for itself, its heirs, assigns and every successor in interest to the Property herein described or any part thereof that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the Property hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to any successor in title to this conveyance to enforce any of the following covenants herein agreed.

A.  **AS-IS, WHERE-IS PROVISION**

1.  **GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PROPERTY STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PROPERTY AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PROPERTY'S CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PROPERTY.  EXCEPT AS SET FORTH IN SECTION VI. A. 3., BELOW, THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR**

ENCUMBRANCE MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PROPERTY.

2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PROPERTY, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PROPERTY FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PROPERTY.

3.  NOTHING IN THIS "AS IS, WHERE IS" PROVISION WILL BE CONSTRUED TO MODIFY OR NEGATE THE GRANTOR'S OBLIGATION UNDER THE CERCLA COVENANT OR ANY OTHER STATUTORY OBLIGATIONS.

IN WITNESS WHEREOF, the United States of America has caused these presents to be executed this _____ day of _____, 2022.

UNITED STATES OF AMERICA

        Acting by and through the
        Secretary of Department of Interior,
        Bureau of Land Management
        By: _____


**ATTACHMENT 1 – ORIGINAL ACQUISITION GAS GRANT**

# Attachment E
## SAMPLE GAS GRANT WITHOUT WARRANTY - BIVINS

| | | |
|---|---|---|
| **STATE OF TEXAS** | )( | |
| | )( | **KNOW ALL BY THESE PRESENTS:** |
| **COUNTY OF POTTER** | )( | |

**THIS GAS GRANT WITHOUT WARRANTY** (hereinafter collectively referred to as the "Gas Grant") is made this _____ day of _____, 2022, by and between the United States of America, also sometimes referred to as the "Government") is made this __ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____**,** a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

## I.   CONSIDERATION FOR THE GAS GRANT

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2. The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

       (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

       (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

       (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

       (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

       (v) the ASSIGNMENTS OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE  EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

       (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

       (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR THE  STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

       (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

       3.  All covenant ants and agreements of the Assignee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Gas Grant.

## II.  CONVEYANCE OF THE GAS GRANT

Grantor, for the valuable consideration described in Section I, above,  together with the Grantee's covenant and agreement that Grantee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights,  conditions and agreements hereinafter set forth in this Gas Grant, does hereby grants, convey, remise, to the Grantee, its successors and assigns, WITHOUT WARRANTY, under and subject to the reservations, restrictions, covenants, exceptions, notifications, third party oil owner rights, and agreements hereinafter set forth, all right, title and interest in the following described property situated in Potter County, State of Texas, more particularly described as follows:

    **T**itle and possession in all gas in or under, or which may be hereafter be found in or under and produced from the Lands as more specifically described the Judgment rendered in the case of United States of America v. Mary Elizabeth Bivins, et.al, United States District Court, Northern District of Texas, Amarillo Division, No. 708 At Law (CONDEMNATION) Potter County, State of Texas,  dated October 23, 1933, filed for record February 25, 1958, Document No. 185187, in Vol 793, 415-424, of the records of the Office of the Potter County Clerk, Texas which is attached hereto, marked "ATTACHMENT 1" (the Original Acquisition Gas Grant), and which is fully incorporated into this Gas Grant, and made a part hereof (the "Property").

**TO HAVE AND TO HOLD** the Property, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications,  third party oil owner rights,  conditions, and agreements hereinafter set forth in this Gas Grant, either in law or in equity, for the use, benefit and behalf of the Grantee, its successors and assigns forever.

III. CONVEYANCE OF GAS GRANT WITHOUT WARRANTY

**As a material part of the Consideration for this Gas Grant, Government and Grantee mutually covenant and agree that Assignee, for itself, and its successors and assign, accepts this Gas Grant "WITHOUT WARRANTY" and "AS IS" and "WHERE IS" with all latent and patent defects including, but not limited to the agreement of the Parties there is no warranty by Government that the Property to title, particular financial value or is fit for a particular purpose. Assignee, for itself, and its successors and assigns, acknowledges, and stipulates that Grantee, is not relying upon any representation, statement, or other assertion with respect to condition of theProperty but is relying upon Grantee's own examination of the Property. Grantee, for itself, and its successors and assigns, takes the Property with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.**

IV.  SPECIAL AND GENERAL EXCEPTIONS AFFECTING THE PROPERTY

This Gas Grant covering the Property is expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Property:

A.  All existing permits, servitudes, easements and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits and canals on, over and across said land., whether or not of record.

**B.** All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditches and reservoir rights, as well as all existing interests reserved or outstanding in third parties in and to oil, gas, and/or minerals, whether or not of record.

C.  All existing interests in third parties created by the Federal Helium Reserve System Helium Storage and Delivery Contracts as well as the Assignment and Assumption of Obligations of 2.2 Bcf, more or less, of Purchased Helium Storage Contract Without Warranty created prior to or simultaneously with this Gas Grant, whether or not of record.

**D.** All other existing interests reserved by any grantor(s) in chain of title unto said grantor(s), their respective successors and assigns, which affect any portion of the Property interest(s) hereinabove described, whether or not of record.

E.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Property.

**F.** Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules and regulations and water conservancy district rules and regulations, of public record and affecting all or any portion of the subject property.

V.  CERCLA NOTICES, COVENANTS AND RESERVATIONS

A.  **Notice of Hazardous Substance Activity.**  Pursuant to 40 CFR § 373.2 and Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA) (42 U.S.C. § 9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States of America gives notice that no hazardous substances have been released, or disposed of, or stored for one year or more on the Property.

B.  **CERCLA Covenant.**  Grantor warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this Gas Grant Without Warranty.  Grantor warrants that it shall take any additional response action found to be necessary after the date of this Gas Grant Without Warranty regarding hazardous substances located on the Property on the date of this Gas Grant.

1.  This covenant shall not apply:

a.  in any case in which Grantee, its successor(s) or assign(s), or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this Gas Grant Without Warranty; **OR**

b.  to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successor(s) or assign(s), or any party in possession after the date of this Gas Grant Without Warranty that either:

(1) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this Gas Grant Without Warranty; **OR**

(2) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which were known and identified to the applicable regulatory authority as of the date of this Gas Grant Without Warranty; **OR**

(3) in the case of a hazardous substance(s) previously unknown by Grantor and Grantee as of the date of this conveyance but which is hereafter discovered by Grantee, its successor(s) or assign(s), or any party in

possession and where after such discovery, Grantee, its successor(s) or assign(s), or any party in possession thereafter causes or exacerbates a release or threatened release of such hazardous substance(s).

2. In the event Grantee, its heir(s), successor(s) or assign(s), seeks to have Grantor conduct or pay for any additional response action, and, as a condition precedent to Grantor incurring any additional cleanup obligation or related expenses, the Grantee, its heir(s), successor(s) or assign(s), shall provide Grantor at least 45 days written notice of such a claim and provide credible evidence that:  (a) the associated contamination existed prior to the date of this Gas Grant Without Warranty; and (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, its heir(s), successor(s) or assign(s), or any party in possession.

C. **Access.**  Grantor reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action.  This reservation includes the right of access to and use of available utilities at reasonable cost to Grantor.  These rights shall be exercisable in any case in which a remedial action, response action or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property.  Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities.  Any such entry, including such activities, responses or remedial actions, shall be coordinated with record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

D. **Non-Disturbance Clause**.  Grantee covenants and agrees for itself, its heirs, successors and assigns and every successor in interest to the Property, or part thereof, that a party occupying any of the Property shall not interfere, hinder or prevent Grantor, the United States Government, and its officers, agents, employees, contractors and subcontractors, in conducting any required remedial investigations, response actions or oversight activities on the Property or adjoining property.

## VI. MISCELLANEOUS NOTICES, TERMS, CONDITIONS, AGREEMENTS, AND COVENANTS

Except as otherwise provided by 42 U.S.C. § 9620(h)(3), Grantee covenants for itself, its heirs, assigns and every successor in interest to the Property herein described or any part thereof that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the Property hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to any successor in title to this conveyance to enforce any of the following covenants herein agreed.

A. **AS-IS, WHERE-IS PROVISION**

1. **GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PROPERTY STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PROPERTY AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PROPERTY'S CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PROPERTY.  EXCEPT AS SET FORTH IN SECTION VI. A. 3., BELOW, THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR**

ENCUMBRANCE MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PROPERTY.

2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PROPERTY, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PROPERTY FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PROPERTY.

3.  NOTHING IN THIS "AS IS, WHERE IS" PROVISION WILL BE CONSTRUED TO MODIFY OR NEGATE THE GRANTOR'S OBLIGATION UNDER THE CERCLA COVENANT OR ANY OTHER STATUTORY OBLIGATIONS.

IN WITNESS WHEREOF, the United States of America has caused these presents to be executed this _____ day of _____, 20__.

UNITED STATES OF AMERICA

                                 Acting by and through the
                                 Secretary of Department of Interior,
                                 Bureau of Land Management

                                 By: _____

**ATTACHMENT 1 – ORIGINAL ACQUISITION GAS GRANT**

# Attachment F
## SAMPLE BILL OF SALE OF CLIFFSIDE FIELD
## PERSONAL PROPERTY
## WITHOUT WARRANTY

**STATE OF TEXAS**         )

**COUNTY OF POTTER**    )

                              **KNOW ALL BY THESE PRESENTS:**

**THIS BILL OF SALE OF CLIFFSIDE FIELD PERSONAL PROPERTY WITHOUT WARRANTY** (hereinafter referred to as the "Bill of Sale") is made this_____ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

**I. CONSIDERATION**

A. The consideration in favor of Government given by Grantee for this Bill of Sale is the following:

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($____ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2. The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

       (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

       (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

       (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

       (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD  PERSONAL PROPERTY WITHOUT WARRANTY; and,

       (v) the ASSIGNMENTS OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

       (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

       (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR THE  STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

       (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

       3.  The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Bill of Sale.

**II. CONVEYANCE WITHOUT WARRANTY OF  PERSONAL PROPERTY LOCATED AT THE CLIFFSIDE FIELD FACILITY**

A.  For the consideration specified by Section I, above, Government hereby conveys to Grantee, its successors and assign, without warranty of any nature whatsoever, all right, title, and interest in and to all  personal property which is associated the constructed improvements located on the real property located on the Cliffside Field Facility, Potter County, Texas, as defined in 50 U.S.C. §167, as amended, (hereinafter referred to as the " Personal Property"), subject to the exceptions hereinafter set forth.

B.  **PERSONAL PROPERTY CONDITION WITHOUT WARRANTY, "AS IS", "WHERE IS"**

**As a material part of the Consideration for this Bill of Sale, Government and Grantee mutually covenant and agree that Grantee is taking the  Personal Property "WITHOUT WARRANTY", "AS IS"," WHERE IS" with all latent and patent defects and that there is no warranty by Government that the  Personal Property has a particular financial value or is fit for a particular purpose. Grantee acknowledges and stipulates that Grantee is not relying upon any representation, statement, or other assertion with respect to condition of the  Personal Property but is relying upon**

Grantee's examination of the Personal Property. Grantee takes the Personal Property with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.
**III. SPECIFIC EXCEPTIONS AND RESERVATIONS IN FAVOR OF THE GOVERNMENT TO THE PERSONAL PROPERTY CONVEYED.**
A.  Notwithstanding the provisions of Article II, above, Grantee covenants and agrees that this conveyance of the Personal Property **EXCEPT THE FOLLOWING PERSONAL PROPERTY WHICH IS SPECIFICALLY RESERVED AND RETAINED BY THE GOVERNMENT, IT'S LESSOR, CONTRACTORS, AND SUBCONTRACTORS**:

1.  All tooling, hand tools, vehicles, equipment, machines, office equipment and furniture, supplies, materials and other personal property identified as property of the Government, its Contractors, Subcontractors, and Lessor which are hereby incorporated and made a part hereof; and,

2.  All tooling, equipment, fixtures, machines, supplies, and other personal property of any nature whatsoever, which is owned by the Government's contractors, subcontractors, and Lessor pursuant to all applicable existing or expired Government acquisition Lease, Contracts, and associated Subcontracts.

3.  This exception to retain personal property shall no longer be in force and effect if the Government does not remove tooling, equipment, fixtures, machines, supplies, and other personal property of any nature whatsoever, which is owned by the Government within 45 calendar days of this Bill of Sale; it being understood that such personal property not removed shall become the property of the Grantee.

For purposes of this subsection, Grantee, for itself and its successors assigns, investors and/or financial institutions, further covenant and agrees that it will not challenge any future determination made by the the Government's Contractors, Subcontractors and Lessor for any personal property located at the Cliffside Field Facility claimed as their property of .

     **IN WITNESS WHEREOF**, the United States of America has caused these presents to be executed this ____ _____day of _____, 2022.

**UNITED STATES OF AMERICA**
Acting by and through the Administrator of the Department of Interior,
Bureau of Land Management
By:

# Attachment G

**SAMPLE ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS
OF CLIFFSIDE FIELD REAL ESTATE LEASE WITHOUT WARRANTY**

**STATE OF TEXAS            )**

**COUNTY OF POTTER      )**                                **KNOW ALL BY THESE PRESENTS:**

**THIS ASSIGNMENT  AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE,WITHOUT WARRANTY,** (hereinafter referred to as the "Lease Assignment") is made this ___ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Assignee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

**I.  REAL ESTATE LEASE BEING ASSIGNED**

The real estate lease being assigned pursuant to this Lease Assignment is that certain lease (the "Lease") entered and made by and between GNP Property Management, INC., and UNITED STATES OF AMERICA, acting by and through Bureau of Land Management, Document No. 20190PR0005715, recorded 05/08/2019, records of the County Clerk, Potter County, Texas.  A true and correct copy of the Lease is attached hereto, marked "**Attachment 1**", which is hereby incorporated and made a part hereof.

**II. CONSIDERATION**

The consideration in favor of Government given by Assignee for this Lease Assignment is the following:

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

      (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

      (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

      (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

      (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

      (v) the ASSIGNMENTS OF CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

      (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

      (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE  CONTRACTS FOR  THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

      (viii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

3.  The specific covenants and agreements of the Assignee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Lease Assignment.

**III. ASSIGNMENT WITHOUT WARRANTY**

**As a material part of the Consideration for this Lease Assignment, Government and Assignee mutually covenant and agree that Assignee is taking the Lease Assignment "WITHOUT WARRANTY", "AS IS" and with all latent and patent defects and that there is no warranty by Government that the Lease Assignment has a particular financial value nor is fit for a particular purpose. Assignee acknowledges and stipulates that Assignee is not relying upon any representation, statement, or other assertion with respect to condition of the Lease Assignment but is relying upon Assignee's examination of the Lease Assignment. Assignee, for itself, its successors and assigns, takes the Lease Assignment with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.**

**IV.  ASSIGNEE ASSUMPTION OF ALL LEASE OBLIGATIONS**

Assignee assumes and agrees to perform the tenant's obligations under the Assumed Lease (the "Assumed Lease")  arising after this date.

**V.  ASSIGNEE INDEMNITY**

Assignee will indemnify, defend, and hold Government harmless from any loss, attorney's fees, expenses, or claims arising out of or related to Government's failure to perform any of the obligations of the Lessee under the Assumed Lease after this date.

**VI.  LIMITATIONS**

Nothing in this Lease Assignment is intended to conflict with current law, regulation, directive, or policy of any Party.  If any provision of this Lease Assignment is inconsistent with any such authority, then that provision is deemed to be invalid and subject to modification upon concurrence of the Parties and the remaining terms and conditions of this Lease Assignment will continue in full force and effect.  This Lease Assignment is not intended and should not be construed to create any right or benefit, substantive or procedural, enforceable at law or in equity, by Assignee or any third-party against the United States of America, or any of its employees.

**VII.  SIGNATORIES**

The Secretary of the Department of Interior, Bureau of Land Management, or another agency official with the appropriate delegated authority, must execute this Lease Assignment to be effective.  Assignee's signatory to this Lease Assignment must have full authority to bind Assignee, its successors and assigns, with regard to all matters relating to this Lease Assignment. Government and Assignee may use an electronic signature or an electronic record, as those terms are defined in 15 U.S.C. § 7006, to assent to the terms of this Storage Contracts Assignment, and this Lease Assignment may not be denied legal effect, validity, or enforceability solely because such an electronic signature or electronic record was used in its formation.

**VII.  COUNTERPARTS**

This Lease Assignment may be executed in counterparts, each of which will be deemed to be a duplicate original, and which together will constitute one and the same instrument.

**VII. INTEGRATION AND MERGER**

This Lease Assignment sets out all the terms, conditions and agreements of the Parties and supersedes any previous understandings or agreements regarding the donation, whether oral or written.  No modification or amendment of this Lease Assignment will be effective unless in writing and signed by all Parties.

**IX.  VALIDITY OF PARTS**

If any provision of this Lease Assignment is declared to be invalid by a federal court of competent jurisdiction, the remaining provisions will continue in full force.

**X. NO PUBLIC OFFICIALS TO PARTICIPATE OR BENEFIT**

No member or delegate to the United States Congress, or officers or employees of the United States of America may be admitted to any share or part of this Lease Assignment, or to any benefit that may arise therefrom; provided, however, that this provision will not be construed as extending to any person who may be a shareholder or other beneficial owner of any publicly held corporation or other publicly held entity, if this Lease Assignment is for the general benefit of such corporation or other entity.

**XI.  EFFECTIVE DATE**

This Lease Assignment will become effective when all the Parties have signed it.  The date this Lease Assignment is signed by the last Party to sign it (as indicated by the date stated opposite that Party's signature) will be deemed to be the effective date of this Lease Assignment.

      **IN WITNESS WHEREOF**, the Parties to this Lease Assignment has caused these presents to be executed this _____ day of _____, 2022.

**UNITED STATES OF AMERICA**

Acting by and through the Secretary of the Department of Interior,

Bureau of Land Management,

By:

**ATTACHMENT 1 - ASSUMED LEASE**

## Attachment H
### Cliffside Helium Pipeline
### Texas Legal Descriptions

**Moore County**
- 1-M-1 – Former Exell Helium Plant - Deed Without Warranty, U.S. to Exell Helium Plant, Inc, Recorded in Moore County on 4-18-11, Book 696/921
  - A tract of land out of Section 34, Block PMC, E. L. & R. R. Co. Survey, Moore County, Texas.

- 1-M-1 (Portion & 1-P-12) - Deed Without Warranty, U.S. to Leslie T. Rush and Leslie W. Rush, Recorded in Moore County on 11-3-65, Book 196/166, Recorded in Potter County on 11-12-65, Book 1021/149
  - Reserving for the United States of America and its assigns of perpetual easements for the purpose of maintaining, replacing, removing, reconstructing, and/or operating existing pipelines for the transportation of gas, petroleum, or any of its products, also water or other substances, or either thereof, and as incident thereto to erect and maintain, operate, change, renew, reconstruct communication or electrical lines, or either of them as may be necessary in connection with the use of the pipelines to-wit:
  8-inch Crude Helium Pipeline in, on, under and across a tract of land containing approximately 2.2 acres, 60 feet in width, 30 feet on each side of the located centerline, the centerline being described as follows:
  BEGINNING at a point in the south line of Section 34, Block P-Mc, EL&RR Rwy. Co., Potter County Texas, approximately 2,688 feet east of the southwest corner thereof; THENCE North 17°45' West, a distance of approximately 1,582 feet to the end of this easement.
  - 2-inch Pure Helium Pipeline in, on, under and across a tract of land containing approximately 2.4 acres, 60 feet in width, 30 feet on each side of the located centerline, the centerline being described as follows:
  BEGINNING at a point in the south line of Section 34, Block P-Mc, EL&RR RWY. Co., Potter and Moore Counties, Texas, approximately 2,745 feet east of the southwest corner thereof; THENCE North 18°15' West, a distance of approximately 1,765 feet to the end of this easement.

- 1-M-2 - Condemnation, USDCNDTX, Civil Action No. 3034, JF 4-9-63
  - Record located at NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 415
  - A strip of land 60 feet in width out of Section 33, Block PMc, E.L. & R.R. RR. Co. Survey, Moore, County, Texas and being more particularly described as follows:
  Commence at the Southwest corner of Section 33, Block PMc, E.L. and R.R. RR Co. Survey; THENCE easterly along the south line of said Section 33 a distance of 52.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the south line of said Section 33 a distance of 60 feet to a point; THENCE North 0°23' East a distance of 551.3 feet to a point; THENCE North 14°27' West a distance of 426.7 feet to a point in the west line of Section 33, said point being 963.1 feet northerly from the southwest corner of Section 33, THENCE southerly along the west line of Section 33 a distance of 231.8 feet to a point; THENCE South 14°27' East a distance of 194.9 feet to a point; THENCE South 0°23' West a distance of 543.4 feet to a point in the south line of Section 33 same being the point of beginning.

- TXNM131910 (1-M-3) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 2-8-63
  - Record located at NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 26, Block PMc, E.L.&R.R. RR. Co. Survey, Moore

County, Texas and being more particularly described as follows: Commence at the southeast corner of Section 26, Block PMc, E.L.&R.R. RR. Co. Survey; THENCE northerly along the east line of Section 26 a distance of 731.3 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue northerly along the east line of Section 26 a distance of 231.8 feet to a point; THENCE North 14°27' West a distance of 4674.0 feet to a point in the north line of Section 26, said point being 1211.4 feet westerly along the north line from the northeast corner of Section 26; THENCE westerly along the north line of Section 26 a distance of 62.0 feet to a point; THENCE South 14°27' East a distance of 4913.7 feet to a point in the east line of Section 26, same being the point of beginning.

- TXNM131910 (1-M-4) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 11-13-62
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of the South half (S/2) of Section 27, Block PMc, E.L.&R.R. RR. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the southeast corner of Section 27, Block PMc, E.L.&R.R. RR. Co. Survey; THENCE westerly along the south line of Section 27 a distance of 1211.4 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue westerly along the south line of Section 27 a distance of 62.0 feet to a point; THENCE North 14°27' West a distance of 2830.0 feet to a point in the north line of the Southeast Quarter (SE/4) of Section 27, said point being 707.5 feet easterly along the north line of the Southeast Quarter (SE/4) of Section 27; THENCE easterly along the north line of the Southeast Quarter (SE/4) of Section 27 a distance of 62.0 feet to a point; THENCE South 14°27' East a distance of 2830.0 feet to a point in the south line of Section 27, same being the point of beginning.

- TXNM1223471 (1-M-5) - Condemnation, USDCNDTX, Civil Action No. 3045, JF 2-12-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of the Northeast Quarter of Section 27, Block PMc, E.L. & R.R. RR. Co. Survey, Moore, County, Texas and being more particularly described as follows: Commence at the Northwest corner of the Northeast Quarter of Section 27, Block PMc, E.L. and R.R. RR Co. Survey; THENCE easterly along the north line of said Northeast Quarter of Section 27, a distance of 26.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the north line of said Northeast Quarter of Section 27 a distance of 61.5 feet to a point; THENCE South 12°44' East a distance of 961.5 feet to a point; THENCE South 14°27' East a distance of 1860.6 feet to a point in the south line of the Northeast Quarter of Section 27, said point being 769.5 feet easterly of the southwest corner of the Northeast Quarter of Section 27;  THENCE westerly along the south line of the Northeast Quarter of Section 27, a distance of 62.0 feet to a point; THENCE North 14°27' West a distance of 1845.8 feet to a point; THENCE North 12°44' West a distance of 976.1 feet to a point in the north line of the Northeast Quarter of Section 27, same being the point of beginning.
    The above described 60 foot wide strip contains 1.18 acres more or less.

- TXNM122354 (1-M-6) - Easement, Harrison Johnson to U.S., Rec 3-6-62, Book 169/323
  - Southeast Quarter and West half (SE ¼ & W ½) of Section 28, Block PMc; E.L. & R.R. Co. Survey.

- TXNM132167 (1-M-7) - Condemnation, USDCNDTX, Civil Action No. 3052, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of the West half (W/2) of Section 29, Block PMc E.L.&R.R. Rwy. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the Southwest corner of Section 29, Block PMc, E.L.&R.R. Rwy. Co. Survey, THENCE easterly along the South line of said Section 29 a distance of 1278.2 feet to the true

point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the south line of said Section 29 a distance of 62.0 feet to a point; THENCE North 14°30' West a distance of 5352.6 feet to a point in the West line of Section 29, said point being 241.5 feet southerly from the northwest corner of Section 29; THENCE Southerly along the west line of Section 29 a distance of 239.1 feet to a point; THENCE South 14°30' East a distance of 5105.6 feet to a point in the south line of Section 29, same being the point of beginning.
The above described 60 feet wide strip contains 7.20 acres more or less.

- TXNM132167 (1-M-7A) - Condemnation, USDCNDTX, Civil Action No. 3052, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 20, Block PMc, E.L.&R.R. Railroad Company Survey, Moore County, Texas; and being more particularly described as follows: Commence at the apparent northeast corner of Section 20, Block PMc, E.L.&R.R. Railroad Company Survey, Moore County, Texas; THENCE easterly along the north line of Section 20 a distance of 62.8 feet to a point, same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE South 14°30' East a distance of 251.2 feet to a point on the apparent east line of Section 20, said point being a distance of 241.5 feet southerly from the apparent northeast corner of Section 20; THENCE Southerly along the apparent east line of Section 20, a distance of 239.1 feet to a point; THENCE North 14°30' West a distance of 498.6 feet to a point on the north line of Section 20; THENCE Easterly along the north line of Section 20, a distance of 62.1 feet to a point, same being the point of beginning.
    The above described 60 foot wide strip contains 0.52 acres more or less.

- TXNM122358 (1-M-8) - Easement, Harbert to U.S., Rec 1-15-62, Book 165/415
  - West half (W ½) of Section 15, Block 44, H & T. C. Ry. Co. Abstract # 95

- TXNM132167 (1-M-9) - Condemnation, USDCNDTX, Civil Action No 3052, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 28, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the apparent southwest corner of Section 28, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas; THENCE easterly along the south line of Section 28 a distance of 60.8 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 11°48' West a distance of 297.0 feet to a point in the apparent west line of Section 28, said point being northerly a distance of 290.4 feet from the apparent southwest corner of Section 28; THENCE northerly along the apparent west line of Section 28, a distance of 293.0 feet to a point; THENCE South 11°48' East a distance of 595.9 feet to a point on the south line of Section 28; THENCE westerly along the south line of Section 28 a distance of 61.3 feet to a point, same being the point of beginning.
    The above described 60 foot wide strip contains 0.61 acres more or less

- TXNM132167 (1-M-10) - Condemnation, USDCNDTX, Civil Action No. 3052, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 29 and 56, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the apparent southeast corner of Section 29, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas; THENCE northerly along the apparent east line of Section 29 a distance of 290.4 feet to a point, same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 11°48' West crossing the south line of Section 29 and the south line of Section 56 a distance of 10,660.0 feet to a point on the north line of Section 56 said point being a distance of 3,028.5 feet easterly from the northwest corner of Section 56; THENCE easterly along the north line of Section 56 a distance of 61.3 feet to a point; THENCE South 11°48' East crossing the south line

of Section 56 and the north line of Section 29 a distance of 10,361.1 feet to a point on the apparent east line of Section 29; THENCE southerly along the apparent east line of Section 29 a distance of 293.0 feet to a point, same being the point of beginning.
The above described 60 foot wide strip contains 14.48 acres more or less.

- o  1-M-10 Parcel No. 1 - Condemnation, USDCNDTX, Civil Action No. 3052, JF 4-9-63
  A tract or parcel of land out of Section 56, Block 44, H.&T.C. RR. Co. Survey, Moore County, Texas, to be used as a temporary working space, lying parallel and adjacent to the previously described 60 foot wide strip and being more particularly described as follows: Commence at the Northwest corner of Section 56, Block 44, H. &T.C. RR. Co. Survey, Moore County, Texas; THENCE easterly along the north line of Section 56 a distance of 3054.0 feet to a point; THENCE South 11°48' East a distance of 1,765.0 feet to a point; THENCE North 78°12' East a distance of 35' to a point, same being the true point of beginning of the above mentioned tract or parcel of land; THENCE continuing North 78°12' East a distance of 100 feet to a point; THENCE South 11°48' East a distance of 245 feet to a point; THENCE South 78°12' West a distance of 100 feet to a point; THENCE North 11°48' West a distance of 245 feet to a point, same being the point of beginning.
  The above described parcel contains 0.56 acres more or less.

- o  1-M-10 Parcel No. 2 - Condemnation, USDCNDTX, Civil Action No. 3052, JF 4-9-63
  A tract or parcel of land out of Section 56, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas, to be used as temporary working spaces, lying parallel and adjacent to the previously described 60 foot wide strip and being more particularly described as follows: Commence at the Northwest corner of Section 56, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas; THENCE easterly along the north line of Section 56 a distance of 3054.0 feet to a point; THENCE South 11°48' East a distance of 1,765.0 feet to a point; THENCE South 78°12' West a distance of 25 feet to a point, same being the true point of beginning of the above mentioned tract or parcel of land; THENCE continuing South 78°12' West a distance of 100 feet to a point; THENCE South 11°48' East a distance of 245 feet to a point; THENCE North 78°12' East a distance of 100 feet to a point; THENCE North 11°48' West a distance of 245 feet to a point, same being the point of beginning.
  The above described parcel contains 0.56 acres more or less.

- TXNM131907 (1-M-11) - Condemnation, USDCNDTX, Civil Action No. 3048, JF 2-8-63
  - o  Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - o  A strip of land 60 feet in width out of Section 71, Block 44, H. & T.C. R.R. Co. Survey, Moore County, Texas and being more particularly described as follows:
    Commence at the Southwest of Section 71, Block 44, H. & T.C. R.R. Co. Survey; THENCE easterly along the south line of Section 71 a distance of 3028.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 11°48' West a distance of 1275.8 feet to a point; THENCE North 16°17' West a distance of 2345.7 feet to a point; THENCE North 8°42' West a distance of 1956.6 feet to a point in the north line of Section 71, said point being 769.5 feet easterly of the southwest corner of the Northeast Quarter of Section 27;  THENCE westerly along the south line of the Northeast Quarter of Section 27, a distance of 62.0 feet to a point; THENCE North 14°27' West a distance of 1845.8 feet to a point; THENCE North 12°44' West a distance of 976.1 feet to a point in the north line of the Northeast Quarter of Section 27, same being the point of beginning.
    The above described 60 foot wide strip contains 7.68 acres more or less.

- TXNM131908 (1-M-12) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63
  - o  Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - o  A strip of land 60 feet in width out of Section 98, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 98, Block 44, H.&T.C.R.R. Survey; THENCE easterly along the south line of

said Section 98 a distance of 1774.7 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 8°42' West a distance of 442.7 feet to a point; THENCE North 5°50' West a distance of 4899.3 feet to a point in the north line of Section 98, said point being 1172.3 feet easterly along the north line from the northwest corner of said Section 98; THENCE easterly along the north line of Section 98 a distance of 60.3 feet to a point; THENCE South 5°50' East a distance of 4891.4 feet to a point; THENCE South 8°42' East a distance of 450.6 feet to a point in the south line of Section 98; THENCE westerly along the south line of Section 98 a distance of 60.7 feet to a point, same being the point of beginning.

- TXNM122359 (1-M-13) - Easement, Weidling to U.S., Rec 1-15-62, Book 168/417
  - West half (W ½) of Section 113 and Northeast Quarter (NE ¼) of Northeast Quarter (NE ¼) of Section 114, Block 44, H & T.C. Ry. Co. Survey.

- TXNM122347 (1-M-14) - Condemnation, USDCNDTX, Civil Action No. 3045, JF 2-14-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 140, Block 44, H.&T.C. R.R. Survey, Moore County, Texas and more particularly described as follows:
    Commence at the northwest corner of Section 140, Block 44, H.&T.C. R.R. Survey; THENCE southerly along the west line of said Section 140 a distance of 1446.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing southerly along the west line of Section 140 a distance of 335.0 feet to a point; THENCE South 9°41' East a distance of 3523.4 feet to a point; THENCE South 5°50' East a distance of 23.9 feet to a point in the south line of Section 140, said point being 599.8 feet easterly from the southwest corner of said Section 140; THENCE easterly along the south line of Section 140 a distance of 60.5 feet to a point; THENCE North 5°50' West a distance of 33.8 feet to a point; THENCE North 9°41' West a distance of 3855.0 feet to a point in the west line of Section 140, same being the point of beginning.
    The above described 60 foot wide strip contains 5.12 acres more or less.

- TXNM122360 (1-M-15) - Easement, Clark to U.S., Rec 1-15-62, Book 168/419
  - East half Northeast quarter (E ½ NE ¼) of Section 139; East half and Northeast quarter of Northwest quarter (E ½ & NE ¼ of NW ¼) of Section 156, Block 44, H. & T. C. Survey.

- TXNM131910 (1-M-16) - Condemnation, Civil Action No. 3051, JF 2-12-62
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of that part of the South half (S/2) of Section 181 lying east of the Panhandle and Santa Fe Railroad, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the intersection of the east right of way line of the Panhandle and Santa Fe Railroad and the south line of Section 181, Block 44, H.&T.C.R.R. Co. Survey; THENCE easterly along the south line of said Section 181 a distance of 1091.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 10°56' West a distance of 2085.1 feet to a point; THENCE North 21°18' East a distance of 651.7 feet to a point in the north line of the South half (S/2) of Section 181, said point being 739.6 feet easterly along the north line of the said South half (S/2) of Section 181 from the intersection of the east right of way line of the Panhandle and Santa Fe Railroad and the north line of the South half (S/2) of Section 181; THENCE easterly along the north line of the South half (S/2) of Section 181 a distance of 64.2 feet to a point; THENCE South 21°18' West a distance of 657.2 feet to a point; THENCE South 10°56' East a distance of 2080.1 feet to a point in the south line of Section 181; THENCE westerly along the south line of Section 181 a distance of 61.3 feet to a point, same being the point of beginning.

- TXNM131906 (1-M-17) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 10-29-62
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record

Group: RG21, Identifier: 564461, Box: 416
- o A strip of land 60 feet in width out of that part of the North half (N/2) of Section 181 lying east of the Panhandle and Santa Fe RR., Block 44, H. & T. C., R. R. Co., Survey, Moore County, Texas and being more particularly described as follows: Commence at the intersection of the east right of way line of the P&SF RR and the south line of the nor half (N/2) of Section 181, Block 44, H. & T.C. R.R. Co., Survey; THENCE easterly along the south line of the North half (N/2) of Section 181 a distance of 739.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the south line of the North half (N/2) of Section 181 a distance of 64.2 feet to a point; THENCE North 21°18' East a distance of 1447.4 feet to a point; THENCE North 0°23' West a distance of 218.6 feet to a point in the east right of way line of the P&SF RR Co, said point being 1561.6 feet southwesterly from the intersection of the east right of way line of the P&SF RR and the north line of Section 181; THENCE Southwesterly along the east right of way line of the P&SF RR a distance of 81.2 feet to a point; THENCE South 0°23' East a distance of 152.4 feet to a point; THENCE South 21°18' West a distance of 1458.7 feet to a point in the south line of the North half (N/2) of Section 181 same being the point of beginning.

- TXNM122372 (1-M-18) - Easement Philips Petroleum Co to U.S., Rec 2-7-62, Book 169/20
  - o A strip of land Fifty (50') foot width out of that part of the North half (N ½) lying North and West of the North Plains and Santa Fe Railroad in Section 181, Block 44, H. & T. C. R. R. Survey, Moore County, Texas, and being 25 feet on either side of a center line and described more particularly as follows: COMMENCE at the Northwest (NW) corner of said Section 181, Block 44, H. & T. C. R. R. Survey, Moore County, Texas; THENCE Easterly and along the North line of said Section 181 a distance of 3,076 feet to a point, said point being the true point of beginning of the aforementioned 50' wide right-of-way easement; THENCE South, 00°23' East, a distance of 973 feet to a point in the North right-of-way line of the North Plains and Santa Fe Railroad, said point being the point the point of exit thereof.

- TXNM122376 (1-M-19) - Easement, Crump to U.S. Rec 2-15-62, Book 169/135
  - o East half (E ½) and East half of West half (E ½ of W ½), Section 198 Block 44, H & TC Survey

- TXNM122377 (1-M-20) - Easement, Yongue to U.S. Rec 3-6-62, Book 169/317
  - o West half of Southeast quarter and West half (W ½ of SE ¼ & W ½) of Section 223, Block 44, H. & T. C. Survey

- TXNM131910 (1-M-21) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 3-6-63
  - o Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - o A strip of land 60 feet in width out of the Southwest Quarter (SW/4) of Section 240, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 240, Block 44, H.&T.C.R.R. Co. Survey; THENCE easterly along the south line of said Section 240 a distance of 657.2 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue easterly along the south line of Section 240 a distance of 61.6 feet to a point; THENCE North 12°51' West a distance of 2356.9 feet to a point; THENCE North 43°44' West a distance of 59.3 feet to a point; THENCE North 74°38' West a distance of 154.0 feet to a point in the west line of Section 240, said point being 263.8 feet southerly along the west line from then northwest corner of the Southwest Quarter (SW/4) of said Section 240; THENCE southerly along the west line of Section 240 a distance of 62.1 feet to a point; THENCE South 74°38' East a distance of 121.4 feet to a point; THENCE South 43°44' East a distance of 26.2 feet to a point; THENCE South 12°51' East a distance of 2326.2 feet to a point in the south line of Section 240, same being the point of beginning.

- 1-M-23 - Easement, Schoonover to U.S. Rec 2-7-62, Book 169/22
  - o Northeast quarter of the Southeast quarter (NE/4 of SE/4), also East half of Northeast quarter (E ½ of NE ¼) of Section 241, Block 44 H.& T.C. Survey

- 1-M-24 - Condemnation, USDCNDTX, Civil Action No. 3045, JF 2-8-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 264, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas more particularly described as follows:
  Commence at the southeast corner of Section 264, Block 44, H.&T.C. R.R. Co. Survey; THENCE westerly along the south line of said Section 264 a distance of 353.3 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing westerly along the south line of Section 264 a distance of 61.2 feet to a point; THENCE North 11°11' West a distance of 5372.0 feet to a point in the North line of Section 264, said point being 1492.5 feet westerly from the northeast corner of said Section 264; THENCE easterly along the north line of Section 264 a distance of 61.2 feet to a point; THENCE South 11°11' East a distance of 5372.1 feet to a point in the south line of Section 264, same being the point of beginning.
  The above described 60 foot wide strip contains 7.4 acres more or less.

- TXNM131910 (1-M-25) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 2-15-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of the East half (E/2) of Section 283, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the southeast corner of Section 283, Block 44, H.&T.C.R.R. Co. Survey; THENCE westerly along the south line of said Section 283 a distance of 1431.3 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 11°11' West a distance of 5367.2 feet to a point in the north line of Section 283, said point being 2500.3 feet westerly along the north line from the northeast corner of said Section 283; THENCE westerly along the north line of Section 283 a distance of 61.2 feet to a point; THENCE South 11°11' East a distance of 5366.9 feet to a point in the south line of Section 283; THENCE easterly along the south line of Section 283 a distance of 61.2 feet to a point, same being the point of beginning.

- 1-M-26 - Condemnation, USDCNDTX, Civil Action No. 3045, JF 2-14-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 306, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas and being more particularly described as follows:
  Commence at the southeast corner of Section 306, Block 44, H.&T.C. R.R. Co. Survey; THENCE westerly along the south line of said Section 306 a distance of 2500.3 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing westerly along the south line of Section 306 a distance of 61.2 feet to a point; THENCE North 11°11' West a distance of 5420.0 feet to a point in the north line of Section 306, said point being 1676.5 feet easterly from the northwest corner of said Section 306; THENCE easterly along the north line of Section 306 a distance of 61.2 feet to a point; THENCE South 11°11' East a distance of 5419.9 feet to a point in the south line of Section 306, same being the point of beginning.
  The above described 60 foot wide strip contains 7.47 acres more or less.

- 1-M-27 - Condemnation, USDCNDTX, Civil Action No. 3045, JF 2-14-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 325, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas and being more particularly described as follows:
  Commence at the southwest corner of Section 325, Block 44, H.&T.C. R.R. Co. Survey; THENCE easterly along the south line of said Section 325 a distance of 1676.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 11°11' West a distance of 5241.0 feet to a point in the north line of Section 325, said point being 637.5 feet easterly from the northwest corner of Section 325; THENCE Easterly along the north line of Section 325 a distance

of 61.2 feet to a point; THENCE South 11°11' East a distance of 5241.0 feet to a point in the south line of Section 325; THENCE westerly along the south line of Section 325 a distance of 61.2 feet to a point, same being the point of beginning.
The above described 60 foot wide strip contains 7.22 acres more or less.

- TXNM131906 (1-M-28) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 3-20-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of lad 60 feet in width out of Section 348, Block 44, H. & T. C. R. R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 348, Block 44, H. & T. C. R. R. Co. Survey; THENCE easterly along the south line of said Section 348 a distance of 637.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the south line of Section 348 a distance of 61.2 feet a point; THENCE North 11°11' West a distance of 3311.7 feet to a point in the west line of Section 348, said point being 2175.7 feet southerly along the west line of said Section 348 from the northwest corner; THENCE southerly along the west line of Section 348 a distance of 300.5 feet to a point; THENCE South 11°11' East a distance of 3005.3 feet to a point in the south line of Section 348 same being the point of beginning.

- TXNM122379 (1-M-29) - Easement, Reznik to U,S, Rec 2-7-62, Book 169/24.
  - North three quarters of East half of East half (N ¾ of E ½ of E ½) of Section 347, Block 44, H. & T. C. Survey

- TXNM131906 (1-M-30) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-8-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 368, Block 44, H. & T.C.R.R. Co. Survey, Moore County, Texas, and being more particularly described as follows: Commence at the southeast corner of Section 368, Block 44, H.&T.C.R.R. Co. Survey; THENCE westerly along the south line of said Section 368 a distance of 448.3 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 11°11' West a distance of 15.1 feet to a point; THENCE North 14°21' West a distance of 5446.9 feet to a point in the north line of Section 368, said point being 1837.4 feet westerly along the north line of Section 368 from the northeast corner of said section; THENCE westerly along the north line of Section 368 a distance of 62.0 feet to a point; THENCE South 14°21' East a distance of 5460.8 feet to a point; THENCE South 11°11' East a distance of 1.2 feet to a point in the south line of Section 368; THENCE easterly along the south line of Section 368 a distance of 61.2 feet to a point same being the point of beginning.

- TXNM131906 (1-M-31) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-5-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 389, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas and being more particularly described as follows: Commence at the northwest corner of said Section 389, Block 44, H.&T.C.R.R. Co., Survey, Moore County, Texas; THENCE easterly 2033.7 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the north line of Section 389 a distance of 60.0 feet to a point; THENCE South 00°37' East a distance of 132.1 feet to a point; THENCE South 14°21' East a distance of 5308.9 feet to a point in the south line of said Section 389, said point being 1837.4 feet westerly from the southeast corner of said Section 389; THENCE westerly and along the south line of said Section 389 a distance of 62.0 feet to a point; THENCE North 14°21' West a distance of 5300.5 feet to a point; THENCE North 00°37' West 140.5 feet to a point in the North line of said Section 389 same being the true point of beginning.

- TXNM131906 (1-M-32) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-8-63

- o Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
- o A strip of land 60 feet in width out of Section 410, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas and being more particularly described as follows:
  Commence at the Southwest corner of Section 410, Block 44, H.&T.C.R.R. Co. Survey; THENCE easterly along the south line of said Section 410 a distance of 2033.7 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 00°37' West a distance of 5254.9 feet to a point in the north line of said Section 410, said point being 1964.5 feet easterly from the northwest corner of said Section 410; THENCE easterly along the north line of said Section 410 a distance of 60.0 feet to a point; THENCE South 00°37' East a distance of 5255.1 feet to a point in the south line of Section 410; THENCE westerly along the south line of Section 410 a distance of 60 feet to a point, same being the point of beginning.
  The above described 60 foot wide strip contains 7.24 acres more or less.
- o 1-M-32 Fenced Area - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-8-63A A fenced area 10 feet wide and 30 feet long within the previously described 60 foot wide strip out of Section 410, Block 44, H.&T.C. R.R. Co. Survey, Moore County, Texas and being more particularly described as follows:
  Commence at the southwest corner of said Section 410, Block 44, H.&T.C.R.R. Co. Survey, Moore County, Texas; THENCE easterly along the south line of said section a distance of 2058.7 feet to a point; THENCE North 00°37' West a distance of 135 feet to the true point of beginning of the aforementioned tract of land; THENCE North 89°23' East a distance of 5 feet to a point; THENCE North 00°37' West a distance of 30 feet to a point; THENCE South 89°23' West a distance of 10 feet to a point; THENCE South 00°37' East a distance of 30 feet to a point; THENCE North 89°23' East a distance of 5 feet to a point, same being the true point of beginning. The above described tract of land contains 0.007 acres, more or less, and is to be used to accommodate an above ground appurtenance.

- TXNM122380 (1-M-33) - Easement, Young to U.S., Rec 2-15-62, Book 169/137.
  - o Southeast quarter of Southwest quarter and North three quarters of West half (SE ¼ of SW ¼ & N ¾ of W ½) of Section 431, Block 44, H. & T. C. Survey

- TXNM122389 (1-M-34) - Easement, Thaten to U.S., Rec 3-1-62, Book 169/24
  - o Being known as the Southwest Quarter (SW ¼) of Survey 22, S.F. -2698, A. O. Campbell, Block M-2, about 11 miles North 26° West from Dumas and bought; on the application of A. O. Campbell, same being described by metes and bounds as follows: Beginning at the Southwest (SW) corner of Survey 22, In Block M-2 and the North Line of Survey 431 in Block 44: Thence South 89° 36'20" East 1012.6 varas to a 1" galvanized iron pipe in the North Line of said Survey 431 and the Southwest (SW) corner of the Southeast (SE) Quarter of said Survey 22: Thence North 14'20" West 898.9 varas to a 1"galvanized iron pipe the Northwest (NW) corner of the Southeast Quarter (SE ¼) and the Southeast (SE) corner of the Northwest (NW ¼) of said Survey 22: Thence North 89° 43'30" West 1012.6 varas to the Southwest (SW) corner of the Northwest Quarter (NW ¼) of said Survey 22: Thence South 14' 20" East 896.6 varas to the beginning corner of this tract, and containing 161 acres of land.

- TXNM122390 (1-M-35) - Easement, Holman to U.S., Rec 3-1-62, Book 169/248
  - o South half of Northwest quarter and Northwest quarter of Northwest quarter (S ½ of NW ¼ & NW ¼ of NW ¼) of Section 22, Block M-2, A. O. Campbell Survey

- TXNM122391 (1-M-36) - Easement, Orem to U.S., Rec 3-1-62, Book 169/253
  - o West half of Southwest Quarter (W/2 of SW/4) of Section 23, Block M-2, A. O. Campbell Survey

- TXNM122393 (1-M-37) - Easement, Orem to U.S., Rec 2-222-62, Book 169/194
  - o West half of Northwest quarter (W ½ of NW ¼) of Section 23, Block M-2, A. O. Campbell Survey

- TXNM131910 (1-M-38) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 3-4-63

- o Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
- o A strip of land 60 feet in width out of the South half (S/2) of Section 24, Block M-2, J.C. Gannor Survey, Moore County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 24, Block M-2, J.C. Gannor Survey; THENCE easterly along the south line of said Section 24 a distance of 642.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 3°04' West a distance of 1179.7 feet to a point; THENCE North 3°18' West a distance of 4136.3 feet to a point in the north line of the South half (S/2) of Section 24, said point being 279 feet easterly along the north line of the South half (S/2) of Section 24 from the northwest corner of the said South half (S/2) of Section 24; THENCE easterly along the north line of the South half (S/2) of Section 24 a distance of 60.1 feet to a point; THENCE South 3°18' East a distance of 4133.1 feet to a point; THENCE South 3°04' East a distance of 1182.7 feet to a point in the south line of Section 24; THENCE westerly along the south line of Section 24 a distance of 60.1 feet to a point, same being the point of beginning. Less and except that portion of the above described 60 foot wide strip designated as the Chicago, Rock Island and Pacific Railroad right of way.

- • TXNM131906 (1-M-40) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-8-63
  - o Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - o A strip of land 60 feet in width out of Section 19, Block Q, H. &G.N.R.R. Co. Survey and out of the North half (N/2) of Section 24, Block M-2, J.C. Gannor Survey, all in Moore County, Texas and being more particularly described as follows: Commence at the northeast corner of Section 19, Block Q, H.&G.N.R.R. Co., Survey, Moore County, Texas; THENCE westerly along the north line of said Section 19, a distance of 782.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing westerly along the north line of said Section 19 a distance of 60.7 feet to a point; THENCE South 08°38' East a distance of 2155.8 feet to a point; THENCE South 08°57' East a distance of 3460.8 feet, crossing the North/South line between Section 19, Block Q, H.&G.N.R.R. Co., Survey and Section 24, Block M-2, J.C. Gannor Survey, to a point; THENCE South 03°18' East a distance of 348.4 feet to a point in the south line of the North half (N/2) of Section 24, Block M-2, J.C. Gannor Survey, said point being 279.0 feet easterly from the southwest corner of the North half (N/2) of said Section 24; THENCE easterly and along the south line of said North half (N/2) of Section 24, a distance of 60.1 feet to a point; THENCE North 03°18' West a distance of 354.7 feet to a point; THENCE North 08°57' West a distance of 3463.6 feet, crossing the North/South line between Section 24, Block M-2, J.C. Gannor Survey and Section 19, Block Q, H.&G.N.R.R. Co. Survey, to a point; THENCE North 08°38' West a distance of 2146.7 feet to a point in the north line of Section 19, Block Q, H.&G.N.R.R. Co., Survey, to a point same being the true point of beginning.

- • 1-M-41 (1-S-1) - Condemnation, USDCNDTX, Civil Action No. 3044, JF 2-8-63
  - o Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - o A strip of land 60 feet in width out of Section 30, Block Q, H.&G.N. R.R. Co. Survey, Moore and Sherman Counties, Texas and being more particularly described as follows: Commence at the southeast corner of Section 30, Block Q, H.&G.N. R.R. Co., Survey; THENCE westerly along the south line of said Section 30, a distance of 582.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 8°38' West crossing the Moore-Sherman County Line a distance of 4032.9 feet to a point; THENCE North 4°21' West a distance of 1303.7 feet to a point in the north line of Section 30, said point being 1319.6 feet westerly along the north line from the northeast corner of said Section 30; THENCE westerly along the north line of Section 30 a distance of 60.2 feet to a point; THENCE South 4°21' East a distance of 1311.1 feet to a point; THENCE South 8°38' East crossing the Moore-Sherman County Line a distance of 4026.2 feet to a point in the south line of Section 30; THENCE easterly along the south line of Section 30 a distance of 60.7 feet to a point same being the point of beginning.
    The above described 60 foot wide strip contains 7.35 acres more or less.

**Sherman County**

- 1-S-1 (1-M-41) - Condemnation, USDCNDTX, Civil Action No. 3044, JF 2-8-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 30, Block Q, H.&G.N. R.R. Co. Survey, Moore and Sherman Counties, Texas and being more particularly described as follows: Commence at the southeast corner of Section 30, Block Q, H.&G.N. R.R. Co., Survey; THENCE westerly along the south line of said Section 30, a distance of 582.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 8°38' West crossing the Moore-Sherman County Line a distance of 4032.9 feet to a point; THENCE North 4°21' West a distance of 1303.7 feet to a point in the north line of Section 30, said point being 1319.6 feet westerly along the north line from the northeast corner of said Section 30; THENCE westerly along the north line of Section 30 a distance of 60.2 feet to a point; THENCE South 4°21' East a distance of 1311.1 feet to a point; THENCE South 8°38' East crossing the Moore-Sherman County Line a distance of 4026.2 feet to a point in the south line of Section 30; THENCE easterly along the south line of Section 30 a distance of 60.7 feet to a point same being the point of beginning.
  The above described 60foor wide strip contains 7.35 acres more or less.

- TXNM131910 (1-S-2) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 10-23-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of the East half (E/2) of the Southwest Quarter (SW/4) of Section 6, Block 2, P.S.L. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the southeast corner of the Southwest Quarter (SW/4) of Section 6, Block 2, P.S.L. Survey; THENCE westerly along the south line of the Southwest Quarter (SW/4) of Section 6 a distance of 492.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 4°21' West a distance of 945.9 feet to a point; THENCE North 7°25' West a distance of 1390.0 feet to a point in the north line of the Southwest Quarter (SW/4) of Section 6, said point being 785.7 feet westerly along the north line of the Southwest Quarter (SW/4) of Section 6 from the northeast corner of the Southwest Quarter (SW/4) of Section 6; THENCE westerly along the north line of the Southwest Quarter (SW/4) of Section 6 a distance of 60.6 feet to a point; THENCE South 7°25' East a distance of 1396.9 feet to a point; THENCE South 4°21' East a distance of 939.2 feet to a point in the south line of Section 6; THENCE easterly along the south line of Section 6 a distance of 60.2 feet to the point of beginning.

- TXNM122394 (1-S-3) – Easement, Ford to U.S., Rec 3-14-62, Deed 107/317
  - East half (E ½) of the Northwest quarter (NW ¼) of Section 6, Block 2, PSL Survey

- TXNM122395 (1-S-4) - Easement, Watson to U.S., Rec 3-6-62, Deed 107/300
  - Southwest quarter (SW ¼) of Section 5, Block 2, PSL Survey

- TXNM122396 (1-S-5 & 1-S-7) - Easement, Sherman County Probate Order and Conveyance, Rec 3-9-62, Deed 107/312.
  - The West Half (W ½) of the Northwest Quarter (NW ¼) of Section five (5), Block Two (2), Public Free School Land; and
  - The West Half (W ¼) of the Northwest Quarter (NW ¼) of Section Four Hundred Fifty-five (455), Block One T (1T), T. & N. O. Ry. Co.

- TXNM122406 (1-S-6) - Easement, Bridgeman to U.S., Rec 3-1-62, Deed 107/295
  - West half of Southwest quarter (W ½ of SW ¼) of Section 455, Block 1 T, T. & N.O. R.R. Co. Survey

- TXNM122407 (1-S-8) - Easement, Witt to U.S., Rec 1-15-62, Deed 108/19
  - East half of East half (E ½ of E ½) of Section 456, Block 1 T, T. & N. O. R.R. Co. Survey

- TXNM122408 (1-S-9) - Easement, Macy to U.S., Rec 3-1-62, Deed 108/53
  - East half of Southeast quarter (E ½ of SE ¼) of Section 437, Block 1 T, T. & N.O. R.R. Co. Survey

- TXNM122409 (1-S-10) - Easement, Foreman to U.S., Rec 1-15-62, Deed 107/197
  - East half of Northeast quarter (E ½ of NE ¼) of Section 437, Block 1 T, T. & N.O. R.R. Co. Survey

- TXNM122410 (1-S-11) - Easement, Veterans Land Board to U.S., Rec 3-14-62, Deed 108/73
  - Said right-of-way being 50 feet wide, being 25 feet over and on each side of the centerline thereof, the courses and distance of said right-of-way being as follows, to-wit: Beginning at a point in the S. Line of Section 420, Blk. 1T, T&N.O.R.R. Survey, Sherman Co., Texas; approximately 811' W. of the SE corner of the SE/4 thereof; THENCE N. 3°39' W., 2687' to the point of exit in the N. line of the SE/4 approximately 970' W. of the NE. corner thereof. The above described line represents the center of a 50' wide easement containing 3.08 acres, more or less, all lying in the E/2 of the SE/4 of Section 420, Blk. 1T, T&N.O.R.R. Survey, Sherman Co., Texas.

- TXNM122411 (1-S-12) - Condemnation, USDCNDTX, Civil Action No. 3044
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of the North Half (N1/2) of Section 420, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: COMMENCE at the Southeast corner of North Half (N1/2) of Section 420, Block 1-T, T.&N.O. R.R. Co. Survey; THENCE Westerly along the south line of North Half (N1/2) of Section 420 a distance of 935.9 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 3°39' West a distance of 2650.0 feet to a point in the north line of Section 420, said point being 1083.9 feet westerly along the north line of Section 420 from the northeast corner of Section 420; THENCE Westerly along the north line of Section 420 a distance of 60.1 feet to a point; THENCE South 3°39' East a distance of 2650.0 feet to a point in the south line of the North Half (N1/2) of Section 420; THENCE Easterly along the south line of the North Half (N1/2) of Section 420 a distance of 60.1 feet to a point, same being the point of beginning. The above described 60 feet wide strip contains 3.65 acres more or less.

- TXNM122388 (1-S-13 & 1-S-31) - Easement, Diehl to U.S., Rec 1-15-62, Deed 108/21
  - East half (E ½) of Section 401, Block 1 T, T. & N. O. R.R. Co. Survey
  - West half of East half (W ½ of E ½) and East half of Northwest quarter (E ½ of NW ¼) of Section 127, Block 1 T, T. & N.O. R. Co. Survey
  - Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 127, Block 1 T, T. & N.O. R.R. Co. Survey

- TXNM122412 (1-S-14) - Easement, Mitchell to U.S., Rec 3-6-62, Deed 108/57
  - South half of Southeast quarter (S/2 of SE/4) of Section 384, Block 1 T, T. & N. O. R.R. Co. Survey

- TXNM122413 (1-S-15) - Easement, Klekamp to U.S., Rec 3-14-62, Deed 108/71
  - The Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and Southwest quarter of Northeast quarter (SW ¼ of NE ¼) and Southeast quarter of Northwest quarter of Northwest quarter (SE ¼ of NW ¼) of Section 384, Block 1 T, T. & N. O. R.R. Co. Survey

- TXNM131906 (1-S-16) - Condemnation, USDCNDTX, Civil Action No. 3046
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of the North half (N/2) of the North half (N/2) of Section 384, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the Northeast corner of said Section 384, Block 1-T,

T.&N.O.R.R. Co. Survey, Sherman County, Texas; THENCE westerly and along the north section line of said Section 384, a distance of 2044.7 feet to a point, said point being the true point of beginning of the aforementioned 60 foot wide strip; THENCE South 06°56' East a distance of 1322.0 feet to a point, said point being 1887.7 feet westerly from the east line of said Section 384; THENCE westerly a distance of 60.4 feet to a point; THENCE North 06°56' West a distance of 1322.0 feet to a point in the north line of said Section 384; THENCE easterly and along the north line of Section 384, 60.4 feet to a point, said point being the true point of beginning.

- TXNM122414 (1-S-17 & 1-S-19) - Easement, Pronger to U.S., Rec 1-19-62, Deed 107/277
  - West half of East half (W/2 of E/2) and East half of West half (E/2 of W/2) of Section 367, Block 1 T. T&NO RR Co. Survey, and East half of West half (E/2 of (W/2) and Southwest quarter of Southeast quarter (SW/4 of SE/4) of Section 350, Block 1 T, T&NO RR Co. Survey
  - Easement, Pronger to U.S., Rec 1-19-62, Deed 107/277
    Southwest quarter and West half of Northwest quarter (SW/4 and W/2 of NW/4) of Section 316; West half of West half (W/2 of W/2) of Section 299; East half of East half (E/2 of E/2) of Section 298, all of Block 1 T, T&NO RR Co. Survey

- 1-S-18 - Condemnation, USDCNDTX, Civil Action No. 3044, JF 3-18-64
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of the West Half (W1/2) of Section 333, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: COMMENCE at the Southeast corner of West Half (W1/2) of Section 333, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas; THENCE Westerly along the south line of said Section 333 a distance of 661.0 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE continue westerly along the south line of Section 333 a distance of 60.4 feet to a point; THENCE North 6°56' West a distance of 4464.5 feet to a point; THENCE North 9°14' West a distance of 827.5 feet to a point in the north line of Section 333 said point being 1271.0 feet easterly along the north line of Section 333 from the northwest corner of said Section 333; THENCE Easterly along the north line of Section 333 a distance of 60.7 feet to a point; THENCE South 9°14' East a distance of 819.2 feet to a point; THENCE South 6°56' East a distance of 4472.9 feet to a point in the south line of Section 333 same being the point of beginning. The above described 60 feet wide strip contains 7.29 acres more or less.

- TXNM122415 (1-S-20) - Easement, Keown to U.S., Rec 3-7-62, Deed 107/302
  - East half of East half (E ½ of E ½) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 283, Block 1 T, T. & N.O. R.R. Co. Survey

- 1-S-21 - Condemnation, USDCNDTX, Civil Action No. 3044, JF 3-19-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 264, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: COMMENCE at the Southeast corner Section 264, Block 1-T, T.&N.O. R.R. Co. Survey; THENCE North 7°25' West a distance of 5337.0 feet to a point in the north line of Section 264, said point being 1631.7 feet westerly along the north line of Section 264 from the northeast corner of Section 264; THENCE Westerly along the north line of Section 264 a distance of 60.5 feet to a point; THENCE South 7°25' East a distance of 5337.0 feet to a point in the south line of Section 264; THENCE easterly along the south line of Section 254 a distance of 60.5 feet to a point, same being the point of beginning. The above described 60 feet wide strip contains 7.35 acres more or less.

- 1-S-22 - Condemnation, USDCNDTX, Civil Action No. 3044, JF 3-19-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416

- ○ A strip of land 60 feet in width out of the East Half (E1/2) of Section 249, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: COMMENCE at the Southeast corner Section 249, Block 1-T, T.&N.O. R.R. Co. Survey; THENCE Westerly along the south line of Section 249 a distance of 1631.7 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North continue westerly along the south line of Section 249 a distance of 60.5 foot to a point; THENCE North 7°25' West a distance of 5314.0 feet to a point in the north line of Section 249, said point being 2916.8 feet easterly along the north line of Section 249 from the northwest corner of Section 249; THENCE Easterly along the north line of Section 249 a distance of 60.5 feet to a point; THENCE South 7°25' East a distance of 5314.1 feet to a point in the south line of Section 249, same being the point of beginning.
  The above described 60 feet wide strip contains 7.32 acres more or less.

- TXNM131906 (1-S-23) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-5-63
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - ○ A strip of land 60 feet in width out of Section 230, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 230, Block 1-T, T.&N.O.R.R. Co. Survey; THENCE along the south line of said Section 230 a distance of 2916.8 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 7°25' West a distance of 5026.2 feet to a point; THENCE North 19°33' West a distance of 323.1 feet to a point in the north line of Section 230, said point being 2169.5 feet easterly from the northwest corner of said Section 230; THENCE easterly along the north line of Section 230 a distance of 63.6 feet to a point; THENCE South 19°33' East a distance of 308.41 feet to a point; THENCE South 7°25' East a distance of 5040.1 feet to a point in the south line of Section 230; THENCE westerly along the south line of Section 230 a distance of 60.5 feet to a point, same being the point of beginning.

- TXNM131906 (1-S-24) - Condemnation, USDCNDTX, Civil Action No. 3046, JF 2-5-63
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - ○ A strip of land 60 feet in width out of that portion of the West half (W/2) of Section 215, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas lying south of the Chicago, Rock Island and Pacific Railroad and being more particularly described as follows: Commence at the southwest corner of Section 215, Block 1-T, T.&N.O.R.R. Co. Survey; THENCE easterly along the south line of said Section 215 a distance of 2169.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 19°33' West a distance of 3439.7 feet to a point; THENCE North 19°33' West a distance of 3439.7 feet to a point; THENCE North 31°04' West a distance of 349.3 feet to a point in the south line of the C.R.I.&P. RR right of way, said point being 941.3 feet northeasterly from the west line of Section 215; THENCE northeasterly along the south line of the C.R.I.&P. RR right of way a distance of 60.2 feet to a point; THENCE South 31°04' East a distance of 360.6 feet to a point; THENCE South 19°33' East a distance of 3466.8 feet to a point in the south line of Section 215; THENCE westerly along the south line of Section 215 a distance of 63.6 feet to a point, same being the point of beginning.

- TXNM122371 (1-S-25) - Easement, Mullins to U.S. Rec 2-14-62, Deed 107/258
  - ○ The West half (W/2) lying north and West of C.R.I. & G. Ry. Company R/W in Section 215. Block 1T, T&NO Ry Company Survey
  - ○ Easement, Mullins to U.S. Rec 2-14-62, Deed 107/258 Southwest Quarter (SW/4) of Section 196, Block 1T, T. &N.O. R.R. Co. Survey

- TXNM131908 (1-S-26) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 2-8-63
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - ○ A strip of land 60 feet in width out of Section 181 and the North one half (N/2) of Section 196,

Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the southwest corner of the North one half (N/2) of Section 196, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas; THENCE easterly along the south line of the North one half (N/2) of Section 196 a distance of 698.3 feet to a point, same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the south line of the North one half (N/2) of Section 196 a distance of 60.0 feet to a point; THENCE North 01°09' West a distance of 2605.4 feet to a point; THENCE North 10°45' West crossing the north line of Section 196 and the south line of Section 181 a distance of 4007.1 feet to a point on the west line of Section 181, said point being 1363.2 feet southerly from the northwest corner of Section 181; THENCE southerly along the west line of Section 181 a distance of 329.8 feet to a point; THENCE South 10°45' East crossing the south line of Section 181 and the north line of Section 196 a distance of 3677.8 feet to a point; THENCE South 01°09' East a distance of 2599.6 feet to a point in the south line of the North one half (N/2) of Section 196, same being the point of beginning.

- TXNM122383 (1-S-27) - Easement, Bryan Fredrick to U.S., Rec 2-7-62, Deed 107/241
  - East half of the Northeast quarter (E ½ of NE ½) of Section 182, Block 1 T, T&NO RR Co. Survey

- TXNM122384 (1-S-28) - Easement, Bayless to U.S., Rec 2-7-62, Deed 108/36
  - All of Southeast Quarter (SE ¼) of Section 161, Block 1T, T & NO Ry. Company Survey, EXCEPT that part conveyed to Veteran Land Board. The part hereby conveyed being about 70 acres on the east side of said quarter section.

- TXNM122386 (1-S-29) - Easement, Flayharty to U.S., Rec 3-1-62, Deed 108/51
  - East half of Northeast quarter (E/2 of NE/4) and Northwest quarter of Northeast quarter (NW/4 of NE/4) of Section 161, Block 1 T, T. & N.O. R. R. Co. Survey

- TXNM122387 (1-S-30) - Easement, Cobb to U.S., Rec 3-7-62, Deed 107/297
  - East half (E ½) of Section 148, Block 1 T, T. & N. O. R. R. Co. Survey

- TXNM122397 (1-S-32) - Easement, Allen to U.S., Rec 3-1-62, Deed 108/49
  - West half of East half (W ½ of E ½) and East half of West half (E ½ of W ½) of Section 114, Block 1 T, T. & N. O. R.R. Co. Survey

- 1-S-33 - Condemnation, USDCNDTX, Civil Action No. 3044, JF 2-5-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Sections 80 and 93, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows:
    COMMENCE at the Northwest corner Section 80, Block 1-T, T.&N.O. R.R. Co. Survey; THENCE Easterly along the north line of Section 80, a distance of 1036.8 feet to a point, same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing easterly along the north line of Section 80, a distance of 60.5 feet to a point; THENCE South 07°41' East a distance of 10,643.0 feet crossing the south line of Section 80 and the north line of Section 93, in Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas, to a point in the south line of Section 93, said point being 2785.4 feet westerly from the southeast corner of said Section 93; THENCE Westerly along the south line of Section 93, a distance of 60.5 feet to a point; THENCE North 07°41' West a distance of 10,643.0 feet, crossing the north line of Section 93 and the south line of Section 80, Block 1-T, T.&N.O. R.R. Co. Survey, to a point in the north line of Section 80, same being the point of beginning.
    The above described 60 foot wide strip contains 14.66 acres more or less.

- TXNM122398 (1-S-34 & 1-S-36) - Easement, Kendrick to U.S., Rec 2-7-62, Deed 107/239
  - Southwest quarter (SW ¼) and West half of Northwest quarter of (W ½ of NW ¼) Section 59, Block 1 T, T. & N. O. R.R. Co. Survey

East half of Northeast quarter (E ½ of NE ¼) of Section 47, Block 1 T, T. & N.O. R.R. Co. Survey

- 1-S-35 - Condemnation, USDCNDTX, Civil Action No. 3044, JF 2-5-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - A strip of land 60 feet in width out of Section 46, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows:
  COMMENCE at the Southwest corner Section 46, Block 1-T, T.&N.O. R.R. Co. Survey; THENCE Easterly along the south line of said Section 46 a distance of 461.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue easterly along the south line of Section 46 a distance of 60.3 feet to a point; THENCE North 6°10' West a distance of 3427.0 feet to a point; THENCE North 39°01' West a distance of 60.6 feet to a point; THENCE North 71°52' West a distance of 135.9 feet to a point in the west line of Section 46, said point being 1804.1 feet southerly along the west line of said Section 46 from the northwest corner; THENCE southerly along the west line of Section 46 a distance of 63.2 feet to a point; THENCE South 71°52' East a distance of 98.3 feet to a point; THENCE South 39°01' East a distance of 25.3 feet to a point; THENCE South 6°10' East a distance of 3403.0 feet to a point in the south line of Section 46 same being the point of beginning.
  The above described 60 foot wide strip contains 4.92 acres more or less.

- TXNM122399 (1-S-37) - Easement, Smith to U.S., Rec 1-16-62, Deed 107/199
  - East half (E ½) of Section 24, Block 1 T, T. & N. O. R.R. Co. Survey

- TXNM132167 (1-S-38) - Condemnation, USDCNDTX, Civil Action No. 3052, JF 2-8-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 13, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the northeast corner of Section 13, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas; THENCE westerly along the north line of Section 13 a distance of 1439.8 feet to a point same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE South 06°38' East a distance of 5281.3 feet to a point in the south line of said Section 13 said point being 859.3 feet westerly from the southeast corner of Section 13; THENCE westerly along the south line of Section 13, a distance of 60.4 feet to a point; THENCE North 06°38' West a distance of 5280.8 feet to a point in the north line of Section 13; THENCE easterly and along the north line of Section 13 a distance of 60.4 feet to a point same being the point of beginning.
  - Parcel No. 1 – A tract or parcel of land out of Section 13, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas, to be used as a temporary working space, lying parallel and adjacent to the previously described 60 foot wide strip and being more particularly described as follows: Commence at the northeast corner of Section 13, Block 1-T, T.&N.O.R.R. Co. Survey; THENCE westerly along the north line of Section 13 a distance of 1475.0 feet to a point; THENCE South 06°38' East a distance of 1160.0 feet to a point; THENCE South 83°22' West a distance of 25.0 feet to a point, same being the true point of beginning of the aforementioned tract or parcel of land; THENCE continuing South 83°22' West a distance of 75.0 feet to a point; THENCE South 06°38' East a distance of 300.0 feet to a point; THENCE North 83°22' East a distance of 75.0 feet to a point; THENCE North 06°38' West a distance of 300.0 feet to a point, same being the point of beginning.
  - Parcel No. 2 – A tract or parcel of land out of Section 13, Block 1-T, T.&N.O.R.R. Co. Survey, Sherman County, Texas, to be used as a temporary working space, lying parallel and adjacent to the previously described 60 foot wide strip and being more particularly described as follows: Commence at the northeast corner of Section 13, Block 1-T, T.&N.O.R.R. Co. Survey; THENCE westerly along the north line of Section 13 a distance of 1475.0 feet to a point; THENCE South 06°38' East a distance of 1160.0 feet to a point; THENCE North 83°22' East a distance of 35.0 feet to a point, same being the true point of beginning of the aforementioned tract or parcel of land; THENCE continuing North 83°22' East a distance of 65 feet to a point; THENCE South

06°38' East a distance of 300.0 feet to a point; THENCE South 83°22' West a distance of 65 feet to a point; THENCE North 06°38' West a distance of 300.0 feet to a point, same being the point of beginning.

- TXNM131908 (1-S-39) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 2, Block 1, P.S.L. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 2, Block 1, P.S.L. Survey; THENCE easterly along the south line of Section 2 a distance of 1327.6 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 6°38' West a distance of 880.1 feet to a point; THENCE North 2°37' West a distance of 3804.0 feet to a point in the north line of Section 2, Block 1, P.S.L. Survey, same being the state line between Texas and Oklahoma, said point being 1039.0 feet easterly along the north line of Section 2 from the northwest corner of said Section 2; THENCE easterly along the north line of Section 2 and the Texas Oklahoma state line a distance of 60.1 feet to a point; THENCE South 2°37' East a distance of 3799.3 feet to a point; THENCE South 6°38' East a distance of 884.6 feet to a point in the south line of Section 2; THENCE westerly along the south line of Section 2 a distance of 60.4 feet to a point, same being the point of beginning.
  - 1-S-39 Parcel No. 1 – Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63.
    A tract or parcel of land out of Section 2, Block 1, P.S.L. Survey, Sherman County, Texas to be used as temporary working space, parallel and adjacent to the previously described 60 foot wide strip, and being more particularly described as follows: Commence at the northwest corner of Section 2, Block 1, P.S.L. Survey; THENCE easterly along the north line of said Section 2 a distance of 1064.0 feet; THENCE South 2°37' East a distance of 199.0 feet to a point; THENCE South 87°23' West a distance of 25 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE continue South 87°23' West a distance of 125 feet to a point; THENCE South 2°37' East a distance of 505.0 feet to a point; THENCE North 87°23' East a distance of 125 feet to a point, THENCE North 2°37' West a distance of 505 feet to a point, same being the point of beginning.
  - 1-S-39 Parcel No. 2 – Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63.
    A tract or parcel of land out of Section 2, Block 1, P.S.L. Survey, Sherman County, Texas to be used as temporary working space, parallel and adjacent to the previously described 60 foot wide strip, and being more particularly described as follows: Commence at the northwest corner of Section 2, Block 1, P.S.L. Survey; THENCE easterly along the north of said Section 2 a distance of 1064.0 feet to a point; THENCE South 2°37' East a distance of 199.0 fee to a point; THENCE North 87°23' East a distance of 35 feet to the point of beginning of the aforementioned tract or parcel of land; THENCE South 2°37' East a distance of 505.0 feet to a point; THENCE North 87°23' East a distance of 125 feet to a point; THENCE North 2°37' West a distance of 505.0 feet to a point; THENCE South 87°23' West a distance of 125 feet to a point, same being the point of beginning.
  - 1-S-39 Valve Description – Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63.
    A fenced area 10 feet wide and 30 feet long within the previously described 60 foot wide strip out of Section 2, Block 1, P.S.L. Survey, Sherman County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 2, Block 1, P.S.L. Survey; THENCE easterly along the south line of said Section 2 a distance of 1352.8 feet to a point; THENCE North 6°38' West a distance of 882 feet to a point; THENCE North 2°37' West a distance of 2761 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE North 87°23' East a distance of 5 feet to a point; THENCE North 2°37' West a distance of 30 feet to a point; THENCE South 87°23' West a distance of 10 feet to a point; THENCE South 2°37' East a distance of 30 feet to a point; THENCE North 87°23' East a distance of 5 feet to a point, same being the point of beginning.

- TXNM131203 (708-1-S-1) - Easement, Kendrick to U.S., Rec 6-2-62, Deed 107/585
  - South half of Southwest quarter (S/2 of SW/4) and South half of Southeast quarter (S/2 of SE/4)

of Survey 59, T & NO RR Survey, Block 1-T

- TXNM131204 (708-1-S-2) - Easement, Riff to U.S., Rec 5-3-63, Deed 107/533
  - The South half of the Northwest quarter (S ½ of NW ¼) of Survey #60, Block 1-T, T & NO RR Survey, Sherman County, Texas.

- TXNM131205 (708-1-S-3) - Easement, Smith to U.S., Rec 6-5-62, Deed 108/195
  - Northeast quarter of Southeast quarter and South half of Southeast quarter (NE ¼ of SE ¼ & S ½ of SE ¼) of Survey 60, Block 1-T, T & NO RR. Survey.

- TXNM131214 (708-1-S-4) - Easement, Browne to U.S., Rec 5-18-62, Deed 107/495
  - South half (S ½) of Survey 61, Block 1-T, T & NO RR.

- TXNM131216 (708-1-S-5) - Easement, Vincent to U.S., Rec 6-27-62, Deed, 108/321
  - Southwest quarter (SW ¼), West half of Southeast quarter and Northeast quarter of Southeast quarter (W ½ of SE ¼ & NE ¼ of SE ¼) of Survey 62, T & NO RR Survey, Block 1-T.

- 708-1-S-6 - Condemnation, USDCNDTX, Civil Action No. 3135, JF 2-8-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 427
  - A strip of land 60 feet in width out of the South Half of the North Half (S1/2 of N1/2) and the North Half of the South half (N1/2 of S1/2) of Section 63, Block 1-T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows:
  COMMENCE at the Southwest corner of Section 63, Block 1-T, T.&N.O. R.R. Co. Survey; THENCE Northerly along the West line of Section 63 a distance of 1969.6 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 83°56' East a distance of 5320.0 feet to a point in the East line of Section 63, said point being 2538.8 feet Northerly along the East line from the Southeast corner of said Section 63; THENCE Northerly along the East line of Section 63 a distance of 60.3 feet to a point; THENCE South 83°56' West a distance of 5320.0 feet to a point in the West line of Section 63; THENCE Southerly along the West line of Section 63 a distance of 60.3 feet to a point, same being the point of beginning.
  The above described 60 feet wide strip contains 7.33 acres more or less.

- TXNM131217 (708-1-S-7) - Easement, Diehl to U.S., Rec 5-24-62, Deed 108/178
  - South half of Northwest quarter (S ½ of NW ¼) and North half of Southwest quarter (N ½ of SW ¼) of Survey 64, Block 1-T, T & NO RR Survey.

- TXNM131220 (708-1-S-8) - Easement, Ingham to U.S., Rec 6-27-62, Deed 107/624
  - North half of Southeast quarter (N/2 of SE/4) and South half of Northeast quarter (S/2 of NE/4) of Survey 64, Block 1-T, T&NO RR.

- TXNM131231 (708-1-S-9) - Easement, Ingham to U.S., Rec 5-29-62, Deed 107/520
  - North half of Southwest quarter (N/2 of SW/4) and South half of North half (S/2 of N/2) of Survey 65, Block 1-T, T&NO RR.

- TXNM131232 (708-1-S-10) - Easement, Ross to U.S., Rec 5-31-62, Deed 107/533
  - Northeast quarter (NE ¼), South half of Northwest quarter (S ½ of NW ¼) of Survey 66, Block 1-T, T & NO RR.

- 708-1-S-11 - Condemnation, USDCNDTX, Civil Action No. 3135, JF 6-7-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 427
  - A strip of land 60 feet in width out of the North Half (N1/2) of Section 67, Block 1T, T.&N.O. R.R. Co. Survey, Sherman County, Texas and being more particularly described as follows:
  COMMENCE at the Northwest corner of Section 67, Block 1T, T.&N.O. R.R. Co. Survey;

THENCE Southerly along the West line of Section 67 a distance of 1465.1 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 86°34' East a distance of 3811.6 feet to a point; THENCE North 77°11' East a distance of 1520.5 feet to a point in the East line of Section 67, said point being 841.5 feet Southerly along the East line from the Northeast corner of said Section 67; THENCE Southerly along the East line of Section 67 a distance of 61.5 feet to a point; THENCE South 77°11' West a distance of 1512.0 feet to a point in the West line of Section 67; THENCE South 86°34' West a distance of 3819.8 feet to a point in the West line of Section 67; THENCE Northerly along the West line of Section 67 a distance of 60.1 feet to a point, same being the point of beginning.
The above described 60 feet wide strip contains 7.34 acres more or less.

- TXNM131233 (708-1-S-12 & 708-1-S-14) - Easement, Brady to U.S., Rec 5-24-62, Deed 108/176
  - West half of Northwest quarter and Northeast quarter of Northwest quarter (W ½ of NW ¼ & NE ¼ of NW ¼) and North half of Northeast quarter (N ½ of NE ¼) of Survey 68, Block 1-T, T & NO RR.
  - South half of Southwest quarter and Northeast quarter of Southwest quarter (S ½ of SW ¼ & NE ¼ of SW ¼) and Southeast quarter (SE ¼) of Survey 36, Block 1-T, T & NO RR.
  - This property is subject to a lease between the Grantor herein and Jack Heil dated in May, 1961 expiring July 31, 1963.

- TXNM131234 (708-1-S-13) - Easement, Houston Bank & Trust to U.S., Rec 6-21-62, Deed 107/600
  - South half of Southeast quarter (S ½ of SE ¼) and Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Survey 37, Block 1-T, T & NO RR.

- TXNM131235 (708-1-S-15) - Easement, Pugh to U.S., Rec 5-18-62, Deed 108/161
  - South half of Northeast quarter (S ½ of NE ¼), North half of Southeast quarter (N ½ of SE ¼), Southwest quarter (SW ¼) of Survey 223, Block 1-C, GH & H RR.

- TXNM131243 (708-1-S-16) - Easement, Elliott to U.S., Rec 6-26-62, Deed 107/618
  - Northwest quarter of Southeast quarter (NW/4 of SE/4), North half of Southwest quarter (N/2 of SW/4), South half of Northwest quarter (S/2 of NW/4), Northeast quarter (NE/4) of Survey 198; Northwest quarter (NW/4), West half of Northeast quarter and Northeast quarter of Northeast quarter (W/2 of NE/4 & NE/4 of NE/4) of Survey 193; North half of Northwest quarter (N/2 of NW/4) of Survey 168, all in Block 1-C, GH & H RR Survey

- TXNM131244 (708-1-S-17) - Easement, Hamilton to U.S., Rec 6-22-62, Deed 107/602
  - South half of South half (S ½ of S ½) if Survey 167 and South half (S ½) of Survey 164 lying North of RR., both in Block 1-C, GH & H RR

- TXNM131245 (708-1-S-18) - Easement, Pitzer to U.S., Rec 6-27-62, Deed 108/313
  - That part of the South half of Section 164, Block 1-C, G. H. & H. Ry. Co. Survey, Sherman County, Texas, lying South and East of the C. R. I. & P. R. R. Right of Way and that part of Section 137, Block 1-C, G. H. & H. Ry. Co. Survey, described as follows: Beginning at the Southwest corner of said Section 137; Thence South 89° 49'40" East along the boundary line between Sections 137 and 138, Block 1-C, G. H. & H. Ry. Co. 99.65 varas to a fence; Thence North 40° 40' West 1.3 varas following said fence; Thence North 0° 33' East 950 varas to the boundary line between the North half and the South half of Section 137; Thence North 89°49' 40: West 105.04 varas to the West boundary line of Section 137; Thence South 0° 10' 35" West 950 varas to the place of beginning, containing 17.59 acres.

- TXNM131246 (708-1-S-19) - Easement, Oldaker to U.S., Rec 5-18-62, Deed 108/163
  - That part of the South half of Section 137, Block 1C, GH & H RR Co. Survey, Sherman County, Texas, lying within the following described tract of land: Beginning at the southeast corner of Section 137, Block 1C, GH & H Ry Co: thence North 89° 49' 40" West, with the north line of Section 138, said block, and the south line of Section 137, at 18

varas pass a 1 ¼ inch galvanized iron pipe under a fence running north and south, at 1,801 varas, a point under fence whence the southwest corner of Section 137, above mentioned, bears North 89° 49' 40" West, 99.65 varas; thence North 40°42' West with a fence, 1.3 varas to the corner of a fence; thence South 88° 33' 40" East, with the line of a fence 1,796 varas to a point in the east line of Section 137; thence South 0° 10' 35" West, 934 varas to the beginning corner of this tract, and containing 303.89 acres of land.

- TXNM131249 (708-1-S-20) - Easement, Pugh to U.S., Rec 6-20-62 Deed 107/604
  - North half of Southwest quarter (N ½ of SW ¼), Southeast quarter of Northwest quarter (SE ¼ of NW ¼), South half of Northeast quarter (S ½ of NE ¼) of Survey 134, Block 1-C, GH & H Ry. Co.

- TXNM131250 (708-1-S-21) - Easement, Aycock to U.S., Rec 6-25-62, Deed 107/609
  - North half of Northeast quarter (N ½ of NE ¼), Northwest quarter (NW ¼) of Survey 107, Block 1-C, GH & H RR

- TXNM131251 (708-1-S-22) - Easement, Riffe to U.S., Rec 6-27-62, Deed 108/315
  - Southeast quarter of Southeast quarter (SE ¼ of SE ½) of Survey 106, Block 1-C GH & H RR.

- TXNM131252 (708-1-S-23) - Easement, Schafer to U.S., Rec 6-23-62, Deed 107/606
  - South half of Southwest quarter and Northeast quarter of Southwest quarter (S ½ of SW ¼ & NE ¼ of SW ¼) and Southeast quarter (SE ¼) of Survey 105, Block 1-C, GH & H RR.

- TXNM131253 (708-1-S-24) - Easement, Craig to U.S., Rec 6-20-62, Deed 107/598
  - North half of South half (N ½ of S ½), Southwest quarter of Southwest quarter (SW ¼ of SW ¼) of Survey 76, Block 1-C, GH & H RR.

- TXNM131254 (708-1-S-25) - Easement, Renner to U.S., Rec 6-25-62, Deed 108/289
  - South half of Northwest quarter (S ½ of NW ¼) and North half of Southwest quarter (N ½ of SW ¼) of Survey 75, Block 1-C, GH & H RR.

- TXNM131255 (708-1-S-26) - Easement, Renner to U.S., Rec 6-27-62, Deed 108/317
  - South half of Northeast quarter (S ½ of NE ¼), Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Survey 75, Block 1-C, GH & H RR.
  - South half of Northwest quarter and Northeast quarter of Northwest quarter (S ½ of NW ¼ & NE ¼ of NW ¼) of Survey 46, Block 1-C, GH & H RR.

- TXNM131256 (708-1-S-27) - Easement, Lavake to U.S., Rec 6-20-62, Deed 107/596
  - Northeast quarter (NE ¼) of Survey 46, Block 1-C, GH & H RR. Survey.

- TXNM131257 (708-1-S-28) - Easement, Schafer to U.S., Rec 5-18-62, Deed 107/493
  - North half of North half (N ½ of N ½) of Survey 45, Block 1-C, GH &H RR.

- TXNM131258 (708-1-S-29) - Easement, Mullinix to U.S., Rec 5-18-62, Deed 107/491
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼), South half of Southeast quarter (S ½ of SE ¼) of Survey 24, Block 1, PSL

- TXNM131260 (708-1-S-30) - Easement, Riffe to U.S., Rec 6-5-62, Deed 108/197
  - Section 25, Blk. 1, PSL Survey and a part of Section 26, Blk. 1, PSL Survey, described as follows: Commencing at the southeast corner of Section 26, Blk. 1 PSL Survey, Sherman County, Texas; Thence north 89° 49' 25" West 918.7 varas along south boundary line of said Section 26 to the point of beginning of the tract described below; Thence north 28° 46" east to a point in the north boundary line of said Section 26; Thence westerly along the north boundary line of said Section 26 to the northwest corner of said Section 26; Thence southerly along the west boundary line of said Section 26 to the most westerly southwest corner of said Section 26; Thence easterly along the south line of said Section 26 to its most southerly southeast corner; Thence northerly with its

most westerly east line to a 2" iron pipe over a 1 ¼" G.I.P. marked 1-26; Thence easterly along the most northerly south line of said Section 26 to the point of beginning.

- 708-1-S-32 – Easement, Riffe to U.S., Rec 4-16-63, Deed 108/193
    - A tract of land out of Section 27, Block 1, P.S.L. Survey, Sherman County, Texas.

**Hansford County**
- TXNM131691 (708-1-H-1 & 708-1-S-31) - Easement, Riffe to U.S., Rec 6-5-62, Deed 108/191
    - Survey 27, Block 1, PLS Survey, Sherman and Hansford Counties, Texas, and a part of Section 26, Block 1, PSL Survey Sherman County, Texas, described as follows: Commencing at the northeast corner of Section 26, Blk. 1, PLS Survey, Sherman County, Texas; Thence south 0° 6' west 1358.60 varas to the southeast corner of said Section 26; Thence north 89° 49' 25" west 918.7 varas to a point in the south boundary line of said Section 26; Thence north 28° 46" east to a point in the north boundary line of said Section 26; Thence easterly along boundary line of said Section 26 to place of beginning.

- TXNM132168 (708-1-H-2) - Condemnation, USDCNDTX, Civil Action No. 3135, JF 2-8-63
    - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 427
    - A strip of land 60 feet in width out of Section 1 and the West 472 acres of Section 2, Block 1, PSL Survey, Hansford County, Texas and being more particularly described as follows: COMMENCE at the Northwest corner Section 1, Block 1, PSL Survey; THENCE Southerly along the West line of Section 1 a distance of 1091.7 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE South 89°56' East a distance of 11,641.1 feet to a point in the East line of the West 472 acres of Section 2, said point being 1109.3 feet Southerly along the East line form the Northeast corner of the said West 472 acres of Section 2; THENCE Southerly along the East line of the West 472 acres of Section 2 a distance of 60.0 feet; THENCE North 89°56' West a distance of 11,640.8 feet to a point in the West line of Section 1; THENCE Northerly along the West line of Section 1 a distance of 60.0 feet to a point, same being the point of beginning.
    The above described 60 feet wide strip contains 16.03 acres more or less.

- 708-1-HA-2 – Condemnation, USDCNDTX, Civil Action No. 3135, JF 2-8-63
    - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 427
    - The East 120 acres of Section 2, Block 1, P.S.L. Survey, Hansford County, Texas.

- TXNM131692 (708-1-H-3) - Easement, Garrett to U.S., Rec 5-18-62, Deed 43/513
    - North half (N ½) of East 120 acres of Survey 2 and North half of West half (N ½ of W ½) of Survey 3, Block 1, PSL.

- TXNM131693 (708-1-H-4) - Easement, Blake, Executrix to U.S., <span style="color:red">**Recordation Data Unavailable**</span>
    - North half of East half (N/2 of E/2) of Survey 3, Block 1, PSL
    - A strip of land 60 feet in width out of the East half (E 1/2) of Section 3, Block 1, PSL Survey, Hansford County, Texas and being more particularly described as follows: COMMENCE at the Northwest corner of the East half (E 1/2) of Section 3, Block 1, PSL Survey; THENCE Southerly along the West line of the East half (E 1/2) of Section 3 a distance of 1220.5 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE South 87°10' East a distance of 2067.3 feet to a point; THENCE North 88°45' East a distance of1155.7 feet to a point in the East line of Section 3, said point being 1291.4 feet Southerly along the East line from the Northeast corner of said Section 3; THENCE Southerly along the East line of Section 3 a distance of 60.0 feet to a point; THENCE South 88°45' West a distance of 1156.5 feet to a point; THENCE North 87°10' West a distance of 2066.5 feet to a point in the West line of the East half (E 1/2) of Section 3; THENCE Northerly along the West line of the East half (E 1/2) of Section 3 a distance of 60.0 feet to a point, same being the point of beginning.

- TXNM131183 (708-1-H-5) - Easement, Dahl to U.S., Rec 6-5-62, Deed 43/633
  - North half (N ½) of Survey 4, North half (N ½) of Survey 5 and North half (N ½) of West 76.6 acres of Survey 6, Block 1, PSL

- TXNM131194 (708-1-H-6) - Easement, Dahl to U.S., Rec 6-1-62, Deed 43/635
  - The North half of the South half (N/2 of S/2) and the South half of the North half (S/2 of N/2) of the Second, Third, Fourth and Fifth Eights of Section 6, Block 1, PSL. Said eighths being measured from the West line of Section 6, Hansford County, Texas

- 708-1-H-7 - Condemnation, USDCNDTX, Civil Action No. 3135, JF 10-23-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 427
  - A strip of land 60 feet in width out of the sixth and seventh eighths from the West line of Section 6, Block 1, PSL Survey, Hansford County, Texas and being more particularly described as follows: COMMENCE at the Southwest corner of the Sixth eighth from the West line of Section 6, Block 1, PSL Survey; THENCE Northerly along the West line of the said sixth eighth a distance of 2081.2 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE South 88°32' East a distance of 1708.1 feet to a point in the East line of the seventh eighth from the West line of Section 6, said point being 2040.5 feet Northerly along the East line from the Southeast corner of the said seventh eighth; THENCE Northerly along the East line of the seventh eighth from the West line of Section 6 a distance of 60.0 feet to a point; THENCE North 88°32' West a distance of 1708.0 feet to a point in the West line of the sixth eighth from the West line of Section 6; THENCE Southerly along the West line of the sixth eighth from the West line of Section 6 a distance of 60.0 feet to a point, same being the point of beginning.
  The above described 60 feet wide strip contains 2.35 acres more or less.

- TXNM131199 (708-1-H-8) - Easement, Johnson to U.S., Rec 6-1-62, Deed 43/637
  - The North half of the South half (N/2 of S/2) and the S708-1-H-7 A strip of land 60 feet in width out of the sixth and seventh eighths from the West line of Section 6, Block 1, PSL Survey, Hansford County, Texas and being more particularly described as follows: COMMENCE at the Southwest corner of the Sixth eighth from the West line of Section 6, Block 1, PSL Survey; THENCE Northerly along the West line of said sixth eight a distance of 2081.2 feet to the true POINT OF BEGINNING of the aforementioned 60 feet wide strip: THENCE South 88°32' East a distance of 1708.1 feet to a point on the East line of the seventh eighth from the West line of Section 6, said point being 2040.5 feet Northerly along the East line from the Southeast corner of the said seventh eighth; THENCE Northerly along the East line of the seventh eighth from the West line of Section 6 a distance of 60.0 feet to a point; THENCE North 88°32' West a distance of 1708.0 feet to a point on the West line of the sixth eighth from the West line of Section 6; THENCE Southerly along the West line of the sixth eighth from the West line of Section 6 a distance of 60.0 feet to a point; same being the POINT OF BEGINNING
  South half of the North half (S/2 of N/2) of the East 77.2 acres of Section 6, Block 1, PSL, Hansford County, Texas

- TXNM131200 (708-1-H-9) - Easement, Peterson to U.S., Rec 6-8-62, Deed 43/681
  - The North half of the South half (N ½ of S ½) and the South half of the North half (S ½ of N ½) of the West five-eighths of Section 7, Blk. 1, Public Free School Land, in Hansford County, Texas, except 40 acres, more or less, in the Southwest corner of said Section owned by Michigan-Wisconsin Pipe Line Company, as shown by deed recorded in Volume 56, Pages 457-460, Deed Records of Hansford County, Texas
  The grantee agrees to water-pack the ditch and backfill within the herein granted right-of-way and the grantor agrees to furnish all necessary water for said water-parking operation.

- TXNM131201 (708-1-H-9P) - Easement, Phillips Petroleum Company to U.S., Rec 5-18-62, Deed 43/511

- A strip of land 50 feet in width the centerline of which is described as follows: COMMENCE at the point in the West line of the East Three-Eights of Section 7, Block 1, PSL Survey, Hansford County, Texas 114 feet Southerly from the Southwest corner of that part of the East three-eights of said Section 7 owned by the Michigan Wisconsin Pipeline Co.; Thence South 88° 32' East a distance of 30 feet to a point; Thence South 89° 54' East a distance of 1232 feet to a point of ending.
  The above described 50 feet wide strip contains 1.45 acres more or less.

**Potter County**
- TXNM131907 (1-P-1) - Condemnation, USDCNDTX, Civil Action No. 3048, JF 6-19-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A tract of land out of Section 26, Block 6, B.S.&F. Survey, Potter County, Texas more particularly described as follows: Commence at the southeast corner of Section 26, Block 6, B.S.&F. Survey; THENCE northerly along the east line of said Section 26 a distance of 280.0 feet to the true point of beginning of the aforementioned tract; THENCE continue northerly along the east line of Section 26 a distance of 460.0 feet to a point; THENCE westerly and parallel with the south line of Section 26 a distance of 213.3 feet to a point; THENCE North 7°45' East a distance of 1581.7 feet to a point in the east line of Section 26, said point being 2307.3 feet northerly along the east line from the southeast corner of Section 26; THENCE northerly along the east line of Section 26 a distance of 444.9 feet to a point; THENCE South 7°45' West a distance of 2030.7 feet to a point; THENCE westerly and parallel to the south line of Section 26 a distance of 118.2 feet to a point; THENCE southerly and parallel to the east line of Section 26 a distance of 460.0 feet to a point; THENCE easterly and parallel to the south line of Section 26 a distance of 392.0 feet to a point, same being the point of beginning.
  - 1-P-1 Parcel No. 1 - Condemnation, USDCNDTX, Civil Action No. 3048, JF 6-19-63.
    A tract or parcel of land out of Section 26, Block 6, B.S.&F. Survey, Potter County, Texas to be used as a temporary working space and being more particularly described as follows: Commence at the southeast corner of Section 26, Block 6, B.S.&F. Survey; THENCE northerly along the east line of Section 26 a distance of 740.0 feet to a point; THENCE westerly and parallel to the south line of Section 26 a distance of 112.4 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE continuing westerly and parallel to the south line of Section 26 a distance of 100.9 feet to a point; THENCE North 7°55' East a distance of 464.9 feet to a point; THENCE South 82°05' East a distance of 100.0 feet to a point; THENCE South 7°55' West a distance of 451.3 feet to a point same being the point of beginning.
  - 1-P-1 Parcel No. 2 - Condemnation, USDCNDTX, Civil Action No. 3048, JF 6-19-63.
    A tract or parcel of land out of Section 26, Block 6, B.S.&F. Survey, Potter County, Texas to be used as temporary working space and being more particularly described as follows: Commence at the southeast corner of Section 26, Block 6, B.S.&F. Survey; THENCE northerly along the east line of Section 26 a distance of 740.0 feet to a point; THENCE westerly and parallel to the south line of Section 26 a distance of 273.8 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE continuing westerly and parallel to the south line of Section 26, a distance of 100.9 feet to a point; THENCE North 7°55' East a distance of 486.7 feet to a point; THENCE South 82°05' East a distance of 100.0 feet to a point; THENCE South 7°55' West a distance of 473.1 feet to a point, same being the point of beginning.

- TXNM131908 (1-P-2) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 6-19-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Sections 23 and 24, Block 6, B.S.&F. Survey, Potter County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 23, Block 6, B.S.&F. Survey; THENCE northerly along the west line of Section 23 a distance of 2307.3 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue northerly along the west line of Section 23 a distance of 444.9 feet to a point; THENCE North 7°55' East a distance of 3537.9 feet to a point; THENCE 6°02' East a distance of

4229.6 feet to a point; THENCE North 5°53' East a distance of 111.5 feet to a point in the north line of Section 24, said point being 919.9 feet easterly along the north line of Section 24 from the northwest corner of Section 24; THENCE easterly along the north line of Section 24 a distance of 60.3 feet to a point; THENCE South 5°53' West a distance of 117.5 feet to a point; THENCE South 6°02' West a distance of 4230.6 feet to a point; THENCE South 7°55' West a distance of 3979.8 feet to a point in the west line of Section 23, same being the point of beginning.

- 1-P-2 Parcel 2 - Condemnation, USDCNDTX, Civil Action No. 3050, JF 6-19-63.

A tract or parcel of land out of Section 23, Block 6, B.S.&F. Survey, Potter County, Texas and being more particularly described as follows: Commence at the southwest corner of Section 23, Block 6, B.S.&F. Survey; THENCE northerly along the west line of said Section 23 a distance of 280 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE easterly and parallel to the south line of Section 23 a distance of 68.0 feet to a point; THENCE northerly and parallel to the west line of Section 23 a distance of 100.0 feet to a point; THENCE easterly and parallel to the south line of Section 23 a distance of 45.5 feet to a point; THENCE southerly and parallel to the west line of Section 23 a distance of 130 feet to a point; THENCE easterly and parallel to the south line of Section 23 a distance of 23.5 feet to a point; THENCE southerly and parallel to the west line of Section 23 a distance of 250.0 feet to a point in the south line of said Section 23, said point being 137.0 feet easterly along the south line from the southwest corner of said Section 23; THENCE easterly along the south line of Section 23 a distance of  76.5 feet to a point; THENCE northerly and parallel to the west line of Section 23 a distance of 480 feet to a point; THENCE westerly and parallel to the south line of Section 23 a distance of 145.5 feet to a point; THENCE northerly and parallel to the west line of Section 23 a distance of 260.0 feet to a point; THENCE westerly and parallel to the south line of Section 23 a distance of 68.0 feet to a point in the west line of said Section 23; THENCE southerly along the west line of Section 23 a distance of 460.0 feet to a point, same being the point of beginning.

- 1-P-4 – Easement, Ross Rentfro and Sylvia Rentfro, Rec. 1-15-62, Book 911/255
  - Section 22, Block 021W, G.C. & S.F. R.R. Co. Survey, Potter County, Texas

- **Government Fee-Owned Parcels** - Humble Oil and Refining Company to U.S by Deed dated 3-6-31, Rec. 9-17-31, Volume 227/221.  (1-P-3, 1-P-5)
  - A 645 acre tract of land, all of Section 21, Block 021W, G.C. & S.F. R.R. Co. Survey, Patent No. 242, Dated March 6th, 1880, Recorded in Volume 1, Page 93 of the Patent Records, Potter County, Texas
    - New Easement Abstract Label: A-310
    - Survey Name: Gulf, Colorado and Santa Fe Railway Company
    - Section Number: 21
    - Potter County, Texas
  - A 328.4 acre tract of land out of the East Half of Section 3, Block 0004E, G. & M. Survey, Patent No. 58, dated June 11, 1892, and recorded in Volume 1, Page 64 of the Patent Records, Potter County, Texas
    - New Easement Abstract Label: A-479
    - Survey Name: Gunter & Munscn
    - Block Number: GM-4
    - Section Number: 3
    - Potter County, Texas
  - A 639.6 acre tract of land, all of Section 42, Block 0005, G. & M. Survey, Patent No. 79, Volume 12 of the Patent Records, Potter County, Texas
    - New Easement Abstract Label: A-537
    - Survey Name: Gunter & Munscn
    - Block Number: GM-5
    - Section Number: 42
    - Potter County, Texas
  - East 103 acres of Section 43, Block 0005, G. & M. Survey, Patent No. 75, Volume 12 of the Patent Records, Potter County, Texas

- ▪ New Easement Abstract Label: A-538
- ▪ Survey Name: Gunter & Munscn
- ▪ Block Number: GM-5
- ▪ Section Number: 43
- ▪ Potter County, Texas
  - ○ East 37.2 acres of Section 48, Block 0005, G. & M. Survey, Patent No. 70, Volume 12 of the Patent Records, Potter County, Texas
    - ▪ New Easement Abstract Label: A-543
    - ▪ Survey Name: Gunter & Munscn
    - ▪ Block Number: GM-5
    - ▪ Section Number: 48
    - ▪ Potter County, Texas

- ● TXNM131908 (1-P-6) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - ○ A strip of land 60 feet in width out of Section 85, 86 & 87, Block 47, H.&T.C.R.R. Co. Survey, Potter County, Texas and being more particularly described as follows: Commence at the northeast corner of Section 85, Block 47, H.&T.C.R.R. Co. Survey; THENCE westerly along the north line of said Section 85 a distance of 387.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue westerly along the north line of Section 85 a distance of 67.3 feet to a point; THENCE South 27°03' West a distance of 2905.2 feet to a point; THENCE South 41°10' West a distance of 2749.2 feet to a point; THENCE South 12°50' West a distance of 2029.0 feet to a point; THENCE South 32°34' West a distance of 1009.4 feet to a point; THENCE South 24°26' West a distance of 1216.9 feet to a point; THENCE South 19°37' West a distance of 401.9 feet to a point on the north bank of the Canadian River, said point being 725.3 feet southeasterly along the north bank of the Canadian River from the intersection of the north bank of the Canadian River with the west line of Section 87; THENCE southeasterly along the north bank of the Canadian River a distance of 60.0 feet to a point; THENCE North 19°37' East a distance of 387.7 feet to a point; THENCE North 46°19' East a distance of 848.5 feet to a point; THENCE North °26' East a distance of 1224.3 feet to a point; THENCE North 32°34' East a distance of 1015.6 feet to a point; THENCE North 12°50' East a distance of 2024.3 feet to a point; THENCE North 41°10' East a distance of 2943.1 feet to a point in the north line of Section 85 same being the point of beginning.
  - ○ 1-P-6 Valve Description – Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63. A fenced area 10 feet wide and 30 feet long within the previously described 60 foot wide strip out of Section 87, Block 47, H.&T.C.R.R. Co. Survey, Potter County, Texas and being more particularly described as follows: Commence at the intersection of the north bank of the Canadian River and the west line of Section 87; THENCE southeasterly along the north bank of the Canadian River a distance of 750.3 feet to a point on the north bank of the Canadian River; THENCE North 19°37' East a distance of 281.0 feet to the true point of beginning of the aforementioned tract of land; THENCE North 70°23' West a distance of 5 feet to a point; THENCE North 19°37' East a distance of 30 feet to a point; THENCE South 70°23' East a distance of 10 feet to a point; THENCE South 19°37' West a distance of 30 feet to a point; THENCE North 70°23' West a distance of 5 feet to a point same being the point of beginning.
  - ○ 1-P-6 Parcel No. 1 – Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63. A tract or parcel of land out of Section 87, Block 47, H.&T.C.R.R. Co. Survey, Potter County, Texas to be used as permanent working space lying parallel and adjacent to the previously described 60 foot wide strip and being more particularly described as follows: Commence at the intersection of the north bank of the Canadian River with the west line of Section 87, Block 47, H.&T.C.R.R. Co. Survey; THENCE southeasterly along the north bank of the Canadian River a distance of 725.3 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE North 19°37' East a distance of 401.9 feet to a point; THENCE North 46°19' East a distance of 109.9 feet to a point; THENCE North 43°41' West a distance of 125.0 feet to a point; THENCE South 46°19' West a distance of 139.6 feet to a point; THENCE South 19°37' West a

distance of 431.6 feet to a point on the north bank of the Canadian River; THENCE southeasterly along the north bank of the Canadian River a distance of 125 feet to the point of beginning.

- ○ 1-P-6 Parcel No. 2 Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63.
  A tract or parcel of land out of Section 87, Block 47, H.&T.C.R.R. Co. Survey, Potter County, Texas to be used as permanent working space lying parallel and adjacent to the previously described 60 foot wide strip and being more particularly described as follows: Commence at the intersection of the north bank of the Canadian River with the west line of Section 87, Block 47, H.&T.C.R.R. Co. Survey, THENCE southeasterly along the north bank of the Canadian River a distance of 785.3 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE North 19°37' East a distance of 387.7 feet to a point; THENCE North 46°19' East a distance of 94.7 feet to a point; THENCE South 43°41' East a distance of 125.0 feet to a point; THENCE South 46°19' West a distance of 66.0 feet to a point; THENCE South 19°37' West a distance of 358.0 feet to a point on the north bank of the Canadian River a distance of 125 feet to the point of beginning.

- ● 1-P-7 - Condemnation, USDCNDTX, Civil Action No. 3051, JF 4-9-63
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - ○ A strip of land 60 feet in width out of Section 79, Block 2, G.&M. Survey, Potter County, Texas and being more particularly described as follows:
    Commence at the southeast corner of Section 79, Block 2, G.&M. Survey; THENCE westerly along the south line of said Section 79 a distance of 387.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing westerly along the south line of said Section 79 a distance of 67.2 feet to a point; THENCE North 27°03' East a distance of 903.8 feet to a point on the east line of Section 79; THENCE Southerly along the east line of Section 79 a distance on 132.2 feet to a point, said point being 663.3 feet northerly from the southeast corner of said Section 79; THENCE South 27°03' West a distance of 755.6 feet to a point on the south line of Section 79 same being the point of beginning.
    The above described 60 foot wide strip contains 1.14 acres, more or less.

- ● TXNM131908 (1-P-8) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - ○ A strip of land 60 feet in width out of Sections 11, 17 & 18, Block B-11, E.L.&R.R. Railroad Co. Survey, Sections 80, 82, 83 & 84, Block 2, G.&M. Survey and Section 81, BLOCK D18 D.&P. RY. Co. Survey, Potter County, Texas and being more particularly described as follows: Commence at the Southwest (SW) corner of Section 17, Block B-11, E.L.&R.R. Railway Co. Survey; THENCE Northerly along the West line of said Section 17 a distance of 1349.2 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 27°03' East a distance of 2019.1 feet to a point; THENCE North 22°38' East a distance of 428.1 feet to a point;  THENCE North 04°06' East, leaving Section 17 and entering Section 18, a distance of 2935.8 feet to a point; THENCE North 13°36' East a distance of 609.1 feet to a point; THENCE North 21°23' West, leaving Section 18, E.L.&R.R. RR. Co. Survey, Block B-11, and entering Section 82, G&M Survey, Block 2, a distance of 2063.9 feet to a point; THENCE North 20°49' West a distance of 1073.9 feet to a point; THENCE North 04°40 West a distance of 2691.8 feet to a point; THENCE North 21°43 East, leaving Section 82, entering and leaving Section 80 and entering Section 83, a distance of 6653.6 feet to a point; THENCE North 09°35' West, crossing the Southwest (SW) corner of Section 11 and leaving Section 83 and entering Section 84, a distance of 5613.7 feet to a point; THENCE North 0°38' East, leaving Section 84, G.&M. Survey, Block 2, and entering Section 81, D.&P. RY. Co. Survey, Block 018, a distance of 4549.3 feet to a point in the North line of Section 81, that is common to the South line of Section 4, said point being 971.5 feet westerly along the North line of Section 81 and the South line of Section 4 from the Southeast (SE) corner of Section 4; THENCE Westerly along the North line of Section 81 a distance of 60.0 feet to a point; THENCE South 0°38' West, leaving Section 81, D.&P. RY. Co. Survey, Block 018 and entering Section 84, G.&M. Survey Block 2, a distance of 4552.2 feet to a point; THENCE South

09°35' East, leaving section 84 and entering Section 83, a distance of 5608.2 feet to a point; THENCE South 21°43' West, leaving Section 83, entering and leaving Section 80 and entering Section 82, a distance of 6650.9 feet to a point; THENCE South 04°40' East a distance of 2714.4 feet to a point; THENCE South 20°49' East a distance of 1082.7 feet to a point; THENCE South 21°23' East, leaving Section 82, G.&M. Survey, Block 2 and entering Section 18, E.L.&R.R. R.R. Co. Survey, Block B-11, a distance of 2045.2 feet to a point; THENCE South 13°36' West a distance of 595.2 feet to a point; THENCE South 04°06' West leaving Section 18 and entering Section 17, a distance of 293.0 feet to a point; THENCE South 22°38' West a distance of 416.0 feet to a point; THENCE South 27°03' West a distance of 1895.9 feet to a point in the west line of Section 17; THENCE Southerly along the west line of Section 17 a distance of 132.2 feet to a point, same being the point of beginning.

- 1-P-8 Temporary Working Space – Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63
  A tract or parcel of land out of Section 17, Block B-11, E.L.&R.R. RR. Co. Survey, Potter County, Texas, to be used as temporary working space parallel and adjacent to the previously described 60 foot wide strip, and being more particularly described as follows: Commence at the southwest corner of Section 17, Block B-11, E.L.&R.R. RR. Co. Survey; THENCE northerly along the west line of said Section 17 a distance of 1481.4 feet to a point; THENCE North 27°03' East a distance of 939.9 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE North 62°57' West a distance of 100 feet to a point; THENCE North 27°03' East a distance of 200 feet to a point; THENCE South 62°57' East a distance of 100 feet to a point; THENCE South 27°03' West a distance of 200 feet to a point, same being the point of beginning.

- TXNM131910 (1-P-9) - Condemnation, USDCNDTX, Civil Action No. 3051, JF 2-8-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 4, Block O-18, D.&P. Survey, Potter County, Texas and being more particularly described as follows: Commence at the southeast corner of Section 4, Block O-18, D.&P. Survey, Potter County, Texas; THENCE westerly along the south line of said Section 4 a distance of 971.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 0°38' East a distance of 4354.0 feet to a point; THENCE North 0°47' West a distance of 975.7 feet to a point in the north line of Section 4, said point being 967.0 feet westerly along the north line of Section 4 from the northeast corner of Section 4; THENCE westerly along the north line of Section 4 a distance of 60.0 feet to a point; THENCE South 0°47' East a distance of 976.2 feet to a point; THENCE South 0°38' West a distance of 4355.7 feet to a point in the south line of Section 4; THENCE easterly along the south line of Section 4 a distance of 60.0 feet to a point, same being the point of beginning.

- TXNM131908 (1-P-10) - Condemnation, USDCNDTX, Civil Action No. 3050, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417
  - A strip of land 60 feet in width out of Section 3, Block 018, D.&P. Survey, Potter County, Texas and being more particularly described as follows: Commence at the southeast corner of Section 3, Block 018, D.&P. Survey; THENCE westerly along the south line of said Section 3 a distance of 967.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 0°47' West a distance of 1186.3 feet to a point; THENCE North 6°18' West a distance of 3711.9 feet to a point; THENCE North 13°26' West a distance of 422.6 feet to a point in the north line of Section 3 from the northeast corner of Section 3; THENCE westerly along the north line of Section 3 a distance of 61.8 feet to a point; THENCE South 13°26' East a distance of 433.6 feet to a point; THENCE South 6°18' East a distance of 3705.2 feet to a point; THENCE South 0°47' East a distance of 1182.3 feet to a point in the south line of Section 3; THENCE easterly along the south line of Section 3 a distance of 60.0 feet to a point, same being the point of beginning.

- 1-P-11 - Condemnation, USDCNDTX, Civil Action No. 3051, JF 4-9-63
  - Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 417

- ○ A strip of land 60 feet in width out of Sections 2 and 12, Block 0-18, D.&P. Ry. Co. Survey, Potter County, Texas and being more particularly described as follows: Commence at the Southeast corner of Section 2, Block 0-18, D.&P.  Ry. Co. Survey; THENCE westerly along the south line of said Section 2 a distance of 404.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continuing westerly along the south line of said Section 2 a distance of 61.8 feet to a point; THENCE North 13°26' West a distance of 2087.9 feet to a point; THENCE North 17°45' West a distance of 7109.2 feet to a point being 2619.3 feet westerly from the Northeast corner of Section 12; THENCE Easterly along the north line of Section 12 a distance of 63.1 feet to a point; THENCE South 17°45' East a distance of 7091.9 feet to a point; THENCE South 13°26' East distance of 2104.9 feet to a point in the south line of Section 2 same being the point of beginning.
  The above described 60 foot wide strip contains 12.67 acres more or less.

- ● 1-P-12 (Portion 1-M-1) - Deed Without Warranty, US to Leslie T. Rush and Leslie W. Rush, Recorded in Moore County on 11-3-65, Book 196/166, Recorded in Potter County on 11-12-65, Book 1021/149
  - ○ Reserving for the United States of America and its assigns of perpetual easements for the purpose of maintaining, replacing, removing, reconstructing, and/or operating existing pipelines for the transportation of gas, petroleum, or any of its products, also water or other substances, or either thereof, and as incident thereto to erect and maintain, operate, change, renew, reconstruct communication or electrical lines, or either of them as may be necessary in connection with the use of the pipelines to-wit:
    8-inch Crude Helium Pipeline in, on, under and across a tract of land containing approximately 2.2 acres, 60 feet in width, 30 feet on each side of the located centerline, the centerline being described as follows:
    BEGINNING at a point in the south line of Section 34, Block P-Mc, EL&RR Rwy. Co., Potter County Texas, approximately 2,688 feet east of the southwest corner thereof; THENCE North 17°45' West, a distance of approximately 1,582 feet to the end of this easement.
  - ○ 2-inch Pure Helium Pipeline in, on, under and across a tract of land containing approximately 2.4 acres, 60 feet in width, 30 feet on each side of the located centerline, the centerline being described as follows:
    BEGINNING at a point in the south line of Section 34, Block P-Mc, EL&RR RWY. Co., Potter and Moore Counties, Texas, approximately 2,745 feet east of the southwest corner thereof; THENCE North 18°15' West, a distance of approximately 1,765 feet to the end of this easement.

- ● TXNM132170 - Condemnation, USDCNDTX, Civil Action No. 3049, JF 3-20-62
  - ○ Record located in NARA, Fort Worth, Accession #: 48N022F, Location: 5-21-2-18-6, Record Group: RG21, Identifier: 564461, Box: 416
  - ○ 59.78 acres of land, more or less, in Potter County
  - ○ A roadway 100 feet in width across Section 51, Block 9, B.S.&F. Survey, Potter County, Texas, the centerline of which is described as follows: Commence at a point in the south line of Section 51, Block 9, B.S.&F. Survey which is 2174.3 feet westerly along the south line from the southeast corner; thence North 49°03' West a distance of 347 feet to a point; thence North 40°13' West a distance of 455 feet to a point; thence North 31°02' West a distance of 1250 feet to a point; thence North 42°49' West a distance of 430 feet to a point; thence North 53°13' West a distance of 312 feet to a point; thence North 60°41' West a distance of 252 feet to a point; thence North 39°11' West a distance of 474 feet to a point; thence North 42°21' West a distance of 415 feet to a point; thence North 50°00' West a distance of 333 feet to a point; thence North 69°27' West a distance of 362 feet to a point in the west line of Section 51, said point being 3274 feet northerly along the west line from the southwest corner. The above described 100 foot wide roadway contains 10.63 acres, more or less.
  - ○ A roadway 100 feet in width across Section 21, Block 6, B.S.&F. Survey, Potter County, Texas, the centerline of which is described as follows: Commence at a point in the east line of Section 21, Block 6, B.S.&F. Survey which is 505.9 feet southerly along the west line from the northeast

corner; thence North 52°19' West a distance of 686 feet to a point; thence North 61°49' West a distance of 189 feet to a point in the north line of Section 21, said point being 709.7 feet westerly along the north line from the northeast corner. The above described 100 foot wide roadway contains 2.01 acres, more or less.

- o  A roadway 100 feet in width across Section 13, Block 6, B.S.&F. Survey, Potter County, Texas, the centerline of which is described as follows: Commence at a point in the south line of Section 13, Block 6, B.S.&F. Survey which is 1516.5 feet easterly along the south line from the southwest corner; thence North 52°23' West a distance of 802 feet to a point; thence North 55°08' West a distance of 718 feet to a point; thence North 50°40' West a distance of 376 feet to a point in the west line of Section 13, said point being 1132.6 feet northerly along the west line from the southwest corner. The above described 100 foot wide roadway contains 4.35 acres, more or less.

- o  A roadway 100 feet in width across Section 20, Block 6, B.S.&F. Survey, Potter County, Texas, the centerline of which is described as follows: Commence at a point in the east line of Section 20, Block 6, B.S.&F. Survey which is 1132.6 feet northerly along the east line from the southeast corner; thence North 50°40' West a distance of 641 feet to a point; thence North 58°40' West a distance of 432 feet to a point; thence North 49°44' West a distance of 266 feet to a point; thence North 40°46' West a distance of 416 feet to a point; thence North 27°41' West a distance of 289 feet to a point; thence North 14°36' West a distance of 1220 feet to a point; thence North 37°39' West a distance of 430 feet to a point; thence North 42°31' West a distance of 545 feet to a point; thence North 51°48' West a distance of 503 feet to a point; thence North 75°14' West a distance of 201 feet to a point; thence North 89°29' West a distance of 686 feet to a point; thence South 83°08' West a distance of 272 feet to a point; thence South 68°42' West a distance of 217 feet to a point; thence North 84°11' West a distance of 396 feet to a point; thence South 87°41' West a distance of 458 feet to a point; thence North 83°29' West a distance of 211 feet to a point; thence North 52°19' West a distance of 114 feet to a point in the west line of Section 20, said point being 505.9 feet southerly along the west line from the southwest corner of Section 20. The above described 100 foot wide roadway contains 16.75 acres, more or less.

- o  A roadway 100 feet in width across Section 22, Block 6, B.S.&F. Survey, Potter County, Texas, the centerline of which is described as follows: Commence at a point in the south line of Section 22, Block 6, B.S.&F. Survey which is 709.7 feet westerly along the south line from the southeast corner; thence North 61°49' West a distance of 59 feet to a point; thence North 50°08' West a distance of 782 feet to a point; thence North 46°22' West a distance of 510 feet to a point; thence North 53°41' West a distance of 289 feet to a point; thence North 44°45' West a distance of 508 feet to a point; thence North 38°51' West a distance of 1861 feet to a point; thence North 39°11' West a distance of 2378 feet to a point; thence North 14°32' West a distance of 616 feet to a point in the north line of Section 22, said point being 163.5 feet easterly along the north line from the northwest corner. The above described 100 foot wide roadway contains 16.08 acres, more or less.

- o  A roadway 100 feet in width across Section 52, Block 9, B.S.&F. Survey, Potter County, Texas, the centerline of which is described as follows: Commence at a point in the east line of Section 52, Block 9, B.S.&F. Survey which is 3274 feet northerly along the east line from the southeast corner; thence North 69°27' West a distance of 75 feet to a point; thence North 65°29' West a distance of 305 feet to a point; thence North 71°43' West a distance of 641 feet to a point; thence North 65°39' West a distance of 653 feet to a point; thence North 77°02' West a distance of 366 feet to a point; thence North 62°25' West a distance of 254 feet to a point; thence North 54°56' West a distance of 1376 feet to a point; thence North 52°23' West a distance of 669 feet to a point in the north line of Section 52, said point being 1516.5 feet easterly along the north line from the northwest corner. The above described 100 foot wide roadway contains 9.96 acres, more or less.

## Attachment I
### Cliffside Helium Pipeline
### Oklahoma Legal Descriptions

**Cimarron County**
- OKNM132169 (2-C-0) - Condemnation, USDCWDOK, Civil Action No. 9631, JF 12-10-63
  - Record located at NARA, Kansas City, Accession #: 021-72M117, Location: 5-19-2-13-7, Record Group: RG21, Identifier: 564461, Box: 159
  - A strip of land 60 feet in width out of Section 1, T-1-S, R-8-E, Cimarron County, Oklahoma and being more particularly described as follows: Commence at the southeast corner of Section 1, T-1-S, R-8-E, same being a point on the state line between Oklahoma and Texas; THENCE westerly along the south line of Section 1, same being the state line between Oklahoma and Texas a distance of 197.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 2°37' West a distance of 336.0 feet to a point on the north line of Section 1, said point being 211.8 feet westerly along the north line of Section 1 from the northeast corner of Section 1; THENCE westerly along the north line of Section 1 a distance of 60.1 feet to a point; THENCE South 2°37' East a distance of 336.0 feet to a point on the south line of Section 1, same being the state line between Oklahoma and Texas; THENCE easterly along the south line of Section 1 a distance of 60.1 feet to a point, same being the point of beginning.
  - Valve Description – A fenced area 10 feet wide by 30 feet long within the previously described 60 foot wide strip out of Section 1, T-1-S, R-8-E, Cimarron County, Oklahoma, and being more particularly described as follows: Commence at the northeast corner of Section 1, T-1-S, R-8-E; THENCE westerly along the north line of said Section 1 a distance of 246.8 feet to a point; THENCE South 2°37' East a distance of 225 feet to the true point of beginning of the aforementioned tract or parcel of land; THENCE South 87°23' West a distance of 5 feet to a point; THENCE South 2°37' East a distance of 30 feet to a point; THENCE North 87°23' East a distance of 10 feet to a point; THENCE North 2°37' West a distance of 30 feet to a point; THENCE South 87°23' West a distance of 5 feet to a point, same being the point of beginning.

- OKNM122400 (2-C-1) - Easement, Protho to U.S., Rec 3-7-62, Book 99/260
  - East half of Southeast quarter (E/2 of SE/4) and Northeast quarter (NE/4) of Section 36, Township 1 North, Range 8 East
  - Southeast quarter (SE/4) of Section 25, Township 1 North, Range 8 East

- OKNM122401 (2-C-2 & 4) - Easement, Strickler to U.S., Rec 2-14-62, Book 99/75
  - Northeast quarter (NE ¼) of Section 25, Township 1 North, Range 8 East C M
  - West half of Northeast quarter (W ½ of NE ¼) of Section 24, Township 1 North, Range 8 East C M

- OKNM122402 (2-C-3) - Easement, Harrison to U.S.A., Rec 2-9-62, Book 99/39
  - Southeast quarter (SE ¼) of Section 24, Township 1 North, Range 8 East

- OKNM122403 (2-C-5) - Easement, Johnson to U.S., Rec 1-29-62, Book 99/173
  - The South half (S/2) of Section 13, Township 1 North, Range 8 East

- OKNM122404 (2-C-6) - Easement, Johnson to U.S., Rec 3-1-62, Book 99/174
  - West half of Northeast quarter (W ½ of NE ¼) of Section 13, Township 1 North, Range 8 East

- OKNM2169 (2-C-7) - Condemnation, USDCWDOK, Civil Action No. 9631, JF 3-7-63
  - Record located at NARA, Kansas City, Accession #: 021-72M117, Location: 5-19-2-13-7, Record Group: RG21, Identifier: 564461, Box: 159
  - A strip of land 60 feet in width out of Section 12, T-1-N, R-8-E, Cimarron County, Oklahoma and being more particularly described as follows: Commence at the southwest corner of Section 12,

T-1-N, R-8-E, THENCE easterly along the south line of said Section 12 a distance of 2700.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 4°44' West a distance of 5304.0 feet to a point in the north line of Section 12, said point being 2255.9 feet easterly along the north line of Section 12 form the northwest corner of Section 12; THENCE easterly along the north line of Section 12 a distance of 60.2 feet to a point; THENCE South 4°44' East a distance of 5304.0 feet to a point in the south line of Section 12; THENCE westerly along the south line of Section 12 a distance of 60.2 feet to a point, same being the point of beginning.

- OKNM122419 (2-C-8) - Easement, Crabeal to U.S., Rec 2-9-62, Book 99/40
  - East half of Southwest quarter (E ½ of SW ¼), Section 1, Township 1 North, Range 8 East

- OKNM122424 (2-C-9) - Easement, Lee to U.S., Rec 2-9-62, Book 99/14
  - Northwest quarter (NW ¼) of Section 1, Township 1 North, Range 8 East

- OKNM122425 (2-C-10) - Easement, Cox to U.S., Rec 2-9-62, Book 99/42
  - The Southwest Quarter (SW ¼) of Section 36, Township 2 North, Range 8 East

- OKNM122426 (2-C-11 & 12) - Easement, Cox to U.S., Rec 2-9-62, Book 99/45
  - The Northwest quarter (NW ¼) of Section 36, Township 2 North, Range 8 East C M
  - The Southwest quarter (SW ¼) of Section 25, Township 2 North, Range 8 East C M

- OKNM122427 (2-C-13) Easement, Snell to U.S., Rec 3-1-62, Book 99/176
  - Northwest quarter (NW1/4) of Section 25, Township 2 North, Range 8 East

- OKNM122428 (2-C-14) - Easement, Cox to U.S., Rec 2-9-62, Book 99/43
  - West half of Southwest quarter (W ½ of SW ¼) of Section 24, Township 2 North, Range 8 East

- OKNM122517 (2-C-15) - Easement, Cox to U.S., Rec 2-9-62, Book 99/15
  - West half of Northwest quarter (W ½ of NW ¼) of Section 24, Township 2 North, Range 8 East

- OKNM122518 (2-C-16) - Easement, Twombly to U.S., Rec 2-16-62, Book 99/84
  - West half of Southwest quarter (W ½ of SW ¼) of Section 13, Township 2 North, Range 8 East
  - Being the same land described in that certain deed from C .E. Twombly, et ux to Charles A. Twombly, dated March 2, 1943, recorded in Volume 43, Page 464, of the Deed Records of said county.

- OKNM122519 (2-C-17) - Easement, Twombly to U.S., Rec 2-6-62, Book 99-217
  - East half of Southeast quarter (E ½ of SE ¼) of Section 14, Township 2 North, Range 8 East

- OKNM122520 (2-C-18) - Easement, Taylor to U.S., Rec 3-7-62, Book 99/256
  - East half of Northeast quarter (E ½ of NE ¼) of Section 14, Township 2 North, Range 8 East

- OKNM122524 (2-C-19) - Easement, Dougherty to U.S., Rec 2-9-62, Book 99/46
  - East half of Southeast quarter (E ½ of SE ¼) and Northeast quarter (NE ¼) of Section 11, Township 2 North, Range 8 East

- OKNM122525 (2-C-31 & 20) - Easement, Gowdy to U.S., Rec 3-7-62, Book 99/258
  - East half of Southeast quarter (E ½ of SE ¼) of Section 34, Township 4 North, Range 8 East
  - Southeast Quarter (SE ¼) of Section 2, Township 2 North, Range 8 East C M

- OKNM122526 (2-C-21) - Easement, Trovinger to U.S., Rec 3-1-62, Book99/177
  - Northeast quarter (NE ¼) of Section 2, Township 2 North, Range 8 East C M

- OKNM122526-01 (2-C-21) - Easement, Helm to U.S., Rec 3-1-62, Book 99/178
  - Northeast quarter (NE ¼) of Section 2, Township 2 North, Range 8 East C M

- OKNM122527 (2-C-22) - Easement, Pugh to U.S., Rec 2-9-62, Book 99/48
  - Southeast quarter (SE ¼) of Section 35, Township 3 North, Range 8 East C M
  - South half of Northeast quarter (S ½ of NE ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 35, Township 3 North, Range 8 East C M
  - West half of East half (W ½ of E ¼) of Section 26, Township 3 North, Range 8 East

- 2-C-23 - Easement is within the (GAP/Pugh easement) cited above based on pipeline location. Pipeline does not traverse the cited legal description below and **is therefore not relevant.**
  - East Half of West Half (E ½ of W ½) and West half of East half (W ½ of E ½) of Section 26, Township 3 North, Range 8 East

- OKNM122528 (2-C-24) - Easement, Omohundro to U.S., Rec 2-25-62, Book 99/125
  - East half of West half (E ½ of W ½) and West half of East half (W ½ of E ½) of Section 23, Township 3 North, Range 8 East

- OKNM132169 (2-C-25) - Condemnation, USDCWDOK, Civil Action No. 9631, JF 3/7/63
  - Record located at NARA, Kansas City, Accession #: 021-72M117, Location: 5-19-2-13-7, Record Group: RG21, Identifier: 564461, Box: 159
  - A strip of land 60 feet in width out of the Southwest Quarter (SW ¼) of Section 14, T-3-N, R-8-E, Cimarron County, Oklahoma and being more particularly described as follows: Commence at the southeast corner of Section 14, T-3-N, R-8-E; THENCE westerly along the south line of said Section 14 a distance of 3177.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 7°07' West a distance of 2699.0 feet to a point in the north line of the Southwest Quarter (SW ¼) of Section 14, said point being 3495.9 feet westerly along the north line of the South half (S ½) of Section 14 from the northeast corner of the South half (S ½) of Section 14; THENCE westerly along the north line of the South half (S ½) of Section 14 a distance of 60.5 feet to a point; THENCE South 7°07' East a distance of 2699.0 feet to a point in the south line of Section 14; THENCE easterly along the south line of Section 14 a distance of 60.5 feet to a point, same being the point of beginning.

- OKNM122529 (2-C-26) - Easement, Gowdy to U.S., Rec 2-9-62, Book 99/17
  - The Northwest quarter (NW ¼) of Section 14, Township 3 North, Range 8 East C M

- OKNM122530 (2-C-27) - Easement, Finney to U.S., Rec 2-9-62, Book 99/18
  - The west half (W ½) of Section 11, Township 3 North, Range 8 East C M

- OKNM122531 (2-C-28) - Easement, Hinds to U.S., Rec 2-14-62, Book 99/77
  - West half of Southwest quarter (W ½ of SW ¼) of Section 2, Township 3 North, Range 8 East

- OKNM122532 (2-C-29) - Easement, Aman to U.S., Rec 3-1-62, Book 99/180
  - Lot Four (4) and the Southwest Quarter of the Northwest Quarter (SW ¼ NW ¼) of Section Two (2), Township Three North (T3N), Range Eight East of Cimarron Meridian (R8E cm), Cimarron County, Oklahoma.

- OKNM122533 (2-C-30) - Easement, Wagner, Trustee to U.S., Rec 3-6-62, Book 99/218
  - West half of Southwest quarter (W ½ of SW ¼) and Southwest quarter of Northwest quarter (SW ¼ of NW ¼) of Section 35, Township 4 North, Range 8 East

- OKNM122534 (2-C-31) - Easement, Gowdy to U.S., Rec 3-7-62, Book 99/258
  - East half of Southeast quarter (E ½ of SE ¼) of Section 2, Township 2 North, Range 8 East CM

- OKNM122534 (2-C-32) - Easement, Harbaugh to U.S., Rec 2-20-61, Book 98/166
  - East half of Northeast quarter (E ½ of NE ¼) of Section 34, Township 4 North, Range 8 East

- OKNM122451 (2-C-33) - Easement, Rhoton to U.S., Rec 2-9-62, Book 99/20
  - East half of (E ½) Section 27, Township 4 North, Range 8 East

- OKNM122452 (2-C-34) - Easement, Wiggins to U.S., Rec 2-23-62, Book 99/126
  - The Southeast quarter (SE ¼) of Section 22, Township 4 North, Range 8 East C M
  - Except a strip of land 50 feet wide, North and South, and one half (½) mile long, East and West off of the North side of the Southeast quarter (SE ¼)

- OKNM122453 (2-C-35) - Easement, Wiggins to U.S., Rec 3-12-62, Book 99/284
  - South half of Northeast quarter (S ½ of NE ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 22, Township 4 North, Range 8 East

- OKNM122454 (2-C-36) - Easement, David to U.S., Rec 2-23-62, Book 99/128
  - West half of Southeast quarter (W ½ of SE ¼) of Section 15, Township 4 North, Range 8 East

- OKNM122455 (2-C-37) - Easement, Harris to U.S., Rec 2-23-62, Book 99/129
  - West half of Northeast quarter (W ½ of NE ¼) of Section 15, Township 4 North, Range 8 East

- OKNM122456 (2-C-38) - Easement, Colvin to U.S., Rec 3-12-62, Book 99/285.
  - West half of Southeast quarter (W ½ of SE ¼) pf Section 10, Township 4 North, Range 8 East

- OKNM122457 (2-C-39) - Easement, Blankenship to U.S., Rec 3-22-62, Book 99/370
  - West half of Northeast quarter (W ½ of NE ¼) of Section 10, Township 4 North, Range 8 East

- OKNM122458 (2-C-40) - Easement, McCoy to U.S., Rec 3-20-352, Book 99/352
  - East half of Northwest quarter (E ½ of NW ¼) of Section 10, Township 4 North, Range 8 East

- OKNM122460 (2-C-41) - Easement, Hurst to U.S., Rec 3-15-62, Book 99/308
  - East half of Southwest quarter (E ½ of SW ¼), Section 3, Township 4 North, Range 8 East

- OKNM122461 (2-C-42) Keyes Helium Plant (Deed to Cimarron Industrial Partnership with Govt retained easements, Rec 9/27/1990, Book 0272/387 Doc# 4459
  - A tract of land situated in Lots Three (3) and Four (4), and the South half of the Northwest Quarter (S/2 of NW/4), and the Southwest Quarter (SW/4) of Section Three (3), in Township Four (4) North, Range Eight (8) East of the Cimarron Meridian, situated in Cimarron County, State of Oklahoma, more particularly described as follows, to-wit: BEGINNING at ¼-inch iron pin located on the northwest corner of Section 3, Township 4 North, Range 8 East, Cimarron County, Oklahoma, for the northwest corner of this tract. THENCE, North 89 degrees 55 minutes East, two thousand six hundred thirty-eight and three-tenths (2638.3) feet along the north boundary line of Section 3 to the northeast corner of Lot 3, and the northwest corner of Lot 2, of Section 3, for the northeast corner of this tract. THENCE, South 0 degrees 05 minutes East, along the East boundary of Lot 3 and the west boundary of Lot 2, and the east boundary of the south half of the northwest one-quarter of Section 3, two thousand four hundred fifteen and four tenths (2415.4) feet to a point in the north boundary of the Atchison, Topeka, and Santa Fe Railway Company right-of-way for the southeast corner of this tract. THENCE, South 60 degrees 42 minutes West, along the north boundary of said right-of-way, being a line fifty (50) feet northwesterly perpendicular to and parallel to the center-line of said right-of-way and the approximate center-line of railroad tracks, three thousand twenty-five and six-tenths (3025.6) feet to a point in the west boundary of Section 3 for the southwest corner of this tract. THENCE, North 0 degrees 03 minutes West along the west boundary of Section 3, three thousand eight hundred ninety-two and three-tenths (3892.3) feet to the place of beginning, containing 191.1 acres, more or less, except all or any interests in and to all oil, gas and other minerals, including but not limited to

hydrocarbons.

- OKNM122462 (2-C-43) - Easement, Carlsen to U.S., Rec 4-25-62, Book 100/93
  - Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 33, Township 5 North, Range 8 East

- OKNM122463 (2-C-44) - Easement, McCoy to U.S., Rec 2-14-62, Book 99/78
  - Southwest quarter (SW ¼) and North half of Southeast quarter (N ½ of SE ¼) of Section 34, Township 5 North, Range 8 East

- OKNM132180 (2-C-45) - Condemnation, USDCWDOK, Civil Action No. 9651
  - Northeast quarter (NE ¼) of Section 34, Township 5 North, Range 8 East

- OKNM122464 (2-C-46) - Easement, Barrick to U.S., Rec 4-13-62, Book 100/28
  - West half of Northwest quarter (W/2 of NW/4) and Northeast quarter of Northwest quarter (NE/4 of NW/4) and Northwest quarter of Northeast quarter (NW/4 of NE/4) of Section 35, Township 5 North, Range 8 East

- OKNM122465 (2-C-47) - Easement, Estate of Rose to U.S., Rec 4-13-62, Book 100/26
  - Southeast Quarter of Southwest Quarter (SE/4 of SW/4) and Southeast Quarter (SE/4) of Section 26, Township 5 North, Range 8 East

- OKNM122466 (2-C-48) - Easement, Gross to U.S., Rec 3-15-62, Book 99/309
  - North half of Southwest quarter (N ½ of SW ¼) of Section 25, Township 5 North, Range 8 East

- OKNM122467 (2-C-49) - Easement, Rose to U.S., Rec 3-15-62, Book 99/311
  - South half of Northwest quarter (S ½ of NW ¼) pf Section 25, Township 5 North, Range 8 East

- OKNM122468 (2-C-50) - Easement, Burns to U.S., Rec 3-15-62, Book 99/312
  - Northeast quarter (NE ¼) of Section 25, Township 5 North, Range 8 East

- OKNM122469 (2-C-51) - Easement, Burns to U.S., Rec 3-20-62, Book 99/354
  - Lot 1 of Section 30, Township 5 North, Range 9 East

- OKNM122470 (2-C-52) - Easement, Harryman to U.S., Rec 4-13-62, Book 100/30
  - South half of Southwest quarter (S ½ pf SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 19, Township 5 North, Range 9 East; also described as lot 4 and East half of Southwest quarter (E ½ of SW ¼) of Section 19, Township 5 North, Range 9 East of Cimarron Meridian.

- OKNM122471 (2-C-53) - Easement, Hatcher to U.S., Rec 3-15-62, Book 99/314
  - West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 19, Township 5 North, Range 9 East

- OKNM122472 (2-C-54) - Easement, Rodgers to U.S., Rec 4-5-62, Book 99/551
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 20, Township 5 North, Range 9 East

- OKNM122473 (2-C-55) - Easement, Harryman to U.S., Rec 3-22-62, Book 99/373
  - Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 19, Township 5 North, Range 9 East and Northwest quarter (NW ¼) of Section 20, Township 5 North, Range 9 East

- OKNM122474 (2-C-56) - Easement, Woodside to U.S., Rec 4-25-62, Book 100/99.
  - West half of Northeast quarter (W/2 of NE/4) and Northeast quarter of Northeast quarter (NE/4 of

NE/4) of Section 20, Township 5 N, Range 9 East

- OKNM 122475 (2-C-57) - Easement, Jermyn to U.S., Rec 3-22-62, Book 99/374
  - South half of Southeast quarter (S ½ of SE ¼) of Section 17, Township 5 North, Range 9 East

- OKNM122475-01 (2-C-58) - Easement, Jermyn to U.S., Rec 3-22-62, Book 99/376
  - Southwest quarter (SW ¼) of Section 16, Township 5 North, Range 9 East C M

- OKNM122476 (2-C-59) - Easement, Baughman to U.S., Rec 3-27-62, Book 99/378
  - North half of Southeast quarter (N ½ of SE ¼) of Section 16, Township 5 North, Range 9 East
  - (subject to prior easements and oil and gas leases of record)
    (Route to be surveyed and staked within six months)

- OKNM122477 (2-C-60) - Easement, Thrash to U.S., Rec 3-22-62, Book 99/380
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 16, Township 5 North, Range 9 East

- OKNM122479 (2-C-61) - Easement, Melton to U.S., Rec 4-20-62, Book100/81
  - Northwest quarter (NW ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 15, Township 5 North, Range 9 East

- OKNM122480 (2-C-62) - Easement, Sparkman to U.S., Rec 3-22-62, Book 99/382
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 10, Township 5 North, Range 9 East

- OKNM122481 (2-C-63) - Easement, DeMaio to U.S., Rec 3-22-62, Book 99/384
  - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 11, Township 5 North, Range 9 East

- OKNM122482 (2-C-64 & 67) - Easement, Sparkman to U.S., Rec 3-22-62, Book 99/386
  - South half of Northwest quarter (S ½ of NW ¼) of Section 11, Township 5 North, Range 9 East
  - South half of Southwest quarter (S ½ of SW ¼) of Section 1, Township 5 North, Range 9 East

- OKNM122483 (2-C-65) - Easement, Purcell to U.S., Rec 3-22-62, Book 99/388
  - Northeast quarter (NE ¼) of Section 11, Township 5 North, Range 9 East

- OKNM122484 (2-C-66) - Easement, Zdanovich to U.S., Rec 3-12-62, Book 99/390
  - North half of Northwest quarter (N ½ of NW ¼) of Section 12, Township 5 North, Range 9 East

- OKNM122485 (2-C-68) - Easement, Duckett to U.S., Rec 3-22-62, Book 99/392
  - Southeast quarter (SE ¼) of Section 1, Township 5 North, Range 9 East

**Texas County**
- OKNM122490 (2-T-1) - Easement, Mitchell to U.S., Rec 2-8-62, Book 329/434
  - Lot six (6) of Section Six (6), Range Ten (10) East C.M.

- OKNM122491 (2-T-2) - Easement, Manary to U.S. to U.S., Rec 2-13-62, Book 329/441
  - The South half of Northwest quarter and Northeast quarter of Northwest quarter (S ½ of NW ¼ & NE ¼ of NW ¼) of Section 6, Township 5 North, Range 10 East C M

- OKNM122492 (2-T-3) - Easement, Buck to U.S., Rec 3-1-62, Book 329/451
  - Lots One and Two (1 & 2) and the Southwest quarter of the Northeast quarter all in Section Six (6), Township 5 North, Range 10 East of C. M.

- OKNM122493 (2-T-4) - Easement, Street to U.S., Rec 3-1-62, Book 329/435
  - One hundred feet (100), more or less, across the Northwest corner of: The Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 5, Township 5 North, Range 10 East C M
    It is further agreed that there shall be no above ground installations within the herein granted right -of-way.

- OKNM122494 (2-T-5) - Easement, Hanke to U.S., Rec 2-8-21, Book 329/437
  - South half of Southwest quarter and Northeast quarter of Southwest quarter S ½ of SW ¼ & NE ¼ of SW ¼) of Section 32, Township 6 North, Range 10 East C M

- OKNM122495 (2-T-6) - Easement, Brown to U.S., Rec 2-5-62, Book 329/432
  - North half of Southeast quarter and Southwest quarter of Southeast quarter N ½ of SE ¼ & SW ¼ of SE ¼) of Section 32, Township 6 North, Range 10 East C M

- OKNM122496 (2-T-7) - Easement, Brown to U.S., Rec 2-19-62, Book 329/447
  - South half of Northeast quarter (S ½ of NE ¼) of Section 32, Township 6 North, Range 10 East

- OKNM122497 (2-T-8) - Easement, Hutson to U.S., Rec 3-12-62, Book 329/455
  - Northwest quarter and West half of Northeast quarter and Northeast quarter of Northeast quarter (NW ¼ and W ½ of NE ¼ and NE ¼ of NE ¼) of Section 33, Township 6 North, Range 10 East C M

- OKNM122498 (2-T-9) - Easement, Brown to U.S., Rec 2-19-62, Book 329/448.
  - South half of Southeast quarter (S ½ of SE ¼) of Section 28, Township 6 North, Range 10 East C M

- OKNM122499 (2-T-10) - Easement, Denning to U.S., Rec 3-29-62, Book 329/504
  - Southwest quarter (SW ¼) of Section 27, Township 6 North, Range 10 East

- OKNM122500 (2-T-11) - Easement, Green to U.S., Rec 2-23-62, Book 329/449
  - North half of Southeast quarter and South half of Northeast quarter (N ½ of SE ¼ & S ½ of NE ¼) of Section 27, Township 6 North, Range 10 East C M

- OKNM122501 (2-T-12) - Easement, Quigley to U.S., Rec 2-8-62, Book 329/502
  - Northwest quarter (NW ¼) Northwest (NW) of RR and North half of Northeast Quarter (N ½ of NE ¼) of Section 26, Township 6 North, Range 10 East

- OKNM122502 (2-T-13) - Easement, Quigley to U.S., Rec 2-8-62, Book 329/438
  - South half of Southeast quarter (S ½ of SE ¼) of Section 23, Township 6 North, Range 10 East C M

- OKNM122503 (2-T-14) - Easement, Forbes to U.S., Rec 4-12-62, Book 329/510
  - The South Half of Southwest quarter and Northeast Quarter of Southwest Quarter (S ½ of SW ¼ & NE ¼ of SW ¼), Southeast Quarter of Northwest Quarter of Southwest quarter (SE ¼ of NW ¼ of SW ¼) of Section 24, Township 6 North, Range 10 East C M

- OKNM122504 (2-T-15) - Easement, Shrauner to U.S., Rec 3-12-62, Book 329/454
  - North half of Southeast quarter (N ½ of SE ¼) and South half Northeast quarters (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 24, Township 6 North, Range 10 C M

- OKNM122505 (2-T-16 & 21) - Easement, Tucker to U.S., Rec 2-3-62, Book 329/439
  - South half of Northeast Quarter (S ½ of NE ¼) and Northeast Quarter of Northeast quarter (NE ¼ of NE ¼) of Section 17, Township 6 North, Range 11 East C.M.

The Northwest Quarter (NW ¼) of Section 19, Township 6 North, Range 11 East C.M.

- OKNM122506 (2-T-17) - Easement, Walker to U.S., Rec 2-13-62, Book 329/442
  - North half of Northeast quarter (N ½ of NE ¼) of Section 19, Township 6 North, Range 11 East C M
    EXCEPT a six (6) acre tract located in the Northeast quarter of Northeast quarter (NE ¼ of NE ¼)

- OKNM122507 (2-T-18) - Easement, McClung to U.S., Rec 3-13-62, Book 329/456
  - South half of Southeast quarter and Northeast quarter of Southeast quarter (S ½ of SE ¼ & NE ¼ of SE ¼) of Section 18, Township 6 North, Range 11 East C M

- OKNM122508 (2-T-19) - Easement, Richterberg to U.S., Rec 2-8-62, Book 329/440
  - Southwest quarter (SW ¼) of Section 17, Township 6 North, Range 11 East C M
    EXCEPT Northwest quarter of Northwest quarter of Southwest quarter (NW ¼ of NW ¼ of SW ¼)

- OKNM122509 (2-T-20) - Easement, Mitchell to U.S., Rec 2-8-62, Book 329/433
  - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 17, Township 6 North, Range 11 East C M

- OKNM122510 (2-T-22) - Easement, Butler to U.S., Rec 3-29-62, Book 329/503
  - Lots 3 and 4, and Southwest quarter of the Northwest quarter (SW/4 of NW/4) of Section 16, Township 6 North, Range 11 East C.M.

## Attachment J
### Cliffside Helium Pipeline
### Kansas Legal Descriptions

**Morton County**

- KSNM122535 (3-M-1 & 3-M-6) - Easement, McClung to U.S., Rec 2-9-62, Deed 35/608
  - Lot #2 in Section 22 and Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Section 15, Township 35 South, Range 42 West
  - North half of Southwest quarter (N ½ of SW ¼) South half of Northwest quarter (S ½ of NW ¼), and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 7, Township 35 South, Range 41 West

- KSNM122514 (3-M-2) - Easement, Barnes to U.S., Rec 2-14-62, Deed 35/616
  - West half (W ½) of Lot #1, Section 22, and Southeast quarter (SE ¼) of Section 15, Township 35 South, Range 42 West

- KSNM122515-02 (3-M-3) - Easement, Horton to U.S., Rec 4-13-62, Deed 35/658
  - South half of Northwest quarter (S/2 of NW/4) and Northeast quarter (NE/4) of Section 14, Township 35 South, Range 42 West

- KSNM122515 (3-M-3A) - Easement, Miller to U.S., Rec 4-13-62, Deed 35/655
  - Southwest quarter of Southwest quarter (SW/4 of SW/4), North half of Southwest quarter (N/2 of SW/4), Section 14, Township 35 South, Range 42 West

- KSNM122515-01 (3-M-3A) - Easement, Sharp to U.S., Rec 5-15-62, Deed 37/6
  - Southwest quarter of Southwest quarter (SW/4 of SW/4), North half of Southwest quarter (N/2 of SW/4), Section 14, Township 35 South, Range 42 West

- KSNM122521 (3-M-4) - Easement, Krey to U.S., Rec 3-15-62, Deed 35/626
  - North half of Northwest quarter (N ½ of NW ¼) of Section 13, Township 35 South, Range 42 West

- KSNM122522 (3-M-5 & 3-M-10) - Easement, Hoopengarner to U.S., Rec 3-15-62, Deed 35/628
  - South half of Southwest quarter (S ½ of SW ¼), Northeast quarter of Southwest quarter (NE ¼ of SW ¼), and Southeast quarter (SE ¼) of Section 12, Township 35 South, Range 42 West
  - North half of Southeast quarter (N ½ of SE ¼), Southwest quarter of Southeast quarter (SW ¼ of SE ¼), and South half (S ½) of Northeast quarter (NE ¼) of Section 5, Township 35 South, Range 41 West

- KSNM122536 (3-M-7) - Easement, Wright to U.S., Rec 3-15-62, Deed 35/632
  - North half of Northeast quarter (N ½ of NE ¼) and Southwest quarter of Northeast quarter (SW ¼ of NE ¼) of Section 7, Township 35 South, Range 41 West

- KSNM122537 (3-M-8) - Easement, Gerber to U.S., Rec 3-15-62, Deed 35/630
  - South half of Southeast quarter (S ½ of SE ¼) of Section 6, Township 35 South, Range 41 West West half of Northeast quarter (N/2 of NE/4) of Section 4, Township 35 South, Range 41 West

- KSNM122538 (3-M-9) - Easement, Gerber to U.S., Rec 4-13-62, Deed 35/651
  - Southwest quarter (SW ¼) of Section 5, Township 35 South, Range 41 West

- KSNM122539-01 (3-M-11) - Easement, Rowland to U.S., Rec 4-13-62, Deed 35/652
    - Northwest quarter (NW ¼) of Section 4, Township 35 South, Range 41 West

- KSNM122539 (3-M-12) - Easement, Crawley to U.S., Rec 4-13-62, Deed 35/363
    - North half of the Northeast quarter (N ½) of Section 4, Township 35 South, Range 41 West

- KSNM122540 (3-M-13, 3-M-15, 3-M-17, 3-M-32,) - Easement, Shraumer to U.S., Rec 11-27-61, Deed 329/329

- KSNM122541 (3-M-14) - Easement, Bressler to U.S., Rec 2-14-62, Deed 35/618
    - Southwest quarter (SW ¼) of Section 34, Township 34 South, Range 41 West

- 3-M-15; 3-M-17; 3-M-32; 3-M-13 MEMORANDUM OF UNDERSTANDING AGREEMENT, Bureau of Mines to Forest Service Supervisor
    - T. 34 South, Range 41 West, Morton County, Kansas Section 34, N ½ SE ¼ and S ½ NE ¼ and NE ¼ NE ¼
    - T. 34 South, Range 41 West, Morton County, Kansas Section 25, W ½ SW ¼ , NE ¼ SW ¼ , S ½ NW ¼,
    - T. 34 South, Range 40 West, Morton County, Kansas, Section 30, W ½ NW ¼, NE ¼ NW ¼,
    - Section 17, SE ¼ SE ¼, T. 34 South, Range 41 West, Morton County, Kansa
    - Section 21, N ½ NW ¼, Section 19, S ½, SW ¼, T. 34 South, Range 41 West, Morton County, Kansas

- KSNM122542 (3-M-16) - Easement, Hinch to U.S., Filed 2-14-62, Deed 35/617
    - Southeast quarter of Southwest quarter (SE ¼ of SW ¼), South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter (NE ¼ of SE ¼) of Section 26, Township 34 South, Range 41 West

- KSNM122543 (3-M-18) - Easement, Dallas to U.S., Rec 4-13-62, Deed 35/657
    - South half of Southwest quarter (S/2 of SW/4) and Northeast quarter of Southwest quarter (NE/4 of SW/4) of Section 16, Township 34 South, Range 40 West
      Said pipeline to enter said tract approximately 239 feet east of the Southwest corner of said Section 16, then proceeding in a Northeasterly direction and leaving said tract at a point approximately 1118 feet North of the Southeast corner of the Southwest Quarter of said Section 16. Subject to oil and gas lease granted to Cities Service Oil Company and to the rights of all persons in possession thereunder.

- KSNM122544 (3-M-19) - Easement, Littell to U.S., Rec 2-9-62, Deeds 35/609
    - Southeast quarter (SE ¼) of Section 16, Township 34 South, Range 40 West

- KSNM122545 (3-M-20) Easement, Mingenback to U.S., Rec 4-13-62, Deeds 35/660
    - Northwest quarter of Southwest quarter (NW/4 of SW/4) and Northwest quarter (NW/4) of Section 15, Township 34 South, Range 40 West

- KSNM122668 (3-M-21) - Easement, Mingenback to U.S., Rec 4-13-62, Deeds 35/656
    - West half of Northeast Quarter (W ½ of NE ¼) and Northeast Quarter of Northeast Quarter (NE/4 of NE/4) of Section 15, Township 34 South, Range 40 West

- KSNM122669 (3-M-22) - Easement, Johnson to U.S., **Recordation Data Unavailable**
    - South half of Southeast Quarter (S ½ of SE ¼) of Section 10, Township 34 South, Range 40 West

- KSNM122670 (3-M-23) - Easement, Link to U.S., Rec 4-13-62, Deeds 35/659
    - Southwest Quarter (SW ¼) of Section 11, Township 34 South, Range 40 West

- KSNM122671 (3-M-24) Easement, Markville to U.S., Rec 4-13-62, Deeds 35/661
  - North half of Southeast Quarter (N ½ of SE ¼) of Section 11, Township 34 South, Range 40 West

- KSNM122672 (3-M-25) - Easement, Fouts to U.S., Rec 2-9-62, Deeds 35/610
  - South half of Northeast Quarter (S ½ of NE ¼) of Section 11, Township 34 South, Range 40 West

- KSMN12267501 (3-M-26) – Condemnation, USDCKS, Civil Action No. T-3056
  - East half of the Northwest Quarter (E ½ of NW ¼) of Section 12, Township 34 South, Range 40 West

- KSNM122676 (3-M-27) - Easement, Carpenter to U.S., **Recordation data unavailable.**
  - East half of Northwest Quarter (E ½ of NW ¼) of Section 12, Township 34 South, Range 40 West

- KSNM132177 (3-M-28) - Condemnation, USDCKS, Civil Action No. T-3056, Rec 8-2-63
  - A strip of land 60 feet in width out of the Northeast Quarter (NE/4) of Section 12, T-34-S, R-40-W, Morton County, Kansas and being more particularly described as follows: Commence at the northwest corner of the Northeast Quarter (NE/4) of Section 12, T-34-S, R-40-W; THENCE southerly along the west line of the said Northeast Quarter (NE/4) of Section 12 a distance of 779.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 65°15' East a distance of 1570.3 feet to a point; THENCE North 26°05' East a distance of 131.2 feet to a point in the north line of Section 12, said point being 1487.4 feet easterly along the north line of Section 12 from the northwest corner of the Northeast Quarter (NE/4) of said Section 12; THENCE easterly along the north line of Section 12 a distance of 66.7 feet to a point; THENCE South 26°05' West a distance of 181.6 feet to a point; THENCE South 65°15' West a distance of 1618.8 feet to a point in the west line of the Northeast Quarter (NE/4) of Section 12; THENCE northerly along the west line of the Northeast Quarter (NE/4) of Section 12 a distance of 65.8 feet to a point, same being the point of beginning.

- KSNM122677 (3-M-29) - Easement, Weese to U.S., Rec 4-13-62, Deed 35/662
  - South half of Southeast quarter (S/2 of SE/4) of Section 1, Township 34 South, Range 40 West

- KSNM122678 (3-M-30) - Easement, Kornele to U.S., Rec 4-16-62, Deed 35/654
  - Lots Three and Four (L. 3 & 4) and the East half of the Southwest Quarter (E ½ of SW ¼), the same being all of the Fractional Southwest quarter (SW ¼); and the Northwest quarter of the Southeast quarter (NW ¼ of SE ¼) of Section 6, Township 34 South, Range 39 West of the 6th p.m.

- KSNM122679 (3-M-31) - Easement, Fiske to U.S., Rec 4-13-62, Deed 35/649
  - Southeast quarter of Northwest quarter (SE ¼ of NW ¼) and South half of Northeast quarter (S ½ of NE ¼) of Section 6, Township 34 South, Range 39 West

- 3-M-33 - Condemnation, USDCKS, Civil Action No. T-3081, Filed 5-24-62
  - Northeast quarter of the Northwest quarter (NE ¼ of NW ¼), Section 5, T34S, R39W

- KSNM122680 (3-M-34) - Easement, Thompson to U.S., Rec 4-13-62, Deed 35/648
  - The East half of West half (E ½ of W ½) lying South of RR and Southeast quarter (SE ¼) lying South of RR, all in Section 32, Township 33 South, Range 39 West

- KSNM122681 (3-M-35) - Easement, Light to U.S., Rec 4-25-62, Deed 37/5
  - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter

(NE ¼ of SW ¼), Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and all of Northwest quarter (NW ¼) South of the Railroad, Section 33, Township 33 South, Range 39 West

- KSNM122682 (3-M-36) - Easement, Muse to U.S., Rec 4-13-62, Deed 35/650
  - Northeast quarter (NE ¼) of Section 33, Township 33 South, Range 39 West, less and except the right of way for railroad and highway

**<u>Stevens County</u>**
- KSNM122683 (3-ST-1) - Easement, Light to U.S., Rec 4-25-62, Misc 37/199
  - Northwest quarter (NW/4) of Section 34, Township 33 South, Range 39 West, except the Railroad Right of Way of the D.C. and C.V. Railway as now located over and across said quarter section, containing 10.57 acres, more or less.

- KSNM122684 (3-ST-2) - Easement, Morgan to U.S., Rec 2-9-62, Misc 37/140
  - South half of Southwest quarter (S ½ of SW ¼) and Southeast quarter (SE ¼) of Section 27, Township 33 South, Range 39 West

- KSNM122685 (3-ST-3 & 5) - Easement, Morgan to U.S., Rec 3-12-62, Misc 37/162
  - North half of Southwest quarter (N ½ of SW ¼) and Northeast quarter (NE ¼) of Section 26, Township 33 South, Range 39 West

- KSNM122686 (3-ST-4) - Easement, Buddenberg to U.S., Rec 4-10-62, Misc 37/181
  - South half of Northwest quarter (S ½ of NW ¼) of Section 26, Township 33 South, Range 39 West

- KSNM132274 (3-ST-6) - Condemnation, USDCKS, Civil Action No. T-3074
  - A strip of land 60 feet in width out of the Northwest Quarter (NW/4) of Section 25, T-33-S, R-39-W, Stevens County, Kansas and being more particularly described as follows: Commence at the northwest corner of Section 25, T-33-S, R-39-W; THENCE southerly along the west line of Section 25 a distance of 600.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 63°21' East a distance of 1141.5 feet to a point; THENCE North 28°15' East a distance of 91.9 feet to a point in the north line of Section 25, said point being 1060.6 feet easterly along the north line of Section 25 from the northwest corner of said Section 25; THENCE easterly along the north line of Section 25 a distance of 67.8 feet to a point; THENCE South 28°15' West a distance of 142.5 feet to a point; THENCE South 63°21' West a distance of 1191.1 feet to a point in the west line of Section 25; THENCE northerly along the west line of Section 25 a distance of 67.4 feet to a point, same being the point of beginning.

- KSNM122687 (3-ST-7) - Easement, Gastineau to U.S., Rec 4-25-62, Misc 37/203
  - South half of Southwest quarter (S/2 of SW/4) and Northeast quarter of Southwest quarter (NE/4 of SW/4) of Section 24, Township 33 South, Range 39 West

- KSNM122688 (3-ST-8) - Easement, Miller to U.S., rec 3-29-62, Misc 37/173
  - West half of Southeast quarter (W ½ of SE ¼) of Section 24, Township 33 South, Range 39 West

- KSNM122716 (3-ST-9 & 39) - Condemnation, USDCKS, Civil Action No. T-3078, Rec 1-2-64.
  - Northwest Quarter (NW/) of Section 23, Township 32 South, Range 37 West; and East half of Southeast quarter (E ½ of SE ¼) of Section 24, Township 33 South, Range 39 West

- KSNM122689 (3-ST-10 & 13) - Easement, Bane to U.S., Rec 2-14-62, Misc 37/157
  - North half of Southwest quarter (N ½ of SW ¼) of Section 19, Township 33 South, Range 38 West

- Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 20, Township 33 South, Range 38 West

- KSNM122690 (3-ST-11) - Easement, Gregory to U.S., Rec 4-10-62, Misc 37/182
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 19, Township 33 South, Range 38 West

- KSNM122692 (3-ST-12) - Easement, Swanson to U.S., Rec 4-10-62, Misc 37/183
  - Southwest quarter of Northeast quarter (SW ¼ of NE ¼) and North half of Northeast quarter (N ½ of NE ¼) of Section 19, Township 33 South, Range 38 West

- KSNM122693 (3-ST-14) - Easement, Gregory to U.S., Rec, 4-10-62, Misc 37/184
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 17, Township 33 South, Range 38 West

- KSNM122694 (3-ST-15) - Easement, Davis to U.S., Rec 8-30-62, Misc 37/214
  - Southwest quarter of Southeast quarter (SW ¼ of SE/4) of Section 17, Township 33 South, Range 38 West

- KSNM132272 (3-ST-16) - Condemnation, USDCKC, Civil Action No. T-3060
  - A strip of land 60 feet in width out of the North half (N/2) of the Southeast Quarter (SE/4) of Section 17, T-33-S, R-38-W, Stevens County, Kansas and being more particularly described as follows: Commence at the southeast corner of the North half (N/2) of the Southeast Quarter (SE/4) of Section 17 a distance of 1575.2 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 68°33' East a distance of  1284.2 to a point; THENCE North 64°39' East a distance of 414.0 feet to a point in the east line of Section 17, said point being 642.7 feet northerly along the east line of Section 17 from the southeast corner of the North half (N/2) of the Southeast Quarter (SE/4) of Section 17; THENCE northerly along the east line of Section 17 a distance of 66.1 feet to a point; THENCE South 64°39' West a distance of 439.7 feet to a point; THENCE South 68°33' West a distance of 1436.1 feet to a point in the south line of the North half (N/2) of the Southeast Quarter (SE/4) of Section 17; THENCE easterly along the south line of the North half (N/2) of the Southeast Quarter (SE/4) of Section 17 a distance of 165.2 feet to a point, same being the point of beginning.

- KSNM122695 (3-ST-17) - Condemnation, USDCKS, Civil Action No. T-3078, Rec 11-5-63
  - A strip of land 60 feet in width out of the North Half of the Southwest Quarter 9N ½ of SW 1/4), the Northwest Quarter (NW ¼), the West half of the Northeast Quarter (W 1/2 of NE 1/4) and the Northeast Quarter of the Northeast Quarter (NE 1/4  of NE 1/4) of Section 16, T-33-S, R-38-W, Stevens County, Kansas and being more particularly described as follows: COMMENCE at the Southwest corner of Section 16, T-33-S, R-38-W; THENCE Northerly along the West line of Section 16 a distance of 1972.4 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 64°39' East a distance of 1059.7 feet to a point; THENCE North 56°38' East a distance of 4879.3 feet to a point in the North line from the Northeast corner of said section 16; THENCE Westerly along the North line of Section 16 a distance of 68.6 feet to a point; THENCE South 28°21' West a distance of 148.9 feet to a point; THENCE South 56°38' West a distance of 4859.9 feet to a point; THENCE South 64°39' West a distance of 1027.6 feet to a point in the West line of Section 16; THENCE Southerly along the West line of Section 16 a distance of 66.2 feet to a point, same being the point of beginning.

- KSNM122696 (3-ST-18 & 21) - Easement, Miller to U.S., Rec 3-12-62, Misc 37/163
  - South half of Southeast quarter (S ½ of SE ¼) of Section 9, Township 33 South, Range 38 West
  - Northwest quarter (NW ¼) of Section 11, Township 33 South, Range 38 West

- KSNM122697 (3-ST-19) - Easement, Greenwood to U.S., Rec 3-12-62, Misc 37/164
  - Southwest quarter (SW ¼) of Section 10, Township 33 South, Range 38 West

- KSNM122698 (3-ST-20) - Easement, Gaskill to U.S., Rec 3-12-62, Misc 37/165
  - North half of Southeast quarter (N ½ of SE ¼) and South half of Northeast quarter (S ½ of NE ¼) of Section 10, Township 33 South, Range 38 West

- KSNM122699 (3-ST-22) - Easement, Smith to U.S., Rec 3-12-62, Misc 37/166
  - North half of Northeast quarter (N ½ of NE ¼) of Section 11, Township 33 South, Range 38 West

- KSNM122700 (3-ST-23) - Easement, Spikes to U.S., Rec 2-16-62, Misc 37/159
  - South half of the Southeast quarter (S ½ of SE ¼) and the Northeast quarter of the Southeast quarter (NE ¼ of SE ¼) of Section 2, Township 33 South, Range 38 West.

- KSNM122695 (3-ST-24) - Condemnation, USDCKS, Civil Action No. T-3078, Rec 12-31-63
  - A strip of land 60 feet in width out of the Southwest Quarter (SW 1/4) of Section 1, T-33-S, R-38-W, Stevens County, Kansas and being more particularly described as follows: COMMENCE at the Southwest corner of Section 1, T-33-S, R-38-W; THENCE Northerly along the West line of Section 1 a distance of 1040.1 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue Northerly along the West line of Section 1 a distance of 66.6 feet to a point; THENCE North 63°46' East a distance of 2783.5 feet to a point; THENCE North 52°52' East a distance of 135.3 feet to a point in the East line of the Southwest Quarter (SW 1/4) of Section 1, said point being 232.8 feet Southerly along the East line from the Northeast corner of the said Southwest Quarter (SW 1/4) of Section 1; THENCE Southerly along the East line of the Southwest Quarter (SW 1/4) of Section 1 a distance of 74.9 feet to a point; THENCE South 52°52' West a distance of 96.1 feet to a point; THENCE South 63°46' West a distance of 2818.2 feet to a point in the West line of Section 1, same being the point of beginning.

- KSNM122701 (3-ST-25) - Easement, Bane to U.S., Rec 2-14-62, Misc 37/156
  - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and Northeast quarter (NE ¼) of Section 1, Township 33 South, Range 38 West

- KSNM122702 (3-ST-26) - Easement, Fields to U.S., Rec 2-9-62, Misc 37/141
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 6, Township 33 South, Range 37 West

- KSNM122703 (3-ST-27) - Easement, Kuharic, Rec 2-9-62, Misc 37/142
  - Lot 4, Southeast quarter (SE ¼ of SW ¼) and South half of Southeast quarter (S ½ of SE ¼) of Section 31, Township 32 South, Range 37 West

- KSNM122704 (3-ST-28) - Easement, Pottorff to U.S, Rec 4-10-62, Misc 37/186
  - North half of Southeast quarter (N ½ of SE ¼) of Section 31, Township 32 South, Range 37 West

- KSNM122705 (3-ST-29) - Easement, Ratcliff to U.S., 4-5-62, Misc 37/175
  - Northwest quarter of Southwest quarter (N.W. ¼ of S.W. ¼) and South half of Northwest quarter (S ½ of N.W. ¼) and Northeast quarter of Northwest quarter (N.E. ¼ of N.W. ¼) of Section 32, Township 32 South, Range 37 West.

- KSNM122706 (3-ST-30) - Easement, Duvall-Brown to U.S., Rec 4-25-62, Misc 37/202
  - West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter of Northeast quarter (NE

¼ of NE ¼) of Section 32, Township 32 South, Range 37 West

- KSNM122707 (3-ST-31) - Easement, Stewart to U.S., Rec 2-5-62, Misc 37/143
  - South half of Southeast quarter (S ½ of SE ¼) of Section 29, Township 32 South, Range 37 West

- KSNM122710 (3-ST-32) - Easement, Keve to U.S., Rec 4-5-62, Misc 37/176
  - Southwest quarter (SW/4) of Section 28, Township 32 South, Range 37 West

- KSNM122711 (3-ST-33) - Easement, The Schowalter Foundation to U.S., Rec 2-23-62, Misc 37/160
  - West half (1/2) of the North half of Southeast quarter (N ½ of SE ¼) of Section 28, Township 32 South, Range 37 West

- KSNM122712 (3-ST-34) - Easement, Hutton to U.S., Rec 2-9-62, Misc 37/144
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 28, Township 32 South, Range 37 West

- KSNM122713 (3-ST-35 & 37) - Easement, Hutton to U.S., Rec 4-25-62, Misc 37/200
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 27, Township 32 South, Range 37 West
  - Southeast quarter (SE ¼) of Section 22, Township 32 South, Range 37 West

- KSNM122714 (3-ST-36) - Easement, Curtis to U.S., Rec 3-12-62, Misc 37/167
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Section 22, Township 32 South, Range 37 West

- KSNM122715 (3-ST-38) - Easement, Keefer to U.S., Rec 4-10-62, Misc 37/187
  - North half of Southwest quarter (N ½ of SW ¼) of Section 23, Township 32 South, Range 37 West

- KSNM122695 (3-ST-39) - Condemnation, USDCKS, Civil Action No. T-3078, JF 9-25-63.
  - A strip of land 60 feet in width out of the South Half of the Northwest Quarter (S 1/2 of NW 1/4) and the Northeast Quarter of the Northwest Quarter (NE 1/4 of NW 1/4) of Section 23, T-32-S, R-37-W, Stevens County, Kansas and being more particularly described as follows: COMMENCE at the Southwest corner of the Northwest Quarter (NW 1/4) of Section 23, T-32-S, R-37-W; THENCE Easterly along the South line of the Northwest Quarter (NW 1/4) of Section 23 a distance of 882.7 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 54°36' East a distance of 2161.2 feet to a point in the East line of the Northwest Quarter (NW 1/4) of Section 23, said point being 1383.4 feet Southerly along the East line from the Northeast corner of the said Northwest Quarter (NW 1/4) of Section 23; THENCE Southerly along the East line of the Northwest Quarter (NW 1/4) of Section 23 a distance of 73.4 feet to a point; THENCE South 54°36' West a distance of 2043.2 feet to a point in the South line of the Northwest Quarter (NW 1/4) of Section 23; THENCE Westerly along the South line of the Northwest Quarter (NW 1/4) of Section 23 a distance of 96.7 feet to a point, same being the point of beginning.

- KSNM122547 (3-ST-40) - Easement, Chandley to U.S., Rec 2-14-62, Misc 37/152
  - Northeast quarter (NE ¼) of Section 23, Township 32 South, Range 37 West

- KSNM122548 (3-ST-41) - Easement, Wilson to U.S., Rec 2-9-62, Misc 37/145
  - Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 24, Township 32 South, Range 37 West
  - Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 14, Township 32 South, Range 37 West
  - Southwest quarter (SW ¼) of Section 13, Township 32 South, Range 37 West

- KSNM122549 (3-ST-42) - Easement, Howard to U.S., Rec 4-10-62, Misc 37/188
  - West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) and South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 13, Township 32 South, Range 37 West
  - Northwest quarter (NW ¼) of Section 18, Township 32 South, Range 36 West

- KSNM122550 (3-ST-43) - Easement, Dudley to U.S., Rec 5-7-62, Misc 37/212
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 18, Township 32 South, Range 36 West

- KSNM122551 (3-ST-44) - Easement, Forward to U.S. Rec 2-9-62, Misc 37/146
  - Southeast quarter & Southeast quarter of Southwest quarter (SE ¼ & SE ¼ of SW ¼), Section 7, Township 32 South, Range 36 West

- KSNM122552 (3-ST-45) - Easement Muse to U.S., Rec 2-9-62, Misc 37/147
  - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 8, Township 32 South, Range 36 West.

- KSNM122553 (3-ST-46) - Easement, Lambert to U.S., Rec 4-10-62, Misc 37/189
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter (NE ¼) of Section 8, Township 32 South, Range 36 West

- KSNM122554 (3-ST-47) - Easement, Hanke to U.S., Rec 3-15-62, Misc 37/169
  - North half of Northwest quarter (N ½ of NW ¼) of Section 9, Township 32 South, Range 36 West

- KSNM122559 (3-ST-48) - Easement, Clark to U.S., Rec 4-13-62, Misc 37/194
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 4, Township 32 South, Range 36 West

- KSNM122555 (3-ST-49) - Easement, Bunton to U.S., Rec 3-12-62, Misc 37/168
  - Southeast quarter (SE ¼) of Section 4, Township 32 South, Range 36 West

- KSNM122556 (3-ST-50) - Easement, Barngrover to U.S., Rec 3-15-62, Misc 37/170
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) and Northwest quarter (NW ¼) and West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 3, Township 32 South, Range 36 West,
    It is agreed that the pipe laid hereon is not to exceed 8 5/8 inches in diameter. That no above ground appurtenances are to be installed excepted vent pipes on crossroads and that any pipe laid will have at least 36 inches of covering across this tract.

- KSNM132272 (3-ST-51) - Condemnation, USDCKS, Civil Action No. CIV T-3060
  - A strip of land 60 feet in width out of the South one half (S 1/2) of the Southeast Quarter (SE 1/4) of the Southeast Quarter (SE 1/4) of Section 34, T-31-S, R-36-W, Stevens County, Kansas and being more particularly described as follows: Commence at the southeast corner of said Section 34, T-31-S, R-36-W, Stevens County, Kansas; THENCE northerly along the east line of said Section 34 a distance of 475.6 feet to a point, said point being the true point of beginning of the aforementioned 60 foot wide strip; THENCE South 58°50' West a distance of 908.6 feet to a point in the south line of Section 34, said point being 772.0 feet westerly along the south line of Section 34 from the southeast corner of Section 34; THENCE westerly along the south line of Section 34 a distance of 114.5 feet to a point; THENCE North 58°50' East a distance f 1043.0 feet to a point in the east line of Section 34; THENCE southerly along the east line of Section 34 a distance of 70.5 feet to a point, same being the true point of beginning.

- KSNM122557 (3-ST-52) - Easement, Mast to U.S., Rec 4-10-62, Misc 37/179
  - Southwest quarter (SW/4), Southeast quarter of Northwest quarter (SE/4 of NW/4), North half of Southeast quarter (N/2 of SE/4), South half of Northeast quarter (NE/4 of NE/4) all in Section 35, Township 31 South, Range 36 West

- KSNM122558 (3-ST-53) - Easement, Wilson to U.S., Rec 3-15-62, Misc 37/171
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 36, Township 31 South, Range 36 West

- KSNM122560 (3-ST-54) - Easement, Loomis to U.S., Rec 2-9-62, Misc 37/148
  - South half of Southwest quarter (S ½ of SW ¼) and Southeast quarter (SE ¼) of Section 25, Township 31 South, Range 36 West

- KSNM122561 (3-ST-55) - Easement, Shriver to U.S., Rec 4-27-62, Misc 37/211
  - North half of the Southwest quarter (N/2 of SW/4) of Section 30, Township 31 South, Range 35 West

- KSNM122565 (3-ST-56) - Easement, Logan to U.S., Rec 3-29-62, Misc 37/174
  - Lot 2 and East half of Northwest quarter (E/2 of NW/4) of Section 30, Township 31 South, Range 35 West

- KSNM122561-07 (3-ST-57) - Easement, Meredith to U.S., Rec 4-10-62, Misc 37/192
  - Northeast quarter (NE/4) of Section 30, Township 31 South, Range 35 West of 6th p.m. and the Northwest quarter of the Northwest quarter (NW/4 of NW/4) of Section 29, Township 31 South, Range 35 West of 6th p.m.

- KSNM122566 (3-ST-58) - Easement, Moorhead to U.S., Rec 2-14-62, Misc 37/153
  - Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 19, Township 31 South, Range 35 West

- KSNM122567 (3-ST-59) - Easement, Phillips to U.S., Rec 2-14-62, Misc 37/154
  - Southwest quarter (SW ¼) of Section 20, Township 31 South, Range 35 West

- KSNM122568 (3-ST-60) - Easement, Easement, Leffler to U.S., Rec 2-14-62, Misc 37/155,
  - North half of Southeast quarter (N ½ of SE ¼) of Section 20, Township 31 South, Range 35 West

- KSNM122569 (3-ST-61) - Easement, Gillespie to U.S., Rec 2-9-62, Misc 37/149
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 20, Township 31 South, Range 35 West

- KSNM122570 (3-ST-62) - Easement, Gaskill to U.S., Rec 4-25-62, Misc 37/201
  - Northwest quarter (NW ¼) of Section 21, Township 31 South, Range 35 West

- KSNM122571 (3-ST-63) - Easement, Stoopes to U.S., Rec 4-10-62, Misc 37/193
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) and Southeast quarter (SE ¼) Section 16, Township 31 South, Range 35 West

- KSNM122572 (3-ST-64) - Easement, Prather to U.S., Rec 4-5-62, Misc 37/178
  - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 15, Township 31 South, Range 35 West

- KSNM122573 (3-ST-65) - Easement, McCue to U.S., Rec 3-15-62, Misc 37/172
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) and Northeast quarter (NE ¼) of Section 15, Township 31 South, Range 35 West

- KSNM122574 (3-ST-66A) - Easement, Hanke to U.S., Rec 4-10-62, Misc 37/180
  - Northwest quarter of Northwest quarter (NW/4 of NW/4) of Section 14, Township 31 South, Range 35 West
  No above ground installations shall be made except along highway or boundary lines)

- KSNM122575 (3-ST-67) - Easement, Lambert to U.S., Rec 2-9-62, Misc 37/150
  - Southwest quarter (SW ¼) of Section 11, Township 31 South, Range 35 West

- KSNM122576 (3-ST-68 & 3-ST-70 & 3-ST-66) Easement, Dunlap to U.S., Rec 2-23-62, Misc 37/161
  - West half of Southeast quarter (W ½ of SE ¼) and Northeast, quarter of Southeast quarter (NE ¼ of SE ¼) of Section 11, Township 31 South, Range 35 West
  West half of Northwest quarter (W ½ of NW ¼) of Section 12, Township 31 South, Range 35 West
  Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 10, Township 31 South, Range 35 West
  (Subject to prior easements and oil and gas leases of record).
  (Route to be surveyed and staked within six months).

- KSNM122577 (3-ST-69) - Easement, Easement, Young to U.S., Rec 2-9-62, Misc 37/151
  - South half of Northeast quarter (S ½ of NE ¼) of Section 11, Township 31 South, Range 35 West

- KSNM122578 (3-ST-71) - Easement, Colvin U.S., Rec 5-7-62, Misc 37/213
  - East half of Northwest quarter (E/2 of NW/4) and West half of Northeast quarter (W/2 of NE/4) and Northeast quarter of Northeast quarter (NE/4 of NE/4) of Section 12, Township 31 South, Range 35 West, except the West Fifteen (15) acres of the Northeast Quarter (NW/4) of the Northeast Quarter (NE/4)
  (subject to prior easements and oil and gas leases of record).
  (Route to be surveyed and staked within six months).

- KSNM122579 (3-ST-72) - Easement, Cutter to U.S., Rec 2-16-62, Misc 37/158
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 1, Township 31 South, Range 35 West

**Seward County**
- KSNM122580 (3-SE-1) - Easement, Wilson to U.S., Rec 4-10-62, Misc 199/508
  - Lots 6 and 7 and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 6, Township 31 South, Range 34 West
  (Subject to prior easements and oil and gas leases of record).
  (Route to be surveyed and staked within six months).

- KSNM122581 (3-SE-2) - Easement, Popejoy Construction Co. to U.S., 4-5-62, Misc 199/435
  - Lot 5 and Southeast quarter of Northwest quarter (SE ¼ of NW ¼) of Section 6, Township 31 South, Range 34 West

- KSNM122582 (3-SE-3) - Easement, Davis to U.S., Rec 2-13-62, Misc 199/139
  - Lots 1 and 2 and South half of Northeast quarter (S ½ of NE ¼) of Section 6, Township 31 South, Range 34 West

- KSNM122583 (3-SE-4) - Easement, Young to Young, Rec 4-5-62, 199/437
  - North half of Northwest quarter (N ½ of NW ¼) of Section 5, Township 31 South, Range 34 West, also described as Lots 3 and 4 of Section 5, Township 31 South, Range 34 West

- KSNM131683 (702-3-SE-1) - Easement Simpson to U.S., Rec 6-4-62, Misc 200/129
  - East half of Northwest quarter (E ½ of NW ¼), West half of Northeast quarter and Southeast quarter of Northeast quarter (W ½ of NE ¼ & SE ¼ of NE ¼), North half of Southeast quarter and Southeast quarter of Southeast quarter (N ½ of SE ¼ & SE ¼ of SE ¼) of Section 4, Township 31 South, Range 33 West.

- KSNM131684 (702-3-SE-2) - Easement, Hatfield to U.S., Rec 6-4-62, Misc 200/131
  - West half of Southwest quarter (W ½ of SW ¼) of Section 3, Township 31 South, Range 33 West

- KSNM131685 (702-3-SE-3) - Easement, Becker to U.S., Rec 6-4-62, Misc 200/133
  - Northwest quarter (NW/4), East half of Southwest quarter (E/2 of SW/4), West Half of Southeast quarter (W/2 of SE/4) of Section 10, Township 31 South, Range 33 West

- KSNM131686 (702-3-SE-4) - Easement, Fincham to U.S., Rec 6-4-62, Misc 200/135
  - Northeast quarter (NE ¼), East half of Southeast quarter (E ½ of SE ¼) of Section 15, Township 31 South, Range 33 West

- KSNM131687 (702-3-SE-5) - Easement, Prater to U.S., Rec 6-4-62, Misc 200/137
  - West half of Southwest quarter and Southeast quarter of Southwest quarter (W ½ of SW ¼ & SE ¼ of SW ¼) of Section 14, Township 31 South, Range 33 West

- KSNM131688 (702-3-SE-6) - Easement, Thompson to U.S., Rec 6-4-62, Misc 200/139
  - Northwest quarter (NW ¼) of Section 23, Township 31 South, Range 33 West

- KSNM131689 (702-3-SE-8) - Easement, Thompson to U.S., Rec 6-4-62, Misc 200/141
  - South half of Southeast quarter and Northwest quarter of Southeast quarter (S ½ of SE ¼ & NW ¼ of SE ¼) and Southwest quarter of Northeast quarter (SW ¼ of NE ¼ of Section 23, Township 31 South, Range 33 West

- KSNM131690 (702-3-SE-9) - Easement, Johnson to U.S., Rec 6-4-62, Misc 200/143
  - North half of Northeast quarter and Southeast quarter of Northeast quarter (N ½ of NE ¼ & SE ¼ of NE ¼) of Section 26, Township 31 South, Range 33 West

- KSNM131266 (702-3-SE-10) - Easement, Becker to U.S., Rec 6-4-62, Misc 200/145
  - West half of Northwest Quarter (W/2 of NW/4) and the Southwest Quarter (SW/4) of Section 25, Township 31 South, Range 33 West.

- KSNM131267 (702-3-SE-11) - Easement, Coons to U.S., Rec 6-4-62, Misc 200/147
  - North half of Northwest quarter and Southeast quarter of Northwest quarter (N ½ of NW ¼ & SE ¼ of NW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 36, Township 31 South, Range 33 West

- KSNM131268 (702-3-SE-12) - Easement, Rademacher to U.S., Rec 6-4-62, Misc 200/149
  - West half of Northeast quarter (W ½ of NE ¼) of Section 36, Township 31 South, Range 33 West

- KSNM132383 (702-3-SE-13) - Condemnation, USDCKS, Civil Action No. T-3121, JF 6-21-63
  - A strip of land 60 feet in width out of the Southeast Quarter (SE 1/4) of Section 36, T-31-S, R-33-W, Seward County, Kansas and being more particularly described as follows: Commence at the Northwest corner of the Southeast Quarter (SE 1/4) of Section 36, T-31-S,

R-33-W; THENCE Easterly along the North line of the Southeast Quarter (SE 1/4) of Section 36 a distance of 470.3 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE continue Easterly along the North line of the Southeast Quarter (SE 1/4) of Section 36 a distance of 66.3 feet to a point; THENCE South 24°54' East a distance of 2897.9 feet to a point in the South line of Section 36, said point being 913.5 feet Westerly along the South line from the Southeast corner of said Section 36; THENCE Westerly along the South line of Section 36 a distance of 66.1 feet to a point; THENCE North 24°54' West a distance of 2898.2 feet to a point in the North line of the Southeast Quarter (SE 1/4) of Section 36, same being the point of beginning.

  o  Valve – A fence area 10 feet wide and 20 feet long within the previously described 60 feet wide strip out of the Southeast Quarter (SE 1/4) of Section 36, T-31-S, R-33-W, Seward County, Kansas and being more particularly described as follows: Commence at the Southeast corner of Section 36, T-31-S, R-33-W; THENCE Westerly along the South line of Section 36 a distance of 941 feet to a point; THENCE North 24°54' West a distance of 124 feet to the true point of beginning of the aforementioned tract of land; THENCE South 65°06' West a distance of 5 feet to a point; THENCE North 24°54' West a distance of 20 feet to a point; THENCE North 65°06' East a distance of 10 feet to a point; THENCE South 24°54' East a distance of 20 feet to a point; THENCE South 65°06' West a distance of 5 feet to a point; same being the point of beginning.

- KSNM131269 (702-3-SE-14) - Easement, Angell to U.S., Rec 6-4-62, Misc 200/152
  o  Also described as Lots 1 and 2 and Southeast quarter of Northeast Quarter (SE ¼ of NE ¼) of Section 1, Township 32 South, Range 33 West.

- KSNM131274 (702-3-SE-15) - Easement, Cotton to U.S., Rec 6-4-62, Misc 200/165
  o  Lots 4 and 5 and Southeast quarter of Northwest quarter (SE ¼ of NW ¼) of Section 6, Township 32 South, Range 32 West

- KSNM131275 (702-3-SE-16) - Easement, Yost to U.S., Rec 6-20-62, Misc 200/255
  o  Lots 6 and 7 and the East half of Southwest quarter (E ½ of SW ¼) of Section 6, Township 32 South, Range 32 West

- KSNM131276 (702-3-SE-17) - Easement, Printz to U.S., Rec 6-4-62, Misc 200/167
  o  East half of Northwest quarter (E ½ of NW ¼), Northwest quarter of Northeast quarter and South half of Northeast quarter (NW ¼ of NE ¼ & S ½ of NE ¼) and Southeast quarter (SE ¼) of Section 7, Township 32 South, Range 32 West

- KSNM131277 (702-3-SE-18) - Easement, Hatcher to U.S., Rec 6-4-62, Misc 200/169
  o  East half of Northeast quarter (E ½ of NE ¼) of Section 18, Township 32 South, Range 32 West

- KSNM131278 (702-3-SE-19) - Easement, Owen to U.S., Rec 7-6-62, Misc 200/399
  o  Northwest quarter of Northwest quarter and South half of Northwest quarter (NW ¼ of NW ¼ & S ½ of NW ¼) and Southwest quarter (SW ¼) of Section 17, Township 32 South, Range 32 West

- KSNM131279 (702-3-SE-20) - Easement, Lambert to U.S., Rec 6-4-62, Misc 200/171
  o  East half of Northwest quarter (E ½ of NW ¼), Northwest quarter of Northeast quarter and South half of Northeast quarter (NW ¼ of NE ¼ & S ½ of NE ¼) of Section 20, Township 32 South, Range 32 West

- KSNM131280 (702-3-SE-21) - Easement, Koenig to U.S., Rec 6-4-62, Misc 200/173
  o  Southeast quarter (SE ¼) of Section 20, Township 32 South, Range 32 West

- KSNM131281 (702-3-SE-22) - Easement, Prater to U.S., Rec 6-4-62, Misc 200/177
  - East half of Northeast quarter (E ½ of NE ¼) of Section 29, Township 32 South, Range 32 West

- KSNM131283 (702-3-SE-23) - Easement, Deffenbaugh to U.S., Rec 6-4-62, Misc 200/179
  - West half of North third of Northwest quarter (W ½ of N 1/3 of NW ¼) of Section 28, Township 32 South, Range 32 West

- KSNM131284 (702-3-SE-24) - Easement, Deffenbaugh to U.S., 6-4-62, Misc 200/181
  - South two thirds of Northwest quarter (S 2/3 of NW ¼) of Section 28, Township 32 South, Range 32 West

- KSNM131285 (702-3-SE-25) - Easement, Isaacs to U.S., **Recordation data unavailable**.
  - Southwest quarter (SW ¼) of Section 28, Township 32 South, Range 32 West. East one half of Northwest quarter (E ½ of NW ¼) of Section 33, Township 32 South, Range 32 West

- KSNM131307 (702-3-SE-26) - Easement, Prater to U.S., Rec 6-4-62, Misc 200/183
  - Northwest quarter of Northeast quarter and South half of Northeast quarter (NW ¼ of NE ¼ & S ½ of NE ¼) and Southeast quarter (SE ¼) of Section 33, Township 32 South, Range 32 West

- KSNM131312 (702-3-SE-27) - Easement, Hirn to U.S., Rec 6-4-62, Misc 200/185
  - Lot 1 and Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 4, Township 33 South Range 32 West

- KSNM131313 (702-3-SE-28) - Easement to U.S., Headrick to U.S., Rec 6-4-62, Misc 200/187
  - Lot 4 and the Southwest quarter of the Northwest Quarter (Lot 4 & SW ¼ of NE ¼) of Section 3, Township 33 South, Range 32 West

- KSNM131314 (702-3-SE-29) - Easement, Kaufman to U.S. Rec 6-4-62, Misc 200/189
  - Southwest quarter (SW ¼) of Section 3, Township 33 South, Range 32 West

- KSNM131315 (702-3-SE-30) - Easement, Smith to U.S. Rec 6-4-62, Misc 200/191
  - East half of Northwest quarter (E ½ of NW ¼) of Section 10, Township 33 South, Range 32 West

- KSNM 131316 (702-3-SE-31) - Easement Stiles to U.S., Rec 6-4-62, Misc 200/193
  - West half of Northeast quarter and Southeast quarter of Northeast quarter (W ½ of NE ¼ & SE ¼ of NE ¼) of Section 10, Township 33 South, Range 32 West

- KSNM131317 (702-3-SE-32) - Easement, Alexander to U.S., Rec 6-20-62, Misc 200/257
  - Southeast quarter (SE ¼) of Section 10; Southwest quarter of Southwest quarter (SW ¼ of SW ¼) of Section 11; Northwest quarter of Northwest quarter and South half of Northwest quarter (NW ¼ of NW ¼ & S ½ of NW ¼) and Southeast quarter of Southwest quarter (SE ¼ of SW ¼) and West half of Southeast quarter (W ½ of SE ¼) of Section 14; Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 15, all in Township 33 South, Range 32 West
  - North half of Southwest quarter (N/2 of SW/4) Section 14, Township 33 South, Range 32 West

- KSNM131318 (702-3-SE-33) - Easement, Warden to U.S., Rec 6-20-62, Misc 200/259
  - North half of Northeast quarter (N ½ of NE ¼) of Section 23, Township 33 South, Range 32 West

- KSNM131319 (702-3-SE-34) - Easement, Panhandle Eastern Pipeline to U.S., Rec 7-16-62, Misc 200/370
  - A strip of land out of the South half of Northeast quarter (S/2 of NE/4) and North half of Southeast quarter (N/2 of SE/4) of Section 23, Township 33 South, Range 32 West, Seward County, Kansas. Said land described on attached sheet which is made a part hereof.

**Haskell County**
- KSNM122585 (3-HA-1) - Easement, Dennis to U.S. Rec 3-26-62, O&G 19/153
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 33, Township 30 South, Range 34 West

- KSNM122586-01 (3-HA-2) - Easement, Jennie Arburthnot to U.S. Filed 5/28/62 Book 19, Page 24.
  - Southeast quarter and Southeast quarter of Northeast quarter (SE ¼ & SE ¼ of NE ¼) of Section 33, Township 30 South, Range 34 West
    This instrument may be executed in multiple copies and the execution of any copy shall have the same effect as if all of the above grantors had executed one copy.

- KSNM122587 (3-HA-2A) - Easement, Chatfield to U.S., Rec 3-12-62, O&G 19/126
  - North half of Southwest quarter (N ½ of SW ¼) of Section 34, Township 30 South, Range 34 West

- KSNM122588 (3-HA- 3 & 10) - Easement, Schnellbacher to U.S., Rec 2-20-62, O&G 19/58 and Ingles to U.S. filed 5-20-1962, Book 19/24.
  - Northwest quarter (NW ¼) of Section 34, Township 30 South, Range 34 West, containing 160 acres, more or less, except a tract containing 30.3 acres, more or less, owned by Panhandle Eastern PipeLine Company; and a 6 acre tract owned by Osby C. Lawson, et ux, both located in N ½ of NW ¼. North half of Northwest quarter and Southwest quarter of Northwest quarter (N ½ of NW ¼ & SW ¼ of NW ¼) of Section 25, Township 30 South, Range 34 West

- KSNM122589 (3-HA-4) - Easement, Ungles to U.S. Rec 3-12-62, O&G 19/125
  - West Half of the Northeast Quarter (W ½ of NE ¼) of Section 34, Township 30 South, Range 34 West

- KSNM122590 (3-HA- 5 & 7 & 6) - Easement, Ungles to U.S., Rec 3-12-62, O&G 19/124; also see Condemnation USDCKS T-3118.
  - Southwest Quarter (SW ¼) of Section 26, Township 30 South, Range 34 West
  - Northeast Quarter of Northeast Quarter (NE ¼ of NE ¼), Section 34, Township 30 South, Range 34 West
  - South half of Southeast Quarter (S ½ of SE ¼) of Section 27, Township 30 South, Range 34 West,

- KSNM122591 (3-HA-8) - Easement, Blair to U.S., Rec 4-10-62, O&G 19/165
  - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 26, Township 30 South, Range 34 West

- KSNM122592 (3-HA-9) - Easement Boehner to U.S., Rec 3-28-62, O&G 19/154
  - Northeast quarter (NE ¼) of Section 26, Township 30 South, Range 34 West

- KSNM122722 (3-HA-11) - Easement, Smith to U.S. Rec 3-12-62, O&G 19/123
  - South half of Southwest quarter (S ½ of SW ¼) of Section 24, Township 30 South, Range 34 West

- KSNM122723 (3-HA-12) - Easement, Garner to U.S. Condemnation, USDC Kansas CIV T-3073
  - Southeast quarter and Southeast quarter of Northeast quarter (SE ¼ and SE ¼ of NE ¼) of Section 24, Township 30 South Range 34 West

- KSNM132275(3-HA-13) - Condemnation, USDCKS, Civil Action No. T-3075, JF 7-12-63
  - A strip of land 60 feet in width across the Southeast Quarter (SE/4) and the Southeast Quarter of the Northeast Quarter (SE/4 of NE/4) of Section 24, T-30-S, R-34-W, Haskell County, Kansas, and being more particularly described as follows: Commence at the Southwest corner of the Southeast Quarter (SE/4) of Section 24, T-30-S, R-34-W; THENCE Northerly along the West line of the Southeast Quarter (SE/4) a distance of 899.4 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 55°14' East a distance of 3100.7 feet to a point; THENCE North 63°35' East a distance of 106.1 feet to a point in the East line of Section 24, said point being 98.9 feet Northerly along the East line from Southeast corner of the Northeast Quarter (NE/4) of said Section 24; THENCE Northerly along the East line of Section 24 a distance of 67.0 feet to a point; THENCE South 63°35' West a distance of 140.2 feet to a point; THENCE South 55°14' West a distance of 3063.5 feet to a point in the West line of the Southeast Quarter (SE/4) of Section 24; THENCE Southerly along the West line of the Southeast Quarter (SE/4) of Section 24 a distance of 72.9 feet to a point, same being the point of beginning.

- KSNM132171 (3-HA-14) - Condemnation, USDCKS, Civil Action No. T-3042, JF 1-23-64
  - A strip of land 60 feet in width out of the Northwest Quarter (NW/4) of Section 19, T-30-S, R-33-W, Haskell County, Kansas and being more particularly described as follows: Commence at the southwest corner of the Northwest Quarter (NW/4) of Section 19, T-30-S, R-33-W; THENCE northerly along the west line of the Northwest Quarter (NW/4) of Section 19, a distance of 98.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 63°35' East a distance of 148.0 feet to a point; THENCE North 26°49' East a distance of 2812.4 feet to a point in the north line of the Northwest Quarter (NW/4) of Section 19, said point being 1186.8 feet westerly along the north line of said Northwest Quarter (NW/4) of Section 19 from the Northeast corner of the Northwest Quarter (NW/4) of Section 19; THENCE westerly along the north line of the Northwest Quarter (NW/4) of Section 19, a distance of 67.3 feet to a point; THENCE South 26°49' West a distance of 2762.0 feet to a point; THENCE South 63°35' West a distance of 98.3 feet to a point in the west line of the said Northwest Quarter (NW/4) of Section 19; THENCE southerly along the west line of the Northwest Quarter (NW/4) of Section 19 a distance of 67.0 feet to a point, same being the point of beginning

- KSNM122724 (3-HA-15) - Easement, Anton to U.S. Rec 3-12-62, O&G 19/122
  - East half of Southwest quarter (E ½ of SW ¼) of Section 18, Township 30 South, Range 33 West

- KSNM132171 (3-HA-16) - Condemnation, USDCKS, Civil Action No. T-3042, JF 5-21-63
  - A strip of land 60 feet in width out of the Southeast Quarter (SE/4) of Section 18, T-30-S, R-33-W, Haskell County, Kansas and being more particularly described as follows: Commence at the Northwest corner of the Southeast Quarter (SE/4) of Section 18, T-30-S, R-33-W, Haskell County, Kansas; THENCE southerly along the west line of the Southeast Quarter (SE/4) of Section 18 a distance of 187.9 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 26°29' East a distance of 212.6 feet to a point in the North line of the Southeast Quarter (SE/4) of Section 18, said point being 96.1 feet easterly along the North line of said Southeast Quarter (SE/4) of Section 18 from the Northwest corner of the Southeast Quarter (SE/4) of Section 18; THENCE continuing easterly along the North line of the Southeast Quarter (SE/4) of Section 18, a distance of 66.9 feet to a point; THENCE South 26°29' West a distance of 360.0 feet to a point in the west line of the Southeast Quarter (SE/4) of Section 18; THENCE northerly along the west line of the Southeast Quarter (SE/4) of Section 18 a distance of 132.3 feet to a point, same being the true point of beginning.

- KSNM122725 (3-HA-17) - Easement, Black to U.S., Rec 3-12-62, O&G 19/121
  - Northeast quarter (NE ¼) of Section 18, Township 30 South, Range 33 West

- KSNM122727 (3-HA-18 & 18A) - Easement, Williams to U.S., Rec 3-22-62, O&G 19/90
  - East half of Southeast quarter (E ½ of SE ¼) of Section 7, Township 30 South, Range 33 West

- KSNM122584 - Easement, Williams to U.S., Rec 3-23-62, Deeds 39/493
  - East 12 acres of that portion of the Southeast quarter (SE ¼) of the Southeast (SE ¼) of Section 7, Township 30 South, Range 33 West of the 6th Principal Meridian lying South of U.S. Highway No. 56, as described by a plat attached hereto marked Exhibit "A" and made a part hereof.

- KSNM122584-01 - Easement, Williams to U.S., Rec 6-8-62, Deeds 19/366
  - South One Half (S ½) of the Southeast Quarter (SE ¼) of Section 7, Township 30 South, Range 33 West of the 6th Principal Meridian. SAVE AND EXCEPT that certain twelve (12) acre tract conveyed to the United States of America by Warranty Deed dated the 8th day of January 1962.

- KSNM122728 (3-HA-19) - Easement, Cox to U.S., Rec 2-28-62, O&G 19/85
  - North half of Southwest quarter and Southwest quarter of Southwest quarter (N ½ of SW ¼ & SW ¼ of SW ¼) of Section 8, Township 30 South, Range 33 West

- KSNM122729 (3-HA-20) - Easement, Correll to U.S., Rec 2-14-62, O&G 19/47
  - Northeast quarter (NE ¼) of Section 8 and South half of Northwest quarter and Northeast quarter of Northwest quarter (S ½ of NW 1/4 & NE ¼ of NW ¼) of Section 8, Township 30 South, Range 33 West

- KSNM122730 (3-HA-21) - Easement, Warner to U.S., Rec 2-9-62, O&G 19/22
  - Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 9, Township 30 South, Range 33 West

- KSNM122731 (3-HA-22) - Easement, Moore to U.S., Rec 2-9-62, O&G 19/23
  - All of the Southwest quarter (SW ¼) of Section 4, Township 30 South, Range 33 West of the 6th Principal Meridian

- KSNM122732 (3-HA-23) - Easement, Kay to U.S., Rec 2-9-62, O&G 19/24
  - South half of Northeast quarter and Northeast quarter of Northeast quarter (S ½ of NE ¼ & NE ¼ of NE ¼) of Section 4 and North half of Southeast quarter and Southwest quarter of Southeast quarter (N ½ of SE ¼ & SW ¼ of SE ¼) of Section 4, Township 30 South, Range 33 West

- KSNM122733 (3-HA-24 & 26) - Easement, Gheen to U.S., Rec 2-14-62, O&G 19/49
  - Northwest quarter (NW ¼) of Section 3, Township 30 South, Range 33 West
  - Southeast quarter (SE ¼) of Section 34, Township 29 South, Range 33 West

- KSNM122734 (3-HA-25) - Easement, Ellis to U.S., Rec 2-20-62, O&G 19/57
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 3, Township 30 South, Range 33 West

- KSNM122735 (3-HA-27) - Easement, Kirkpatrick to U.S., Rec 2-14-62, O&G 19/45
  - North half of Southwest quarter and Southwest quarter of Southwest quarter (N ½ of SW ¼ & SW ¼ of SW ¼) of Section 35, Township 29 South, Range 33 West

- KSNM122736 (3-HA-28) - Easement, Robb to U.S., Rec 2-28-62, O&G 19/86
  - South half of Northwest quarter (S ½ of NW ¼) of Section 35, Township 29 South, Range 33 West

- KSNM122737 (3-HA-29) - Easement, McCoy to U.S., Rec 2-9-62, O&G 19/25
  - Northeast quarter (NE ¼) of Section 35, Township 29 South, Range 33 West and Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 36, Township 29 South, Range 33 West

- KSNM122738 (3-HA-30) – Easement, Daniel to U.S. Rec 2-20-62, O&G 19/56
  - South half of Southwest quarter and Northeast quarter of Southwest quarter (S ½ of SW ¼ & NE ¼ of SW ¼) of Section 25, Township 29 South, Range 33 West

- KSNM132165 (3-HA-31) - Condemnation, USDCKS, Civil Action No. T-3056, JF 10-30-64
  - A strip of land 60 feet in width out of the Southeast Quarter (SE/4) of Section 25, T-29-S, R-33-W, Haskell County, Kansas and being more particularly described as follows: Commence at the southwest corner of the Southeast Quarter (SE/4) of Section 25, T-29-S, R-33-W; THENCE Northerly along the west line of the Southeast Quarter (SE/4) of Section 25 a distance of 1456.7 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 58°04' East a distance of 2332.0 feet to a point in the north line of the Southeast Quarter (SE/4) of Section 25, said point being 670.9 feet westerly along the north line form the Northeast corner of the said Southeast Quarter (SE/4) of Section 25; THENCE westerly along the north line of the Southeast Quarter (SE/4) of Section 25 a distance of 113.3 feet to a point; THENCE South 58°04' West a distance of 2198.3 feet to a point in the west line of the Southeast Quarter (SE/4) of Section 25; THENCE southerly along the west line of the Southeast Quarter (SE/4) of Section 25 a distance of 70.8 feet to a point, same being the point of beginning.

- KSNM122739 (3-HA-32) - Easement, Chaffin to U.S., Rec 2-14-62, O&G 19/29
  - South half of Northeast quarter (S ½ of NE ¼) of Section 25, Township 29 South, Range 33 West

- KSNM122740 (3-HA-33) - Easement, Rosenwinkle to U.S., Rec 3-8-62, O&G 19/114
  - Northwest quarter (NW ¼ and North half of Northeast quarter (N ½ of NE ¼), of Section 30, Township 29 South, Range 32 West.

- KSNM122741 (3-HA-34) - Easement, Dewell to U.S., 2-20-62, O&G 19/55
  - South half of Southeast quarter and Northeast quarter of Southeast quarter (S ½ of SE ¼ & NE ¼ of SE ¼) of Section 19, Township 29 South, Range 32 West

- KSNM132162 (3-HA-35) - Condemnation, USDCKS, Civil Action No. T-3025, JF 10-8-63
  - A strip of land 60 feet in width out of Section 29, T-29-S, R-32-W in Haskell County, Kansas and being more particularly described as follows: COMMENCE at the Northwest corner of Section 20, T-29-S, R-32-W; THENCE Southerly along the West line of said Section 20 a distance of 4033.5 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 58°58' East a distance of 3855.23 feet to a point; THENCE North 55°25' East a distance of 2416.36 feet to a point in the east line of Section 20, said point being 660.3 feet southerly from the northeast corner of Section 20; THENCE Southerly along the east line of Section 20 a distance of 72.74 feet to a point; THENCE South 55°25' West a distance of 2377.10 feet to a point; THENCE South 58°58' West a distance of 3893.08 feet to a point on the west line of Section 20; THENCE Northerly along the west line of Section 20 a distance of 69.98 feet to a point, same being the point of beginning.

- KSNM122742 (3-HA-36) - Easement, Leonard to U.S., Rec 2-9-62, O&G 19/26
  - Northwest Quarter (NW/4) of the Northwest Quarter (NW/4) of Section 21, Township 29

South, Range 32 West of the 6th p.m.

- KSNM122743 (3-HA-37) - Easement, Simmons to U.S., Rec 2-20-62, O&G 19/54
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 16, Township 29 South, Range 32 West

- KSNM122744 (3-HA-38) - Easement, Rutledge to U.S., Rec 2-23-62, O&G 19/67
  - West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) and Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 16, Township 29 South, Range 32 West

- KSNM122745 (3-HA-39) - Easement, Ricketts to U.S., Rec 2-9-62, O&G 19/27
  - All of the Northwest Quarter of Section 15, Township 29 South, Range 32 West of the 6th Principal Meridian

- KSNM122746 (3-HA-40) - Easement, Ricketts to U.S., Rec 2-20-62, O&G 19/53
  - West half of Northeast Quarter (W ½ of NE ¼) and Northeast Quarter of Northeast Quarter (NE ¼ of ¼), Section 15, Township 29 South, Range 32 West

- KSNM122747 (3-HA-41) - Easement, Brooks to U.S., Rec 2-20-62, O&G 19/52
  - South half of Southeast quarter (S ½ of SE ¼) of Section 10, Township 29 South, Range 32 West

- KSNM122748 (3-HA-42) - Easement, Murphy to U.S., Rec 2-20-62, O&G 19/51
  - Southwest quarter (SW ¼) of Section 11, Township 29 South, Range 32 West

- KSNM122749 (3-HA-43) - Easement, Howell to U.S., Rec 2-20-62, O&G 19/50
  - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼), Sec 11, Township 29 South, Range 32 West

- KSNM122750 (3-HA-44) - Easement, Robson to U.S., Rec 2-28-62, O&G 19/87
  - Southwest Quarter of Northwest Quarter (SW ¼ of NW ¼) and North half of Northwest Quarter (N ½ of NW ¼) of Section 12, Township 29 South, Range 32 West

- KSNM 122751 (3-HA-45) - Easement, Flory to U.S., Rec 2-14-62, O&G 19/46
  - South half of Southwest Quarter (S ½ of SW ¼) and Southeast Quarter (SE ¼) of Section 1, Township 29 South, Range 32 West

- KSNM122752 (3-HA-46) - Easement, Schultz to U.S., Rec 2-28-62, O&G 19/88
  - North half of Southwest Quarter (N ½ of SW ¼) of Section 6, Township 29 South, Range 31 West

- KSNM122755 (3-HA-47) - Easement Dietz to U.S., Filed 2/23/62, Book 19, Page 69
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 6, Township 29 South, Range 31 West

- KSNM122756 (3-HA-48) - Easement, Dennis to U.S., 3-2-62, O&G 19/113
  - Southwest quarter of Northeast quarter (SW ¼ of NE ¼) and North half of Northeast quarter (N ½ of NE ¼) of Section 6, Township 29 South, Range 31 West

- KSNM122757 (3-HA-49) - Easement, Smith to U.S., 2-28-62, O&G 19/89
  - Southeast Quarter of Southeast Quarter (SE ¼ of SE ¼) of Section 31, Township 28 South, Range 31 West

- KSNM122758 (3-HA-50) - Easement. Lemon to U.S, Rec 2-23-62, O&G 19/71
  - Southwest Quarter (SW ¼) of Section 32, Township 28 South, Range 31 West

- KSNM122759 (3-HA-51) - Easement, Simmons to U.S., Rec 2-23-62, O&G 19/72
  - North half of Southeast Quarter (N ½ of SE ¼) of Section 32, Township 28 South, Range 31 West

- KSNM122760 (3-HA-52) - Easement, Ocker to U.S., Rec 2-9-62, O&G 19/28
  - South half of Northeast Quarter (S ½ of NE ¼) and Northeast Quarter of Northeast Quarter (NE ¼ of NE ¼) of Section 32, Township 28 South, Range 31 West

- KSNM122761 (3-HA-53) Easement, McColm to U.S., Rec 2-19-62, O&G 19/70
  - Northwest Quarter (NW ¼) of Section 33, Township 28 South, Range 31 West of the 6th p.m.

- KSNM122762 (3-HA-54) - Easement, Vawter to U.S, Rec 2-23-62, O&G 19/73
  - Northwest Quarter (NW ¼) of Northeast Quarter (NE ¼) of Section 33, Township 28 South, Range 31 West

- KSNM122763 (3-HA-55) - Easement, Wynn to U.S., Rec 2-23-62, O&G 19/74
  - South half of Southeast Quarter (S ½ of SE ¼) and Northeast Quarter of Southeast Quarter (NE ¼ of SE ¼) of Section 28, Township 28 South, Range 31 West

- KSNM122764 (3-HA-56) - Easement, Schmidt, Guardian to U.S., 5-28-62, O&G 19/322
  - Southwest Quarter of Southwest Quarter (SW ¼ of SW ¼) and North Half of Southwest Quarter (N ½ of SW ¼) of Section 27, Township 28 South, Range 31 West

- KSNM122765 (3-HA-57) - Easement, Helmke to U.S., Rec 2-23-62, O&G 19/75
  - South half of Northwest quarter (S ½ of NW ¼) of Section 27, Township 28 South, Range 31 West

- KSNM122767 (3-HA-58) - Easement, Schmidt to U.S., Rec 2-14-62, O&G 19/47
  - Northeast Quarter of Section 27, Township 28 South, Range 31 West of the 6th p.m.
  - The Southeast Quarter (SE ¼) of Section 27, Township 28 South, Range 31 West of the 6th p.m.

- KSNM122768 (3-HA-59) - Easement, Garetson to U.S., Rec 2-23-62, O&G 19/76
  - North half of Northwest Quarter (N ½ of NW ¼) of Section 26, Township 28 South, Range 31 West, South half of Southwest Quarter (S ½ of SW ¼) and Northeast Quarter of Southwest Quarter (NE ¼ of SW ¼) of Section 23, Township 28 South, Range 31 West

- KSNM122769 (3-HA-60) - Easement, Monniger to U.S., Rec 2-23-62, O&G 19/64
  - Southeast quarter (SE ¼) of Section 23 and Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 24, Township 28 South, Range 31 West

- KSNM122770 (3-HA-61) - Easement, Weirauch to U.S., Rec 2-23-62, O&G 19/83
  - Southeast Quarter of Northeast Quarter (SE ¼ of NE ¼) of Section 23, Township 28 South, Range 31 West and Northwest Quarter (NW ¼) of Section 24 Township 28 South, Range 31 West

- KSNM122771 (3-HA-62) - Easement, Hammond to U.S., Rec 2-23-62, O&G 19/68
  - North half Northeast Quarter (N ½ of NE ¼) of Section 24 Township 28 South, Range 31 West and South half of Southeast Quarter (S ½ of SE ¼) of Section 13, Township 28 South, Range 31 West

- KSNM131328 (701-3-HA-1 and 701-3-HA-3) - Easement, Williams, Rec 5-28-62, O&G 19/323
  - Southeast Quarter and Northeast Quarter of the Southwest Quarter (SE/4 and NE/4 of SW/4), Section 7, Township 30 South, Range 33 West.
  - The Southwest Quarter of the Southwest Quarter (SW/4 of SW/4) of Section 6, Township 30 South, Range 33 West.

- KSNM131330 (701-3-HA-2) - Easement, Watkins to U.S., Rec 5-28-62, O&G 19/330
  - Northwest quarter and Southwest quarter of Northeast quarter NW ¼ & SW ¼ of NE ¼) of Section 7, Township 30 South, Range 33, West
  - Any pipeline to be laid under this easement shall not exceed (8) inches inside diameter and shall be laid at least 60 inches below ground level, and no above ground appurtenances shall be installed on the premises, except vent pipes at highway and road crossings; the topsoil shall be removed from the pipe trench and shall be saved and replaced at the top of the backfilled trench.

- KSNM131331 (701-3-HA-4) - Condemnation, USDCKS, Civil Action No. T-3118, JF 8-29-63
  - Southeast quarter (SE ¼) of Section 1, Township 30 South, Range 34 West
  - A strip of land 60 feet in width out of the Southeast Quarter (SE 1/4) of Section 1, T-30-S, R-34-W, Haskell Count, Kansas and being more particularly described as follows: COMMENCE at the Southeast corner of Section 1, T-20-S, R-34-W; THENCE Northerly along the East line of Section 1 a distance of 190.1 feet to the true point of beginning of the aforementioned 60 feet wide strip: THENCE North 64°37' West a distance of 110.9 feet to a point; THENCE North 50°29' West a distance of 3303.6 feet to a point in the West line of the Southeast Quarter (SE 1/4) of Section 1, said point being 2319.8 feet Northerly along the West line from the Southwest corner of the Southeast Quarter (SE 1/4) of Section 1; THENCE Northerly along the West line of the Southeast Quarter (SE 1/4) of Section 1 a distance of 77.8 feet to a point; THENCE South 50°29' East a distance of 3345.6 feet to a point; THENCE South 64°67' East a distance of 75.1 feet to a point in the East line of Section 1; THENCE Southerly along the East line of Section 1 a distance of 66.4 feet to a point, same being the point of beginning.

- KSNM131332 (701-3-HA-5) - Easement, Moody to U.S., Rec 5-28-62, O&G 19/333
  - Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 1, Township 30 South, Range 34 West

- KSNM131333 (701-3-HA-6) - Easement, Blair to U.S., Rec 5-28-62, O&G 19/337
  - Northwest quarter (NW ¼) of Section 1, Township 30 South, Range 34 West

- KSNM131334 (701-3-HA-7) Easement, Light to U.S., Rec 5-29-62, O&G 19/338
  - Lots 1 and 2 of Section 2, Township 30 South, Range 34 West

- KSNM131335 (701-3-HA-8) - Easement, Vail to U.S., Rec 6-6-62, O&G 19/365
  - North half of Southwest quarter and Southeast quarter of Southwest quarter (N ½ of SW ¼ & SE ¼ of SW ¼), South half of Northwest quarter and Northwest quarter of Northwest quarter (S ½ of NW ¼ & NW ¼ of NW ¼), and West half of Southeast quarter and Southeast quarter of Southeast quarter (W ½ of SE ¼ & SE ¼ of SE ¼) of Section 35, Township 29 South, Range 34 West

- KSNM131336 (701-3-HA-9 & 11) - Easement, Murphy to U.S., Rec 5-28-62, O&G 19/334
  - North half of Northeast quarter and Southeast quarter of Northeast quarter (N ½ of NE ¼ & SE ¼ of NE ¼) of Section 34, and South half of Southeast quarter and Northwest quarter of Southeast quarter (S ½ of SE ¼ & NW ¼ of SE ¼) of Section 27, Township 29 South, Range 34 West
  - South half of Northwest quarter (S ½ of NW ¼) of Section 27, Township 29 South, Range 34 West

- KSNM131337 (701-3-HA-10) - Easement, Schmitt to U.S., Rec 6-11-62, O&G 19/376
  - North half of Southwest quarter and Southeast quarter of Southwest quarter (N ½ of SW ¼ & SE ¼ of SW ¼) of Section 27, Township 29 South, Range 34 West

- KSNM131338 (701-3-HA-12) - Easement, Summers to U.S., Rec 5-28-62, O&G 19/332
  - The Northeast quarter (NE ¼) of Section 28, Township 29 South, Range 34 West

- KSNM131339 (701-3-HA-13) Easement, Koenig to U.S., Rec 5-28-62. O&G 19/331
  - The Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 28,
  - Township 29 South, Range 34 West

- KSNM131340 (701-3-HA-14) Easement, Black to U.S. Rec 5-28-62, O&S 19/329
  - Southwest quarter (SW ¼) of Section 21, Township 29 South, Range 34 West

- KSNM131341 (701-3-HA-15) - Easement, Love to U.S., Rec 5-28-62, O&G 19/324
  - Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 20, Township 29 South, Range 34 West

- KSNM131342 (701-3-HA-16) - Easement, Ponceti to U.S., Rec 6-11-62, O&G 19/375
  - Northeast quarter (NE ¼) of Section 20, Township 29 South, Range 34 West

- KSNM131343 (701-3-HA-17) - Easement Hall to U.S., Rec 5-28-62, O&G 19/326
  - Southwest quarter (SW ¼) of Section 17 and North half of Northwest quarter (N ½ of NW ¼) of Section 20, Township 29 South, Range 34 West

- KSNM131344 (701-3-HA-18) - Easement, Ungles to U.S., Rec 5-28-62, O&G 19/325
  - North half of Southeast quarter and Southeast quarter of Southeast quarter (N ½ of SE ¼ & SE ¼ of SE ¼) of Section 18, Township 29 South, Range 34 West

- KSNM131345 (701-3-HA-19) - Easement, Thurow to U.S., Rec 5-28-62, O&G 19/327
  - Northwest quarter of Northeast quarter and South half of Northeast quarter (NW ¼ of NE ¼ & S ½ of NE ¼) of Section 18, Township 29 South, Range 34 West

- KSNM131346 (701-3-HA-20) - Easement, Thurow to U.S., Rec 5-28-62, O&G19/328
  - North half of Northwest quarter and Southeast quarter of Northwest quarter (N ½ of NW ¼ & SE ¼ of NW ¼) of Section 18, Township 29 South, Range 34 West

- KSNM131347 (701-3-HA-21) - Condemnation, USDCKS, Civil Action No. T-3116
  - South half of Southwest quarter and Northwest quarter of Southwest quarter (S ½ of SW ¼ & NW ¼ of SW ¼) of Section 7, Township 29 South, Range 34 West

- KSNM131348 (702-3-HA-1) - Easement, Black to U.S., Rec 6-6-62, O&G 19/166
  - Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 18, Township 30 South, Range 33 West
  - Northwest quarter of Northwest quarter and South half of Northwest quarter (NE ¼ of NW ¼ & S ½ of NW ¼), Southwest quarter (SW ¼), and Southwest quarter of Southeast quarter (SW ¼ of SE ¼) of Section 17, Township 30 South, Range 33 West

- KSNM131349 (702-3-HA-2) - Easement, Williams to U.S., Rec 5-23-62, O&G 19/320
  - Northeast quarter of Northwest quarter (NE ¼ of NW ¼) and Northeast quarter (NE ¼) of Section 20, Township 30 South, Range 33 West

- KSNM131350 (702-3-HA-3) - Easement, Willett to U.S., Rec 5-28-62, O&G 19/319
  - North half of Southeast quarter and Southeast quarter of Southeast quarter (N ½ of SE ¼ &

SE ¼ of SE ¼) of Section 20, Township 30 South, Range 33 West

- KSNM131351 (702-3-HA-4) - Easement, Anton to U.S., Rec 5-28-62, O&G 19/318
  - Northwest quarter of Southwest quarter and South half of Southwest quarter (NW ¼ of SW ¼ & S ½ of SW ¼) of Section 21, Township 30 South, Range 33 West

- KSNM131352 (702-3-HA-5) - Easement, Hickman to U.S., Rec 6-4-62, O&G 19/363
  - Northwest quarter (NW ¼) of Section 28, Township 30 South, Range 33 West

- KSNM131680 (702-3-HA-6) - Easement, Tiller to U.S., Rec 5-28-62, O&G 19/317
  - Southwest quarter of Northeast quarter (SW ¼ of NE ¼) of Section 28, Township 30 South, Range 33 West

- KSNM132382 (702-3-HA-7) - Condemnation, USDCKS, Civil Action No. T-3118, rec 6-12-63
  - A strip of land 60 feet in width out of the Southeast Quarter (SE 1/4) of Section 28, T-30-S, R-33-W, Haskell County, Kansas and being more particularly described as follows: Commence at the Northwest corner of the Southeast Quarter (SE 1/4) of Section 28, T-30-S, R-33-W; THENCE easterly along the North line of the said Southeast Quarter (SE 1/4) a distance of 30.1 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE continue Easterly along the North line of the Southeast Quarter (SE 1/4) of Section 28 a distance of 71.8 feet to a point; THENCE South 33°07' East a distance of 3160.9 feet to a point in the South line of Section 28, said point being 795.2 feet Westerly along the South line of Section 28 from the Southeast corner of said Section 28; THENCE Westerly along the South line of Section 28 a distance of 71.6 feet to a point; THENCE North 33°07' West a distance of 3161.2 feet to a point, same being the point of beginning.

- KSNM131681 (702-3-HA-8) - Easement, Arbuthnot to U.S. Rec 5-28-62, O&G 19/321
  - North half of Northeast quarter and Southeast quarter of Northeast quarter (N1/2 of NE ¼ & SE ¼ of NE ¼) of Section 33, Township 30 South, Range 33 West.

- KSNM131682 (702-3-HA-9) - Easement, Nation to U.S., Rec 6-6-62, O&G 19/364
  - Northwest quarter of Northwest quarter and South half of Northwest quarter (NW ¼ of NW ¼ & S ½ of NW ¼), North half of Southwest quarter (N ½ of SW ¼), Southeast quarter of Southwest quarter (SE ¼ of SW ¼), and Southwest quarter of Southeast quarter (SW ¼ of SE ¼) of Section 34, Township 30 South, Range 33 West.
  - Pipeline shall not exceed 4 inches in diameter, inside measurement, and no above ground appurtenances, except at property line or roadways, shall be installed.

### Gray County
- KSNM122772 (3-G-1) - Easement, Reier to U.S., Rec 2-12-62, Book 59/261
  - Southwest quarter of Section 18 (SW ¼) and Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 18, Township 28 South, Range 30 West

  KSNM122773 (3-G-2) - Easement, Nelson to U.S., Rec 2-20-62, Book 59/310
  - South half of Northeast quarter (S ½ of NE ¼) and The Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 18, Township 28 South, Range 30 West and West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 17, Township 28 South, Range 30 West

- KSNM122780 (3-G-3 & 7) - Easement, Josserand to U.S, Rec 2-14-62, Book 59/295
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Section 8, Township 28 South, Range 30 West
  - South half of Southeast quarter (S ½ of SE ¼) of Section 4, Township 28 South, Range 30 West

- KSNM122781 (3-G-4) - Easement, Dirks to U.S., Rec 2-12-62, Book 59/263
  - Southeast quarter (SE ¼) of Section 8, Township 28 South, Range 30 West and Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 9, Township 28 South, Range 30 West

- KSNM122783 (3-G-5) - Easement, Blew to U.S., Rec 2-12-62, Book 59/265
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 9, Township 28 South, Range 30 West

- KSNM122785 (3-G-6) - Easement, Smith to U.S., Rec 2-20-62, Book 59/312
  - Southwest quarter of Northeast quarter (SW ¼ of NE ¼) and North half of Northeast quarter (N ½ of NE ¼) of Section 9, Township 28 South, Range 30 West

- KSNM122774 (3-G-8) - Easement, Wieland to U.S., Rec 2-20-62, Book 59/314
  - Southwest quarter (SW ¼), Southeast quarter of Northwest quarter (SE ¼ of NW ¼), Northwest quarter of Southeast quarter (NW ¼ of SE ¼), Northeast quarter (NE ¼), all in Section 3, Township 28 South, Range 30 West

- KSNM122787 (3-G-9) - Easement, Fry to U.S., Rec 2-19-62, Book 59/306
  - Southwest quarter of Northwest quarter (SW ¼ of NW ¼) and North half of Northwest quarter (N ½ of NW ¼) of Section 2, Township 28 South, Range 30 West and South half of Southwest quarter (S ½ of SW ¼) of Section 35, Township 27 South, Range 30 West

- KSNM122789 (3-G-11) - Easement, Ullom to U.S., Rec 2-8-62, Book 59/237
  - South half of Northeast quarter (S ½ of NE ¼) of Section 35, Township 27 South, Range 30 West. Southeast quarter (SE ¼) Section 35, Township 27 South, Range 30 West

- KSNM122790 (3-G-12) - Easement, Stroup to U.S., Rec 2-28-62, Book 59/330
  - The Northwest quarter (NW ¼) of Section 36, Township 27 South, Range 30 West of the 6th p.m.

- KSNM122792 (3-G-13) - Easement, Koehn to U.S., Rec 2-23-62, Book 59/319
  - Northwest quarter of Northeast (NW ¼ of NE ¼) of Section 36, Township 27 South, Range 30, West

- KSNM122793 (3-G-14) - Easement, Koehn to U.S., Rec 2-23-62, Book 59/321
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 25, Township 27 South, Range 30 West

- KSNM122794 (3-G-15) - Easement, Stude to U.S., Rec 2-14-62, Book 59/287
  - Southwest quarter of Southwest quarter (SW ¼ of SW ¼) and North half of Southwest quarter (N ½ of SW ¼) of Section 30, Township 27 South, Range 29 West

- KSNM122795 (3-G-16) - Easement, Ginest to U.S., Rec 2-23-62, Book 59/317
  - Southwest quarter of Northwest quarter (SW ¼ of NW ¼) and East half of Northwest quarter (E ½ of NW ¼) and Northeast quarter (NE ¼) of Section 30, Township 27 South, Range 29 West; also described as
  - Lot 2 and East half of Northwest quarter (E ½ of NW ¼) and Northeast quarter (NE ¼) of Section 30, Township 27 South, Range 29 West
  - KSNM 122796 (3-G-17 & 19) Easement, Unruh to U.S., Rec 3-12-62, Book 59/377
  - The Northwest quarter (NW ¼) of Section 29, Township 27 South, Range 29 West
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 20, Township 27 South, Range 29 West

- KSNM122797 (3-G-18) - Easement, Unruh to U.S., Rec 2-14-62, Book 59/297
  - Southwest quarter (SW ¼) of Section 20 and Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 20, in Township 27 South, Range 29 West

- KSNM122798 (3-G-20) - Easement, Flowers to U.S., Rec 2-12-62, Book 59/267
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 21, Township 27 South, Range 29 West

- KSNM122799 (3-G-21) - Easement, Koehn to U.S., Rec 2-14-62, Book 59/289
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) and Southeast quarter (SE ¼) of Section 16, Township 27 South, Range 29 West

- KSNM122800 (3-G-22) - Easement, Flowers to U.S., Rec 2-12-62, Book 59/269
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 15, Township 27 South, Range 29 West

- KSNM122801 (3-G-23) - Easement, Flowers to U.S., Rec 2-12-62, Book 59/271
  - Northwest quarter (NW ¼) of Section 15 and Southwest quarter of Northeast quarter (SW ¼ of NE ¼) and North half of Northeast quarter (N ½ of NE ¼) of Section 15, Township 27 South, Range 29 West

- KSNM122802 (3-G-24) - Easement, Koppisch to U.S., Rec 2-8-62, Book 59/239
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 10, Township 27 South, Range 29 West

- KSNM122803 (3-G-25) - Easement, Davidson to U.S., Rec 2-28-62, Book 59/332
  - Southwest quarter of Southwest quarter and North half of Southwest quarter (SW ¼ of SW ¼ and N ½ of SW ¼) and Southeast quarter of Northwest quarter (SE ¼ of NW ¼) of Section 11, Township 27 South, Range 29 West

- KSNM132163 (3-G-25A) - Condemnation, USDCKS, Civil Action No. T-3033, JF 5-29-63
  - A strip of land 60 feet in width out of the South half (S/2) of the Northeast Quarter (NE/4) of Section 11, T-27-S, R-29-W, Gray County, Kansas and being more particularly described as follows: COMMENCE at the northwest corner of the South half (S/2) of the Northeast Quarter (NE/4) of Section 11, T-27-S, R-29-W; THENCE Southerly along the west line of the said South half (S/2) a distance of 1147.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 53°44' East a distance of 1942.5 feet to a point in the north line of the South half (S/2) of the Northeast Quarter (NE/4) of Section 11 said point being 1567.7 feet easterly along the north line from the northwest corner of the South half (S/2) of the Northeast Quarter (NE/4) of Section 11; THENCE easterly along the north line of the South half (S/2) of the Northeast Quarter (NE/4) of Section 11 a distance of 101.6 feet to a point; THENCE South 53°44' West a distance of 2068.4 feet to a point in the west line of the South half (S/2) of the Northeast Quarter (NE/4) of Section 11; THENCE northerly along the west line of the South half (S/2) of the Northeast Quarter (NE/4) a distance of 74.4 feet to a point, same being the point of beginning.

- KSNM122804 (3-G-25-B) - Easement, Breitenbach to U.S., Rec 3-8-62, Book 59/354
  - North one half of Northeast quarter (N ½ of NE ¼) Section 11, Township 27 South, Range 29 West
  - North half of Northeast quarter (N ½ of NE ¼) Section 11, Township 27 South, Range 29 West

- KSNM122805 (3-G-26) - Easement, Egbert to U.S., Rec 2-12-62, Book 59/273
  - Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 12, Township 27 South, Range 29 West

- KSNM122806 (3-G-27) - Easement, Virtue to U.S., Rec  2-23-62, Book 59/323
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 1, Township 27 South, Range 29 West

- KSNM122807 (3-G-28) - Easement, Breitenbach to U.S., Rec 2-8-62, Book 59/241
  - Southwest quarter of Southeast quarter (SW ¼ of SE ¼) and North half of Southeast quarter (N ½ of SE ¼) and South half of Northeast quarter (S ½ of NE ¼) of Section 1, Township 27 South, Range 29 West

- KSNM122808 (3-G-29) - Easement, Flowers to U.S., Rec 2-8-62, Book 59/243
  - Northwest quarter (NW ¼) of Section 6, Township 27 South, Range 28 West of the 6th p.m.

- KSNM122809 (3-G-30) - Easement, Ratzlaff to U.S., Rec 2-8-62, Book 59/245
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 6, Township 27 South, Range 28 West

- KSNM122810 (3-G-31) - Easement, Vath to U.S., Rec 2-8-62, Book 59/247 AND Condemnation, USDCKS, Civil 3036, JF 10-30-64.
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 31, Township 26 South, Range 28 West and West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 32, Township 26 South, Range 28 West

- KSNM122811 (3-G-32) - Easement, Schauf to U.S., Rec 2-8-62, Book 59/249
  - South half of Northwest quarter (S ½ of NW ¼) of Section 32, Township 26 South, Range 28 West

- KSNM122812 (3-G-33) - Easement, Ferrell to U.S., Rec 2-14-62, Book 59/299
  - Northeast Quarter (NE ¼) of Section 32, Township 26 South, Range 28 West of the 6th p.m.

- KSNM122813 (3-G-34) - Easement, Shafer to U.S., Rec 2-28-62, Book 59/334
  - Northwest Quarter of Northwest Quarter (NW ¼ of NW ¼) of Section 33 Township 26 South, Range 28 West

- KSNM122814 (3-G-35) - Easement, Walker to U.S., Rec 2-8-62, Book 59/251
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 28, Township 26 South, Range 28 West

- KSNM122815 (3-G-36 & 38) - Easement, Addison to U.S., Rec 2-19-62, Book 59/308
  - West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 28, Township 26 South, Range 28 West
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) and Northwest quarter (NW ¼) and West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 27, Township 26 South, Range 28 West

- KSNM122816 (3-G-37) - Easement, Odle to U.S., Rec 2-14-62, Book 59/301
  - Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 28, Township 26, South Range 28 West

- KSNM122818 (3-G-40) - Easement, McKibbin to U.S., Rec 2-14-62, Book 59/291
  - Southwest Quarter (SW ¼) of Section 23 and Southeast Quarter of Northwest Quarter (SE ¼ of NW ¼) of Section 23, Township 26 South, Range 28 West

- KSNM122819 (3-G-41) - Easement, Addison to U.S., Rec 2-8-62, Book 59/253
  - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and South 100 Acres of Northeast quarter (NE ¼) of Section 23, Township 26 South, Range 28 West

- KSNM122820 (3-G-42) - Easement, Cheney to U.S., Rec 2-12-62, Book 59/275
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest (NE ¼

of NW ¼), Section 24, Township 26 South, Range 28 West
- o Except a 2 acre tract in NW corner of NW/4 owned by Church of God in Christ, Mennonite, and except Highway Right of Way

- KSNM122821 (3-G-43) - Easement, Settles to U.S., Rec 2-8-62, Book 59/255
  - o South half of Southwest Quarter (S ½ of SW ¼) and Northeast Quarter of Southwest Quarter (NE ¼ of SW ¼) and Southeast quarter (SE ¼) of Section 13, Township 26 South, Range 28 West.

- KSNM122822 (3-G-44) - Easement, Berger to U.S., Rec 2-12-62, Book 59/277
  - o Southeast Quarter of Northeast Quarter (SE ¼ of NE ¼) of Section 13, Township 26 South, Range 28 West, and Lots 3,4 and 5 and the Southeast quarter of Northwest Quarter (SE ¼ of NW ¼) of Section 18, Township 26 South Range 27 West

- KSNM122823 (3-G-45) – Easement, Crick to U.S., Rec 2-12-62, Book 59/279
  - o Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 18, Township 26 South, Range 27 West

- KSNM122824 (3-G-46) - Easement, Miller to U.S., Rec 2-8-62, Book 59//257
  - o Lots 5 and 6 and Southeast Quarter of Northeast Quarter (SE ¼ of NE ¼) of Section 7, Township 26 South, Range 27 West

- KSNM122825 (3-G-46-A) - Easement, Miller to U.S., Rec 2-14-62, Book 59/293
  - o Lot 4 and Northwest quarter (NW ¼) of Section 8, Township 26 South, Range 27 West

- KSNM122826 (3-G-47) - Easement, Salmans to U.S., Rec 2-23-62, Book 59/325
  - o Northwest Quarter of Northeast Quarter (NW ¼ of NE ¼) of Section 8, Township 26 South, Range 27 West; and Southeast Quarter (SE ¼) of Section 5, Township 26 South, Range 27 West

- KSNM122827 (3-G-48) - Easement, Sands to U.S., Rec 3-2-62, Book 59/339
  - o West half of Southwest Quarter (W ½ of SW ¼) and Northeast quarter of Southwest Quarter (NE ¼ of SW ¼) of Section 4, Township 26 South, Range 27 West

- KSNM122830 (3-G-49) - Easement, Trainer to U.S., Rec 2-23-62, Book 59/327
  - o South half of Northwest Quarter (S ½ of NW ¼) of Section 4, Township 26 South, Range 27 West

- KSNM122831 (3-G-50) General Mission … to U.S., Rec 2-8-62, Book 59/259
  - o Lot 1 and 2 and the South one half (S ½) of the Northeast quarter (NE ¼) of Section 4. Also known as the Northeast quarter (NE ¼) of Section 4, Township 26 South, Range 27 West of the 6th p.m. Containing in all 216 acres, more or less, according to The Government Survey, thereof.

- KSNM122832 (3-G-51) - Easement, Lynch to U.S., Rec 2-12-62, Book 59/281
  - o Lots 3 and 4 in Section 3, Township 26 South, Range 27 West
  - o The topsoil shall be removed from the pipe trench and shall be saved and replaced at the top of the backfilled trench.

- KSNM122833 (3-G-52) - Easement, Sauer to U.S., Rec 2-28-62, Book 59/336
  - o Southwest Quarter (SW ¼) of Section 35 and West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast Quarter (NE ¼ of SE ¼) of Section 35, Township 25 South, Range 27 West

- KSNM122834 (3-G-53) - Easement, Obee to U.S., Rec 2-14-62, Book 59/303
  - o South half of Northeast Quarter (S ½ of NE ¼) of Section 35, Township 25 South, Range 27 West

- KSNM122835 (3-G-54) - Easement, Ohnmacht to U.S., Rec 2-12-62, Book 59/283
  - o Northwest Quarter (NW ¼) of Section 36 and Northwest Quarter of North east Quarter (NW ¼ of

NE ¼) of Section 36, Township 25 South, Range 27 West and Southeast Quarter of Southwest Quarter (SE ¼ of SW ¼) and Southeast Quarter (SE ¼) of Section 25, Township 25 South, Range 27 West

**Ford County**
- KSNM122840 (3-F-1) - Easement, Cook to U.S., Rec 2-23-62, Book 14/87 Misc
  - Lots 2,3, & 4 Northeast quarter of Southwest quarter (NE ¼ of SW ¼), Southeast quarter of Northwest quarter (SE ¼ of NW ¼) of Section 30, Township 25 South, Range 26 West

- KSNM122841 (3-F-2) - Easement, Young to U.S., Rec 2-23-62, Book 14/89 Misc
  - Northeast quarter (NE ¼) of Section 30, Township 25 South, Range 26 West of the 6th p.m.

- KSNM122843 (3-F-3) - Easement, Johnson to U.S., Rec 2-23-62, Book 14/91 Misc
  - Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 29, Township 25 South, Range 26 West

- KSNM 122844 (3-F-4) - Easement, Gonder to U.S., Rec 2-28-62, Misc 14/103
  - Southwest quarter (SW ¼) and West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 20, Township 25 South, Range 26 West

- KSNM122845 (3-F-5) - Easement, Starks to U.S., Rec 2-23-62, Misc 14/93
  - South half of Northeast quarter (S ½ of NE ¼) of Section 20, Township 25 South, Range 26 West

- KSNM122846 (3-F-6) - Easement, Schuette to U.S., Rec 2-23-62, Misc 14/95
  - Northwest quarter (NW ¼) of Section 21, Township 25 South, Range 26 West

- KSNM122847 (3-F-7) - Easement, Schuette to U.S., Rec 3-1-62, Misc 14/117
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 21, Township 25 South, Range 26 West

- KSNM122848 (3-F-8) - Easement, Key, Guardian... to U.S., Rec 3-23-62, Misc 14/153
  - An undivided one-half interest in and to the South Half of the Southeast Quarter (S ½ SE ¼) of Section Sixteen (16) and the Northeast Quarter of the Southeast Quarter (NE ¼ SE ¼) of Section Sixteen (16), all in Township Twenty-five (25) South, Range Twenty-six (26) West of the 6th p.m.

- KSNM122848-01 (3-F-8) - Easement, Key to U.S. Rec 3-23-62, Misc 14/155
  - South half of the Southeast Quarter (S ½ of SE ¼) and the Northeast Quarter of the Southeast Quarter (NE ¼ of SE ¼) of Section Sixteen (16), Township Twenty-five (25) South, Range Twenty-six (26) West of the 6th p.m.

- KSNM122849 (3-F-9) - Easement, Harms to U.S., Rec 2-28-62, Misc 14/105
  - North half of Southwest quarter (N ½ of SW ¼) and Southwest quarter of Southwest quarter (SW ¼ of SW ¼) of Section 15, Township 25 South, Range 26 West

- KSNM122850 (3-F-10) - Easement, Andrews to U.S., Rec 2-28-62, Misc 14/107
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter (NE ¼) of Section 15, Township 25 South, Range 26 West

- KSNM122851 (3-F-11) - Easement, Starks to U.S., Rec 2-28-62, Misc 14/109
  - North half of Northwest quarter (N ½ of NW ¼) of Section 14, Township 25 South, Range 26 West

- KSNM122852 (3-F-13) - Easement, Harms to U.S., Rec 2-23-62, Misc 14/97
  - Southeast Quarter (SE ¼) and the East one half of the Southwest Quarter (E ½ of SW ¼) of Section 11, Township 25 South, Range 26 West of the 6th p.m.

- KSNM122853 (3-F-14) - Easement, Zimmer to U.S., Rec 2-28-62, Misc 14/111
  - Southeast Quarter of Northeast Quarter (SE ¼ of NE ¼) of Section 11, Township 25 South, Range 26 West

- KSNM122854 (3-F-15) - Easement, Slattery to U.S., Rec 2-23-62, 14/99
  - Northwest Quarter of Southwest Quarter (NW ¼ of SW ¼) and North Half of Northeast Quarter (N ½ of NE ¼) and Northwest Quarter (NW ¼) of Section 12, Township 25 South, Range 26 West

- KSNM122855 (3-F-16) - Easement, Rebein to U.S., Rec. 3-1-62, Misc 14/119
  - South half of Southeast Quarter (S ½ of SE ¼) of Section 1, Township 25 South, Range 26 West

- KSNM122856 (3-F-17) - Easement, Miller to U.S., Rec. 2-28-62, Misc 14/113
  - West one half (W ½) of Section 6, Township 25 South, Range 25 West of the 6th p.m.

- KSNM122857 (3-F-18) - Easement, Norris to U.S., Rec 3-1-62, Misc 14/121
  - South half of Northeast quarter (S/2 of NE/4) and North Half of Southeast quarter (N/2 of SE/4) of Section 6, Township 25 South, Range 25 West

- KSNM122858 (3-F-19) - Easement, Miller to U.S., Rec 2-28-62, Misc 14/115
  - Northwest quarter (NW ¼) of Section 5, Township 25 South, Range 25 West

- KSNM122859 (3-F-20) - Easement, King to U.S., Rec 3-1-62, Misc 14/123
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 5, Township 25 South, Range 25 West

**Hodgeman County**
- KSNM122860 & KSNM132176 (3-HO-1) - Condemnation, USDCKS, Civil Action No.   T-3043.
  - South half of Southeast quarter and Northeast quarter of Southeast quarter (S ½ of SE ¼ and NE ¼ of SE ¼) of Section 32, Township 24 South, Range 25 West
  - A strip of land 60 feet in width out of the Southeast Quarter (SE/4) of Section 32, T-24-S, R-25-W, Hodgeman County, Kansas and being more particularly described as follows: Commence at the southwest corner of the Southeast Quarter (SE/4) of Section 32, T-24-S, R-25-W; THENCE easterly along the south line of Section 32 a distance of 105.2 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE continue easterly along the south line of Section 32 a distance of 100.2 feet to a point; THENCE North 52°54' East a distance of 1457.4 feet to a point; THENCE North 58°41' East a distance of 1520.2 feet to a point in the east line of Section 32, said point being 1661.2 feet northerly along the east line of Section 32 from the southeast corner of said Section 32; THENCE northerly along the east line of Section 32 a distance of 70.0 feet to a point; THENCE South 58°41' West a distance of 1559.3 feet to a point; THENCE South 52°54' West a distance of 1540.7 feet to a point in the south line of Section 32 same being the point of beginning.

- KSNM122862 (3-HO-2) - Easement, Boger to U.S., Rec 2-24-62. Misc 7/16
  - West half of Southwest quarter and Northeast quarter of Southwest quarter (W ½ of SW ¼ and NE ¼ of SW ¼) of Section 33 and South half of Northwest quarter (S ½ of NW ¼) of Section 33, Township 24 South, Range 25 West

- KSNM122864 (3-HO-3) - Easement, Eichman to U.S., Rec 9-21-62, Misc 7/137
  - Northeast quarter (NE/4) and Northwest quarter of Southeast quarter (NW/4 of SE/4) of Section 33, Township 24 South, Range 25 West

- KSNM122864-01 (3-HO-3) - Easement, Hull to U.S., Rec 3-1-62, Misc 7/72
  - Northeast quarter (NE/4) and Northwest quarter of Southeast quarter (NW/4 of SE/4) of Section 33, Township 24 South, Range 25 West

- KSNM122865 (3-HO-4) - Easement, Howey to U.S., Rec 3-7-62, Misc 7/76
  - Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 34, Township 24 South, Range 25 West

- KSNM122866 (3-HO-5) - Easement, Harms to U.S., Rec 2-24-62, Misc 7/17
  - South half of Northeast quarter (S ½ of NE ¼), North half of Southeast quarter (N ½ of SE ¼) and Southwest quarter of Southeast quarter (SW ¼) of SE ¼), East half of Southwest quarter (E ½ of SW ¼) and Southwest quarter of Southwest quarter (SW ¼ of SW ¼) of Section 27, Township 24 South, Range 25 West

- KSNM122867 (3-HO-6) - Easement, Harms to U.S., Rec 2-24-62, Misc 7/18
  - Northwest quarter (NW ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 26, Township 24 South, Range 25 West

  KSNM122868 (3-HO-7) - Easement, Durr to U.S., Rec 2-24-62, Misc 7/19
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) and Southeast quarter (SE ¼) of Section 23, Township 24 South, Range 25 West

- KSNM122869 (3-HO-8) - Easement, Harms to U.S., Rec 2-28-62, Misc 7/44
  - North half of Southwest quarter and Southwest quarter of Southwest quarter (N ½ of SW ¼ and SW ¼ of SW ¼) of Section 24, Township 24 South, Range 25 West

- KSNM122871 (3-HO-9) - Easement, Phillips to U.S., Rec 2-27-62, Misc 7/45
  - East half of Northwest quarter and Southwest quarter of Northwest quarter (E ½ of NW ¼ and SW ¼ of NW ¼) of Section 24, Township 24 South, Range 25 West

- KSNM132176 (3-HO-10) - Condemnation, USDCKS, Civil Action No. T-3043.
  - A strip of land 60 feet in width out of the Northeast Quarter (NE/4) of Section 24, T-24-S, R-25-W, Hodgeman County, Kansas and being more particularly described as follows: Commence at the southwest corner of the Northeast Quarter (NE/4) of Section 24, T-24-S, R-25-W; THENCE northerly along the west line of the Northeast Quarter (NE/4) of Section 24 a distance of 953.4 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 51°39' East a distance of 2540.4 feet to a point; THENCE North 26°39' East a distance of 122.3 feet to a point in the north line of Section 24, said point being 518.9 feet westerly along the north line of Section 24 from the northeast corner of Section 24; THENCE westerly along the north line of Section 24 a distance of 67.1 feet to a point; THENCE South 26°39' West a distance of 79.0 feet to a point; THENCE South 51°39' West a distance of 2479.7 feet to a point in the west line of the Northeast Quarter (NE/4) of Section 24; THENCE southerly along the west line of the Northeast Quarter (NE/4) of Section 24 a distance of 76.5 feet to a point, same being the point of beginning.

- KSNM122872 (3-HO-11) - Easement, Durr to U.S., Rec 2-24-62, Misc 7/20
  - Southwest quarter (SW ¼) of Section 18, Township 24 South, Range 24 West, being also described as Lots 3 and 4 and East One half (E ½) of Section 18.

- KSNM122873 & KSNM132176 (3-HO-12) - Condemnation, USDCKS, Civil Action No. T-3043.
  - North half of Southeast quarter (N ½ of SE ¼) of Section 18, Township 24 South, Range 24 West
  - A strip of land 60 feet in width out of the Southeast Quarter (SE/4) of Section 18, T-24-S, R-24-W, Hodgeman County, Kansas and being more particularly described as follows: Commence at the northwest corner of the Southeast Quarter (SE/4) of Section 18, T-24-S, R-24-W; THENCE southerly along the west line of said Southeast Quarter (SE/4) a distance of 319.2 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 54°35' East a distance of 545.3 feet to a point in the north line of the Southeast Quarter (SE/4) of Section 18, said point being 443.2 feet easterly along the north line of the Southeast Quarter (SE/4) of Section 18; THENCE easterly along the north line of the Southeast Quarter (SE/4) of Section 18 a distance of 102.7 feet to a point; THENCE South 54°35' East a distance of 671.8 feet to a point

in the west line of the Southeast Quarter (SE/4) of Section 18; THENCE northerly along the west line of the Southeast Quarter (SE/4) of Section 18 a distance of 73.9 feet to a point, same being the point of beginning.

- KSNM122874 (3-HO-13) - Easement, Randel to U.S., Rec 3-1-62, Misc 7/70
  - Southeast quarter of Northwest quarter (SE ¼ of NW ¼), South half of Northeast quarter and Northeast quarter of Northeast quarter (S ½ of NE ¼ and NE ¼ of NE ¼) of Section 18, Township 24 South, Range 24 West

- KSNM122875 (3-HO-14) - Easement, Burr to U.S, Rec 2-28-62, Misc 7/46
  - North half of Northwest quarter and Southwest quarter of Northwest quarter (N ½ of NW ¼ and SW ¼ of NW ¼) of Section 17, Township 24 South, Range 24 West

- KSNM122876 (3-HO-15) - Easement, Charles to U.S., Rec 2-24-62, Misc 7/21
  - Southeast quarter (SE ¼), Southeast quarter of Northeast quarter (SE ¼ of NE ¼), East half of Southwest quarter and Southwest quarter of Southwest quarter (E ½ of SW ¼ and SW ¼ of SW ¼) of Section 8, Township 24 South, Range 24 West

- KSNM122877 (3-HO-16) - Easement, Benish to U.S., Rec 2-24-62, Misc 7/22
  - Northwest quarter (NW ¼), Northwest quarter of Southwest quarter (NW ¼ of SW ¼) and North half of Northeast quarter (N ½ of NE ¼) of Section 9, Township 24 South, Range 24 West

- KSNM122878 (3-HO-17) - Easement, Schneider to U.S., Rec 3-1-62, Misc 7/71
  - South half of Southeast quarter and Northeast quarter of Southeast quarter (S ½ of SE ¼ and NE ¼ of SE ¼) of Section 4, Township 24 South, Range 24 West

- KSNM122894 (3-HO-18) - Easement, Schraeder to U.S., Rec 2-28-62, Misc 7/47
  - West half of Southwest quarter (W ½ of SW ¼), Northeast quarter of Southwest quarter (NE ¼ of SW ¼), Northeast quarter (NE ¼) of Section 3, Township 24 South, Range 24 West
  South quarter of Southeast quarter (SE ¼ of SE ¼), of Section 34, Township 23 South, Range 24 West

- KSNM122895 (3-HO-18-A) - Easement, Schraeder to U.S., Rec 2-28-62, Misc 7/48
  - The Northwest quarter of Section 3, Township 24 South, Range 24 West

- KSNM122896 (3-HO-19) - Easement, Sturgeon to U.S. Rec 2-28-62, Misc 7/49.
  - Southwest quarter and the Southeast quarter of the Northwest quarter (SW ¼ and SE ¼ of NW ¼), South half of the Northeast (S ½ of NE ¼), and the Northeast quarter of the Northeast quarter (NE ¼ of NE ¼), and the North half of the Southeast (N ½ of SE ¼), Section 35, Township 23 South, Range 24 West.

- KSNM122897 (3-HO-20) - Easement, Boyce to U.S., Rec 2-24-62, Misc 7/23
  - North half of Northwest quarter and Southwest quarter of Northwest quarter (N ½ of NW ¼ and SW ¼ of NW ¼) of Section 36, Township 23 South, Range 24 West

- KSNM122898 (3-HO-21) - Easement, Phillips to U.S., Rec 2-28-62, Misc 7/50
  - South half of Southwest quarter (S ½ of SW ¼) of Section 25, Township 23 South, Range 24 West

- KSNM122899 (3-HO-22) - Easement, Mix to U.S., Rec 2-24-62, Misc 7/24
  - West one half of the East one half (W ½ of E ½) of Section 25, Township 23 South, Range 24 West.

- KSNM122900 (3-HO-23 & 25) - Easement, Thresher to U.S., Rec 2-28-62, Misc 7/51
  - East half of Southeast quarter (E ½ of SE ¼), Southeast quarter of Northeast quarter (SE ¼ of

NE ¼) of Section 25, Township 23 South, Range 24 West and Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 30, Township 23 South, Range 23 West
North half of Northeast quarter (N ½ of NE ¼) of Section 30, Township 23 South, Range 23 West

- KSNM122901 (3-HO-24) - Easement, MacNair to U.S., Rec 2-28-62, Misc 7/52
  - Northwest quarter (NW ¼) of Section 30, Township 23 South, Range 23 West

  KSNM122902 (3-HO-26) - Easement, MacNair to U.S., Rec 2-28-62, Misc 7/53
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 19, Township 23 South, Range 23 West

- KSNM122903 (3-HO-27) - Easement, Bailey to U.S., Rec 2-28-62, Misc 7/54
  - North half of Southwest quarter and Southwest quarter of Southwest quarter (N ½ of SW ¼ and SW ¼ of SW ¼), Southeast quarter of Northwest quarter (SE ¼ of NW ¼, Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and Northeast quarter (NE ¼) of Section 20, Township 23 South, Range 23 West and Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 17, Township 23 South, Range 23 West

- KSNM122904 (3-HO-28) - Easement, Jarnagin to U.S., Rec 2-24-62, Misc 7/15
  - Southwest quarter (SW ¼), Southeast quarter of Northwest quarter (SE ¼ of NW ¼) Northwest quarter of Southeast quarter (NW ¼ of SE ¼), and Northeast quarter (NE ¼) of Section 16, Township 23 South, Range 23 West and the Northwest quarter of the Northwest quarter (NW ¼ of NW ¼) of Section 21, Township 23 South, Range 23 West

- KSNM122905 (3-HO-29) - Easement, Hoagland to U.S., Rec 2-24-62, Misc 7/25
  - Southeast quarter of Southeast (SE ¼ of SE ¼) of Section 9, Township 23 South, Range 23 West

- KSNM122906 (3-HO-30) - Easement, Hubin to U.S., Rec 2-24-62, Misc 7/26
  - Southwest quarter (SW ¼) and Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 10, Township 23 South, Range 23 West

- KSNM122907 (3-HO-31 & 33) - Easement, Hubin to U.S., Rec 2-28-62, Misc 7/55
  - South half of Northeast quarter and Northeast quarter of Northeast quarter (S ½ of NE ¼ and NE ¼ of NE ¼) of Section 10, and West half of Northwest quarter and Northeast quarter of Northwest quarter (W ½ of NW ¼ and NE ¼ of NW ¼) of Section 11, Township 23 South, Range 23 West
  Lot 1 and South half of Northeast quarter (S ½ of NE ¼) of Section 2, Township 23 South, Range 23 West

- KSNM122908 (3-HO-32) - Easement, Bristow to U.S., Rec 2-24-62, Misc 7/27
  - Southwest quarter of Southwest quarter (SW ¼ of SW ¼), East half of Southwest quarter (E ½ of SW ¼), West half of Southeast quarter (W ½ of SE ¼), Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 2, Township 23 South, Range 23 West

- KSNM122909 & KSNM 132176 (3-HO-34) - Condemnation, USDCKC, Civil Action No. T-3075, Book 77/95.
  - Northwest quarter (NW ¼) of Section 1, Township 23 South, Range 23 West
  - A strip of land 60 feet in width out of the Northwest Quarter (NW/4) of Section 1, T-23-S, R-23-W, Hodgeman County, Kansas and being more particularly described as follows: Commence at the southwest corner of the Northwest Quarter (NW/4) of Section 1, T-23-S, R-23-W, Hodgeman County, Kansas; THENCE northerly along the west line of the Northwest Quarter (NW/4) of Section 1, a distance of 887.1 feet to a point, same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 51°01' East a distance of 130.2 feet to a point in the north line of Condemnation, USDC Kansas See the Northwest Quarter (NW/4) of Section 1, said point being 531.3 feet westerly along the north line of the Northwest Quarter (NW/4) of Section 1 form the northeast corner of the Northwest Quarter (NW/4) of Section 1; THENCE

westerly along the north line of the Northwest Quarter (NW/4) of Section 1, a distance of 66.3 feet to a point; THENCE South 26°01' West a distance of 88.7 feet to a point; THENCE South 51°01' West a distance of 2566.4 feet to a point in the west line of the Northwest Quarter (NW/4) of Section 1; THENCE southerly along the west line of the Northwest Quarter (NW/4) of Section 1, a distance of 76.9 feet to a point, same being the point of beginning of the aforementioned 60 foot wide strip.

- KSNM122910 (3-HO-35&37) - Easement, Salmans to U.S., Rec 2-15-62, Misc 7/9
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Section 36 and all that part of Southeast quarter (SE ¼) of Section 36 lying South (S) of AT & SF RR Right of Way Township 22 South, Range 23 West
  - Northwest quarter (NW ¼) of Section 31 and Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 31, Township 22 South, Range 22 West

- KSNM122911 (3-HO-36) - Easement, Lupfer to U.S., Rec 2-24-62, Misc 7/28
  - All of the part of Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 36 lying North (N) of AT & SF RR Right of Way and Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 36, Township 22 South, Range 23 West

- KSNM122912 (3-HO-38) - Easement, Glunt to U.S., Rec 2-24-62, Misc 7/29
  - North half of Northeast quarter (N ½ of NE ¼) of Section 31, Township 22 South, Range 22 West

- KSNM122913 (3-HO-39) - Easement, Housman to U.S., Rec 2-24-62, Misc 7/30
  - South half of Southeast quarter and Northeast quarter of Southeast quarter (S ½ of SE ¼ and NE ¼ of SE ¼) of Section 30, Township 22 South, Range 22 West

- KSNM122914 (3-HO-40) Easement, Ewy to U.S., Rec 2-24-62, Misc 7/31
  - North half of Southwest quarter and Southwest quarter of Southwest quarter (N ½ of SW ¼ and SW ¼ of SW ¼) of Section 29, Township 22 South, Range 22 West

- KSNM122915 (3-HO-41) - Easement, Miller to U.S., Rec 2-24-62, Misc 7/32
  - South half of Northwest quarter and Northeast quarter of Northwest quarter (S ½ of NW ¼ and NE ¼ of NW ¼) of Section 29, Township 22 South, Range 22 West

- KSNM122916 (3-HO-42, 44 & 46) – Easement, Miller to U.S., Rec 2-24-62, Misc 7/33
  - West half of Northeast quarter and Northeast quarter of Northeast quarter (W ½ of NE ¼ and NE ¼ of NE ¼) of Section 29, Township 22 South, Range 22 West
    Southwest quarter (SW ¼) of Section 21, Township 22 South, Range 22 West
    Northeast quarter (NE ¼) of Section 21, Township 22 South, Range 22 West

- Condemnation, USDC Kansas CIV T-3043
  - Northwest Quarter of the Northwest Quarter (NW/4 of NW/4) of Section 28, Township 22 South, Range 22 West

- KSNM122917 (3-HO-43) - Easement, Bamberger to U.S., Rec 2-24-62, Misc 7/34
  - South half of Southeast quarter (S ½ of SE ¼) of Section 20, Township 22 South, Range 22 West

- KSNM122918 (3-HO-45) - Easement, Lingenfelder to U.S., Rec 2-24-62, Misc 7/35
  - Southeast quarter of Northwest quarter (SE ¼ of NW ¼) of Section 21, Township 22 South, Range 22 West

- KSNM122919 (3-HO-47) - Easement, Sipes to U.S., Rec 2-28-62, Misc 7/56
  - North half of Northwest quarter (N ½ of NW ¼) of Section 22, Township 22 South, Range 22 West

- KSNM122920 (3-HO-48) - Easement, Carlisle to U.S., Rec 2-28-62, Misc 7/57
  - South half of Southwest quarter and Northeast quarter of Southwest quarter (S ½ of SW ¼ and NE ¼ of SW ¼) of Section 15, Township 22 South, Range 22 West

- KSNM122921 (3-HO-49) - Easement, Carlisle to U.S., Rec 2-28-62, Misc 7/58
  - North half of Southeast quarter and Southwest quarter of Southeast quarter (N ½ of SE ¼ and SW ¼ of SE ¼) of Section 15, Township 22 South, Range 22 West

- KSNM122922 (3-HO-50) - Easement, Uhruh to U.S., Rec 2-28-62, Misc 7/59
  - South half of Northeast quarter (S ½ of NE ¼) of Section 15, Township 22 South, Range 22 West

- KSNM122923 (3-HO-51) - Easement, Notestine to U.S., Rec 2-28-62, Misc 7/60
  - Northwest quarter (NW ¼) of Section 14, Township 22 South, Range 22 West

- KSNM122924 (3-HO-52) - Easement, Korf to U.S., Rec 2-24-62, Misc 7/36
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 14, Township 22 South, Range 22 West

- KSNM122926 (3-HO-53) - Easement, Miller to U.S., Rec 2-28-62, Misc 7/61
  - Southeast quarter (SE ¼) of Section 11, Township 22 South, Range 22 West

- KSNM122927 (3-HO-54 & 56) - Easement, Pitts to U.S., Rec 2-28-62, Misc 7/62
  - West half of Southwest quarter and Northeast quarter of Southwest quarter (W ½ of SW ¼ and NE ¼ of SW ¼) and Northeast quarter (NE ¼) of Section 12, Township 22 South, Range 22 West

- KSNM122928 (3-HO-55) - Easement, Salmans to U.S., Rec 2-24-62, Misc 7/37
  - South half of Northwest quarter and Northeast quarter of Northwest quarter (S ½ of NW ¼ and NE ¼ of NW ¼) of Section 12, Township 22 South, Range 22 West

- KSNM122929 (3-HO-57) - Easement, Neufeld to U.S., 2-28-62, Misc 7/63
  - Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 1, Township 22 South, Range 22 West

- KSNM122930 (3-HO-58) - Easement, Warner to U.S., Rec 2-28-62, Misc 7/69
  - Southwest quarter (SW ¼) of Section 6, Township 22 South, Range 21 West

- KSNM122931 (3-HO-59) - Easement, Douglas to U.S., 3-2-64, Misc 7/73
  - North half of Southeast quarter (N ½ of SE ¼) of Section 6, Township 22 South, Range 21 West

- KSNM122932 (3-HO-60) - Easement, Schmitt to U.S., Rec 3-2-62, Misc 7/74
  - South half of Northeast quarter (S ½ of NE ¼) of Section 6, Township 22 South, Range 21 West

- KSNM122933 (3-HO-61) - Easement, Hahn to U.S., Rec 3-2-62, Misc 7/75
  - Lots 3 and 4 and South half of Northwest quarter (S ½ of NW ¼) of Section 5, Township 22 South, Range 21 West

- KSNM122934 (3-HO-62) - Easement, Heinen to U.S., Rec 2-28-62, Misc 7/68
  - Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 5, Township 22 South, Range 21 West

- KSNM122935 & KSNM132176 (3-HO-63) – Condemnation, USDCKS, Civil Action No. T-3043.
  - That part of the Southeast quarter (SE ¼) of Section 32, Township 21, South Range 21 West of the 6th p.m. described as follows: Beginning at the Southwest (SW) corner; thence North (N) 80 rods; thence East (E) 64 rod thence 80 rods South (S); thence West (W) 64 rods to the place of beginning.

- o   A strip of land 60 feet in width out of the west 64 rods of the south 80 rods of the Southeast Quarter (SE/4) of Section 32, T-21-S, R-21-W, Hodgeman County, Kansas and being more particularly described as follows: Commence at the southwest corner of the Southeast Quarter (SE/4) of Section 32, T-21-S, R-21-W; THENCE easterly along the south line of Section 32 a distance of 453.3 feet to the point of beginning of the aforementioned 60 foot wide strip; THENCE continue easterly along the south line of Section 32 a distance of 66.6 feet to a point; THENCE North 25°30' East a distance of 88.5 feet to a point; THENCE North 56°30' East a distance of 595.7 feet to a point in the east line o the west 64 rods of the south 80 rods of the Southeast Quarter (SE/4) of Section 32, said point being 406.9 feet northerly along the said east line from the southeast corner of the said west 64 rods of the south 80 rods; THENCE northerly along the east line of the west 64 rods of the south 80 rods of the Southeast Quarter (SE/4) of Section 32 a distance of 71.8 feet to a point; THENCE South 56°30' West a distance of 651.8 feet to a point; THENCE South 25°30' West a distance of 134.0 feet to a point in the south line of Section 32, same being the point of beginning.

- KSNM122936 (3-HO-64) - Easement, Winget to U.S., Rec 2-28-62, Misc 7/67
  - o   That part of the Southeast quarter (SE ¼) of Section 32, Township 21 South, Range 21 West of the 6th p.m. described as follows: Beginning at the Southeast (SE) corner, thence North (N) 80 rods; thence West (W) on a line parallel with the South (S) line of said quarter a distance of 96 rods; thence South (S) on a line parallel with the East (E) line of said quarter a distance of 80 rods and to the South (S) line of said quarter section; thence  East (E) along the South (S) line of said quarter section a distance of 96 rods to the place of beginning. Containing 48 acres, more or less.
  - o   Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 32, Township 21 South, Range 21 West

- KSNM122937 (3-HO-65) - Easement, Bryant to U.S., Rec 2-28-62, Misc 7/66
  - o   North half of Southwest quarter and Southwest quarter of Southwest quarter (N ½ of SW ¼ and SW ¼ of SW ¼) of Section 33, Township 21 South, Range 21 West

- KSNM122938 (3-HO-66) - Easement, Warner to U.S., Rec 2-28-62, Misc 7/65
  - o   Southeast quarter of Northwest quarter and Northeast quarter (SE ¼ of NW ¼ and NE ¼) of Section 33, Township 33, Township 21, South, Range 21 West

- KSNM122939 (3-HO-67) - Easement, Lynam to U.S., Rec 2-24-62, Misc 7/38
  - o   North half of Northwest quarter (N ½ of NW ¼) of Section 34, Township 21 South, Range 21 West

- KSNM122940 (3-HO-68) - Easement, Leadley to U.S., Rec 2-28-62, Misc 7/64
  - o   South half of Southwest quarter and Northeast quarter of Southwest quarter (S ½ of SW ¼ and NE ¼ of SW ¼) of Section 27, North half of Southeast quarter and Southwest quarter of Southeast quarter (N ½ of SE ¼ and SW ¼ of SE ¼) of Section 27, Township 21 South, Range 21 West

- KSNM122941 (3-HO-69) - Easement, Leadley to U.S., Rec 2-24-62, Misc 7/39
  - o   South half of Northeast quarter (S ½ of NE ¼) of Section 27, Township 21 South, Range 21 West

- KSNM122942 (3-HO-70) - Easement, Eakin to U.S., Rec 2-24-62, Misc 7/40
  - o   Northwest quarter (NW ¼) of Section 26, Township 21 South, Range 21 West

- KSNM122943 (3-HO-71 & 73) - Easement, Eakin to U.S., Rec 2-24-62, Misc 7/42
  - o   Southeast quarter of Southwest quarter (SE ¼ of SW ¼) and Southeast quarter of Northeast quarter (SE ¼ of NE ¼) and Southeast quarter (SE ¼) of Section 23, Township 21 South, Range 21 West
  - o   South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 24, Township 21 South, Range 21 West

- KSNM122944 (3-HO-72) - Easement, Eakin to U.S., Rec 2-24-62, Misc 7/41
  - North half of Southwest quarter (N ½ of SW ¼) of Section 24, Township 21 South, Range 21 West

- KSNM122946 (3-HO-74) - Easement, Eakin to U.S., Rec 2-24-62, Misc 7/43
  - South half of Southeast quarter (S ½ of SE ¼) of Section 13, North half of Northeast quarter and Southwest quarter of Northeast quarter (N ½ of NE ¼ and SW ¼ of NE ¼) of Section 24, Township 21 South, Range 21 West

**Pawnee County**
- KSNM122949 (3-P-1) - Easement, Eakin to U.S., Rec 2-13-62, M-34/476
  - The Southwest quarter (SW ¼) of Section 18, Township 21 South, Range 20 West

- KSNM122950 (3-P-2) - Easement, Steffen to U.S., Rec 3-7-62, M-34/516
  - The Southeast quarter of the Northwest quarter (SE ¼ NW ¼) of Section 18, Township 21 South, Range 20 West

  KSNM122951 (3-P-3) - Easement, Miller to U.S., Rec 2-13-62, M-34/475
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 18 Township 21 South, Range 20 West

- KSNM122952 (3-P-4) - Easement, Thompson to U.S., Rec 2-7-62, Misc 34/415
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 17, Township 21 South, Range 20 West.

- KSNM122953 (3-P-5) - Easement, Steffen to U.S., Rec 2-19-62, M-34/477
  - South half of Southwest quarter (S ½ of SW ¼), Southeast quarter (SE ¼), and Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 8, Township 21 South, Range 20 West

- KSNM122954 (3-P-6) - Easement, Lewis to U.S., Rec 3-2-62, M-34/512
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 9, Township 21 South, Range 20 West

- KSNM122955 (3-P-7) - Easement, Schraeder to U.S., Rec 2-13-62, M-34/471
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 9, Township 21 South, Range 20 West

- KSNM122956 (3-P-8) - Easement, Schnack to U.S., Rec 2-28-62, M-34/509
  - West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter Northeast quarter (NE ¼ of NE ¼) of Section 9, Township 21 South, Range 20 West and Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 4, Township 21 South, Range 20 West

- KSNM122957 (3-P-9) - Easement, Beltz to U.S., Rec 2-7-62, M-34/416
  - Southwest Quarter (SW ¼) and West half of Southeast Quarter (W ½ of SE ¼) and Northeast Quarter of Southeast Quarter (NE ¼ of SE ¼) of Section 3, Township 21 South, Range 20 West

- KSNM122958 (3-P-10) - Easement, Thompson to U.S., Rec 2-28-62, M-34/510
  - East half of Northeast quarter (E ½ of NE ¼) and Southwest quarter of Northeast quarter (SW ¼ of NE ¼), Section 3, Township 21 South, Range 20 West.

- KSNM122959 (3-P-11) - Easement, Spreier to U.S., Rec 3-2-62, M-34/513
  - Lots 3 and 4 and the Southwest quarter of the Northwest quarter (SW ¼ of NW ¼) of Section 2, Township 21 South, Range 20 West.

- KSNM122960 (3-P-12) - Easement, Deckert to U.S., Rec 2-21-62, M-34/478
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 36, Township 20 South, Range 20 West

- KSNM122961 (3-P-13) - Easement, Alexander to U.S., Rec 2-28-62, M-34/511
  - West half of Southeast quarter (W ½ of SE ¼) and Northeast Quarter of Southeast quarter (NE ¼ of SE ¼) and South half of Northeast quarter (S ½ of NE ¼) of Section 36, Township 20 South, Range 20 West; Northwest quarter (NW ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 31, Township 20 South, Range 19 West

- KSNM122962 (3-P-14) - Easement, Brannan to U.S., Rec 2-7-62, M-34/417
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 30, Township 20 South, Range 19 West
  - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼); South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter, (NE ¼ of NE ¼) Northeast quarter of Section 29, Township 20 South, Range 19 West

- KSNM122963 (3-P-15) - Easement, Delhotal to U.S., Rec 4-13-62, M-34/632
  - Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 20, Township 20 South, Range 19 West

- KSNM122964 (3-P-16) - Easement, Balman to U.S., Rec 3-23-62, M-34/530
  - Southwest quarter (SW ¼) of Section 21, Township 20 South, Range 19 West

- KSNM122965 (3-P-17) - Easement, Thurman to U.S., Rec 2-7-62, M-34/418
  - North half of Southeast quarter (N ½ of SE ¼) of Section 21, Township 20 South, Range 19 West

- KSNM 122966 (3-P-18) - Easement, Weisensee to U.S., Rec 2-7-62, M-34/419
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 21, Township 20 South, Range 19 West

- KSNM122967 (3-P-19) - Easement, Smith to U.S., Rec 2-7-62, M-34/420
  - West half of Northwest quarter (W ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 22, Township 20 South, Range 19 West

- KSNM122968 (3-P-20) - Easement, Holman to U.S. Rec 3-2-62, M-34/514
  - South half of Southwest quarter (S ½ of SW ¼), Section 15, Township 20 South, Range 19 West

  KSNM122969 (3-P-21) - Easement, Winkler to U.S., Rec 2-7-62, M-34/421
  - Southeast quarter (SE ¼) of Section 15, Township 20 South, Range 19 West

- KSNM122970 (3-P-22) - Easement, Hagerman to U.S., Rec 2-7-62, M-34/422
  - South half of Northwest quarter (S ½ of NW ¼) and North half of Southwest quarter (N ½ of SW ¼) of Section 14, Township 20 South, Range 19 West

- KSNM122971 (3-P-23) - Easement, Hagerman to U.S., Rec 2-7-62, M-34/423
  - Northeast quarter of Northwest quarter (NE ¼ of NW ¼), West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 14, Township 20 South, Range 19 West

- KSNM122972 (3-P-24) - Easement, Josefiak to U.S., Rec 3-13-62, M-34/517
  - South one half (S ½) of the Southeast quarter (SE ¼) of Section Eleven (11), Township 20 South, Range 19 West

- KSNM122973 (3-P-25) - Easement, Meier to U.S., Rec 2-13-62, M-34/474
  - Southwest quarter (SW ¼) and North half of Southeast quarter (N ½ of SE ¼) of Section 12, Township 20 South, Range 19 West

- KSNM122974 (3-P-26) - Easement, Marlett to U.S., Rec 4-11-62, M-34/621
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 12, Township 20 South, Range 19 West

- KSNM122975 (3-P-27) - Easement, Tammen to U.S., Rec 4-11-62, M-34/622
  - A strip of land 50 feet in and out of the West half (W ½) of the Northwest quarter (NW ¼) of Section 7, T20S, R18W, Pawnee County, Kansas, the centerline of which is described as follows: Commence at a point in the west line of Section 7, T20S, R18W, said point being approximately 1335 feet southerly along the west line from the Northwest corner of Section 7; thence North 58° 35' East a distance of 1980 feet more or less, to a point in the West line of the East half (E ½) of the Northwest quarter (NW ¼) of said Section 7, said point being approximately 275 feet south of the corner of the East half (E ½) of the Northwest quarter of Section 7. The above described 50 foot wide strip contains 2.27 acres more or less.

- KSNM122976 (3-P-27-A) - Easement, Hagerman to U.S., Rec 4-11-62, M-34/623
  - A strip of land in and out of the East Half (E1/2) of the Northwest quarter (NW ¼) of Section 7, T20S, R18W, Pawnee County, Kansas, the centerline of which is described as follows: Commence at a point in the north line of Section 7, T20S, R18W, said point being approximately 895 feet westerly along the north line from the northeast corner of the Northwest quarter (NW ¼) of said Section 7; thence South 58° 35' West , a distance of 511 feet more or less to a point in the East line of the West half (W ½) of the Northwest quarter (NW ¼) of said Section 7, said point being approximately 275 feet South of the Northeast corner of the West half (W ½) of the Northwest quarter (NW ¼) of Section 7.  The above described 50 foot wide strip contains 0.59 acres more or less.

- KSNM122977 (3-P-28) - Easement, Hagerman to U.S., Rec 3-13-62, M-34/518
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼), Section 6, Township 20 South, Range 18 West

- KSNM122978 (3-P-28A) - Easement, Hagerman to U.S., Rec 3-13-62, M-34/519
  - Southeast quarter (SE ¼), Section 6, Township 20 South, Range 18 West

- KSNM122979 (3-P-29) - Easement, Lewis to U.S., Rec 2-13-62, M-34/472
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 5, Township 20 South, Range 18 West

- KSNM122980 (3-P-30) - Easement, Lewis to U.S., Rec 2-13-62, M-34/473
  - Southwest quarter of Northwest quarter (SW ¼ of NW ¼), East half of Northwest quarter (E ½ of NW ¼), West half of Northeast quarter (W ½ of NE ¼), Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 5, Township 20 South, Range 18 West

**Rush County**
- KSNM122981 (3-R-1) - Easement, Campbell to U.S., Rec 4-2-62, Misc 71/672
  - East half (E ½) of South 130 Acres of South half (S ½) of Section 32, Township 19 South, Range 18 West

- KSNM122982 (3-R-2) - Easement, Harris to U.S., Rec 4-2-62, Misc 71/673
  - Southwest quarter (SW ¼) and Southeast quarter of Northwest quarter (SE ¼ of NW ¼, and North half of Southeast quarter (N ½ of SE ¼) and South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼), Section 33, Township 19 South, Range 18 West.

- KSNM122983 (3-R-3) - Easement, Estes to U.S., Rec 3-20-62, Misc 71/655
    - West half of Northwest quarter (W ½ of NW ¼) Section 34 Township 19 South, Range 18 West

- KSNM122984 (3-R-4) - Easement, Hanken to U.S., Rec 3-20-62, Misc 71/656
    - Northeast quarter of Northwest quarter (NE ¼ of NW ¼), Section, 34, Township 19 South, Range 18 West

- KSNM122985 (3-R-5) - Easement, Hemken to U.S, Rec 4-2-62, Misc 71/674
    - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼), Section 27, Township 19 South, Range 18 West

- KSNM122986 (3-R-6) - Easement, Ummen to U.S., Rec 4-5-62, Misc 71/680
    - Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 27, Township 19 South, Range 18 West
    - West half of Southeast quarter (W ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼), Section 27, Township 19 South, Range 18 West

- KSNM122986-01 (3-R-6) - Easement, Enerson to U.S, Rec 4-5-62, Misc 71/681
    - Southwest Quarter (SW/4) of Southeast Quarter (SE/4) of Section 27, Township 19 South, Range 18 West

- KSNM122987 (3-R-7) - Easement, Hall to U.S., Rec 3-20-62, Misc 71/657
    - Northwest quarter (NW ¼) and Northwest quarter of Northeast quarter (NW ¼ of NE ¼) of Section 26, Township 19 South, Range 18 West

- KSNM122988 (3-R-8) - Easement, Conard to U.S., Rec 3-20-62, Misc 71/658
    - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) and Southeast quarter (SE ¼), Section 23, Township 19 South, Range 18 West

- KSNM122989 (3-R-9) - Easement, Stueckemann to U.S., Rec 3-20-62, Misc 71/659
    - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 24, Township 19 South, Range 18 West

- KSNM122990 (3-R-10) - Easement, Stejskal to U.S., Rec 4-2-62, Misc 71/675
    - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼), Section 24, Township 19 South, Range 18 West

- KSNM122991 (3-R-11) - Easement, Graver to U.S., Rec 4-11-62, Misc 73/545
    - West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼), Section 24, Township 19 South, Range 18 West

- KSNM122992 (3-R-12) - Easement, Bortz to U.S., Rec 3-20-62, Misc 71/660
    - South half of Southeast quarter (S ½ of SE ¼), Section 13 Township 19 South, Range 18 West

- KSNM122993 (3-R-13 & 15) – Easement, Schraeder to U.S., Rec 3-20-62, Misc 71/661
    - South half of Southwest quarter (S ½ of SW ¼), Section 18, Township 19 South, Range 17 West
    - Southeast quarter of Northwest quarter (SE ¼ of NW ¼) of Section 18, Township 19 South, Range 17 West

- KSNM122994 (3-R-14) - Easement, Schraeder to U.S., Rec 4-11-62, Misc 73/546
    - North half of Southwest quarter (N ½ of SW ¼), Section 18, Township 19 South, Range 17 West

- KSNM122995 (3-R-16) - Easement, Schrader to U.S., Rec 4-11-62, Misc 73/547
    - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) and Northeast quarter (NE ¼), Section

18, Township 19 South, Range 17 West

- KSNM122996 (3-R-17) - Condemnation, USDCKS, Civil Action No. T-3082
  - Northwest quarter of Northwest quarter (NW ¼ of NW ¼) of Section 17, Township 19 South, Range 17 West

- KSNM132166 (3-R-18) - Condemnation, USDCKS, Civil Action No. T-3037, Rec 7-9-63
  - A strip of land 60 feet in width out of the Southwest Quarter (SW/4) of Section 8, T-19-S, R-17-W, Rush County, Kansas and being more particularly described as follows: Commence at the southwest corner of Section 8, T-19-S, R-17-W; THENCE easterly along the south line of said Section 8 a distance of 343.0 feet to the true point of beginning of the aforementioned 60 foot wide strip; THENCE North 27°06' East a distance of 272.9 feet to a point; THENCE North 55°13' East a distance of 1190.0 feet to a point; THENCE North 58°35' East a distance of 1294.8 feet to a point; THENCE North 54°10' East a distance of 111.9 feet to a point in the east line of the Southwest Quarter (SW/4) of Section 8, said point being 946.3 feet southerly along the east line from the northeast corner of the said Southwest Quarter (SW/4) of Section 8; THENCE southerly along the east line of the Southwest Quarter (SW/4) of Section 8 a distance of 73.8 feet to a point; THENCE South 54°10' West a distance of 71.3 feet to a point; THENCE South 58°35' West a distance of 1295.2 feet to a point; THENCE South 55°13' West a distance of 1173.2 feet to a point; THENCE South 27°06' West a distance of 227.5 feet to a point in the south line of Section 8; THENCE westerly along the south line of Section 8 a distance of 67.3 feet to a point, same being the point of beginning.

- KSNM122997 (3-R-19) - Condemnation, USDCKS, Civil Action No. T-3082
  - West half of Southeast quarter (W ½ of SE ¼) of Section 8, Township 19 South, Range 17 West

- Condemnation, USDCKS, Civil Action No. T-3082
  - Northwest Quarter of the Southeast Quarter (NW/4 of SE/4) of Section 8, Township 19 South, Range 17 West

- KSNM122998 (3-R-20) – Condemnation, USDCKS, Civil Action No. T-3082
  - Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 8, Township 19 South, Range 17 West

- KSNM122999 (3-R-21) - Easement, Dirks to U.S., Rec 4-2-62, Misc 71/676
  - South half of Northeast quarter (S ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 8, Township 19 South, Range 17 West

- KSNM123000 (3-R-22) - Easement, Stejskal to U.S., Rec 3-20-62, Misc 71/662
  - Northwest quarter (NW ¼) of Section 9, Township 19 South, Range 17 West

- KSNM123001 (3-R-23) - Easement, Spicka to U.S., Rec 3-20-62, Misc 71/663
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Section 4, Township 19 South, Range 17 West

- KSNM123002 (3-R-24) - Easement, Owens to U.S., Rec 4-5-62, Misc 71/682
  - South half of Southeast quarter (S ½ of SE ¼) of Section 4, Township 19 South, Range 17 West

- KSNM123003 (3-R-25) - Easement, Schuetz to U.S, Rec 3-20-62, Misc 71/664
  - North ½ of Southeast quarter (N ½ of SE ¼) of Section 4, Township 19 South, Range 17 West

- KSNM123004 (3-R-26) - Easement, Fairbank to U.S., Rec 3-20-62, Misc 71/665
  - North half of Southwest quarter (N ½ of SW ¼) of Section 3, Township 19 South, Range 17 West

- KSNM123005 (3-R-27) - Easement, Dirks to U.S., Rec 4-2-62, Misc 71/677

- o South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼ of NW ¼) of Section 3, Township 19 South, Range 17 West

- KSNM123006 (3-R-28) - Easement, Bizek to U.S., Rec 3-20-61, Misc 71/666
  - o West half of Northeast quarter (W ½ of NE ¼) and Northeast quarter of Northeast quarter (NE ¼ of NE ¼) of Section 3, Township 19 South, Range 17 West

- KSNM123008 (3-R-29) - Easement, Murphy to U.S., Rec 4-23-62, Misc 73/644
  - o Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 34, Township 18 South, Range 17 West

- KSNM123009 (3-R-30) - Easement, Baker to U.S, Rec 6-7-62, Misc 71/695
  - o All that part of the Southwest quarter (SW ¼) od Section 35, Township 18 South, Range 17 West, which lies East of the following described line: Commencing at the Northwest corner of Section 35, Township 18 South, Range 17 West, thence South on section line 15.33 chains, thence East of South, E 29° 10' S. 2.21 chains thence East of South, E. 1° 50' S. 41.94 chains, thence West of South W 14° 05' S. 6.78 chains thence South of West, S. 53 50' West of South to section line, thence South on Section line to the Southwest corner of Section 35.

- KSNM123009-01 (3-R-30) - Easement, Erb to U.S., Rec 5-14-62, Misc 71/694
  - o Southwest quarter of Section 35, (SW ¼), Township 18 South, Range 17 West, EXCEPT 5.5 acres in Northwest (NW) corner

- KSNM123010 (3-R-31) - Easement, Petersen to U.S., Rec 4-13-62, Misc 73/551
  - o Southwest quarter of Southeast quarter (SW ¼ of SE ¼) and North half of Southeast quarter (N ½ of SE ¼) of Section 35, Township 18 South, Range 17 West

- KSNM123011 (3-R-32) - Easement, Kraisinger to U.S., Rec 4-11-62, Misc 73/548
  - o South half of Northeast quarter (S ½ of NE ¼) of Section 35, Township 18 South, Range 17 West

- KSNM123012 (3-R-33) - Easement, Roth to U.S., Rec 4-2-62, Misc 71/678
  - o Northwest quarter (NW ¼) of Section 36, Township 18 South, Range 17 West

  KSNM123013 (3-R-34) - Easement, Scheideman to U.S., Rec 3-20-62, Misc 71/667
  - o North half of Northeast quarter (N ½ of NE ¼) of Section 36, Township 18 South, Range 17 West

- KSNM123014 (3-R-35) - Easement, Rodie to U.S., Rec 4-2-62, Misc 71/679
  - o South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼) of Section 25, Township 18 South, Range 17 West

- KSNM123015 (3-R-36) - Easement, Lawrence to U.S., Rec 4-5-62, Misc 71/683
  - o Southwest quarter (SW ¼), Section 30, Township 18 South, Range 16 West

- KSNM123016 (3-R-37) - Easement, Wilhelm to U.S., Rec 4-18-62, Misc 73/571
  - o Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 30, Township 18 South, Range 16 West

- KSNM123017 (3-R-38) - Easement, Schneider to U.S., Rec 3-20-62, Misc 71/668
  - o Southeast quarter of Northwest quarter (SE ¼ of NW ¼) and Northeast quarter (NE ¼) of Section 30, Township 18 South, Range 16 West

- KSNM123018 (3-R-39) - Easement, Luft to U.S., Rec 3-20-62, Misc 71/669
  - o North half of Northwest quarter (N ½ of NW ¼) and Southwest quarter of Northwest quarter (SW ¼ of NW ¼), Section 29, Township 18 South, Range 16 West

- KSNM123019 (3-R-40) - Easement, Riffel to U.S., rec 4-5-62, Misc 71/684
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 20, Township 18 South, Range 16 West

- KSNM123020 (3-R-41) - Easement, Roth to U.S., 4-5-62, Misc 71/685
  - Southwest quarter of Southeast quarter (SW ¼ of SE ¼) North half of Southeast quarter (N ½ of SE ¼) South half of Northeast quarter (S ½ of NE ¼) Northeast Quarter of Northeast quarter (NE ¼ of NE ¼), Section 20, Township 18 South, Range 16 West

- KSNM123021 (3-R-42) - Easement, Hanhardt to U.S., Rec 4-5-62, Misc 71/686
  - That part of the Northwest quarter (NW ¼) lying North of the AT & SF RR, Section 21, Township 18 South, Range 16 West, except the East (E) 96.5 Rods.

- KSNM123040 (3-R-43) - Condemnation, USDCKS, Civil Action No. T-3082
  - North 80 Rods of the East 96.5 Rods of the Northwest quarter (NW ¼) Section 21, Township 18 South, Range 16 West.

- KSNM123041 (3-R-44) - Easement, Ater to U.S., Rec 4-5-62, Misc 71/687
  - South half of Southwest quarter (S ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 16, Township 18 South, Range 16 West

- KSNM123042 (3-R-45) - Easement, Schrott to U.S., Rec 4-11-62, Misc 73/549
  - Southeast quarter (SE ¼) of Section 16, Township 18 South, Range 16 West

- KSNM123043 (3-R-46) - Easement, Brack to U.S., Rec 4-11-62, Misc 73/550
  - Southeast quarter of Northeast quarter (SE ¼ of NE ¼) of Section 16, Township 18 South, Range 16 West

- KSNM123044 (3-R-47) - Easement, Frick to U.S., Rec 4-5-62, Misc 71/688
  - Southwest quarter of Northwest quarter (SW ¼ of NW ¼) of Section 15, Township 18 South, Range 16 West

- KSNM123045 (3-R-48) - Easement, Butherus to U.S., Rec 4-23-62, Misc 73/643
  - North half of Northwest quarter (N ½ of NW ¼), Section 15, Township 18 South, Range 16 West.

- KSNM123046 (3-R-49) - Easement, Bartel to U.S., Rec 4-5-62, Misc 71/689
  - Southeast quarter of Southwest quarter (SE ¼ of SW ¼) of Section 10, Township 18 South, Range 16 West

- KSNM123047 (3-R-50) - Easement, Brack to U.S., Rec 3-20-62, Misc 71/670
  - Southeast quarter (SE ¼) of Section 10, Township 18 South, Range 16 West

- KSNM123048 (3-R-51) - Easement, Butherus to U.S., Rec 4-23-62, Misc 73/572
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 11, Township 18 South, Range 16 West

- KSNM123021 (3-R-52) - Condemnation, USDCKS, Civil Action No. T-3082
  - Northwest Quarter (NW/4) of Section 11, Township 18 South, Range 16 West

- KSNM123049 (3-R-53) - Easement, Hagerman to U.S., Rec 4-5-62, Misc 71/690
  - The East one half of the Northeast quarter (E ½ of NE ¼), Section 11, Township 18 South, Range 16 West

- KSNM123050 (3-R-53-A) - Easement, Hagerman to U.S., Rec 4-5-62, Misc 71/691
  - The West one half of the Northeast quarter (W ½ of NE ¼), Section 11, Township 18 South,

Range 16 West

- KSNM123051 (3-R-54) - Easement, Schmidt to U.S., Rec 4-5-62, Misc 71/692
  - South half of Southeast quarter (S ½ of SE ¼) and Northeast quarter of Southeast quarter (NE ¼ of SE ¼), Section 2, Township 18 South, Range 16 West

- KSNM123052 (3-R-55) - Condemnation, USDCKS, Civil Action No. CIV T-3082
  - West half of Southwest quarter (W ½ of SW ¼) and Northeast quarter of Southwest quarter (NE ¼ of SW ¼), Section 1, Township 18 South, Range 16 West

- KSNM123053 (3-R-56) - Easement, Lebsack to U.S., Rec 4-5-62, Misc 71/693
  - Northwest quarter of Southeast quarter (NW ¼ of SE ¼) of Section 1, Township 18 South, Range 16 West

- KSNM123054 (3-R-56A) - Deed from U.S. to Slocum Gas Company but Government reserving helium pipeline. Recordation data unavailable.
  - A tract of land situate in Section 13, Township 18 South, Range 16 West of the 6th p.m., Rush County, Kansas, more particularly described as follows:
    Commencing at the Southeast corner of the Southwest quarter of said Section 13; thence North 2,640 feet to the center of Section 13; thence west 50 feet along the north line of the SW ¼ of Section 13; thence South 2,640 feet parallel to the east boundary of the southwest quarter of Section 13; thence East 50 feet along the south line of Section 13 to the point of beginning, containing 3.03 acres, more or less.
    All of that part of the following described tract of land lying within the NE ¼ of Section 1, Township 18 South, Range 16 West, of the 6th p.m., Rush County, Kansas.
    Commencing at the Northwest corner of the NE ¼ of Section 1, thence east to the Northeast corner of said quarter section, thence south 1241.75 feet, thence West parallel with the north line 1,320 feet, thence South 838.65 feet parallel with the east line, thence west 1,324 feet parallel with the north line, thence 2069.5 feet to the point of beginning and containing 100.42 acres, more or less.
    Excepting therefrom a 100' x 100' tract described as:
    Commencing at the northwest corner of the NE ¼ of Section 1, T 18 S, R 16 W of the 6th p.m., in Rush County, Kansas, thence 1,081 feet south to the point of beginning; thence 100 feet south, thence 100 feet east, thence 100 feet north, thence 100 feet west to the point of beginning, and containing 0.23 acres, more or less

- KSNM123055 (3-R-57) - Easement, Krmela to U.S., Rec 3-20-62, Misc 71/671
  - South half of Southeast quarter (S ½ of SE ¼), Section 36, Township 17 South, Range 16 West (Rush County)

**Barton County**
- KSNM123105 (3-B-1) - Easement, Carter to U.S., Rec 2-8-62, GR 248/32
  - South half of Southwest quarter (S ½ of SW ¼) of Section 31, Township 17 South, Range 15 West

- KSNM123106 (3-B-2) - Easement, Axman to U.S., Rec 2-8-62, GR 248/33
  - South half of Southeast quarter (S ½ of SE ¼) of Section 31, Township 17 South, Range 15 West

- KSNM123107 (3-B-3) - Easement, Riedel to U.S., Rec 2-8-62, GR 248/34
  - Southwest quarter (SW ¼) of Section 32, Township 17 South, Range 15 West

- KSNM123108 (3-B-4) - Easement, Riedel to U.S., Rec 2-15-62, GR 248/67
  - South half of Southeast quarter (S ½ of SE ¼) of Section 32, Township 17 South, Range 15 West

- KSNM123109 (3-B-5) - Schenk to U.S., Not relevant - pipeline not located on cited property.
  - North half of Southeast quarter (N ½ of SE ¼) of Section 32, Township 17 South, Range 15 West

- KSNM123110 (3-B-6) - Easement, Maneth to U.S., Rec 2-8-62, GR 248/35
  - West half of Southwest quarter (W ½ of SW ¼) of Section 33, Township 17 South, Range 15 West

- KSNM123111 (3-B-7) - Easement, Ohnmacht to U.S., Rec 2-8-62, GR 248/36
  - West half of Southeast quarter (W ½ of SE ¼) and East half of Southwest quarter (E ½ of SW ¼) of Section 33, Township 17 South, Range 15 West, West of the 6th p.m.

- KSNM123112 (3-B-8) - Easement, Maneth to U.S., Rec 2-8-62, GR 248/37
  - East one half (E ½) of the Southeast quarter (SE ¼) of Section 33, Township 17 South, Range 15 West

- KSNM123113 (3-B-9) - Easement, Bartonek to U.S., Rec 2-19-62, GR 248/84
  - West half of Southwest quarter (W ½ of SW ¼) of Section 34, Township 17 South, Range 15 West

- KSNM123114 (3-B-10) - Easement, Bartonek to U.S., Recordation unavailable.
  - Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 34, Township 17 South, Range 15 West

- KSNM132373 (3-B-11) - Condemnation, USDCKS, Civil Action No. T-3079, RF 1-8-63.
  - A strip of land 60 feet in width out of the Southeast Quarter (SE 1/4) of Section 34, T-17-S, R-15-W, Barton County, Kansas and being more particularly described as follows: Commence at the Northwest corner of the Southeast Quarter (SE 1/4) of Section 34, T-17-S, R-15-W; THENCE Southerly along the West line of the Southeast Quarter (SE 1/4) of Section 34 a distance of 859.9 feet to the true point of beginning of the aforementioned 60 feet wide strip; THENCE North 85°16' East a distance of 2645.9 feet to a point in the East line of the Southeast Quarter (SE 1/4) of Section 34, such point being 628.9 feet southerly along the East line of the Southeast Quarter of Section 34, from the Northeast corner of the said Southeast Quarter (SE 1/4) of Section 34; THENCE Southerly along the East line of the Southeast Quarter (SE 1/4) of Section 32, a distance of 60.2 feet to a point; THENCE South 85°16' West a distance of 2646.1 feet to a point in the west line of the Southeast Quarter (SE 1/4) of Section 34; THENCE Northerly along the West line of the Southeast Quarter (SE 1/4) of Section 34 a distance of 60.2 feet to a point, same being the point of beginning.

- KSNM123115 (3-B-12) - Easement, Schreiber to U.S., Rec 4-11-62, GR 248/231
  - North half of Southwest quarter (N ½ of SW ¼) of Section 35, Township 17 South, Range 15 West of the 6th pm

- KSNM123116 (3-B-13) - Easement, Meitner to U.S., Rec 2-8-62, GR 248/38
  - North half of Southeast quarter (N ½ of SE ¼) of Section 35, Township 17 South, Range 15 West

- KSNM123117 (3-B-14) - Easement, Hlavaty to U.S., Rec 2-8-62, GR 248/39
  - North half of Southwest quarter (N ½ of SW ¼) of Section 36, Township 17 South, Range 15 West

- KSNM123118 (3-B-15) - Easement, Hlavaty to U.S., Rec 2-8-62, GR 248/40
  - South half of Northwest quarter (S ½ of NW ¼) of Section 36, Township 17 South, Range 15 West

- KSNM123119 (3-B-16) - Easement, Mater to U.S., Rec 2-8-62, GR 248/41
  - South half of Northeast quarter (S ½ of NE ¼) of Section 36, Township 17 South, Range 15 West

- KSNM123120 (3-B-17) - Easement, Rowley to U.S., Rec 2-15-62, GR 248/73
  - South half of Northwest quarter and Northeast quarter of Northwest quarter (S ½ of NW ¼ & NE ¼ of NW ¼) of Section 31, Township 17 South, Range 14 West

- KSNM123121 (3-B-18) - Easement, Schneider to U.S., Rec 2-8-62, GR 248/42
  - Northeast quarter of Northeast quarter and Southeast quarter of Northeast quarter and Southwest quarter of Northeast quarter (NE ¼ of NE ¼ & SE ¼ of NE ¼ & SW ¼ of NE ¼) of Section 31, Township 17 South, Range 14 West

- KSNM123122 (3-B-19) - Easement, Steiner to U.S., Rec 2-8-62, GR 248/43
  - West half of Northwest quarter (W ½ of NW ¼) of Section 32, Township 17 South, Range 14 West

- KSNM123123 (3-B-20) - Easement, Behr to U.S., Rec 2-15-62, GR 248/70
  - East half of Northwest quarter and West half of Northeast quarter (E ½ of NW ¼ & W ½ of NE ¼) of Section 32, Township 17 South, Range 14 West

- KSNM123124 (3-B-21) - Easement, Hunt to U.S., Rec 3-20-62, GR 248/152
  - East half of Northeast quarter (E ½ of NE ¼) of Section 32, Township 17 South, Range 14 West

- KSNM123125 (3-B-22) - Condemnation, USDCKS, Civil Action No. 3076, RF 10-8-63
  - Northwest Quarter (NW ¼) of Section 33, Township 17 South, Range 14 West

- KSNM123126 (3-B-23) - Easement, Keenan to U.S, Rec 2-15-62, GR 248/74
  - North half of Northeast Quarter (N ½ of NE ¼) of Section 33 17 South, Range 14 West, less a strip 40 feet wide and 2650 feet wide off the North side.

- KSNM123127 (3-B-24) - Condemnation, USDCKS, Civil Action No. T-3076, RF 10-8-63
  - Northwest Quarter (NW ¼) of Section 34, Township 17 South, Range 14 West, except a strip of land 40 feet wide along North side of Northwest Quarter (NW ¼) of Section 34, Township 17 South, Range 14 West for Highway Purposes

- KSNM123128 (3-B-25) - Easement, Finger to U.S., Rec, 3-23-62, GR 248/169
  - Northeast Quarter (NE ¼) of Section 34, Township 17 South, Range 14 West

- KSNM123129 (3-B-26) - Easement, Logan to U.S., Rec 4-2-62, GR 248/198
  - Northwest Quarter (NW ¼) of Section 35, Township 17 South, Range 14 West

- KSNM123130 (3-B-27) - Easement, Tempero, Guardian to U.S., Rec 4-18-62, GR 248/253
  - West 54 acres of Northeast Quarter (NE ¼) of Section 35 Township 17 South, Range 14 West

- KSNM123131 (3-B-28) - Easement, Williams to U.S., Rec 4-2-62, GR 248/200
  - North half of Northwest Quarter (N ½ of NW ¼) of Section 36, Township 17 South, Range 14 West
  - East 103.87 acres of Northeast Quarter (NE ¼) of Section 35 Township 17 South, Range 14 West and North half of Northwest Quarter (N ½ of NW ¼) of Section 36, Township 17 South, Range 14 West.

- KSNM123132 (3-B-29) - Easement, Williams to U.S., Rec 4-2-62, GR 248/199
  - North half of Northeast Quarter (N ½ of NE ¼), Section 36, Township 17 South, Range 14 West.

- KSNM123133 (3-B-30) - Easement, Sette to U.S., Rec 4-2-62, GR 248/201
  - North half (N ½) of Section 31, Township 17 South, Range 13 West

- KSNM123134 (3-B-31) - Easement, Morgenstern to U.S., Rec 2-15-62, GR 248/68
  - West half of Northwest Quarter (W ½ of NW ¼) of Section 32, Township 17 South, Range 13 West

- KSNM123135 (3-B-32) - Easement, Sausen to U.S., Rec 2-8-62, GR 248/44
  - Northeast Quarter of Northwest Quarter (NE ¼ of NW ¼) Section 32, Township 17 South, Range 13 West

- KSNM123136 (3-B-33) - Easement, Beetz to U.S., Rec 4-2-62, GR 248/202
  - North half of Northeast Quarter (N ½ of NE ¼) except piece in Northeast (NE) corner 238 feet by 366.05 feet, Section 32, Township 17 South, Range 13 West.

- KSNM123137 (3-B-34) - Easement, Morgenstern to U.S., 2-15-62, GR 248/69
  - Northwest Quarter (NW ¼), Section 33, Township 17 South, Range 13 West

- KSNM132178 (3-B-35) - Condemnation, USDCKS, Civil Action No. T-3057
  - A strip of land 60 feet in width out of the Northeast Quarter (NE/4) of Section 33, T-17-S, R-13-W, Barton County, Kansas and being more particularly described as follows: Commence at the northwest corner of the Northeast Quarter (NE/4) of Section 33, T-17-S, R-13-W, Barton County, Kansas; THENCE southerly along the west line of the said Northeast Quarter (NE/4) of Section 33, a distance of 192.9 feet to a point, same being the true point of beginning of the aforementioned 60 foot wide strip; THENCE South 84°50' East a distance of 2621.9 feet to a point in the east line of the Northeast Quarter (NE/4) of Section 33, said point being 424.9 feet southerly along the east line of the said Northeast Quarter (NE/4) of Section 33 from the northeast corner thereof; THENCE Southerly along the east line of the Northeast Quarter (NE/4) of Section 33, a distance of 60.2 feet to a point; THENCE North 84°50' West a distance of 2622.1 feet to a point in the west line of the Northeast Quarter (NE/4) of Section 33; THENCE northerly along the west line of the Northeast Quarter (NE/4) of Section 33 a distance of 60.2 feet to a point, same being the true point of beginning.

- KSNM123138 (3-B-36) - Easement, Boger to U.S., 4-2-62, GR 248/203
  - North 52 acres of Northwest quarter (NW ¼) of Section 34, Township 17 South, Range 13 West

- KSNM123139 (3-B-37) - Easement, Boger to U.S., Not Relevant - Pipeline not located in tract description.
  - That portion of the Northwest quarter (NE ¼) of Section 34, Township 17 South, Range 13 West, described by metes and bounds as follows: Commencing at a point 51 5/6 rods, north of Southwest (N of SW) corner of said quarter (1/4) section for a place of beginning; thence North (N) on the West (W) line of said Section, 51 5/6 rods, thence East (E) and parallel with North (N) line of said Section, 160 rods, to the East line of said quarter (1/4) section, thence South (S) on East (E) line of said quarter (1/4) section, 51 5/6 rods, thence West (W) and parallel with North (N) line of said Section, 160 rods, to place of beginning.

- KSNM123140 (3-B-38) - Easement, Ladenberger to U.S., Rec 4-11-62, GR 248/233
  - Northeast quarter (NE ¼) of Section 34, Township 17 South, Range 13 West
  - This agreement is being executed in counterparts which collectively constitute on Easement for Pipeline Right of Way
  - The pipeline described herein enters the above described property at a point in the East line of the NE ¼ of Section 34,912 feet, more or less, south of the NE corner of said NE 1/4; thence running NW approximately 2750 feet and exiting said NE ¼ at a point 836 feet, more or less, south of the NW corner of said NE ¼ of Section 34.

- KSNM123140-01 (3-B-38) - Easement, Ladenberger to U.S., Rec 4-11-62, GR 248/233
  - Northeast quarter (NE ¼) of Section 34, Township 17 South, Range 13 West

- KSNM123141 (3-B-39) - Easement, Morgenstern to U.S., Rec 4-13-62, GR 248/243
  - Northwest quarter (NW ¼), Section 35, Township 17 South, Range 13 West

- KSNM123142 (3-B-40) - Easement, Morgenstern to U.S., Rec 4-13-62, GR 248/244
  - Northeast quarter (NE ¼) of Section 35, Township 17 South, Range 13 West

- KSNM123143 (3-B-41) - Easement, Morris to U.S, Rec 3-20-62, GR 248/153
  - Northwest quarter (NW ¼) of Section 36, Township 17 South, Range 13 West

- KSNM123144 (3-B-42) - Easement, Cofer to U.S., Rec 4-1-62, GR 248/264
  - West half of Northeast quarter (W ½ of NE ¼) of Section 36, Township 17 South, Range 13 West

- KSNM123145 (3-B-43) - Easement, Donovan to U.S., Rec 4-18-62, GR 248/254
  - (A) East half of East half of Northeast quarter (E ½ of E ½ of NE ¼), Section 36, Township 17 South, Range 13 West
  - (B) West half of East half of Northeast quarter (W ½ of E ½ of NE ¼), Section 36, Township 17 South, Range 13 West

- KSNM123146 (3-B-44) - Easement, Guinn to U.S., Rec 2-21-62, GR 248/85
  - North half (N ½) of Section 31, Township 17 South, Range 12 West

- KSNM123147 (3-B-45) - Easement, Steiner to U.S., Rec 2-8-62, GR 248/45
  - Northwest quarter (NW ¼) of Section 32, Township 17 South, Range 12 West

- KSNM123150 (3-B-46) - Easement, Hoeffner to U.S., Rec 2-8-62, GR 248/46
  - Northeast quarter (NE ¼) of Section 32, Township 17 South, Range 12 West

- KSNM123164 (3-B-47) - Easement, Jenisch to U.S., Rec 2-8-62, GR 248/47
  - Northwest quarter (NW ¼) of Section 33, Township 17 South, Range 12 West

- KSNM123176 (3-B-48) - Easement, Rziha to U.S., Rec 2-8-62, GR 248/48
  - Northeast quarter (NE ¼) of Section 33, Township 17 South, Range 12 West

- KSNM123177 (3-B-49) - Easement, Gerritzen to U.S., Rec 4-23-62, GR 248/266
  - Northwest Quarter (NW ¼) of Section 34, Township 17 South, Range 12 West.

- KSNM123178 (3-B-50) - Easement, Schneweis to U.S., Rec 2-8-62, GR 248/49
  - Northeast Quarter (NE ¼) of Section 34, Township 17 South, Range 12 West.

- KSNM123148 (3-B-51) - Easement, Steiner to U.S., Rec 4-13-62, GR 248/245
  - Northwest Quarter (NW ¼) of Section 35, Township 17 South, Range 12 West.

- KSNM123149 (3-B-52) - Easement, Schneweis to U.S., Rec 2-8-62, GR 248/50
  - Northeast Quarter (NE ¼) of Section 35, Township 17 South, Range 12 West

- KSNM123151 (3-B-53) - Easement, Moeder to U.S., Rec 2-8-62, GR 248/52
  - Northwest Quarter (NW ¼) of Section 36, Township 17 South, Range 12 West.

- KSNM123152 (3-B-54) - Easement, Moeder to U.S., Rec 2-8-62, GR 248/52
  - South half of Northeast Quarter (S ½ of NE ¼) of Section 36, Township 17 South, Range 12 West.

- KSNM123153 (3-B-55) - Easement, Huslig to U.S., Rec 4-18-62, GR 248/246
  - South half of Northwest quarter (S ½ of NW ¼) and Northeast quarter of Northwest quarter (NE ¼

of NW ¼ of Section 31, Township 17 South, Range 11 West

- KSNM123154 (3-B-56) - Easement, Schneweis to U.S., Rec 2-8-62, GR 248/53
  - West half of the Northeast Quarter (W ½ of NE ¼) of Section 31, Township 17 South, Range 11 West of the 6th p.m.

- KSNM123155 (3-B-57) - Easement, Bortz to U.S., Rec 4-23-62, GR 248/262
  - East half of the Northeast Quarter (E ½ of NE ¼) of Section 31, Township 17 South, Range 11 West of the 6th p.m.
  - And the Northwest Quarter (NW ¼) of Section 32, Township 17 South, Range 11 West

- KSNM123156 (3-B-58) - Easement, Patzner to U.S., Rec 4-13-62, GR 248/247
  - Northeast quarter (NE ¼) of Section 32, Township 17 South, Range 11 West of the 6th p.m.

- KSNM123157 (3-B-59) - Easement, Routledge to U.S., Rec 3-20-62, GR 248/154
  - Northwest quarter (NW ¼), Section 33, Township 17 South, Range 11 West

- KSNM123158-01 (3-B- 60A) - Easement, Evenson o U.S., Rec 6-5-62, GR 250/92
  - North half of Northeast quarter (N/2 of NE/4) and North half of South half of Northeast quarter (N/2 of S/2 of NE/4) of Section 33 and Northwest quarter (NW/4) of Section 34, all in Township 17 South, Range 11 West

- KSNM123159 (3-B-61) - Easement, Grossardt to U.S., Rec 2-15-62, GR 248/71
  - Northeast quarter (NE ¼) of Section 34, Township 17 South, Range 11 West

- KSNM123160 (3-B-62) - Easement, Moran to U.S., Rec 2-15-62, GR 248/75
  - West half of Northwest quarter (W ½ of NW ¼) and Southeast quarter of Northwest quarter (SE ¼ of NW ¼), Section 35, Township 17 South, Range 11 West

- 3-B-63 – Easement, Bloomer to U.S. Rec 3-8-1963, Book 248, Page 72
  - South half of the Northeast Quarter (S ½ of NE ¼) of Section 35, Township 17 South, Range 11 West
  - South half of the Northwest Quarter (S ½ of NW ¼) and South half of the Northeast Quarter (S ½ of NE ¼) of Section 36, Township 17 South, Range 11 West

**Ellsworth County**
- 3-E-1 - Condemnation, USDCKS, Civil Action No. T-3080
  - South half of the Northwest Quarter (S ½ of NW ¼) and South half of the Northeast Quarter (S ½ of NE ¼) of Section 31, Township 17 South, Range 10 West

- KSNM123162 (3-E-2) - Easement, Smith to U.S., Rec 3-13-62, Misc L/382
  - South half of Northwest Quarter (S ½ of NW ¼) of Section 32, Township 17 South, Range 10 West

- KSNM123163 (3-E-3) - Easement, Dougherty to U.S., Rec 3-12-62, Misc L/384
  - South half of Northeast quarter (S ½ of NE ¼) of Section 32, Township 17 South, Range 10 West and South half of Northwest quarter of (S ½ of NW ¼) Section 33, Township 17 South, Range 10 West

- KSNM123165 (3-E-4) - Easement, Disque to U.S., Rec 3-13-62, Misc L/386
  - North half of Southeast Quarter of (N ½ of SE ¼) Section 32, Township 17 South, Range 10 West

- KSNM123166 (3-E-4-A) - Easement, Stumps to U.S, Rec 2-7-62, Misc L/332
  - North half of South half (N ½ of S ½) of Section 33, Township 17 South, Range 10 West

- KSNM123167 (3-E-5) - Easement, Tracy to U.S., Rec 4-5-62, Misc L/403
  - Northwest quarter of Southwest quarter (NW ¼ of SW ¼) of Section 34, Township 17 South, Range 10 West

- KSNM123168 (3-E-6) - Easement, Blaylok to U.S., Rec 4-5-62, Misc L/405
  - Northeast quarter of Southwest quarter (NE ¼ of SW ¼) of Section 34, Township 17 South, Range 10 West

- KSNM123169 (3-E-7) - Easement, Maes to U.S., Rec 2-7-62, Misc L/339,
  - North half of Southeast quarter (N ½ of SE ¼) and Southeast quarter of Southeast quarter (SE ¼ of SE ¼) of Section 34, Township 17 South, Range 10 West

- KSNM123170 (3-E-8) - Easement, Maes to U.S., Rec 2-7-62, Misc L/336
  - Southwest quarter (SW ¼) of Section 35, Township 17 South, Range 10 West

- KSNM123171 (3-E-9) - Easement, Schultz to U.S., Rec 4-11-62, Misc L/413
  - North half of Southeast quarter (N ½ of SE ¼) of Section 35, Township 17 South, Range 10 west

- KSNM123172 (3-E-10) - Easement, Stumps to U.S., **Recordation Data Unavailable**
  - North half of Southwest quarter (N ½ of SW ¼), Section 36, Township 17 South, Range 10 West

- KSNM123173 (3-E -10-A) - Easement, McKay to U.S., Rec 3-13-62, Misc L/388
  - South half of Southwest quarter (S ½ of SW ¼) of Section 36, Township 17 South, Range 10 West

- KSNM123174 (3-E-11) - Easement, Schroeder to U.S., Rec 4-5-62, Misc L/407
  - Southeast quarter (SE ¼) of Section 36, Township 17 South, Range 10 West

- KSNM123175 (3-E-12) - Easement, Northern Gas Products to U.S., Rec 7-27-62, Misc M/19
  - Southwest quarter (SW/4) of Section 31, township 17 South, Range 9 West
  - South half of Southeast quarter (S/2 of SE/4) of Section 31, Township 17 South, Range 9 West

**Grant County**
- KSNM131324 (701-3-G-1) - Easement, Miller to U.S., Rec 6-4-62, ROW 1/451
  - Northwest quarter of Northwest quarter and East half of Northwest quarter (NW ¼ of NW ¼ & E ½ of NW ¼), West half of Northeast quarter and Southeast quarter of Northeast quarter (W ½ of NE ¼ & SE ¼ of NE ¼) and East half of Southeast quarter and Northwest quarter of Southeast quarter (E ½ of SE ¼ & NW ¼ of SE ¼) of Section 12, Township 29 South, Range 35 West

- KSNM131325 (701-3-G-2) - Easement, Miller to U.S., Rec 6-4-62, ROW 1/450
  - South half of Southwest quarter (S ½ of SW ¼) of Section 1, Township 29 South, Range 35 West

- KSNM131326 (701-3-G-3) - Easement, Diehl to U.S., Rec 6-4-62, ROW 1/449
  - Northeast quarter of Southwest quarter (NE ¼ of SW ¼), Southwest quarter of Northeast quarter (SW ¼ of NE ¼), East half of Northwest quarter (E ½ of NW ¼) and Southeast quarter (SE ¼) of Section 2, Township 29 South, Range 35 West

- KSNM131327 (701-3-G-3P) - Easement, Cities Service Helex, Inc. to U.S., Rec 8-30-62 ROW 1/457
  - West Half of the West Half of the East Half of the Northwest Quarter (W/2 of W/2 of E/2 of NW/4) and the West Half of Northwest Quarter (W/2 of NW/4) of Section 2, Township 29 South, Range 35 West, containing 100 acres, more or less

# Attachment K

**ASSIGNMENT OF TEXAS CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY**

| | |
|---|---|
| **STATE OF TEXAS** )( | |

**KNOW ALL BY THESE PRESENTS:**

**COUNTY OF ___** )(

**THIS ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY** (hereinafter collectively referred to as the ("Assignment of Pipeline Easements") ") is made this __ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Assignee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

I.  **CONSIDERATION FOR THE ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS**

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

> (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,
> (ii) the QUITCLAIM DEED (Satanta, Kansas); and,
> (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,
> (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY, WITHOUT WARRANTY; and,
> iv) the ASSIGNMENTS OF CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENTS, WITHOUT WARRANTY covering multiple counties in the State of Texas; and,
> (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,
> (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR  STORAGE AND DELIVERY OF HELIUM; and,
> (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

3.  The specific covenants and agreements of the Assignee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Crude Helium Pipeline Right-Of-Way Easements Without Warranty.

II.  **CONVEYANCE OF THE ASSIGNMENT OF PIPELINE EASEMENTS**

Grantor, for the valuable consideration described in Section I, above,  together with the Assignee's covenant and agreement that Assignee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, conditions and agreements hereinafter set forth in this Assignment of Pipeline Easements, does hereby grants, convey, remise, release and forever to the Assignee, its successors and assigns, the Crude Helium Pipeline Right-Of-Way Easements, Without Warranty, as hereinafter described in Attachment "1" below, which is hereby incorporated and made a part hereof (the "Pipeline Easements"),  under and subject to the reservations, restrictions, covenants, exceptions, notifications, conditions, and agreements hereinafter set forth, all right, title and interest without warranty in the following described property situated in _____ County, State of Texas, more particularly described as follows:

III.  **EXCEPTIONS TO ASSIGNMENT OF PIPELINE EASEMENTS**

Any conveyance of the Pipeline Easements, described in Section II, above, is to be expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Pipeline Easements:

1.  All existing permits, servitudes and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits, and canals on, over and across said land, whether or not of record.

2.  All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditch and reservoir rights, as well as oil, gas, and/or minerals, whether or not of record.

3.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Easement.

4.  Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules and regulations and water conservancy district rules and regulations of public record, and affecting all or any portion of the subject Easement.

**TO HAVE AND TO HOLD** the Pipeline Easements hereby conveyed, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications,  third party oil owner rights, conditions, and agreements hereinafter set forth in this CRUDE HELIUM  PIPELINE RIGHT-OF-WAY EASEMENTS WITHOUT WARRANTY, either in law or in equity, for the use, benefit and behalf of the Assignee, its successors and assigns forever.

**IV. <u>CONVEYANCE OF ASSIGNMENT OF CRUDE HELIUM  PIPELINE RIGHT-OF-WAY EASEMENTS WITHOUT WARRANTY</u>**

 **As a material part of the Consideration for this Assignment of Crude Helium Pipeline Easements, Government and Assignee mutually covenant and agree that Assignee, for itself, and its successors and assign, accepts this QUITCLAIM Assignment of Pipeline Easements "WITHOUT WARRANTY" and "AS IS" with all latent and patent defects,  including, but not limited that there are no warranties given by Government; that the Pipeline Easements to title, particular financial value,  or is fit for a particular purpose. Assignee, for itself, and its successors and assigns, acknowledges, and stipulates that Assignee, is not relying upon any representation, statement, or other assertion with respect to condition of the Pipeline Easements but is relying upon Assignee's own examination of the Pipeline Easements. Assignee, for itself, and its successors and assigns, takes the Pipeline Easements with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.**

**V. <u>AS-IS, WHERE-IS PROVISION</u>**

**1.  ASSIGNEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE  PIPELINE EASEMENTS STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. ASSIGNEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PIPELINE EASEMENTS AVAILABLE FOR INSPECTION BY ASSIGNEE AND ASSIGNEE'S REPRESENTATIVES. ASSIGNEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PIPELINE EASEMENTS TO THE EXTENT FELT NECESSARY BY ASSIGNEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. ASSIGNEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE EASEMENTS CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, ASSIGNEE IS RELYING SOLELY AND WHOLLY ON ASSIGNEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PIPELINE EASEMENTS, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PIPELINE EASEMENTS.  THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. ASSIGNEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND ASSIGNEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PIPELINE EASEMENTS.**

**2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PIPELINE EASEMENTS, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PIPELINE EASEMENTS FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE**

**HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PIPELINE EASEMENTS OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PIPELINE EASEMENTS.**

**IN WITNESS WHEREOF**, the United States of America has caused these presents to be executed this _____ day of ___, 2022.

**UNITED STATES OF AMERICA**

Acting by and through the
Secretary of Department of Interior,
Bureau of Land Management
By: _____


**ATTACHMENT 1 – LEGAL DESCRIPTIONS OF ALL CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS**

# Attachment L

## CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENT
## AGREEMENT WITHOUT WARRANTY

**THIS CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENT WITHOUT WARRANTY** (hereinafter sometimes collectively referred to as the (" Pipeline Easement") ") is made this __ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

Date:                               [**insert date**]

Grantor:                         The United States of America
Grantor's Mailing Address:  C/O U.S. Bureau of Land Management
                                    [Office]
                                    [Address]
                                    ( County)
                                    Attention:  Attorney

Grantee:
                                    [**Insert name**]
Grantee's Mailing Address:   [insert]
Easement Property or Premises: Two parcels of land located in Potter County, Texas, more particularly described as follows:
(Type in the

**A map of the current location of the Helium Gas Right-of-Way Easement is more fully described in Attachment "1", which is attached hereto and made a part hereof.**

Easement Purpose:  The purpose of the Easement is for placing, constructing, operating, repairing, rebuilding, replacing, relocating, and removing a helium gas right-of-way pipeline within the Easement Property, and for making connections therewith, and for no other purpose.

**I.        CONSIDERATION FOR THE ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENT**

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Grantee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

        (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

        (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

(iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

(iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY, WITHOUT WARRANTY; and,

iv) the ASSIGNMENTS OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS, WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

(vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

(vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 2022-2027 CONTRACTS FOR STORAGE AND DELIVERY OF HELIUM; and,

(viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf , MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

3.  The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Crude Helium Pipeline Right-Of-Way Easements Without Warranty.

## II.  CONVEYANCE OF THE ASSIGNMENT OF PIPELINE EASEMENTS

Grantor, for the valuable consideration described in Section I, above,  together with the Grantee's covenant and agreement that Grantee, for itself and its successors and assigns, further agrees to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, conditions and agreements hereinafter set forth in this Pipeline Easement, does hereby grants, convey, remise, release and forever to the Grantee, its successors and assigns, the Crude Helium Pipeline Right-Of-Way Easement, Without Warranty, as hereinafter described in Attachment "1" below, which is hereby incorporated and made a part hereof (the "Pipeline Easement"),  under and subject to the reservations, restrictions, covenants, exceptions, notifications, conditions, and agreements hereinafter set forth, all right, title and interest without warranty in the following described property situated in Potter County, State of Texas, more particularly described as follows:

## III.  EXCEPTIONS TO CRUDE HELIUM PIPELINE EASEMENT

Any conveyance of the Pipeline Easements, described in Section II, above, is to be expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Pipeline Easements:

1.  All existing permits, servitudes and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits, and canals on, over and across said land, whether or not of record.

2.  All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditch and reservoir rights, as well as oil, gas, and/or minerals, whether or not of record.

3.  Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Easement.

4.  Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules and regulations and water conservancy district rules and regulations of public record, and affecting all or any portion of the subject Easement.

**TO HAVE AND TO HOLD** the Pipeline Easement hereby conveyed, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications,  third party oil owner rights, conditions, and agreements hereinafter set forth in this CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENT WITHOUT WARRANTY, either in law or in equity, for the use, benefit and behalf of the Grantee, its successors and assigns forever.

IV. **CONVEYANCE OF ASSIGNMENT OF CRUDE HELIUM PIPELINE RIGHT-OF-WAY EASEMENT WITHOUT WARRANTY**

 As a material part of the Consideration for this Assignment of Crude Helium Pipeline Easements, Government and Grantee mutually covenant and agree that Grantee, for itself, and its successors and assign, accepts this Crude Helium Pipeline Right-of-Way Easement "WITHOUT WARRANTY" and "AS IS" with all latent and patent defects, including, but not limited that there are no warranties given by Government; that the Pipeline Easement to title, particular financial value,  or is fit for a particular purpose. Grantee, for itself, and its successors and assigns, acknowledges, and stipulates that Grantee, is not relying upon any representation, statement, or other assertion with respect to condition of the Pipeline Easement but is relying upon Grantee's own examination of the Pipeline Easements. Grantee, for itself, and its successors and assigns, takes the Pipeline Easement with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.

V. **AS-IS, WHERE-IS PROVISION**

   1.  GRANTEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE CRUDE HELIUM PIPELINE RIGHT-OF-WAY EASEMENT STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PIPELINE EASEMENTS AVAILABLE FOR INSPECTION BY GRANTEE AND GRANTEE'S REPRESENTATIVES. GRANTEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PIPELINE EASEMENTS TO THE EXTENT FELT NECESSARY BY GRANTEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE EASEMENTS CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY AND WHOLLY ON GRANTEE'S OWN EXAMINATION OF THE PROPERTY, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PIPELINE EASEMENTS, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PIPELINE EASEMENTS.  THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. GRANTEE IS PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND GRANTEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PIPELINE EASEMENT.

   2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PIPELINE EASEMENTS, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PIPELINE EASEMENTS FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PIPELINE EASEMENTS OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PIPELINE EASEMENTS.

**IN WITNESS WHEREOF**, the United States of America has caused these presents to be executed this _____ day of ___, 2023.

**UNITED STATES OF AMERICA**

Acting by and through the
Secretary of Department of Interior,

Bureau of Land Management

By: _____

THE STATE OF  )(

                 )(

COUNTY OF     )(

       BEFORE ME, a Notary Public in and for the State of _____, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY, and known to me to be the _____, Department of Interior, Bureau of Land Management, _____, and acknowledged to me that the same was the act and Deed of the United States of America and of the Secretary of Department of Interior, Bureau of Land Management and that he executed the same as the voluntary act of the United States of America and of the Secretary of Interior, Bureau of Land Management for the purposes and consideration therein expressed  in the capacity therein stated.

# Attachment M
## QUITCLAIM ASSIGNMENT OF KANSAS/OKLAHOMA
## CRUDE HELIUM RIGHT-OF- WAY PIPELINE EASEMENTS

**STATE OF _____)(**

                              **KNOW ALL BY THESE PRESENTS:**

**COUNTY OF _____)(**

**THIS QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS** (hereinafter collectively referred to as the ("Assignment of Pipeline Easements) is made this \_\_ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Assignee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

**I.   CONSIDERATION FOR THE ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS**

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($\_\_\_ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself and, its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

       (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

       (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

       (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

       iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

       (v) the ASSIGNMENTS OF CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

       (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

       (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE FEDERAL HELIUM RESERVE STORAGE AND DELIVERY CONTRACTS; and,

       (viii) the separate ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF PURCHASED HELIUM STORAGE CONTRACT WITHOUT WARRANTY; and,

 3.  The specific covenants and agreements of the Assignee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Assignment of Pipeline Easements.

**II. CONVEYANCE OF THE ASSIGNMENT OF PIPELINE EASEMENTS**

Grantor, for the valuable consideration described in Section I, above,  together with the Assignee's covenant and agreement that Assignee, for itself and its successors and assigns, further agrees  to abide by and take subject to all reservations, restrictions, covenants, exceptions, notifications, conditions and agreements hereinafter set forth in this Assignment of Pipeline Easements, does hereby quitclaims this Assignment of Pipeline Easements to the Assignee, its successors and assigns, under and subject to the reservations, restrictions, covenants, exceptions, notifications, conditions, and agreements hereinafter set forth, all right, title and interest in the following described property situated in \_\_\_\_ County, State of _____, more particularly described as follows:

**(ALL REAL PROPERTY DESCRIBED IN ATTACHMENT 1, BELOW, WHICH IS HEREBY INCORPORATED AND MADE A PART HEREOF)**

**III.  EXCEPTIONS TO ASSIGNMENT OF PIPELINE EASEMENTS**

Any conveyance of thePipeline Easements, described in Section II, above, is to be expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the Pipeline Easements:

    a.   All existing permits, servitudes and rights-of-way for public streets, roads and highways, public utilities, electric power lines, electric transmission facilities, railroads, pipelines, ditches, conduits, and canals on, over and across said land, whether or not of record.

    b.   All existing interest(s) reserved to or outstanding in third parties in and to water rights, ditch and reservoir rights, as well as oil, gas, and/or minerals, whether or not of record.

    c.   Any survey discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements which may affect the subject Easement.

    d.   Existing ordinances or resolutions, special purpose district rules and regulations, including soil conservation district rules and regulations and water conservancy district rules and regulations of public record and affecting all or any portion of the subject Easement.

**TO HAVE AND TO HOLD** the Pipeline Easements as QUITCLAIMED BY THE GOVERNMENT, together with all improvements, hereditaments, appurtenances therein and all reversions, remainders, issues, profits and other rights belonging or related thereto, and subject to all reservations, restrictions, covenants, exceptions, notifications, conditions, and agreements hereinafter set forth in this Assignment of Pipeline Easements, either in law or in equity, for the use, benefit and behalf of the Assignee, its successors and assigns forever.

**IV.  CONVEYANCE OF QUITCLAIM ASSIGNMENT OF PIPELINE EASEMENTS**

**As a material part of the Consideration for this Assignment of Crude Helium Pipeline Easements, Government and Assignee mutually covenant and agree that Assignee, for itself, and its successors and assign, accepts this QUITCLAIM Assignment of Pipeline Easements "WITHOUT WARRANTY" and "AS IS" with all latent and patent defects,  including, but not limited that there are no warranties given by Government; that the Pipeline Easements to title, particular financial value,  or is fit for a particular purpose. Assignee, for itself, and its successors and assigns, acknowledges, and stipulates that Assignee, is not relying upon any representation, statement, or other assertion with respect to condition of the Pipeline Easements but is relying upon Assignee's own examination of the Pipeline Easements. Assignee, for itself, and its successors and assigns, takes the Pipeline Easements with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.**

**V.  MISCELLANEOUS NOTICES, TERMS, CONDITIONS, AGREEMENTS, AND COVENANTS**

Assignee covenants for itself, its heirs, assigns and every successor in interest to the Pipeline Easements herein described or any part thereof that it shall abide by each of the following covenants, each of which will be covenants running with the land. In addition, the United States of America shall be deemed a beneficiary of each of the following covenants without regard to whether it remains the owner of any land or interest therein in the locality of the pipeline Easements hereby conveyed and shall have a right to enforce each of the covenants herein in any court of competent jurisdiction; provided, however, the United States of America shall have no affirmative duty to any successor in title to this conveyance to enforce any of the following covenants herein agreed.

    **A.  AS-IS, WHERE-IS PROVISION**

        **1.  ASSIGNEE AGREES AND ACKNOWLEDGES THAT GRANTOR IS SELLING THE PIPELINE EASEMENTS STRICTLY ON AN "AS IS, WHERE IS", WITH ALL FAULTS BASIS, WITHOUT WARRANTY, EXPRESS OR IMPLIED, WITH ANY AND ALL LATENT AND PATENT DEFECTS. ASSIGNEE ACKNOWLEDGES THAT GRANTOR HAS MADE THE PIPELINE EASEMENTS AVAILABLE FOR INSPECTION BY ASSIGNEE AND ASSIGNEE'S REPRESENTATIVES. ASSIGNEE HAS INSPECTED, OR WILL HAVE INSPECTED PRIOR TO CLOSING, THE PHYSICAL CONDITION OF THE PIPELINE EASEMENTS TO THE EXTENT FELT NECESSARY BY ASSIGNEE, INCLUDING ALL IMPROVEMENTS THEREON, AND ACCEPTS TITLE TO THE SAME "AS IS" IN ITS EXISTING PHYSICAL CONDITION. ASSIGNEE ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION, WARRANTY STATEMENT OR OTHER ASSERTION OF THE UNITED STATES OF AMERICA, AS GRANTOR, INCLUDING ITS AGENCIES OR ANY OFFICIAL, AGENT REPRESENTATIVE OR EMPLOYEE OF THE FOREGOING, WITH RESPECT TO THE PIPELINE EASEMENTS CONDITIONS. EXCEPT AS SET FORTH IN THE CONTRACT, ASSIGNEE IS RELYING SOLELY AND WHOLLY ON ASSIGNEE'S OWN EXAMINATION OF THE PIPELINE EASEMENTS, IS FULLY SATISFIED WITH THE PROPERTY, AND ACCEPTS ANY LIABILITIES OR COSTS ARISING IN CONNECTION WITH THE CONDITION OF THE PIPELINE EASEMENTS, INCLUDING, BUT NOT LIMITED TO ANY COSTS OR LIABILITIES PERTAINING TO ANY ENVIRONMENTAL CONDITION ON THE PIPELINE EASEMENTS.  THE UNITED STATES OF AMERICA AND ITS AGENCIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND SPECIFICALLY MAKE NO WARRANTIES OF TITLE, HABITABILITY, MERCHANTABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE, OR ANY OTHER WARRANTY WHATSOEVER. ASSIGNEE IS PUT ON NOTICE THAT**

ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND ASSIGNEE IS ADVISED TO EXAMINE ALL PUBLIC RECORDS AVAILABLE REGARDING THE PIPELINE EASEMENTS.

2.  NO EMPLOYEE OR AGENT OF GRANTOR IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY AS TO THE QUALITY OR CONDITION OF THE PIPELINE EASEMENTS, MERCHANTABILITY, SUITABILITY OR FITNESS OF THE  PIPELINE EASEMENTS FOR ANY USE WHATSOEVER, KNOWN OR UNKNOWN TO GRANTOR, OR COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE. IN NO EVENT SHALL GRANTOR BE RESPONSIBLE OR LIABLE FOR LATENT OR PATENT DEFECTS OR FAULTS, IF ANY, IN THE PROPERTY OR FOR REMEDYING OR REPAIRING THE SAME INCLUDING, WITHOUT LIMITATION, DEFECTS RELATED TO ASBESTOS OR ASBESTOS CONTAINING MATERIALS, LEAD, LEAD-BASED PAINT, UNDERGROUND STORAGE TANKS, MOLD, RADON OR HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTE, OR FOR CONSTRUCTING OR REPAIRING ANY STREETS, UTILITIES OR OTHER IMPROVEMENTS SHOWN ON ANY PLAT OF THE PIPELINE EASEMENTS.

**IN WITNESS WHEREOF**, the United States of America has caused these presents to be executed this _____ day of ____, 2022.

**UNITED STATES OF AMERICA**

Acting by and through the
Secretary of Department of Interior,
Bureau of Land Management
By: _____

**ATTACHMENT 1 – LEGAL DESCRIPTIONS OF ALL CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS**

# Attachment N

## 2022-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM BETWEEN THE UNITED STATES OF AMERICA DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

## AND

(This Contract will be Assigned by Government to Purchaser under Agreements, Terms and Conditions Hereinafter Provided.)

### Table of Contents

| | | Page |
|---|---|---|
| ARTICLE I | Definitions | 2 |
| ARTICLE II | Acceptance and Delivery of Helium-Gas Mixtures | 6 |
| ARTICLE III | Effective Date, Term, and Existing Agreements | 12 |
| ARTICLE IV | Fees | 13 |
| ARTICLE V | Billing and Payment | 17 |
| ARTICLE VI | Measurement | 18 |
| ARTICLE VII | Overdrawn | 21 |
| ARTICLE VIII | Right of Access | 22 |
| ARTICLE IX | Liability and Force Majeure | 23 |
| ARTICLE X | Termination | 24 |
| ARTICLE XI | Disposal of Federal Helium System | 25 |
| ARTICLE XII | Assignment of Contract | 26 |
| ARTICLE XIII | Disputes | 26 |
| ARTICLE XIV | Section 889 Representations and Certifications Contract | 27 |
| ARTICLE XV | Complete Agreement | 27 |
| ARTICLE XVI | Notices | 28 |
| ARTICLE XVII | Execution | 28 |

CONTRACT NO. 2022-2027

CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

Between

and the
UNITED STATES OF AMERICA

This Contract is made between _____(hereinafter called Person, as defined in the Helium Stewardship Act, 50 U.S.C. §167), a corporation organized and existing under the laws of the State of _____, with its principal offices at _____ , and the United States of America (hereinafter called "United States" or "Government"), acting through the Bureau of Land Management (BLM) of the Department of the Interior. The executing parties to this Contract are hereinafter jointly referred to as the "Parties".

The Parties jointly understand, acknowledge, and agree that this Contract will be assigned by the Government to the Purchaser of the Federal Helium System upon Federal conveyance of the Federal Helium System to private ownership under the terms and conditions hereinafter provided as required under the provisions of the Helium Stewardship Act, 50 U.S.C. §167d(d), as amended.

In consideration of the mutual promises and covenants contained herein, the United States and Person agree as follows:

ARTICLE I

Definitions

1.1      "Acceptance/Delivery Point" - The term means any pipeline tap or connection to the Federal Helium Pipeline owned by Person prior to the Government Assignment and Conveyance of the Federal Helium System to the Purchaser and any pipeline tap or connection to the Helium Pipeline owned by Person after the Conveyance.

1.2      Allocable gas - The term means the volume of helium used in making allocation calculations and includes all Primary Private helium.

1.3      "Allocation" - The term means that prior to the Government Assignment and Conveyance of the Federal Helium System to the Purchaser, in the event of a shortage, or any time the delivery of helium must be divided among storage Contract holders, the Authorized Officer will allocate the remaining delivery capacity of the Federal Helium System, after the needs of Federal users have been met, among all parties storing helium in the Federal Helium System. Allocation during government ownership of the Federal Helium system will be calculated as a percentage of the remaining delivery capacity of the Federal Helium System according to the proportion of each storage Contract holder's stored volume of Primary Private Helium to the total volume of Primary Private Helium stored by all storage Contract holders. Allocation will be calculated as of 8 a.m. Central Time on October 1, 2021 and annually each year after on October 1. The Authorized Officer may, in his sole discretion, change the allocation method when technical or operational considerations make such changes necessary or appropriate, but the Authorized Officer will notify all storage Contract holders before making any such change.

The term "Allocation" also applies after the Government Assignment and Conveyance to the Purchaser in the event of a shortage. Allocation will be calculated as a percentage of the remaining delivery capacity of the Helium System according to the proportion of each storage Contract holder's stored volume of Primary Private Helium to the total volume of Primary Private Helium stored by all storage Contract holders. Allocation will be calculated as of 8 a.m. Central Time each year annually on October 1. The Purchaser's Representative may, in his sole discretion, change the allocation method when technical or operational considerations make such changes

necessary or appropriate, but the Purchaser's Representative will notify all storage Contract holders before making any such change. If changing the allocation method, Purchaser cannot change the definition of Primary Private Helium or the restriction that the allocation must be based only on volumes of Primary Private Helium. Further, priority access is limited to 20 percent of the total crude production per day of Purchaser's New Helium. See 1.3 Allocable Gas, 1.24 Purchaser's New Helium, 2.3 Delivery of Helium by United States or Purchaser, and

2.7 Shortages After Conveyance- for more information. If the Conveyance occurs in the middle of a fiscal year, the Allocation calculation from October 1 of that year remains in effect until the next October 1.

1.4       "Authorized Officer" - The term means the person authorized to act on behalf of the BLM in approving, revising, managing, and terminating this Contract prior to the Conveyance of the Federal Helium System to Purchaser.

1.5       "Contained helium" - The term means the amount of helium in a "Helium-gas mixture."

1.6       "Contract Year" - The term means a period of time beginning at 8 a.m. Central Time on October 1 and ending at 8 a.m. Central Time on October 1 of the following year. Allocations will be calculated using the storage volumes as of 8 a.m. Central Time each October 1, the first day of the Contract Year.

1.7       "Conveyance" - The term means the Government conveyance of all, right, title, interest, and obligations in and to the Federal Helium System to the Purchaser as required under the provisions of the Helium Stewardship Act, 50 U.S.C. §167d(d), as amended.

1.8       "Day" - The term means a period of twenty-four (24) consecutive hours beginning at 8 a.m. and ending at 8:00 a.m. Central Time the succeeding day.

1.9  "Existing Agreement" - The term means any written agreement between the United States and Person for any helium storage, delivery, or transportation services in or related to the Federal Helium System that is in effect as of the date that both Person and the United States have executed this Contract.

1.10       "Federal Helium Pipeline" - The term means the Federally owned pipeline system through which helium may be transported. The Federal Helium Pipeline extends from the vicinity of Bushton, Kansas, to the Cliffside Field, with lateral extensions to various helium extraction plants connected to said pipeline used or designed for the purpose of gathering and transporting the helium-gas mixture to and from the Bush Dome, Cliffside Field, near Amarillo, Texas.

1.11       "Federal Helium System" - The term means (A) the Federal Helium Reserve; (B) the Cliffside Field; (C) the Federal Helium Pipeline; and (D) all other infrastructure owned, leased, or managed under Contract by the Secretary for the storage, transportation, withdrawal, enrichment, purification, or management of helium.

1.12       "Federal User" - The term means a Federal Agency or extramural holder of one or more Federal research grants using helium. No helium will be provided to Federal Users from the Federal Reserve through the In-Kind Program after September 30, 2022.

1.13       "Force Majeure" - The term means acts of God, acts of public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, civil disturbances, explosions, breakage or accident to machinery or equipment, perforation or breakage of lines of pipe (whether caused by nature or act of a third party), freezing of wells or lines of pipe, partial or entire failure of gas wells or pressure protection devices, inability to obtain materials, supplies, or permits, and any laws, orders, rules, regulations, acts, or restraints of any government or governmental body of authority whether civil or military and any other cause, whether of the kind herein enumerated or otherwise, in each case, whether enumerated herein or otherwise, that is not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to avoid.

1.14       "Government Assignment" - The term means the action by the Government called for under Article II below to assign to Purchaser this Contract as part of the Conveyance to Purchaser of the Federal Helium System.

1.15      "Helium-gas mixture" - The term means the gaseous product contained in the Federal Helium System which is comprised predominantly of helium together with other chemical constituents of natural gas.

1.16      "Helium Pipeline" – The term means the pipeline system owned by the Purchaser after the Government Assignment and Conveyance through which helium may be transported. The Helium Pipeline will extend from the vicinity of Bushton, Kansas, to the Cliffside Field, with lateral extensions to various helium extraction plants connected to said pipeline used or designed for the purpose of gathering and transporting the helium-gas mixture to and from the Bush Dome, Cliffside Field, near Amarillo, Texas.

1.17      "Helium Reserve" – The term means the Federal Helium Reserve after Government sells, assigns, and conveys all title and rights to the Federal Helium System to the Purchaser.

1.18      "Helium System" - The term means (A) the Helium Reserve; (B) the Cliffside Field; (C) the Helium Pipeline; and (D) all other infrastructure owned by Purchaser after Government Assignment and Conveyance to Purchaser and managed under this Contract by Purchaser's Representative for the storage, transportation, withdrawal, enrichment, purification, or management of helium.

1.19      "Mcf" - The term means one thousand (1,000) standard cubic feet.

1.20      "Metering facility" - The term means the meter run, gas chromatograph, electronic flow computer and associated equipment at the Acceptance/ Delivery point on the Federal Helium Pipeline or Helium Pipeline.

1.21      "Month" - The term means a period of time beginning at 8:00 a.m. Central Time on the first day of a calendar month and ending at 8:00 a.m. Central Time on the first day of the succeeding calendar month.

1.22      "Primary Private Helium" - The term means the total of all privately owned helium stored by Person in the Federal Reserve prior to October 1, 2022. Primary Private helium will be managed by the storage Contract terms and will be delivered before and after the Conveyance according to the Contract terms, which will continue through FY 2027. Person may enter a new contract with Purchaser in order to arrange for delivery of Primary Private helium after the expiration of the six-year Contract if Primary Private Helium has not been delivered during six-year Contract term. Person retains ownership of its Primary Private Helium even if a new contract is not entered with Purchaser and Person holds title to its Primary Private Helium until Person has received delivery.

1.23      "Purchaser" – The term means the Party, its successors, and assigns, that is the Government's successor in title for the Federal Helium System. The term also means the Government Assignee of this Contract effective as of the date of Conveyance of the Federal Helium System.

1.24      "Purchaser's New Helium" - The Term means all helium Purchaser gains through the Purchase of the Federal Helium System. Purchaser's New Helium is not Primary Private Helium or Allocable Gas. Purchaser's New Helium is not included in the allocation calculation. In times of shortage, Purchaser has the right to withdraw 20 percent of the total crude helium production per day of Purchaser's New Helium prior to allocating withdrawals of crude helium production to the Storage Contract Holders. Purchaser may transfer this 20 percent of the total crude helium production per day right to other Storage Contract Holders. For any day the Helium System is shut down, Purchaser does not receive priority for 20 percent of the total crude helium production for that day and Purchaser's New Helium priority does not apply and does not carry over.

1.25      "Purchaser's Representative" - The term means the person authorized to act on behalf of the Purchaser, its successors or assigns, in approving, revising, managing, and terminating this Contract as the Assignee of this Contract after the Government Assignment and Conveyance of the Federal Helium System to the Purchaser as required under the provisions of the Helium Stewardship Act, 50 U.S.C. §167d(d), as amended.

1.26      "Required rate of withdrawal" - The term means a withdrawal rate assigned to Person by the Authorized Officer prior to Conveyance or by Purchaser's Representative after the Government Assignment and Conveyance of the Federal Helium System. This rate is equivalent to the allocated rate calculated as described in 1.3.

1.27     "Secondary Private Helium" - The term means any helium added via pipeline to the Federal Helium System after September 30, 2022 and not intended for transfer (see definition of Transfer Helium). After September 30, 2022, any Transfer Helium added by Person that is not transferred within three months will be reclassified as Secondary Private Helium for Person. Secondary Private helium will be excluded from these storage Contract terms and Person must negotiate a separate storage and delivery contract with Purchaser. Any Secondary Private Helium added between September 30, 2022 and the Conveyance will be safeguarded and tracked, totaled, and documented by Government until Conveyance. Government will provide Person with Person's balance of Secondary Private Helium on a monthly basis prior to the Conveyance. Government will provide Person and Purchaser with Person's balance of Secondary Private Helium at the time of Conveyance. After the Conveyance, Person should immediately enter a contract for storage and delivery of Secondary Private Helium with Purchaser. Person may only withdraw Secondary Private Helium under the terms of this Contract prior to the Conveyance if the Federal Helium System is not under allocations, Person has withdrawn all of their Primary Private Helium, and has Secondary Private Helium that they wish to withdraw.

1.28     "Standard cubic foot" - The term means the volume of helium-gas mixture or contained helium, as applicable, which occupies the space in one cubic foot when at a temperature of 60 degrees Fahrenheit and at an absolute pressure of 14.65 pounds per square inch.

1.29     "Transfer Helium" - The term means helium that is added to the Federal Helium System or Helium System after September 30, 2022, with the intention of being transferred within three months. Transfer Helium is not considered Primary Private Helium. The intention for transfer must be sufficiently documented to satisfy the BLM or Purchaser that the helium will be withdrawn. After September 30, 2022, if the transfer of Transfer Helium is not completed within three months, it will be reclassified as Secondary Private Helium for the Person adding it. If the Person receiving the helium does not remove it within the month when it is assigned, it will also become reclassified as Secondary Private Helium.

ARTICLE II

Acceptance and Delivery of Helium-Gas Mixtures

Pursuant to 50 U.S.C. 167d(d), as amended, the BLM will report the Federal Helium System as excess real property for disposal to the General Services Administration (GSA) on or before September 30, 2021 to be disposed of in accordance with the provisions of Title 40 of the United States Code. The Government Assignment and Conveyance to Purchaser of the Federal Helium System, is projected to occur prior to September 30, 2023. At the time of the Conveyance, the United States will assign these storage Contracts to the Purchaser.

2.1     Acceptance and Storage by the United States and Purchaser.

The Government (prior to the Conveyance) and Purchaser (after the Conveyance) will accept all Primary Private Helium rights held by Person subject to the terms and conditions of this Contract.

Prior to September 30, 2022, the Government agrees to accept and store the Primary Private Helium that Person delivers into the Federal Helium Pipeline at a Person's Metering Facility and/or Acceptance/ Delivery Point subject to the conditions listed in 2.1(a).

After September 30, 2022 and prior to the Conveyance, the Government agrees to accept and store the Secondary Private Helium that Person delivers into the Federal Helium Pipeline at a Person's Metering Facility and/or Acceptance/ Delivery Point subject to the conditions listed in 2.1(a). See 4.1(h) for fees for Secondary Private Helium prior to the Conveyance.

After the Conveyance, Purchaser agrees to accept Secondary Private Helium under a separate contract and subject to the conditions listed in 2.1 (a).

Absent a separate new contract with Purchaser for Secondary private helium, Purchaser has no contractual obligation to deliver Person's Secondary Private Helium. However, Purchaser must store Person's Secondary Private Helium and Person must continue to pay the fees for Secondary Private Helium as defined in 4.1(h)

to Purchaser until a new contract can be negotiated.

(a)        In order for Person to add helium to the Federal Helium System or Helium System, Person's helium-gas mixture must contain:

      1)  at least 65 percent helium by volume, except as allowed in paragraph 4.1.d

      2)  no more than 80 percent helium by volume,

      3)  no more than 20 parts per million of neon,

      4)  no more than 200 parts per million of carbon dioxide,

      5)  no more than 3 percent methane (CH4) by volume,

      6)  no more than 96 parts per million of heavy hydrocarbons (C3+),

      7)  no more than 2.3 percent hydrogen by volume,

      8)  no more than 0.3 percent oxygen by volume, and

      9)  no more than 7 pounds of water (H2O) per million cubic feet of gas.

(b)        The temperature of Person's helium-gas mixture will not exceed 110 degrees Fahrenheit.

(c)        Person's helium-gas mixture is delivered at a pressure high enough to enable it to flow directly into the Federal Helium Pipeline or Helium Pipeline against whatever pressure exists in the pipeline at the time and point of acceptance of Person's helium-gas mixture for storage, but not more than 1500 pounds per square inch gauge (psig). The Purchaser may revise the maximum helium pipeline pressure in the Helium Pipeline, if necessary.

(d)        The helium-gas mixture that Person provides for delivery does not contain any component that the United States or Purchaser determined is detrimental to the Federal Helium System or the Helium System. If the Authorized Officer or Purchaser's Representative notifies Person that Person's helium-gas mixture contains any detrimental components, Person must correct the mixture before United States or Purchaser will accept any additional helium-gas mixture from Person.

(e)        Acceptance of Person's helium-gas mixture is subject to the physical limitations of the Federal Helium System, or the Helium System and prudent procedures as determined by the Authorized Officer or Purchaser's Representative. Person may not tender its helium-gas mixture at a pressure in excess of 1,500 psig. The United States or Purchaser will accept Person's helium- gas then existing mixture for storage or transfer at the point where the Federal Helium Pipeline/Helium Pipeline is connected with Person's measurement facilities outlet.

(f)        If Person wishes to deliver helium to the Federal Helium System or Helium System and Person's helium-gas mixture is greater than 80 percent helium by volume, Person may deliver the helium after Person adds nitrogen to reduce the helium concentration to 80 percent.

(g)        In order to store Secondary Private helium in the Federal Helium System or the Helium System, Person must be able to accept transfers of helium and be current on all amounts due and payable under this Contract.

(h)        Adding additional helium mixture to the pipeline for storage does not increase a storage Contract holder's annual allocation proportion (or the monthly allocation proportion) for the remainder of the current fiscal year. Allocation is calculated based only on the proportion of each storage Contract holder's stored volume of Primary Private Helium to the total volume of Primary Private Helium stored by all storage Contract holders as of 8 a.m. Central Time on October 1 of each year. After September 30, 2022, any Secondary helium added for storage is not included in the Allocation calculation under this Contract.

(i)        If Person wishes to deliver Secondary Helium to the Federal Helium System after October 1, 2022 and prior to the Conveyance, the United States will safeguard this Secondary Helium until Person can negotiate a new storage contract with the Purchaser and in order to secure delivery of this secondary private helium after the Conveyance.

(j)        If Person wishes to deliver Secondary Helium to the Helium System after the Conveyance, Person must enter a separate contract with Purchaser.

2.2  Transfer Helium

Transfer Helium is not considered Secondary Private Helium if Person adding helium completes the transfer (from addition to accounting) within three months. If the transfer is not completed within three months, Transfer Helium reverts to Secondary Private Helium for person who added the helium. The removal of Transfer Gas does not subtract from the amount of helium that a storage contract holder can take under allocation during times of helium shortage. However, Person may not remove any helium including Transfer Helium if the pipeline pressure is below 600 psi. Person receiving Transfer Helium must remove the received Transfer Helium within the month when Person's account is credited, or the Transfer Helium will revert to Secondary Private Helium for person receiving the transfer. Person receiving the transfer must ensure that their balance does not go negative at any time due to Person's removal of its Transfer Helium. Person should wait at least 72 hours after addition for removal if their balance cannot cover the removal (to prevent negative daily averages).

(a)        Transportation fees will apply for acceptance and delivery of Transfer Helium per 4.1(c).

(b)        Annually on October 1, beginning on October 1, 2022, Person will provide Authorized Officer or Purchaser's Representative, as applicable, with an estimate of the volumes of Transfer Helium that Person anticipates it will add to the Federal Helium Pipeline or Helium Pipeline as applicable during the Contract Year as well as documentation of length of time the transfer will take from company to company (must be less than three months).

(c)        United States or Purchaser as applicable can waive Secondary Helium reclassification of Transfer Helium if circumstances outside United States' or Purchaser's control warrant it.

2.3        Delivery of Private Helium by Person to Federal Helium System or Helium System. Prior to September 30, 2022, Person will provide to Authorized Officer, as described in 2.2(a), estimates of delivery volumes of Primary Private Helium that Person plans to deliver to the Federal Helium System. After September 30, 2022 and Pre-Conveyance, Person will provide to Authorized Officer, as described in 2.2(a), estimates of delivery volumes of Secondary Private Helium that Person plans to deliver to the Federal Helium Pipeline. After Conveyance, Person will provide to Purchaser's Representative, as described in 2.2(a), estimates of delivery volumes of Secondary Private Helium that Person plans to deliver the Helium Pipeline.

(a)        Annually beginning October 1, 2021, and when this Contract is transferred to Purchaser, Person will provide the Authorized Officer or Purchaser's Representative, as applicable, an estimate of the volumes of Primary or Secondary Private helium-gas mixture, as applicable, that Person anticipates it will deliver or arrange to be delivered to the Federal Helium Pipeline or Helium Pipeline, as applicable, during the Contract Year (or the remainder of the Contract year if the Conveyance occurs in the middle of the Contract year).

(b)        On or before the twentieth day of each calendar month, Person will notify the Authorized Officer or Purchaser's Representative, as applicable, of any changes to the estimated volume of Primary or Secondary Private helium-gas mixture, as applicable, that Person expects to deliver or arrange to be delivered for storage during the succeeding calendar month.

(c)        If Person fails to provide the information required under paragraph (a) or paragraph (b) of this section at the time required, Person agrees to pay $2,000 in liquidated damages to compensate the United States for its administrative costs.

(d)        After Government Assignment and Conveyance to Purchaser of the Federal Helium System, if Person fails to provide the information required under paragraph (a) or paragraph (b) of this section at the time

required, Person agrees to pay $2,000 in liquidated damages to compensate Purchaser for its administrative costs.

 (e)            All other terms and conditions of the section remain in full force and effect as to Purchaser and Person.

2.4            Delivery of Helium by the United States or Purchaser

The United States and Purchaser, as applicable, agree to deliver to Person during the term of this Contract as much of the volume of Primary Private Helium owned by the Person and stored by the United States in the Federal Helium System or stored by Purchaser in the Helium System, as applicable, that Person requests. Delivery is subject to any allocations in place, all terms and conditions of this Contract, the limitations of the Federal Helium System or the Helium System to deliver, the rights of Purchaser to receive Purchaser's New Helium, and the rights of the other storage Contract holders within the Federal Helium System or the Helium System, as applicable.

 (a)            Allocations are calculated on October 1 each year based on amount of Primary Private Helium in the Federal Helium System or Helium System as applicable. The last allocation calculated prior to the Conveyance will remain in effect until it is recalculated the subsequent October 1 after the Conveyance.

 (b)            Purchaser's New Helium and all Storage Contract Holders' Secondary helium is not included in allocation calculations. Purchaser is guaranteed delivery of 20 percent of the total crude production per day of Purchaser's New Helium. The Purchaser's Representative will allocate the remaining delivery capacity of the Helium System among all parties storing helium in the Helium System.

 (c)            Upon Conveyance, the Parties understand, acknowledge, and agree that the United States has no obligation to facilitate or ensure delivery by the Purchaser of Person's Primary and Secondary Private Helium. Purchaser will be bound to the delivery terms and fees described in this Contract for Primary Private Helium during the term of this Contract. Person must enter a separate contract with Purchaser for delivery of its Secondary Private Helium

 (d)            Primary Private Helium will be delivered to Person at Person's Delivery/ Acceptance Point where the Federal Helium Pipeline or Helium Pipeline is connected with a line that goes to Person's facilities, and in a helium-gas mixture containing not less than 50 percent helium by volume, and at the pressure existing in the system at the time and at the point of delivery, and will be delivered under conditions that permit suitable measurement and analysis specified by Article VI.

 (e)            Pursuant to Article IV, Person agrees to compensate the United States or Purchaser, as applicable, for any costs that the United States or Purchaser incurs to deliver a helium-gas mixture containing not less than 50 percent helium by volume.

2.5            Title to Helium.

The Parties agree that title to the other constituents of natural gas other than helium of any helium-gas mixture accepted from Person for storage will pass to United States or Purchaser at the point of acceptance. The Parties further agree that upon delivery to Person of Primary Private Helium (and any Secondary Private Helium delivered prior to the Conveyance) stored under this Contract, title to all constituents of the helium-gas mixture delivered to Person will pass to Person at the point of delivery.

2.6            Person's Estimates of Requests for Delivery.

Person will provide estimates to the Authorized Officer or Purchaser's Representative, as applicable, of all volumes Person plans to request from the Federal Helium System or Helium System as follows:

 (a)            Person agrees that, it will advise the Authorized Officer or Purchaser's Representative, as applicable, annually on October 1 each year of the volume of stored Primary Private Helium of which it expects to request delivery during the Contract Year beginning on October 1 of that year, so that the United States or Purchaser may estimate the total volume of helium which the United States or Purchaser, as applicable, may

need to deliver from the Federal Helium System or Helium System during each Contract Year.

(b)        On or before the twentieth day of each calendar month, Person will notify the Authorized Officer or Purchaser's Representative, as applicable, of any changes to the estimated volume of stored Primary Private Helium of which Person expects to request delivery during the succeeding calendar month.

(c)        If Person fails to provide the information required under paragraph (a) or paragraph

(b) of this section at the time required, Person agrees to pay $2,000 in liquidated damages to compensate the United States or Purchaser's Representative, as applicable, for its administrative costs.

2.7        Shortages prior to the Conveyance

The following provision shall only apply to the United States prior to the Conveyance. If at any time in the sole opinion of the Authorized Officer the delivery capacity of the Federal Helium System is inadequate to meet the total expected delivery requirements (referred to in this section as a "shortage"), and notwithstanding any other provision of this Contract, the available delivery capacity of the Federal Helium System will be used first to supply the helium needs of Federal users and second to meet other requests for the delivery of Primary Private Helium. The Authorized Officer will allocate the remaining delivery capacity of the Federal Helium System after the needs of Federal users have been met among all parties storing Primary Private Helium in the Federal Helium System. That allocation will be calculated as described in 1.3.

2.8        Shortages after the Conveyance

The following provision shall only apply to the Purchaser after the Government Assignment and Conveyance. The Purchaser has the right to remove 20 percent of the total crude production per day of Purchaser's New Helium, each day that the plant is in production. If at any time in the sole opinion of Purchaser's Representative the delivery capacity of the Helium System is inadequate to meet the total expected delivery requirements of the Storage Contract holders with the remaining crude helium production (referred to in this section as a "shortage"), and notwithstanding any other provision of this Contract, Purchaser's Representative will allocate the remaining delivery capacity of the Helium System. That allocation will be calculated as described in 1.3.

2.9        Notification of times when Person's plant is unable to accept deliveries

Person agrees to notify the United States or Purchaser's Representative, as applicable, of all scheduled plant turnarounds and/or major unscheduled plant problems that affect the operations of the Federal Helium System or the Helium System or any other operational events that may affect deliveries of helium from, or acceptance of helium-gas mixture into, the Federal Helium System or the Helium System as soon as practicable after learning of such problems or events. The United States or Purchaser's Representative, as applicable, agrees to keep this information confidential to the extent permitted by law.

ARTICLE III

Effective Date, Term, and Existing Agreements

3.1        This Contract will be effective on October 1, 2021, at 12:00 a.m. Central Time and will continue thereafter for six years, expiring on September 30, 2027 at 11:59 p.m. Central Time.

(a)        This Contract is not renewable.

(b)        If Person does not elect to sign this Contract by September 23, 2021, the FY 2021 contract terminates by expiration and Paragraph 3.2 of the FY 2021 Contract is triggered. Person is required to withdraw all of Person's Helium at the required rate of withdrawal (see 1.18 of FY 2021 Storage Contract), as assigned by the Authorized Officer or Person must transfer Person's Primary Private Helium to another storage Contract holder with a FY 2022-FY 2027 Storage Contract.

3.2        When the FY 2022-2027 Contract terminates by expiration on September 30, 2027, Person retains title to Person's Primary Private Helium. If Person has Primary Private Helium stored in the Helium System

and does not enter a new Contract with Purchaser, Person may transfer Person's helium to another party who has entered a new Contract with the Purchaser. Upon termination of the FY 2022-2027 Contract by expiration, if Person does not enter a new contract with Purchaser, Person must continue to pay the Purchaser fees related to Person's Primary Private Helium remaining in the Helium System in accordance with Article IV until all of Person's Primary Private Helium is withdrawn. Monthly fees will be waived for any month where Person has claimed Force Majeure.

3.3      This Contract supersedes and replaces all Existing Agreements between the United States and Person for storage, delivery, or transportation services on the Federal Helium System. All Existing Agreements are terminated as of the effective date of this Contract, and all Primary Private Helium stored under Existing Agreements is subject to the terms and conditions of this Contract. Person will pay amounts due to the United States for accrued Primary Private Helium storage charges under any Existing Agreements within 30 days of the effective date of this Contract or in accordance with the payment schedule agreed upon between the United States and the Person.

ARTICLE IV

Fees

4.1      Person will pay the United States prior to the Conveyance, and to Purchaser after the Conveyance, for the acceptance, delivery, storage, transportation, and other services provided under this Contract, the following fees. Fees are subject to adjustments as hereinafter provided:

(a)      Contract Administration Fee. For FY 2022-FY2027, whether used or not, on October 1, each year, Person will pay to the United States or Purchaser as applicable eighteen thousand dollars ($18,000) due on the first day of each Contract Year.

(b)      Acceptance/Delivery Point Assessment Fee. For each Acceptance/Delivery Point that Person has to move helium-gas mixtures to or from the helium storage pipeline, Person will pay twenty thousand ($20,000) dollars per year due on the first day of the Contract Year to the United States or Purchaser as applicable Person has_____Acceptance/Delivery Points located at _____.

(c)      Transportation and Storage Fees. The transportation and storage fees will be calculated at the beginning of the Fiscal Year according to the following formula:

$$TR\ (\$/Mcf) = \frac{B}{(sf \times S) + A + D}$$

$$ST\ (\$/Mcf) = sf\ x\ TR$$

Where:

**B** is the annual budget amount (operating cost, overhead costs, new infrastructure costs including costs to make a helium extraction unit operable and spread over the lifetime of the infrastructure), and maintenance costs for the Federal Helium System or the Helium System, as applicable, and its supporting services for each succeeding fiscal year. The annual budget will be adjusted by any over or under collections from the previous Fiscal Year.

**TR** is the Transportation Fee in $ per Mcf to be charged for Primary Private helium delivered to Person or helium accepted from Person during the month. Invoicing and payment procedures are described in Article V below.

**S** is the total volume, in Mcf, of Primary Private Helium in storage prior to the Conveyance in the Federal Helium System or the volume of Primary Helium in storage in the Helium System, after the Conveyance owned by all private owners at the beginning of the Fiscal Year.

**A** is the total volume, in Mcf, of Primary helium prior to the Conveyance that all storage Contract

holders delivered for acceptance into the Federal Helium Pipeline. If the above volume varies significantly from the total of all Contract holders' estimate in Article 2.2a, the United States or Purchaser's Representative, as applicable, may choose to use the estimate, in whole or in part.

**D** is the total volume, in Mcf, of Primary Private Helium that all storage Contract holders delivered prior to the Conveyance through the Federal Helium Pipeline during the previous Fiscal Year. However, D will not exceed the estimated productive capacity of the Federal Helium System or the Helium System, as applicable. If the above volume varies significantly from the total of all Contract holders' estimate in Article 2.5a, the United States or Purchaser's Representative, as applicable, may choose to use the estimate, in whole or in part.

**ST** is Storage Fee in $ per Mcf to be charged prior to the Conveyance for its Primary Private Helium in storage at the beginning of the Fiscal Year. Person will pay its portion in ten equal installments with the first installment due by December 15th each Fiscal Year and the final installment due on September 15th of the Fiscal Year.

**sf** is the Primary and Secondary Private Helium storage factor. The sf is initially set at 1.0 on October 1, 2015. The sf will increase whenever the total privately-owned storage volume for Person at the beginning of the Fiscal Year is more than the Person's total storage of Primary and Secondary Private Helium at the beginning of the previous Fiscal Year. The sf will increase by the same percentage as the total storage volume increased over the previous Fiscal Year, rounded to the nearest tenth. The sf will decrease whenever the total privately-owned storage volume for Person at the beginning of the Fiscal Year is less than the total storage for Person at the beginning of the previous Fiscal Year. The sf will decrease by the same percentage as the total storage volume decreased over the previous Fiscal Year, rounded to the nearest tenth. Therefore, the minimum increase is ten percent. The value for sf will never be less than 1.0.

(d)    Low Purity Fee. For all crude helium plants, the United States and Purchaser, as applicable, agree to accept crude helium that is below 65 percent helium by volume, but will not credit to Person's storage account crude helium that is less than 50 percent helium by volume. If Person delivers Secondary Private Helium that is crude helium that is greater than 50 percent but less than 65 percent helium by volume, Person agrees to pay a low purity fee of $2.50 per Mcf per year.

(e)    Transfer Fee. Prior to the Conveyance, for each transfer of ownership of Primary or Secondary Private Helium (Primary Private Helium must all be delivered first) stored by Person to another storage Contract holder, Person will pay to the United States, $200. After the Conveyance, for each transfer of ownership of Primary Private Helium stored by Person to another storage Contract holder, Person will pay to the Purchaser, $200.

(f)    Low Sample Pressure Fee. Person will conduct sample collection as required under Article VI, paragraph 6.11. Person will pay an administrative fee of $500 for each sample cylinder selected for laboratory analysis that does not have sufficient pressure at the time it is retrieved to allow a laboratory analysis for the previous month's composite accumulated sample. No fee will be assessed for days of plant inactivity.

Sufficient composite sample gas cylinder pressures are: 115 psi for 1-liter containers

450 psi for 250cc containers 900 psi for 125cc containers

(g)    There will be no refund of any fees if Person terminates the Contract before the end of the Contract Year. (See paragraph 10.3).

(h)    Secondary Private Helium will be charged the same rate (ST) as Primary Private Helium prior to the Conveyance while it is safeguarded until Person can negotiate a separate contract for storage and delivery with the Purchaser (see 1.27 for the definition of Secondary Private Helium).

4.2        In addition to the fees specified in paragraph 4.1, 4.2 outlines additional expenditures, requirements, and clarifies ownership of equipment.

(a)        Person will reimburse the United States or Purchaser, as applicable, for the full amount of any expenses incurred by the United States (and not included in the fees identified in paragraph 4.1) for repair, construction, installation, or modification of any facilities, pipeline connections, metering stations, compressor stations, gas measurement software necessary for Person's connection to, or delivery into or from the Federal Helium Pipeline or the Helium Pipeline, as applicable, for the purpose of this Contract.

(b)        Any such activity described in paragraph 4.2(a) which will require the expenditure of more than $5,000, will be made only with the prior written consent of Person.

(c)        In the event that Person refuses to consent to any such activity or fails to pay or reimburse the United States or Purchaser, as applicable, for any expense incurred by United States or Purchaser, as applicable under this paragraph 4.2, the United States and Purchaser, as applicable, will be relieved of any obligation to Person to accept helium under this Contract. United States and Purchaser additionally reserve the right to any other remedies available by law.

(d)        Any facilities constructed or installed by the United States or Purchaser, as applicable, and paid for by Person pursuant to paragraphs 4.2, or 4.3, that may be removed without damaging or otherwise adversely affecting the Federal Helium System or the Helium System will remain the property of Person after any such facilities are no longer necessary for the purpose of this Contract and may be removed by Person within a reasonable time.

4.3        Resource Management Fee

(a)        If Person takes delivery of crude Primary Private Helium from the Federal Helium System or Helium System Person will pay to the United States or Purchaser, as applicable, a Resource Management Fee (RM) on a per Mcf basis for each Mcf of Primary Private helium that Person has in storage in the Federal Helium System or Helium System at 8 a.m. Central Time on the first day of the corresponding Contract Year. The RM fee provides reimbursements for the Government's Crude Helium Enrichment Unit (CHEU) lease and repairs on equipment that is used to produce crude helium and natural gas; or the RM fee is a fee to the Purchaser for operation of its helium extraction equipment. Person agrees to pay the RM in 10 equal installments, with the first payment included in the November billing statement under Article V below. Subsequent installments will be included in each of the following monthly billing statements until the full amount of the RM is billed and installments will be due even if Person terminates the Contract early.

The RM is calculated as follows:

$$\frac{EA \times HP}{S(P)} = RM\ (\$/Mcf)$$

and

$$\frac{HV}{HV+NV} = HP$$

Where:

**EA** is the annual enrichment charge, which equals the BLM's full cost associated with the operation repairs and infrastructure improvement of the CHEU or Purchaser's full cost associated with the operation and repairs and infrastructure improvement of its helium extraction equipment.

**HV** is prior to the Conveyance, the total volume of crude helium produced by the CHEU and is transported through the federal helium pipeline which is calculated by using BLM Status Report Table 3 CHEU Product, in the prior Fiscal Year. Or after the Conveyance, the total volume of crude helium produced by Purchaser's helium extraction equipment and transported through the Helium Pipeline for

delivery to storage contract holders and not to Purchaser, which is calculated using a new report prepared by Purchaser after the Conveyance.

**NV** is the total volume of the natural gas produced before the Conveyance by the CHEU and is transported through the natural gas pipeline, which is calculated using BLM Status Report Table 3 residue gas, during prior Fiscal Year. Or after the Conveyance, the total volume of natural gas produced by Purchaser's helium extraction equipment and transported through the natural gas pipeline, which is calculated using a new report prepared by Purchaser after Conveyance.

**HP** is prior to the Conveyance the percentage of CHEU operational cost associated with the processing of helium which is calculated by dividing the sum of total volume of the crude helium produced by the CHEU (HV) by the sum of the total volume of crude helium produced by the CHEU (HV) and the total volume of the natural gas produced by the CHEU (NV). Or after the Conveyance, HP is the percentage of Purchaser's helium extraction costs associated with the processing of helium for storage contract holders which is calculated by dividing the sum of total volume of the Primary Private crude helium produced by Purchaser's helium extraction equipment by the sum of the total volume of Primary Private crude helium produced by Purchaser's helium extraction equipment and the total volume of the natural gas produced by Purchaser's helium extraction equipment and multiplied by .75.

**S(P)** is prior to the Conveyance the total volume, in Mcf, of Primary Private helium in storage in the Federal Helium System owned by private owners connected to the Federal Helium Pipeline at the beginning of the Fiscal Year. After the Conveyance, S(P) is total volume, in Mcf, of Primary Private helium in storage in the Helium System owned by private owners connected to the Helium Pipeline at the beginning of the Fiscal Year.

**RM** is the Resource Management Fee in dollars per Mcf.

(b)    If Person takes delivery of crude Secondary Private Helium from the Federal Helium System prior to the Conveyance (Person must have no Primary Private Helium left and the system cannot be under allocation), Person will pay to the United States, a Resource Management Fee (RM) on a per Mcf basis for each Mcf for each Mcf of Secondary Private Helium delivered during that month.

(c)    If Person receives all of Person's Primary Private Helium prior to the end of the fiscal year, person must still pay all 10 installments of their RM fee or can pay the remaining balance in one payment.

ARTICLE V
Billing and Payment

5.1    On or before the 15th day of each month, the United States or Purchaser, as applicable, will transmit to Person a statement for the preceding month showing:

(1)  the volume of Primary or Secondary Private Helium-gas mixture, as applicable, accepted by the United States into the Federal Helium System, from Person;

(2)  the percentage of helium in such volume;

(3)  the volume of contained Primary or Secondary Private Helium;

(4)  the volume of Primary Private Helium-gas mixture delivered to Person by the United States or Purchaser, as applicable;

(5)  the percentage of Primary Private Helium in such delivered helium-gas mixture;

(6)  the volume of contained Primary Private Helium delivered;

(7)  the net volume of Person's contained Primary and Secondary Private Helium remaining in the Federal Helium System or the Helium System, as applicable; and,

(8)  the sum of money due and payable to the United States or Purchaser, as applicable for the succeeding month for the applicable fees specified in paragraphs 4.1 to 4.3, together with whatever calculations and any other information as may be required to substantiate the monthly activity.

5.2      Person will pay the amounts due the United States or Purchaser, as applicable, as billed under paragraph 5.1 within 30 days of the date of the bill.

5.3      The United States or Purchaser, as applicable, will bill Person separately for any amounts due the United States under Article IV, paragraph 4.2, or Article VII within 60 days after the United States determines the amounts due.

5.4      In the event of any error in the billing statement, Person shall notify the BLM or Purchaser's Representative, as applicable upon receipt regarding any obvious errors in billing amount. The BLM or Purchaser's Representative may revise and resend the billing statement based upon obvious errors or, for more complex errors, require Person to pay the amount billed notwithstanding such error. Any adjustment resulting from any overpayment by Person will be shown as a credit in the next billing statement after the error is resolved. Any underpayment by Person will be included in the next billing statement after the error is resolved. Any billing error must be initially raised within 1 year of the billing date containing the error or is deemed waived.

5.5      Before date of Government Assignment and Conveyance to Purchaser and in the event that Person fails to pay any amount due by the date due, interest will accrue on the unpaid amount, and the United States may collect the amount due together with interest, penalties, and any other applicable fees or amounts, under the Debt Collection Act of 1982, as amended, 31

U.S.C. §§ 3701 *et seq*., and implementing regulations. After date of Government Assignment and the Conveyance and in the event that Person fails to pay any amount due by the date due, interest will accrue based on the yield of 10-year United States Treasury maturities as reported by the Federal Reserve Board in "Federal Reserve Statistical Release H.15" plus 2% rounded to the nearest one-eighth percent (1/8%) on the unpaid amount and the Purchaser may collect the amount due together with interest, penalties, and any other applicable fees or amounts as well as seek enforcement in the appropriate judicial forum.

ARTICLE VI

Measurement

6.1      Person will install, operate, and maintain at the points of delivery of contained Primary Private Helium and points of acceptance of Secondary Private Helium, and hereunder all of the equipment necessary for the measurement and analysis of the helium-gas mixture tendered by Person to the United States or Purchaser, as applicable, and delivered by the United States or Purchaser to Person which is suitable, in the opinion of the Authorized Officer or Purchaser's Representative, as applicable, for the intended purpose. The United States or Purchaser will not be obligated either to accept Primary or Secondary Private Helium from Person for storage or to deliver Primary Private Helium to Person from storage whenever, in the opinion of the Authorized Officer or Purchaser's Representative, as applicable, any of the said equipment is unsuitable for the intended purpose. (Purchaser is also not obligated to accept Secondary Private Helium for storage if parties are unable to negotiate a new contract for the storage and delivery of Secondary Private Helium).

6.2      The United States or Purchaser, as applicable, may, at its option and expense, install data communication equipment on Person's measurement installation to obtain accurate measurements of helium volumes for billing purposes; however, no such data communication equipment will be installed by the United States or Purchaser in any way that would, in Person's opinion, interfere with the operation or the accuracy of Person's measurement equipment.

6.3      The unit of measurement for the Primary and Secondary Private Helium-gas mixture and contained

helium will be "Mcf" as defined in Article I of this Contract. The helium-gas mixture will be measured at the pressure and temperature conditions in the measurement equipment. The measured volumes of helium-gas mixture and contained helium will be adjusted in accordance with Ideal Gas Laws, corrected for deviation as provided in this Article VI or as the parties may otherwise mutually agree in writing, to derive the accepted or delivered volume at standard temperature and pressure. For purposes of that adjustment calculation, the atmospheric pressure at the meter will be assumed to remain constant at the standard barometric pressure at the altitude of the measurement equipment.

6.4       The helium-gas mixture will be measured by orifice meters installed and operated in accordance with methods prescribed by the American Gas Association, Gas Measurement Committee Report No. 3, dated April 1955, as amended. Person will use the *Emerson ROC 809 Electronic Flow Meter (EFM) using Detailed Characterization Method (DCM)*, including the super-compressibility factors. The United States and Purchaser as applicable may approve or require other meters that meet operational and technical specifications.

6.5       Person will not install or use any new or replacement meter or measuring equipment to which this Article VI applies before the United States or Purchaser, as applicable, has approved the design and installation of the meter or equipment.

6.6       Person will perform the following minimum inspections and tests on orifice meters in the presence of authorized BLM Officer or Purchaser's Representative or other designated Contractors, employees, and agents:

(a)       Person will remove and inspect the orifice plates at least once every 6 months (with no more than 200 days between inspections) or whenever data indicates to either party a potential error of the measurement system, upon notification.

 (b)       Person will inspect the meter tubes whenever requested by the United States or Purchaser and upon initial plant startup or installation of a new or replacement meter tube.

(c)       Person will comply with all calibration requirements for EFM and Multi Variable Sensors (MVS) in the ROCLINK 800 User manual, ROC 809 Remote Operations Controller Instruction Manual, and all other related manufacturer manuals.

(d)       The parties may agree upon additional tests and inspections or alternative times for the tests and inspections required under this Article VI.

6.7       Person will not install any attachments between the point of measurement and the Federal Helium Pipeline after initial startup without the written consent of the Authorized Officer. In addition, Person will not install any attachments between the point of measurement and the Helium Pipeline after initial startup without the written consent of Purchaser's Representative.

6.8       Person will calculate specific gravity and determine the percentage of helium by volume in the helium-gas mixture based on gas chromatograph analysis. Person will maintain and calibrate the gas chromatograph in accordance with its manufacturer's recommendations. Person must provide the gas used in calibration procedures and must obtain BLM's or Purchaser Representative's approval, as applicable, of that gas as the calibration standard. The chromatograph must measure helium, nitrogen, methane, and hydrogen. Person will measure other components as necessary so that at least 99.8 percent of the gas stream components are directly measured.

6.9       Person will maintain at the point of measurement suitable equipment to collect a sample each day proportionate to flow that is representative of the 24-hour helium-gas mixture tendered by Person or delivered by the United States or Purchaser, as applicable, that is adequate for laboratory analysis, consistent with the pressures and cylinder sizes specified in Section 4.1(f). Person will provide this sample to the United States or Purchaser as applicable. The United States or Purchaser's Representative, as applicable, will retain this sample until the United States or Purchaser, as applicable, witnesses the next meter inspection.

6.10     In addition to the inspections provided for under paragraph 6.6, each party will have the right, at reasonable times, to inspect metering facilities installed and operated by the other party in the presence of a representative of the installing party, and to request tests and witness tests thereof but not to alter or in any manner disturb or adjust the facilities of the other party. If either party desires a test or inspection of any meter, or if a party observes a variation between meters upon which a billing statement is based and any check meter, such party will promptly notify the other party thereof. Each party will give the other party reasonable notice of the time of monthly and annual tests and inspections of metering facilities 72 hours in advance of such tests and inspections so that the other party may have its representatives present.

6.11     If, upon test or inspection, operation of any equipment at any metering facility is found to be inaccurate by an amount exceeding 1.0 percent at a reading corresponding to the average rate of flow or condition for the period since the last preceding test or inspection, then the equipment will be adjusted to zero error and any previous readings will be corrected for zero error for the period which is known or agreed upon; but in case the period is not known or agreed upon, such correction will be for a period equal to one-half of the time elapsed since the date of the last such test or inspection.

6.12     The volume of contained helium will be determined by multiplying the volume of helium-gas mixture by the volume percentage of helium. The helium percentage used in this computation will be determined by the recording analytical instrument described in paragraph

6.8 if it is operative; otherwise, a laboratory analysis of the representative sample described in paragraph 6.9 will be used to determine the contained helium for the day. One such computation will be made for the volume of contained helium tendered for delivery hereunder each 15-minute period or as determined by EFM.

6.13     Person will retain all records and electronic data generated by Person's metering facilities and any other information used for billing purposes for the period of this Contract and for 2 additional years thereafter. Person agrees to promptly provide to the BLM or Purchaser, as applicable, all records or data that the BLM or Purchaser's Representative may request.

6.14     In the event that any of the samples or any of the records or analyses mentioned in this Article VI are lost, damaged, or destroyed, and the parties are unable to otherwise agree on a basis for determining any calculation elements or measurement factors that are unknown by reason of such loss or damage, then the readings of such records or results of data analyses will be computed the same as the average corresponding readings or results prevailing in either a 5- day interval preceding or following the period in question, or both intervals if readings and results are available for each.

ARTICLE VII

Overdrawn Account

7.1     This next section applies only between the United States and Person and addresses both overdraws of a monthly allocation (see 1.3) of Person's total storage volume and overdraws during the final withdrawal of Person's remaining Primary and Secondary Private Helium under this Contract (if Person's final withdrawal occurs during the United States' management of the Federal Helium System) and associated potential disconnection from the Federal Helium System.

(a)     The United States will provide e-mail notification that the storage account is overdrawn.

(b)     For any month for which companies are under an allocation, if Person overdraws more crude helium from the Federal Helium System than Person is allocated for that month, the United States will reduce delivery to Person in the next month by a volume equal to Person's overdrawn volume.

(c)     Upon notification by the United States, Person will work to rectify the overdraw of the monthly allocation and will not withdraw anymore until the United States notifies Person that Person may resume withdrawal.

(d)        If overdraw is associated with shutting in of the meter and permanent disconnection from the Federal Helium System or Helium System, and if helium is overdrawn by more than 10 Mcf, Person agrees to pay $5,000 to the United States as liquidated damages.

(e)        For overdraws other than those associated with (d), if Person overdraws its storage account for more than one monthly allocation period in a Contract Year, the United States may at its discretion, declare Person ineligible to receive helium deliveries for a period of up to three months. The fine noted in 7.1(d) only applies for overdraws described in (d).

(f)        The remedies provided in this Article are not in derogation of any other remedy available to the United States, as applicable, by law.

7.2.        This next section applies only between the Purchaser and Person after Government Assignment and Conveyance to Purchaser. This section addresses both overdraws of a monthly allocation (see 1.3) of Person's total storage and overdraws of Person's total storage volume during the final withdrawal of Person's remaining Primary Private Helium from this Contract and associated disconnection of the Helium System if Person does not enter a new contract with Purchaser after the conclusion of this contract.

(a)        Purchaser's Representatives will provide e-mail notification that the storage account is overdrawn.

(b)        For any month for which companies are under an allocation, if Person overdraws more crude helium from the Helium System than Person is allocated for that month, Purchaser's Representative will reduce delivery to Person in the next month by a volume equal to Person's overdrawn volume.

(c)        Upon notification by the Purchaser's Representative, Person will work to rectify the overdraw of the monthly allocation and will not withdraw anymore until the Purchaser, notifies Person that Person may resume withdrawal.

(d)        If overdraw is associated with shutting in of the meter and permanent disconnection from the Helium Pipeline and if helium is overdrawn by more than 10 Mcf, Person agrees to pay $5,000 to the Purchaser as liquidated damages.

(e)        For overdraws other than those associated with (d), if Person overdraws its storage account for more than one monthly allocation period in a Contract Year, Purchaser, may at its discretion, declare Person ineligible to receive helium deliveries for a period of up to three months. The fine noted in 7.1(d) only applies for overdraws described in (d).

(f)        The remedies provided in this Article are not in derogation of any other remedy available to the Purchaser, as applicable, by law.

ARTICLE VIII

Right of Access

8.1        Person will grant to the United States or Purchaser, as applicable, such rights of access to land and facilities owned or controlled by Person as may be necessary for the performance of this Contract. Person further agrees to grant to the United States and Purchaser, as applicable, such rights-of-way as may be necessary for the BLM and Purchaser's Representative, its designated Contractors, employees, and agents, to install appropriate equipment for acceptance and delivery of helium into or from the Federal Helium Pipeline and Helium Pipeline, as applicable. All equipment placed by the United States or Purchaser and paid for by the United States or Purchaser, as applicable, upon land owned or controlled by Person will remain the property of the United States or Purchaser, as applicable. The United States and Purchaser will comply with the Person's reasonable environmental, health and safety rules.

ARTICLE IX

Liability and Force Majeure

9.1        Subject to the United States' authority under the Helium Act, as amended by the Helium Stewardship Act enacted on October 2, 2013, and any other applicable law, prior to the Conveyance the United States shall be responsible for the safe storage of Person's Primary and Secondary Private Helium, and the United States agrees to tender for delivery prior to the Conveyance as much of Person's Primary Private Helium and if all of Person's Primary Helium is delivered and the system is not under allocation, the United States also agrees to tender for delivery as much of Person's Secondary Helium, subject to the limitations of the Federal Helium System. Provided, however, that the United States shall have no liability to Person for any loss or damage to Person's volume of helium as a result of Force Majeure while such helium is in the possession of the United States.

9.2        The Parties further understand, acknowledge, and agree that the United States shall not be liable for safe storage or delivery of Primary or Secondary Private Helium remaining in the Federal Helium System after the Government's Assignment and Conveyance to Purchaser. Subject to the terms of this Contract, after the Conveyance, the Purchaser, its successors, and assigns, shall assume and be fully responsible for the safe storage of Person's volume of Primary Private Helium remaining in the Helium System under this Contract and tender for delivery all of Person's Primary Private Helium remaining under this Contract at the rates assigned by this Contract. Provided however, that the Purchaser, its successors, and assigns, shall have no liability to Person for any loss or damage to Person's volume of Primary or Secondary Private Helium as a result of Force Majeure while such helium is in possession of Purchaser.

9.3        In the event of either Party being rendered unable, in whole or in part, to carry out any non-monetary obligation under this Contract as a result of force majeure, upon such Party giving notice in writing to the other Party as soon as possible after the occurrence of the force majeure event describing the particulars of the event, the obligations of the Party giving notice that are affected by the force majeure event will be suspended. For purposes of this specific clause, Purchaser, its successors, and assigns, is included within the term "Party."

(a)        Such suspension will continue for the duration of the Party's inability to carry out the obligation, but for no longer period.

(b)        The Party giving notice agrees to remedy such inability to perform as soon as practically possible.

(c)        Any loss of helium-gas mixture from the Federal Helium System or Helium System as a result of force majeure will be borne by all Parties, including the United States or Purchaser, its successors and assigns, as applicable, in proportion to each party's ownership of the gas stored in the Federal Helium System or the Helium System, as applicable, as of the first day of the month in which the force majeure event occurs. Any such losses will be reduced by the same proportion of any recovery from any third party for causing a force majeure event. For losses only involving the pipeline, the Authorized Officer or Purchaser's Representative, as applicable, will determine each Party's proportional loss based on the Party's withdrawal of helium from the Federal Helium System or the Helium System, as applicable, during the previous 24 hours. Prior to the conclusion of the In-Kind program, the calculation of this proportional loss using the previous 24-hour withdrawal amount would include any helium used by the In-Kind program for Federal users.

ARTICLE X

Termination

10.1        The United States or Purchaser, as applicable, may at their respective options terminate this Contract if Person continues to fail to comply with any provision of this Contract for a period of 60 days after receipt of notice of the non-compliance. The termination will be effective on the last day of the second month following the month in which Person receives notice of termination.

10.2        In the event of termination by the United States or Purchaser, as applicable, Person agrees:

(a)        Person may sell all of Person's stored helium above the volume referred to in paragraph (c) of this section to a third party who has a helium storage Contract with the United States Purchaser, as applicable within 90 days after termination of this Contract. Person must inform the United States or Purchaser's Representative of the sale.

(b)        To the extent that Person fails to sell all of its remaining stored helium under paragraph (a) of this section, the United States or Purchaser, as applicable, may, on behalf of Person, sell such helium. The United States or Purchaser, as applicable, will arrange for the purchaser to pay the purchase price directly to Person, and Person agrees that the United States and Purchaser bears no liability to Person for any part of the purchase price.

(c)        The United States or Purchaser, as applicable, may take title to and sell that portion of Person's stored helium in the Federal Helium System or the Helium System, as applicable, as is necessary to cover any unpaid amounts owed to the United States or Purchaser under this Contract. United States or Purchaser will inform Person of the sale price for the stored helium when obtaining reimbursement for any unpaid amounts.

10.3       Prior to the Conveyance, the United States may, at its option:

(a)        Terminate this Contract in the event that Congress amends, repeals or withdraws, in whole or in part the appropriations or authorities contained in 50 U.S.C. §§ 167-167q as they exist on the date of execution of this Contract. Termination will be effective on the last day of the month in which Person receives notice of termination.

(b)        In the event of termination by the United States under this section, the parties agree that Person retains ownership of its helium stored in the Federal Helium System, but Person is not required to pay any fees to the United States under this Contract.

10.4       Person may, at its sole option, terminate this Contract if—

(a)        Person has given the United States or Purchaser's Representative, as applicable, 90 days written notice of its election to terminate;

(b)        Person pays all applicable fees due through the end of the Contract Year; and

(c)        All of Person's Primary Private Helium is removed or title thereto is transferred to a third party who has a FY 2022-FY 2027 storage Contract with the United States or Purchaser, as applicable by the proposed termination date.

ARTICLE XI

Disposal of Federal Helium System

11.1       The parties acknowledge that under applicable provisions of the Helium Act, as amended by the Helium Stewardship Act enacted on October 2, 2013, as they exist on the date of execution of this Contract, the United States will designate as excess the remaining assets in the Federal Helium System to the GSA on or before September 30, 2021. The GSA will permit the continued operation of the Federal Helium System and delivery of privately owned helium stored or transported in the Federal Helium System while it conducts its disposal process on behalf of the United States in accordance with the provisions of subtitle I of Title 40 of the United States Code.

11.2       The Parties agree that if the United States sells or transfers ownership of the Federal Helium System to a non-federal entity, the United States will, subject to applicable law at the time of sale or transfer, including but not limited to subtitle I of Title 40 of the United States Code, require as a condition of sale or transfer, that (i) the Purchaser or transferee, it successors and assigns, will take the Federal Helium System subject to Person's ownership interest in its Primary Private Helium stored in the Federal Helium System; (ii) the Purchaser, its

successors and assigns, will assume the obligations of the United States under this Contract to deliver Primary Private Helium stored in the Federal Helium System; and (iii) the Purchaser, its successors and assigns, or transferee will allow Person to withdraw all of Person's Primary Private Helium stored in the Federal Helium System subject to the terms and conditions of this Contract. Upon sale or transfer of ownership of the Federal Helium System to the Purchaser, this Contract will be assigned to the Purchaser subject to the terms and conditions of this Contract.

Person agrees to release the United States from any and all performance obligations under the Contract upon Conveyance of the Contract to the Purchaser.

ARTICLE XII

Assignment of Contract

12.1      This Contract and all terms, conditions, and the covenants hereof, will be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. If a party makes an assignment, they must notify the other party in writing 30 days in advance.

12.2      Assignment of Contract by Person.

(a)      Person will have the right to transfer title to any part of their Primary Private Helium stored in the Federal Helium System or Helium System, as applicable as provided for in this Contract. Title may be transferred to any party that is in good standing and holds an equivalent helium storage Contract with the United States or Purchaser as applicable. Any transfer of Secondary Private Helium is not covered by this Contract and will require a separate independent contract with Purchaser.

(b)      If Person is acquired by or merges with another entity holding a helium storage Contract with the United States or Purchaser, Person agrees that all fees under this Contract will continue until this Contract is terminated pursuant to Article X or the two Contracts are replaced by one Contract between the United States or Purchaser and the entity resulting from the merger.

12.3      Assignment of Contract by United States

(a)      The United States will transfer this Contract to Purchaser upon Conveyance of the Federal Helium System and Purchaser shall fully assume and be responsible for delivery of Primary Helium as contemplated and provided for in this Contract during the term of this Contract.

ARTICLE XIII

Disputes

13.1      **This section only applies to disputes between the United States and Person**. Any dispute concerning a question of fact or law arising under this Contract, while the United States is a party to the Contract, which is not disposed of by agreement will be decided by the Authorized Officer, who will render a decision and serve a copy thereof on Person. If Person disagrees with the Authorized Officer's decision, Person and the United States agree to incorporate the administrative review procedures of 43 C.F.R. 3165.3(b), and Person may appeal the Authorized Officer's decision to the State Director of the BLM State Office having jurisdiction over the Authorized Officer. Pending a final non-appealable decision of a dispute hereunder, both parties will proceed diligently with the performance of their obligations under this Contract and in accordance with the Authorized Officer's decision pursuant to this section 13.1.

13.2      **This section only applies to disputes between the Purchaser and Person**. Any disputes that arise after the Government Assignment and Conveyance will be disposed of strictly between Purchaser and Person whether by mutual written agreement or by seeking legal redress in the appropriate federal or state judicial forum. Person understands, acknowledges, and agrees that the United States shall no longer be a responsible party to either Purchaser or Person after Government Assignment and Conveyance and shall not be made a party any

dispute or judicial proceeding pursuant to this Section 13.2.

ARTICLE XIV

Section 889 Disclosure and Certification

Section 889(a)(1)(B), Prohibition of Certain Telecommunications and Video Surveillance Services or Equipment of the Fiscal Year 2019 National Defense Authorization Act (Pub. L. 115-232) ("Section 889 Part B"), prohibits Contracts on or after August 13, 2020, between the Federal Government and any entity that uses certain covered telecommunications and surveillance equipment from five (5) identified Chinese national corporations.

By signature of this Contract, Person hereby certifies that their entity is in compliance with Section 889, Prohibition of Certain Telecommunications and Video Surveillance Services or Equipment of the Fiscal Year 2019 National Defense Authorization Act (Pub. L. 115- 232). Person specifically represents that it does not use covered telecommunications equipment or services, or use any equipment, system or service that uses covered telecommunications equipment or services. The statute prohibits Contracting by the Government with an entity that uses certain telecommunications equipment or services produced by the below entities, companies, affiliates, or subsidiaries:

· Huawei Technologies Company · ZTE Corporation · Hytera Communications Corporation ·Hangzhou Hikvision Digital Technology Company · Dahua Technology Company

The prohibition of use of these telecommunications equipment or services applies regardless of whether or not that usage is related to the terms and conditions of this Contract and the certification extends until closing of the transaction as specified herein. This section will no longer apply after the Conveyance to Purchaser.

ARTICLE XV

Complete Agreement

15.1   This Contract constitutes the complete agreement between the United States or Purchaser, as applicable, and Person, and there are no oral promises, prior agreements, understandings, obligations, warranties, or representations between the United States or Purchaser, as applicable and Person relating to this Contract other than those set forth herein or as amended.

ARTICLE XVI

Notices

16.1      Prior to the Conveyance, all notices required under this Contract will be served by certified mail, return receipt requested, at the following addresses:

United States:        Authorized Officer

                      Field Manager–Amarillo Field Office

                      U.S. Bureau of Land Management 801 South Fillmore Street, Suite 500 Amarillo, Texas 79101-3545

Person:        _____

16.2      After the Conveyance, all notices required under this Contract will be served by certified mail, return receipt requested to **Purchaser's Representative, address to be provided to Person before the Conveyance.**

Article XVII

Execution

17.1 This Contract may be executed in duplicate original counterparts, and it will not be necessary for each party hereto to execute the same counterpart.


EXECUTED as of the dates adjacent to the signature lines, but effective as of 8:00 a.m., October 1, 2021.

THE UNITED STATES OF AMERICA

Date: _____      By: _____

Title:    Field Manager–Amarillo Field Office


PERSON: _____

Date: _____      By: _____

Title:

## Attachment N-1
### Amendment No. 1 to CONTRACT NO. 2022-
### CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

Between

and the

## UNITED STATES OF AMERICA

The above identified Contract is amended as set forth below.

Article II, Section 2.2 succeeding "Person receiving Transfer Helium must remove the received Transfer Helium within the month when Person's account is credited, or the Transfer Helium will revert to Secondary Private Helium for person receiving the transfer," add, "unless Person is prevented from removing Transfer Helium by the United States or Purchaser due to helium not being made available to Person, or Force Majeure, and Person and United States or Purchaser will negotiate a delivery schedule for such Transfer Helium in the following month or months."

Other than the foregoing modifications, no other term or condition of this Contract is amended hereby.

ACCEPTED AND AGREED:

Date: _____          By: _____          THE UNITED STATES OF AMERICA
_____

Title:     Field Manager–Amarillo Field Office

PERSON: _____

Date: _____          By: _____

Title:

# Attachment N-2

Amendment No. 2 to CONTRACT NO. 2022-
CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

Between

and the

UNITED STATES OF AMERICA

The above identified Contract is amended as set forth below.

Preamble, second paragraph, preceding, *"Purchaser of the Federal Helium System upon Federal conveyance of the Federal Helium System to private ownership,"* insert, *"Real Property"*.

All uses of the term *"Purchaser"* within this Contract and Amendment #1 should be replaced with *"Real Property Purchaser"*.

Article I, Definitions, succeeding paragraph "*1.29"*, add

"1.30 Bcf – The Term means one billion (1,000,000,000) standard cubic feet.

*1.31  Helium Lot #1 – The term means the 1 Bcf of helium in the Federal Helium Reserve sold to a private entity (also, a "Person") in a separate transaction as part of the sale of the Federal Helium System. Helium Lot #1 does not constitute Primary Private Helium.*

*1.32  Real Property Purchaser's Helium – The term means the 0.8 Bcf of helium purchased during the sale of the Federal Helium System by the Real Property Purchaser. Real Property Purchaser's Helium does not constitute Primary Private Helium.*

*1.33  Priority Access – The term means the right for Purchaser of Helium Lot #1 and Real Property Purchaser to withdraw helium in times of shortage. Purchaser of Helium Lot #1 has an 11 percent Priority Access right and Real Property Purchaser has 9 percent Priority Access right."*

Section 1.3, second paragraph, succeeding, "Allocation will be calculated as a percentage of the remaining delivery capacity" insert, "(minus the 11 percent Priority Access for Helium Lot #1, and the 9 percent Priority Access for Real Property Purchaser's Helium)"

Section 1.11, succeeding, "*Federal Helium Reserve"*, insert *"as defined in 50 U.S.C. §167(3)), less Helium Lot #1;"*

Section 1.17 succeeding, "*Federal Helium Reserve*" insert "*, less Helium Lot #1"*

Section 1.18, succeeding, "*the Helium Reserve"* insert "*, less Helium Lot #1"*

Section 1.24 for purposes of this section all references to "*Purchaser*" should be made plural and refer to Purchaser of Helium Lot #1 and Real Property Purchaser.

Section 2.4 preceding, "*to receive Purchaser's New Helium*" insert *"and Purchaser of Helium Lot #1"*.

Section 2.4 (b) second sentence, replace "*is*" with "*of Helium Lot #1 and Real Property Purchaser are*". Add, "*collectively*" at the end of the second sentence.

Article II, Section 2.8, for purposes of this section all references to "*Purchaser*" should be made plural and refer to Purchaser of Helium Lot #1 and Real Property Purchaser. All references to "*Purchaser's New Helium*" should be made plural.

Article IV, Section 4.1(c) preceding, "*Transportation and Storage Fees*" add "*Prior to the Convenance.*" Succeeding the formula for "*ST*", insert (before "*Where*")

"After the conveyance, Transportation and Storage Fees. The transportation and storage fees will be calculated at the beginning of the Fiscal Year according to the following formula:

$$TR\ (\$/Mcf) = \frac{0.8\ (B)}{(sf \times S) + A + D}$$

*and*

$$ST\ (\$/Mcf) = sf \times TR$$

After the conveyance, the Transportation and Storage Fees will be reduced to 80 percent because Purchaser of Helium Lot #1 and Real Property Purchaser are responsible for the remaining 20 percent."

ST: delete "*prior to the conveyance*".

Section 4.2(a) preceding, "*(and not included in the fees identified in paragraph 4.1)*," insert "*or Real Property Purchaser*".

Section 4.3(a) preceding " $\frac{HV}{HV+NV}$ = *HP*" add "*0.75 x*".

Other than the foregoing modifications, no other term or condition of this Contract is amended hereby.

ACCEPTED AND AGREED:

THE UNITED STATES OF AMERICA
Date: _____      By: _____

Title:        Field Manager–Amarillo Field Office

Person: _____

Date: _____      By: _____

Title: _____

# Attachment O
## ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF
## 2022-2027 CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM
## WITHOUT WARRANTY

STATE OF TEXAS       )

                           **KNOW ALL BY THESE PRESENTS:**

COUNTY OF POTTER    )

**THIS ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY,** (hereinafter referred to as the " Contracts for the Storage and Delivery of Helium Assignment") is made this ___ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Assignee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties (the "Parties").

**I. STORAGE CONTRACTS BEING ASSIGNED**

The Contracts for the Storage and Delivery of Helium being assigned pursuant to this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty are all Contracts for the Storage and Delivery of Helium which are attached hereto, marked "**Attachment 1**", all of which are hereby incorporated and made a part hereof.

**II. CONSIDERATION**

The consideration in favor of the Government given by the Assignee for this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty is the following:

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

       (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

       (ii) the QUITCLAIM DEED (Satanta, Kansas); and

       (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

       (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

       (v) the ASSIGNMENT OF CRUDE HELIUM  PIPELINE RIGHT-OF-WAY EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

       (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

       (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

3.  The specific covenants and agreements of the Assignee, for itself, and on behalf of its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Contracts for the Storage and Delivery of Helium Assignment.

**III. ASSIGNMENT WITHOUT WARRANTY**

As a material part of the Consideration for this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty, Assignee, for itself, and its successors and assigns, covenants, and agrees that Assignee is taking the Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty, hereinafter identified and attached hereto in return for the specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take

subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth each of the Contracts for the Storage and Delivery of Helium which are attached hereto, marked Attachment 1, and which are all hereby incorporated by reference and made a part hereof. Assignee, for itself, and its successors and assigns, further  covenants, and agrees that Assignee is taking each and all of the Contracts  for the Storage and Delivery of Helium "AS IS", with all latent and patent defects and that there is no warranty by the Government, that the Contracts for the Storage and Delivery of Helium do not have a particular financial value, nor is fit for a particular purpose. Assignee, for itself, and its successors and assigns, acknowledges, and stipulates that Assignee is not relying upon any representation, statement, or other assertion with respect to the condition of the Contracts for the Storage and Delivery of Helium but is relying upon Assignee's own examination of all identified for the Storage and Delivery of Helium. Assignee takes all  Contracts for the Storage and Delivery of Helium with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.

## IV.  ASSIGNEE ASSUMPTION OF ALL STORAGE CONTRACTS OBLIGATIONS

Assignee, for itself, and its successors and assigns, further specifically assumes, and agrees to perform all Servicer's obligations described in each of the identified Contracts for the Storage and Delivery of Helium existing on this date.

## V.  ASSIGNEE INDEMNITY OF GOVERNMENT

Assignee, for itself, and its successors and assigns, will indemnify, defend, and hold Government harmless from any loss, attorney's fees, expenses, or claims arising out of or related to Assignee's failure to perform any of the obligations of the Government under any of the identified Contracts for the Storage and Delivery of Helium existing on this date.

## VI.  LIMITATIONS

Nothing in this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty is intended to conflict with current law, regulation, directive, or policy of any Party.  If any provision of this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty is inconsistent with any such authority, then that provision is deemed to be invalid and subject to modification upon concurrence of the Parties and the remaining terms and conditions of this Assignment and Assumption of Obligations of System Contracts for the Storage and Delivery of Helium, Without Warranty will continue in full force and effect.  This Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty is not intended and should not be construed to create any right or benefit, substantive or procedural, enforceable at law or in equity, by Assignee or any third-party against the United States of America, or any of its employees.

## VII.  SIGNATORIES

The Secretary of the Department of Interior, Bureau of Land Management, or another agency official with the appropriate delegated authority, must execute this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty to be effective.  Assignee's signatory to this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty must have full authority to bind Assignee, its successors and assigns, with regard to all matters relating to this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty. Government and Assignee may use an electronic signature or an electronic record, as those terms are defined in 15 U.S.C. § 7006, to assent to the terms of this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty, and this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty may not be denied legal effect, validity, or enforceability solely because such an electronic signature or electronic record was used in its formation.

## VII.  COUNTERPARTS

This Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty may be executed in counterparts, each of which will be deemed to be a duplicate original, and which together will constitute one and the same instrument.

## VII. INTEGRATION AND MERGER

This Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty sets out all the terms, conditions and agreements of the Parties and supersedes any previous understandings or agreements regarding the donation, whether oral or written.  No modification or amendment of this Assignment and Assumption of Obligations of  Contracts for the Storage and Delivery of Helium, Without Warranty will be effective unless in writing and signed by all Parties.

## IX.  VALIDITY OF PARTS

If any provision of this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty is declared to be invalid by a federal court of competent jurisdiction, the remaining provisions will continue in full force.

**X. NO PUBLIC OFFICIALS TO PARTICIPATE OR BENEFIT**

No member or delegate to the United States Congress, or officers or employees of the United States of America may be admitted to any share or part of this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty, or to any benefit that may arise therefrom; provided, however, that this provision will not be construed as extending to any person who may be a shareholder or other beneficial owner of any publicly held corporation or other publicly held entity, if this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty is for the general benefit of such corporation or other entity.

**XI. EFFECTIVE DATE**

This Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty will become effective when all the Parties have signed it. The date this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty is signed by the last Party to sign it (as indicated by the date stated opposite that Party's signature) will be deemed to be the effective date of this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty.

    **IN WITNESS WHEREOF**, the Parties to this Assignment and Assumption of Obligations of Contracts for the Storage and Delivery of Helium, Without Warranty have caused these presents to be executed this ___ _____ day of _____, 2022.

**UNITED STATES OF AMERICA**

Acting by and through the Secretary of the Department of Interior,

Bureau of Land Management

By:

**ATTACHMENT 1 (will be provided to winning bidder)**

**THE FEDERAL HELIUM RESERVE CONTRACTS FOR STORAGE**

**AND DELIVERY OF HELIUM**

# Attachment P
## BILL OF SALE OF APPROXIMATELY ONE BILLION CUBIC FEET (1.0 Bcf), MORE OR LESS, OF  GOVERNMENT-OWNED CRUDE HELIUM, WITHOUT WARRANTY

**STATE OF TEXAS**           )

**COUNTY OF POTTER**    )

**KNOW ALL BY THESE PRESENTS:**

**THIS BILL OF SALE OF APPROXIMATELY 1.0 Bfc, MORE OR LESS, OF GOVERNMENT-OWNED CRUDE HELIUM WITHOUT WARRANTY** (hereinafter referred to as the "Bill of Sale") is made this __ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended, and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Grantee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties.

**I. CONSIDERATION**

A. The consideration in favor of the Government given by Grantee for this Bill of Sale is the following:

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Grantee; and,

2. Acceptance, execution, and delivery to the Government of Storage Contract , attached hereto, marked, **Attachment "1",** which is hereby incorporated into this Bill of Sale and made a part hereof; and,

3. The specific covenants and agreements of the Grantee, for itself and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Bill of Sale.

**II. CONVEYANCE WITHOUT WARRANTY OF GOVERNMENT-OWNED CRUDE HELIUM**

A.  For the consideration specified by Section I, above, the Government hereby conveys to Grantee, its successors and assign, without warranty of any nature whatsoever, all right, title, and interest in and to all the Government owned crude helium located on and under the Federal National Helium Reserve, Cliffside Field, Potter County, Texas, amounting to approximately 1.1bfc, more or less  (the Crude Helium"), subject to the exceptions hereinafter set forth.

B.  **CRUDE HELIUM DELIVERY AND CONDITION IS WITHOUT WARRANTY, "AS IS", "WHERE IS"**

**As a material part of the Consideration for this Bill of Sale, Government and Grantee mutually covenant and agree that Grantee is taking the Crude Helium "WITHOUT WARRANTY", "AS IS"," WHERE IS" with all latent and patent defects and that there is no warranty by Government that the Crude Helium has a particular financial value nor is fit for a particular purpose. Grantee acknowledges and stipulates that Grantee is not relying upon any representation, statement, or other assertion with respect to the condition of the Crude Helium but is relying upon Grantee's own examination of the Government's records identifying and describing the Crude Helium. Grantee takes the Crude Helium with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.**

**IN WITNESS WHEREOF**, the United States of America has caused these presents to be executed this ___ _____day of _____, 2022.

**UNITED STATES OF AMERICA**

Acting by and through the Administrator of the Department of Interior,

Bureau of Land Management

By:

# Attachment P1
## 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

BETWEEN

THE UNITED STATES OF AMERICA DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

AND

THE PURCHASER OF HELIUM LOT #1

**(This Contract will be Assigned by Government
to Real Property Purchaser of the Federal Helium System
under Agreements, Terms and Conditions Hereinafter Provided.)**

Table of Contents

| | | Page |
|---|---|---|
| ARTICLE I | Definitions | 2 |
| ARTICLE II | Acceptance and Delivery of Helium-Gas Mixtures | 8 |
| ARTICLE III | Effective Date, Term, and Existing Agreements | 10 |
| ARTICLE IV | Fees | 11 |
| ARTICLE V | Billing and Payment | 13 |
| ARTICLE VI | Measurement | 14 |
| ARTICLE VII | Overdrawn | 17 |
| ARTICLE VIII | Right of Access | 18 |
| ARTICLE IX | Liability and Force Majeure | 18 |
| ARTICLE X | Termination | 19 |
| ARTICLE XI | Disposal of Federal Helium System | 20 |
| ARTICLE XII | Assignment of Contract | 21 |
| ARTICLE XIII | Disputes | 22 |
| ARTICLE XIV | Section 889 Representations and Certifications Contract | 22 |
| ARTICLE XV | Complete Agreement | 23 |
| ARTICLE XVI | Notices | 23 |
| ARTICLE XVII | Execution | 24 |

CONTRACT NO. 2023-_____

CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

Between

THE PURCHASER OF HELIUM LOT #

and the

UNITED STATES OF AMERICA

     This Contract is made between _____ _____ (hereinafter called "Person", as defined in the Helium Stewardship Act, 50 U.S.C. §167 or "Purchaser of Helium Lot #1"), a corporation organized and existing under the laws of the State of _____, with its principal offices at _____ _____, and the United States of America (hereinafter called "United States" or "Government"), acting through the Bureau of Land Management (BLM) of the Department of the Interior. The executing parties to this Contract are hereinafter jointly referred to as the "Parties".

     The Parties jointly understand, acknowledge, and agree that this Contract will be assigned by the Government to the Real Property Purchaser of the Federal Helium System upon Federal conveyance of the Federal Helium System to private ownership under the terms and conditions hereinafter provided as required under the provisions of the Helium Stewardship Act, 50 U.S.C. §167d(d), as amended.

This contract between the Purchaser of Helium Lot #1 and the United States is independent from any FY 2022-2027 Storage Contract that Person may also have. Purchasers' New Helium will be treated separately from any Primary Private Helium owned by any Original Storage Contract Holder and in accordance only with the terms of this contract. In consideration of the mutual promises and covenants contained herein, the United States and Person agree as follows:

ARTICLE I
Definitions

1.1    "Acceptance/Delivery Point" - The term means any pipeline tap or connection to the Federal Helium Pipeline owned by Person prior to the Government Assignment and Conveyance of the Federal Helium System to the Purchaser and any pipeline tap or connection to the Helium Pipeline owned by Person after the Conveyance.

1.2    "Allocable gas" - The term means the volume of helium used in making allocation calculations for the Original Storage Contract Holders.

1.3    "Allocation" - Purchaser of Helium Lot #1 does not have an allocation under this contract but this term is included here because Person's priority access rates relate to the Original Storage Contract Holders' allocations.

The term means that prior to the Government Assignment and Conveyance of the Federal Helium System to the Real Property Purchaser, in the event of a shortage, or any time the delivery of helium must be divided among Original Storage Contract Holders, the Authorized Officer will allocate the remaining delivery capacity of the Federal Helium System, after the needs of Federal users have been

met, among all Original Storage Contract Holders storing helium in the Federal Helium System. Allocation during government ownership of the Federal Helium System will be calculated as a percentage of the remaining delivery capacity of the Federal Helium System according to the proportion of each Original Storage Contract holder's stored volume of Primary Private Helium to the total volume of Primary Private Helium stored by all Original Storage Contract Holders. Allocation will be calculated as of 8 a.m. Central Time on October 1, 2021, and annually each year after on October 1. The total volume of Primary Private Helium will not include the volumes of Helium Lot #1 and Real Property Purchaser's Helium. The Authorized Officer may, in his sole discretion, change the allocation method when technical or operational considerations make such changes necessary or appropriate, but the Authorized Officer will notify all storage Contract Holders before making any such change.

The term "Allocation" also applies after the Government Assignment and Conveyance to the Real Property Purchaser in the event of a shortage. Allocation will be calculated as a percentage of the remaining delivery capacity of the Helium System (minus the 11 percent Priority Access for Helium Lot #1, and the 9 percent Priority Access for Real Property Purchaser's Helium) according to the proportion of each Original Storage Contract holder's stored volume of Primary Private Helium to the total volume of Primary Private Helium stored by all Original Storage Contract Holders. Allocation will be calculated as of 8 a.m. Central Time each year annually on October 1. The Real Property Purchaser's Representative may, in his sole discretion, change the allocation method when technical or operational considerations make such changes necessary or appropriate, but the Real Property Purchaser's Representative will notify all storage Contract holders before making any such change. If changing the allocation method, Real Property Purchaser cannot change the definition of Primary Private Helium or the restriction that the allocation must be based only on volumes of Primary Private Helium, which does not include the volumes of Helium Lot #1 and the Real Property Purchaser's Helium.

In event of a shortage, Purchaser of Helium Lot #1 is assigned an 11 percent priority access right. The priority access right is independent from the allocation calculations under the Original Storage Contracts.

See 1.2 Allocable Gas, 1.22 Purchaser's New Helium, 1.33 Priority Access, 2.3 Delivery of Helium by United States or Real Property Purchaser, and 2.7 Shortages After Conveyance- for more information. If the Conveyance occurs in the middle of a fiscal year, the Allocation calculation for the Original Storage Contract Holders from October 1 of that year remains in effect until the next October 1.

1.4      "Authorized Officer" - The term means the person authorized to act on behalf of the BLM in approving, revising, managing, and terminating this Contract prior to the Conveyance of the Federal Helium System to Purchaser.

1.5      "Contained helium" - The term means the amount of helium in a "Helium-gas mixture."

1.6      "Contract Year" - The term means a period of time beginning at 8 a.m. Central Time on October 1 and ending at 8 a.m. Central Time on October 1 of the following year.

1.7      "Conveyance" - The term means the Government conveyance of all, right, title, interest, and obligations in and to the Federal Helium System to the Real Property Purchaser as required under the provisions of the Helium Stewardship Act, 50 U.S.C. §167d(d), as amended.

1.8      "Day" - The term means a period of twenty-four (24) consecutive hours beginning at 8 a.m. and ending at 8:00 a.m. Central Time the succeeding day.

1.9       "Existing Agreement" - The term means any written agreement between the United States and Person for any helium storage, delivery, or transportation services in or related to the Federal Helium System that is in effect as of the date that both Person and the United States have executed this Contract.

1.10     "Federal Helium Pipeline" - The term means the Federally owned pipeline system through which helium may be transported. The Federal Helium Pipeline extends from the vicinity of Bushton, Kansas, to the Cliffside Field, with lateral extensions to various helium extraction plants connected to said pipeline used or designed for the purpose of gathering and transporting the helium-gas mixture to and from the Bush Dome, Cliffside Field, near Amarillo, Texas.

1.11     "Federal Helium System" - The term means (A) the Federal Helium Reserve, as defined in 50 U.S.C. § 167(3); (B) the Cliffside Field; (C) the Federal Helium Pipeline; and (D) all other infrastructure owned, leased, or managed under Contract by the Secretary for the storage, transportation, withdrawal, enrichment, purification, or management of helium.

1.12     "Force Majeure" - The term means acts of God, acts of public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, civil disturbances, explosions, breakage or accident to machinery or equipment, perforation or breakage of lines of pipe (whether caused by nature or act of a third party), freezing of wells or lines of pipe, partial or entire failure of gas wells or pressure protection devices, inability to obtain materials, supplies, or permits, and any laws, orders, rules, regulations, acts, or restraints of any government or governmental body of authority whether civil or military and any other cause, whether of the kind herein enumerated or otherwise, in each case, whether enumerated herein or otherwise, that is not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to avoid.

1.13     "Government Assignment" - The term means the action by the Government called for under Article II below to assign to Real Property Purchaser this Contract as part of the Conveyance to Real Property Purchaser of the Federal Helium System.

1.14     "Helium-gas mixture" - The term means the gaseous product contained in the Federal Helium System which is comprised predominantly of helium together with other chemical constituents of natural gas.

1.15     "Helium Pipeline" – The term means the pipeline system owned by the Purchaser after the Government Assignment and Conveyance through which helium may be transported. The Helium Pipeline will extend from the vicinity of Bushton, Kansas, to the Cliffside Field, with lateral extensions to various helium extraction plants connected to said pipeline used or designed for the purpose of gathering and transporting the helium-gas mixture to and from the Bush Dome, Cliffside Field, near Amarillo, Texas.

1.16     "Helium Reserve" – The term means the Federal Helium Reserve after Government sells, assigns, and conveys all title and rights to the Federal Helium System to the Purchaser.

1.17     "Helium System" - The term means (A) the Federal Helium Reserve, less Helium Lot #1, (B) the Cliffside Field; (C) the Helium Pipeline; and (D) all other infrastructure owned by Real Property Purchaser after Government Assignment and Conveyance to Real Property Purchaser and managed under this Contract by Real Property Purchaser's Representative for the storage, transportation, withdrawal, enrichment, purification, or management of helium.

1.18    "Mcf" - The term means one thousand (1,000) standard cubic feet.

1.19    "Metering facility" - The term means the meter run, gas chromatograph, electronic flow computer and associated equipment at the Acceptance/ Delivery point on the Federal Helium Pipeline or Helium Pipeline.

1.20    "Month" – The term means a period of time beginning at 8:00 a.m. Central Time on the first day of a calendar month and ending at 8:00 a.m. Central Time on the first day of the succeeding calendar month.

1.21    "Original Storage Contract Holders" - The term means all Storage Contract Holders who entered into Contracts for the Storage and Delivery of Helium with the BLM in August or September of 2021.

1.22    "Primary Private Helium" - The term means the total of all privately owned helium stored by Original Storage Contract Holders in the Federal Reserve prior to October 1, 2022. Purchaser of Helium Lot #1 does not have any Primary Private Helium under this contract but this term is included here because it is used in the calculation of fees.

1.23    "Purchasers' New Helium" - The Term means the helium purchased in Lot #1, and Real Property Purchaser's helium purchased as a part of the 2023 sale of the Federal Helium System. In times of shortage, Purchaser of Helium Lot #1 has the right to withdraw 11 percent and Real Property Purchaser has the right to withdraw 9 percent of the total crude helium production per day of Purchaser's New Helium. Purchaser of Helium Lot #1 may transfer their 11 percent priority access right of the total crude helium production per day to an Original Storage Contract Holder if Person transfers the equivalent amount of helium to the Original Storage Contract Holder. If Purchasers of New Helium do not use or transfer their priority access right for delivery for a specific month, that month's priority access right for delivery would be converted to an allocation and distributed amongst the other Original Storage Contract Holders. For any day the Helium System is shut down, and Purchaser of Helium Lot #1 does not receive its 11 percent priority access right of the total crude helium production for that day, Purchaser's New Helium priority access right does not apply and does not carry over.

1.24    "Real Property Purchaser" - The term means the Party, its successors, and assigns, that is the Government's successor in title for the Real Property Portions of the Federal Helium System. The term also means the Government Assignee of this Contract effective as of the date of Conveyance of the Real Property Portions of the Federal Helium System.

1.25    "Real Property Purchaser's Representative" - The term means the person authorized to act on behalf of the Real Property Purchaser, its successors or assigns, in approving, revising, managing, and terminating this Contract as the Assignee of this Contract after the Government Assignment and Conveyance of the Federal Helium System to the Real Property Purchaser as required under the provisions of the Helium Stewardship Act, 50 U.S.C. §167d(d), as amended.

1.26    "Required rate of withdrawal" - The term means a withdrawal rate assigned to Person by the Authorized Officer prior to Conveyance or by Real Property Purchaser's Representative after the Government Assignment and Conveyance of the Federal Helium System. This rate is equivalent to the allocated rate calculated as described in 1.3 for the Original Storage Contract Holders and is 11 percent for the Purchaser of Helium Lot #1.

1.27    "Secondary Private Helium" - The term means any helium added via pipeline to the Federal Helium System after September 30, 2022, by an Original Storage Contract Holder not intended for transfer (see definition of Transfer Helium). After September 30, 2022, any Transfer Helium added by Person that is not removed within one month will be reclassified as Secondary Private Helium for Person. Secondary Private helium will be excluded from these storage Contract terms and Person must negotiate a separate storage and delivery contract with Purchaser. Any Secondary Private Helium added between September 30, 2022, and the Conveyance will be safeguarded and tracked, totaled, and documented by Government until Conveyance.  Government will provide Person with Person's balance of Secondary Private Helium on a monthly basis prior to the Conveyance. Government will provide Person and Purchaser with Person's balance of Secondary Private Helium at the time of Conveyance. After the Conveyance, Person should immediately enter a contract for storage and delivery of Secondary Private Helium with Purchaser.  Person may only withdraw Secondary Private Helium under the terms of this Contract prior to the Conveyance if the Federal Helium System is not under allocations, Person has withdrawn all of their Primary Private Helium, and has Secondary Private Helium that they wish to withdraw. Purchaser of Helium Lot #1 does not have the right to add helium and this term is included only to explain what happens to Transfer Helium added by Person that is not removed within one month.

1.28    "Standard cubic foot" - The term means the volume of helium-gas mixture or contained helium, as applicable, which occupies the space in one cubic foot when at a temperature of 60 degrees Fahrenheit and at an absolute pressure of 14.65 pounds per square inch.

1.29    "Transfer Helium" - The term means helium that is added to the Federal Helium System or Helium System after September 30, 2022, with the intention of being transferred one month. Transfer Helium is not considered Primary Private Helium. The intention for transfer must be sufficiently documented to satisfy the BLM or Purchaser that the helium will be withdrawn. After September 30, 2022, if the transfer of Transfer Helium is not completed within one month, it will be reclassified as Secondary Private Helium for the Person adding it. If the Person receiving the helium does not remove it within the month when it is assigned, it will also become reclassified as Secondary Private Helium.

1.30    "Bcf" - The Term means one billion (1,000,000,000) standard cubic feet.

1.31    "Helium Lot #1" - The term means the 1 Bcf of helium in the Federal Helium Reserve sold to a private entity (also, a "Person") in a separate transaction as part of the sale of the Federal Helium System. Helium Lot #1 does not constitute Primary Private Helium.

1.32    "Real Property Purchaser's Helium" - The term means the 0.8 Bcf of helium purchased during the sale of the Federal Helium System by the Real Property Purchaser. Real Property Purchaser's Helium does not constitute Primary Private Helium.

1.33    "Priority Access" - The term means the right for Purchaser of Helium Lot #1 and Real Property Purchaser to withdraw helium in times of shortage. Purchaser of Helium Lot #1 has an 11 percent Priority Access right and Real Property Purchaser has 9 percent Priority Access right."

ARTICLE II
Acceptance and Delivery of Helium-Gas Mixtures

Pursuant to 50 U.S.C. 167d(d), as amended, the BLM reported the Federal Helium System as excess property for disposal to the General Services Administration (GSA) on September 24, 2021, to be disposed of in accordance with the provisions of Title 40 of the United States Code. The Government

Assignment and Conveyance to Real Property Purchaser of the Federal Helium System, is projected to occur prior to September 30, 2024. At the time of the Conveyance, the United States will assign this storage contract to the Real Property Purchaser.

2.1     Storage by the United States and Real Property Purchaser.

The United States or Real Property Purchaser, as applicable, agrees to store and deliver the helium of Purchaser of Helium Lot #1 in accordance with the 11 percent priority access right during times of shortage. This contract does not give the Purchaser of Helium Lot #1 the right to add and store any additional helium in the Federal Helium System or Helium System. However, Person may use the Federal Helium System or Helium System for transfers to other storage Contract holders with any transferred helium becoming Secondary Private Helium for the party accepting it, if it is not withdrawn within the same month as the transfer.

2.2     Transfer Helium for Purchaser of Helium Lot #1

The Helium Purchaser of Lot #1 is permitted to negotiate private agreements utilizing the Federal Helium System for transfers with other storage Contract holders in good standing. Person's 11 percent priority access right for withdrawal does not transfer with the helium unless it is delivered in the month of the transfer. If any of Purchaser's New Helium is not delivered in the month of transfer, it becomes Secondary Private Helium consistent with the terms of the Original Storage Contracts and is not factored into future allocation calculations for the transfer recipient.

2.3     Delivery of Helium by the United States or Real Property Purchaser

The United States and Real Property Purchaser, as applicable, agree to deliver to Person during the term of this Contract as much of the volume of Helium Lot #1 owned by the Person and stored by the United States in the Federal Helium System or stored by Real Property Purchaser in the Helium System, as applicable, that Person requests. Delivery is subject to any allocations in place, all terms and conditions of this Contract, the limitations of the Federal Helium System or the Helium System to deliver, and the rights of the other Original Storage Contract Holders within the Federal Helium System or the Helium System, as applicable.

    (a)        Allocations for Original Storage Contract Holders are calculated on October 1 each year based on amount of Primary Private Helium in the Federal Helium System or Helium System, as applicable and do not include the amount of helium in Helium Lots #1 and Real Property Purchaser's helium. The last allocation calculated prior to the Conveyance will remain in effect until it is recalculated the subsequent October 1 after the Conveyance.

    (b)        Purchasers' New Helium and all Original Storage Contract Holders' Secondary helium is not included in allocation calculations.

    (c)        Once this contract is executed, Purchaser of Helium Lot #1 may request delivery of helium per the terms of this contract.

    (d)        In times of shortage, Purchaser of Helium Lot #1, is guaranteed a priority access right of 11 percent of the total crude production per day.

(e)         The Real Property Purchaser's Representative will allocate the remaining delivery capacity of the Helium System among the Original Storage Contract Holders per their Storage Contracts.

(f)         Upon Conveyance, the Parties understand, acknowledge, and agree that the United States has no obligation to facilitate or ensure delivery by the Real Property Purchaser of Purchaser's New Helium. Real Property Purchaser will be bound to the delivery terms and fees described in this Contract for Purchaser's New Helium during the term of this Contract.

(g)         Purchaser's New Helium will be delivered to Person at Person's Acceptance/ Delivery Point where the Federal Helium Pipeline or Helium Pipeline is connected with a line that goes to Person's facilities, and in a helium-gas mixture containing not less than 50 percent helium by volume, and at the pressure existing in the system at the time and at the point of delivery, and will be delivered under conditions that permit suitable measurement and analysis specified by Article VI.

2.4      Title to Helium

The Parties agree that upon delivery to Person of Purchaser's New Helium stored under this Contract, title to all constituents of the helium-gas mixture delivered to Person will pass to Person at the point of delivery.

2.5      Person's Estimates of Requests for Delivery.

Person will provide estimates to the Authorized Officer or Real Property Purchaser's Representative, as applicable, of all volumes Person plans to request from the Federal Helium System or Helium System as follows:

(a)         Person agrees that, it will advise the Authorized Officer or Real Property Purchaser's Representative, as applicable, annually on October 1 each year of the volume of stored Primary Private Helium of which it expects to request delivery during the Contract Year beginning on October 1 of that year, so that the United States or Real Property Purchaser may estimate the total volume of helium which the United States or Real Property Purchaser, as applicable, may need to deliver from the Federal Helium System or Helium System during each Contract Year.

(b)         On or before the twentieth day of each calendar month, Person will notify the Authorized Officer or Real Property Purchaser's Representative, as applicable, of any changes to the estimated volume of stored Purchaser's New Helium of which Person expects to request delivery during the succeeding calendar month.

(c)         If Person fails to provide the information required under paragraph (a) or paragraph (b) of this section at the time required, Person agrees to pay $2,000 in liquidated damages to compensate the United States or Real Property Purchaser's Representative, as applicable, for its administrative costs.

2.6      Shortages.

If the Authorized Officer or Real Property Purchaser's representative, as applicable, believes that the delivery capacity of the Federal Helium System or Helium System is inadequate to meet the total expected delivery requirements (referred to as a "shortage") the Purchaser of Helium Lot #1 has the

right to remove 11 percent priority access of the total crude production from the Cliffside gas field per day of Purchaser's New Helium, each day that the plant is in production. The Real Property Purchaser's Representative will also subtract the 9 percent priority access for Real Property Purchaser and then allocate the remaining delivery capacity of the Helium System to the Original Storage Contract Holders consistent with their contracts.

2.7     Notification of times when Person's plant is unable to accept deliveries.

Person agrees to notify the United States or Real Property Purchaser's Representative, as applicable, of all scheduled plant turnarounds and/or major unscheduled plant problems that affect the operations of the Federal Helium System or the Helium System or any other operational events that may affect deliveries of helium from, the Federal Helium System or the Helium System as soon as practicable after learning of such problems or events. The United States or Real Property Purchaser's Representative, as applicable agrees to keep this information confidential to the extent permitted by law.

ARTICLE III
Effective Date, Term, and Existing Agreements

3.1     This Contract will be effective upon signature by both parties and upon the BLM's receipt and confirmation of payment for Helium Lot #1, and will continue thereafter until September 30, 2027, at 11:59 p.m. Central Time.

        (a)             This Contract is not renewable.

3.2     When this Contract terminates by expiration on September 30, 2027, Person retains title to Helium Lot #1. If Person has Helium Lot #1 stored in the Helium System and does not enter a new Contract with Real Property Purchaser, Person may transfer Person's helium to another party who has entered a new Contract with the Real Property Purchaser. Upon termination of the FY 2022-2027 Contract by expiration, if Person does not enter a new contract with Real Property Purchaser, Person must continue to pay the Real Property Purchaser fees related to Helium Lot #1 remaining in the Helium System in accordance with Article IV until all of Helium Lot #1is withdrawn. Monthly fees will be waived for any month where Person has claimed Force Majeure.

3.3     This Contract is in addition and separate from any Original Storage Contract that Person may also have.

ARTICLE IV
Fees

4.1     Person will pay the United States prior to the Conveyance, and to Real Property Purchaser after the Conveyance, for the acceptance, delivery, storage, transportation, and other services provided under this Contract, the following fees. Fees are subject to adjustments as hereinafter provided:

        (a)             Contract Administration Fee. For FY 2023-FY2027, whether used or not, on October 1, each year, Person will pay to the United States or Real Property Purchaser eighteen thousand dollars ($18,000) due on the first day of each Contract Year. The United States will prorate this fee and pay the remainder to the Real Property Purchaser if the Conveyance occurs in the middle of the year.

(b)          Acceptance/Delivery Point Assessment Fee. For each Acceptance/Delivery Point that Person has to move helium-gas mixtures to or from the helium storage pipeline, Person will pay twenty thousand ($20,000) dollars per year due on the first day of the Contract Year to the United States or Real Property Purchaser as applicable, unless this fee is paid in accordance with an existing helium storage contract. Person has_____Acceptance/Delivery Points located at _____ _____

. The United States will prorate this fee and pay the remainder to the Real Property Purchaser if the Conveyance occurs in the middle of the year.

(c)          Transportation and Storage Fees.

Flat fee of 11 percent of B. If Person withdraws more than their 11 percent of total delivery per year (due to periods when the System was not under allocations), the flat fee will reflect the higher percent that it withdraws.

 Where:

**B** is the annual budget amount (operating cost, overhead costs, new infrastructure costs including costs to make a helium extraction unit operable and spread over the lifetime of the infrastructure), and maintenance costs for the Federal Helium System or the Helium System, as applicable, and its supporting services for each succeeding fiscal year. The annual budget will be adjusted by any over or under collections from the previous Fiscal Year.

(d)          Transfer Fee. Prior to the Conveyance, for each transfer of ownership of Purchaser's New Helium stored by Person to another storage Contract holder, Person will pay to the United States or the Real Property Purchaser each transfer of ownership of Purchaser's New Helium by Person to another storage Contract holder, Person will pay to the Real Property Purchaser, $200.

(e)          There will be no refund of any fees if Person terminates the Contract before the end of the Contract Year. (See paragraph 10.3).

4.2     In addition to the fees specified in paragraph 4.1, 4.2 outlines additional expenditures, requirements, and clarifies ownership of equipment.

(a)          Person will reimburse the United States or Real Property Purchaser, as applicable, for the full amount of any expenses incurred by the United States (and not included in the fees identified in paragraph 4.1) for repair, construction, installation, or modification of any facilities, pipeline connections, metering stations, compressor stations, gas measurement software necessary for Person's connection to, or delivery into or from the Federal Helium Pipeline or the Helium Pipeline, as applicable, for the purpose of this Contract.

(b)          Any such activity described in paragraph 4.2(a) which will require the expenditure of more than $5,000, will be made only with the prior written consent of Person.

(c)          In the event that Person refuses to consent to any such activity or fails to pay or reimburse the United States or Real Property Purchaser, as applicable, for any expense incurred by United States or Real Property Purchaser, as applicable under this paragraph 4.2, the United States and Real Property Purchaser, as applicable, will be relieved of any obligation to Person to accept helium

under this Contract. United States and Real Property Purchaser additionally reserve the right to any other remedies available by law.

(d)         Any facilities constructed or installed by the United States or Real Property Purchaser, as applicable, and paid for by Person pursuant to paragraphs 4.2, or 4.3, that may be removed without damaging or otherwise adversely affecting the Federal Helium System or the Helium System will remain the property of Person after any such facilities are no longer necessary for the purpose of this Contract and may be removed by Person within a reasonable time.

4.3     Resource Management Fee

(a)         If Person takes delivery of helium from the Federal Helium System or Helium System, Person will pay to the United States or Real Property Purchaser, as applicable, a Resource Management Fee (RM) of 11 percent of EA as defined by the Original Storage Contracts. If Person withdraws more than its 11 percent of total delivery per year, the flat fee will reflect the higher percent that it withdraws. The RM fee provides reimbursements for the Government's Crude Helium Enrichment Unit (CHEU) lease and repairs on equipment that is used to produce crude helium and natural gas; or the RM fee is a fee to the Real Property Purchaser for operation of its helium extraction equipment.

Person agrees to pay the RM in 10 equal installments, with the first payment included in the November billing statement under Article V below. Subsequent installments will be included in each of the following monthly billing statements until the full amount of the RM is billed and installments will be due even if Person terminates the Contract early.

EA is the annual enrichment charge, which equals the BLM's full cost associated with the operation repairs and infrastructure improvement of the CHEU or Real Property Purchaser's full cost associated with the operation and repairs and infrastructure improvement of its helium extraction equipment.

(c)         If Person receives all of Purchaser's New Helium prior to the end of the fiscal year, person must still pay all 10 installments of their RM fee or can pay the remaining balance in one payment.

ARTICLE V
Billing and Payment

5.1     On or before the 15th day of each month, the United States or Real Property Purchaser, as applicable, will transmit to Person a statement for the preceding month showing:

(1) the volume of Helium Lot #1 delivered to Person by Real Property Purchaser;

(2) the percentage of Helium Lot #1 in such delivered helium-gas mixture;

(3) the volume of contained Helium Lot #1 delivered;

(4) the net volume of Person's contained Helium Lot #1 remaining in the Federal Helium System or the Helium System, as applicable; and,

(5) the sum of money due and payable to the United States or Real Property Purchaser, as applicable for the succeeding month for the applicable fees specified in paragraphs 4.1 to 4.3, together with whatever calculations and any other information as may be required to substantiate the monthly activity.

5.2     Person will pay the amounts due the United States or Real Property Purchaser, as applicable, as billed under paragraph 5.1 within 30 days of the date of the bill.

5.3     The United States or Real Property Purchaser, as applicable, will bill Person separately for any amounts due the United States or Real Property Purchaser, as applicable under Article IV, paragraph 4.2, or Article VII within 60 days after the United States determines the amounts due.

5.4     In the event of any error in the billing statement, Person shall notify the BLM or the Real Property Purchaser's Representative, as applicable upon receipt regarding any obvious errors in billing amount. The BLM or Real Property Purchaser's Representative may revise and resend the billing statement based upon obvious errors or, for more complex errors, require Person to pay the amount billed notwithstanding such error. Any adjustment resulting from any overpayment by Person will be shown as a credit in the next billing statement after the error is resolved. Any underpayment by Person will be included in the next billing statement after the error is resolved. Any billing error must be initially raised within 1 year of the billing date containing the error or is deemed waived.

5.5     Before date of Government Assignment and Conveyance to Real Property Purchaser and in the event that Person fails to pay any amount due by the date due, interest will accrue on the unpaid amount, and the United States may collect the amount due together with interest, penalties, and any other applicable fees or amounts, under the Debt Collection Act of 1982, as amended, 31 U.S.C. §§ 3701 *et seq.*, and implementing regulations. After date of Government Assignment and the Conveyance and in the event that Person fails to pay any amount due by the date due, interest will accrue based on the yield of 10-year United States Treasury maturities as reported by the Federal Reserve Board in "Federal Reserve Statistical Release H.15" plus 2% rounded to the nearest one-eighth percent (1/8%) on the unpaid amount and the Real Property Purchaser may collect the amount due together with interest, penalties, and any other applicable fees or amounts as well as seek enforcement in the appropriate judicial forum.

ARTICLE VI
Measurement

6.1     Person will install, operate, and maintain at the points of delivery of Helium Lot #1 all of the equipment necessary for the measurement and analysis of the helium-gas mixture delivered by the United States or Real Property Purchaser to Person which is suitable, in the opinion of the Authorized Officer or Real Property Purchaser's Representative, as applicable, for the intended purpose. The United States or Real Property Purchaser will not be obligated to deliver Purchaser's New Helium to Person from storage whenever, in the opinion of the Authorized Officer or Real Property Purchaser's Representative, as applicable, any of the said equipment is unsuitable for the intended purpose.

6.2     The United States or Real Property Purchaser, as applicable, may, at its option and expense, install data communication equipment on Person's measurement installation to obtain accurate measurements of helium volumes for billing purposes; however, no such data communication equipment

will be installed by the United States or Real Property Purchaser in any way that would, in Person's opinion, interfere with the operation or the accuracy of Person's measurement equipment.

6.3     The unit of measurement for helium-gas mixtures and contained helium will be "Mcf" as defined in Article I of this Contract. The helium-gas mixture will be measured at the pressure and temperature conditions in the measurement equipment. The measured volumes of helium-gas mixture and contained helium will be adjusted in accordance with Ideal Gas Laws, corrected for deviation as provided in this Article VI or as the parties may otherwise mutually agree in writing, to derive the delivered volume at standard temperature and pressure. For purposes of that adjustment calculation, the atmospheric pressure at the meter will be assumed to remain constant at the standard barometric pressure at the altitude of the measurement equipment.

6.4     The helium-gas mixture will be measured by orifice meters installed and operated in accordance with methods prescribed by the American Gas Association, Gas Measurement Committee Report No. 3, dated April 1955, as amended. Person will use the *Emerson ROC 809 Electronic Flow Meter (EFM) using Detailed Characterization Method (DCM)*, including the super-compressibility factors. The United States and Real Property Purchaser as applicable may approve or require other meters that meet operational and technical specifications.

6.5     Person will not install or use any new or replacement meter or measuring equipment to which this Article VI applies before the United States or Real Property Purchaser, as applicable, has approved the design and installation of the meter or equipment.

6.6     Person will perform the following minimum inspections and tests on orifice meters in the presence of authorized BLM Officer or Real Property Purchaser's Representative or other designated Contractors, employees, and agents:

        (a)             Person will remove and inspect the orifice plates at least once every 6 months (with no more than 200 days between inspections) or whenever data indicates to either party a potential error of the measurement system, upon notification.

        (b)             Person will inspect the meter tubes whenever requested by the United States or Real Property Purchaser and upon initial plant startup or installation of a new or replacement meter tube.

        (c)             Person will comply with all calibration requirements for EFM and Multi Variable Sensors (MVS) in the ROCLINK 800 User manual, ROC 809 Remote Operations Controller Instruction Manual, and all other related manufacturer manuals.

        (d)             The parties may agree upon additional tests and inspections or alternative times for the tests and inspections required under this Article VI.

6.7     Person will not install any attachments between the point of measurement and the Federal Helium Pipeline after initial startup without the written consent of the Authorized Officer.  In addition, Person will not install any attachments between the point of measurement and the Helium Pipeline after initial startup without the written consent of Real Property Purchaser's Representative.

6.8     Person will calculate specific gravity and determine the percentage of helium by volume in the helium-gas mixture based on gas chromatograph analysis. Person will maintain and calibrate the gas chromatograph in accordance with its manufacturer's recommendations. Person must provide the gas

used in calibration procedures and must obtain BLM's or Real Property Purchaser Representative's approval, as applicable, of that gas as the calibration standard. The chromatograph must measure helium, nitrogen, methane, and hydrogen. Person will measure other components as necessary so that at least 99.8 percent of the gas stream components are directly measured.

6.9     Person will maintain at the point of measurement suitable equipment to collect a sample each day proportionate to flow that is representative of the 24-hour helium-gas mixture tendered by Person or delivered by the United States or Real Property Purchaser, as applicable, that is adequate for laboratory analysis, consistent with the pressures and cylinder sizes specified in Section 4.1(f).  Person will provide this sample to the United States or Real Property Purchaser as applicable.  The United States or Real Property Purchaser's Representative, as applicable, will retain this sample until the United States or Real Property Purchaser, as applicable, witnesses the next meter inspection.

6.10     In addition to the inspections provided for under paragraph 6.6, each party will have the right, at reasonable times, to inspect metering facilities installed and operated by the other party in the presence of a representative of the installing party, and to request tests and witness tests thereof but not to alter or in any manner disturb or adjust the facilities of the other party. If either party desires a test or inspection of any meter, or if a party observes a variation between meters upon which a billing statement is based and any check meter, such party will promptly notify the other party thereof. Each party will give the other party reasonable notice of the time of monthly and annual tests and inspections of metering facilities 72 hours in advance of such tests and inspections so that the other party may have its representatives present.

6.11     If, upon test or inspection, operation of any equipment at any metering facility is found to be inaccurate by an amount exceeding 1.0 percent at a reading corresponding to the average rate of flow or condition for the period since the last preceding test or inspection, then the equipment will be adjusted to zero error and any previous readings will be corrected for zero error for the period which is known or agreed upon; but in case the period is not known or agreed upon, such correction will be for a period equal to one-half of the time elapsed since the date of the last such test or inspection.

6.12     The volume of contained helium will be determined by multiplying the volume of helium-gas mixture by the volume percentage of helium. The helium percentage used in this computation will be determined by the recording analytical instrument described in paragraph 6.8 if it is operative; otherwise, a laboratory analysis of the representative sample described in paragraph 6.9 will be used to determine the contained helium for the day. One such computation will be made for the volume of contained helium tendered for delivery hereunder each 15-minute period or as determined by EFM.

6.13     Person will retain all records and electronic data generated by Person's metering facilities and any other information used for billing purposes for the period of this Contract and for 2 additional years thereafter. Person agrees to promptly provide to the BLM or Real Property Purchaser, as applicable, all records or data that the BLM or Real Property Purchaser's Representative may request.

6.14     In the event that any of the samples or any of the records or analyses mentioned in this Article VI are lost, damaged, or destroyed, and the parties are unable to otherwise agree on a basis for determining any calculation elements or measurement factors that are unknown by reason of such loss or damage, then the readings of such records or results of data analyses will be computed the same as the average corresponding readings or results prevailing in either a 5-day interval preceding or following the period in question, or both intervals if readings and results are available for each.

ARTICLE VII
Overdrawn Account

7.1     This next section applies only between the United States and Person and addresses overdraws of a monthly allocation (see 1.3) of Helium Lot #1 in times of shortage.

(a)          The United States will provide e-mail notification that the storage account is overdrawn.

(b)          For any month for which companies are under an allocation, if Person overdraws more crude helium from the Federal Helium System than Person's priority access right for that month, the United States will reduce delivery to Person in the next month by a volume equal to Person's overdrawn volume.

(c)          Upon notification by the United States, Person shall work to rectify the overdraw of the monthly priority access right and will not withdraw anymore until the United States notifies Person that Person may resume withdrawal.

(d)          If Person overdraws its storage account for more than one month in a Contract Year, the United States may at its discretion, declare Person ineligible to receive helium deliveries for a period of up to three months. The fine noted in 7.1(d) only applies for overdraws described in (d).

(e)          The remedies provided in this Article are not in derogation of any other remedy available to the United States, as applicable, by law.

7.2.   This next section applies only between the Real Property Purchaser and Person after Government Assignment and Conveyance to Real Property Purchaser. This section addresses both overdraws of a monthly allocation (see 1.3) of Person's total storage and overdraws of Person's total storage volume during the final withdrawal of Helium Lot #1 from this Contract and associated disconnection of the Helium System if Person does not enter a new contract with Real Property Purchaser after the conclusion of this contract.

(a)          Real Property Purchaser's Representatives will provide e-mail notification that the storage account is overdrawn.

(b)          For any month for which companies are under an allocation, if Person overdraws more crude helium from the Helium System than Person's priority access right for that month, Real Property Purchaser's Representative will reduce delivery to Person in the next month by a volume equal to Person's overdrawn volume.

(c)          Upon notification by the Real Property Purchaser's Representative, Person shall work to rectify the overdraw of the monthly priority access right and will not withdraw any more until the Real Property Purchaser notifies Person that Person may resume withdrawal.

(d)          If overdraw is associated with shutting in of the meter and permanent disconnection from the Helium Pipeline and if helium is overdrawn by more than 10 Mcf, Person agrees to pay $5,000 to the Real Property Purchaser as liquidated damages.

(e)          For overdraws other than those associated with (d), if Person overdraws its storage account for more than one month in a Contract Year, Real Property Purchaser, may at its

discretion, declare Person ineligible to receive helium deliveries for a period of up to three months. The fine noted in 7.1(d) only applies for overdraws described in (d).

(f)        The remedies provided in this Article are not in derogation of any other remedy available to the Real Property Purchaser, as applicable, by law.

ARTICLE VIII
Right of Access

8.1    Person will grant to the United States or Real Property Purchaser, as applicable, such rights of access to land and facilities owned or controlled by Person as may be necessary for the performance of this Contract. Person further agrees to grant to the United States and Real Property Purchaser, as applicable, such rights-of-way as may be necessary for the BLM and Real Property Purchaser's Representative, its designated Contractors, employees, and agents, to install appropriate equipment for acceptance and delivery of helium into or from the Federal Helium Pipeline and Helium Pipeline, as applicable. All equipment placed by the United States or Real Property Purchaser and paid for by the United States or Real Property Purchaser, as applicable, upon land owned or controlled by Person will remain the property of the United States or Real Property Purchaser, as applicable. The United States and Real Property Purchaser will comply with the Person's reasonable environmental, health and safety rules.

ARTICLE IX
Liability and Force Majeure

9.1    Subject to the United States' authority under the Helium Act, as amended by the Helium Stewardship Act enacted on October 2, 2013, and any other applicable law, prior to the Conveyance the United States shall be responsible for the safe storage of Helium Lot #1, and the United States agrees to tender for delivery prior to the Conveyance as much of Helium Lot #1 if the system is not under allocation and subject to the limitations of the Federal Helium System. Provided, however, that the United States shall have no liability to Person for any loss or damage to Person's volume of helium as a result of Force Majeure while such helium is in the possession of United States.

9.2    The Parties further understand, acknowledge, and agree that the United States shall not be liable for safe storage or delivery of Helium Lot #1 remaining in the Federal Helium System after the Government's Assignment and Conveyance to Real Property Purchaser. Subject to the terms of this Contract, after the Conveyance, the Real Property Purchaser, its successors, and assigns, shall assume and be fully responsible for the safe storage of Person's volume of Helium Lot #1 remaining in the Helium System under this Contract and tender for delivery all of Helium Lot #1 remaining under this Contract at the rates assigned by this Contract. Provided however, that the Real Property Purchaser, its successors, and assigns, shall have no liability to Person for any loss or damage to Helium Lot #1 as a result of Force Majeure while such helium is in possession of Real Property Purchaser.

9.3    In the event of either Party being rendered unable, in whole or in part, to carry out any non-monetary obligation under this Contract as a result of force majeure, upon such Party giving notice in writing to the other Party as soon as possible after the occurrence of the force majeure event describing the particulars of the event, the obligations of the Party giving notice that are affected by the force majeure event will be suspended. For purposes of this specific clause, Real Property Purchaser, its successors, and assigns, is included within the term "Party".

(a)        Such suspension will continue for the duration of the Party's inability to carry out the obligation, but for no longer period.

(b)        The Party giving notice agrees to remedy such inability to perform as soon as practically possible.

(c)        Any loss of helium-gas mixture from the Federal Helium System or Helium System as a result of force majeure will be borne by all Parties, including the United States or Real Property Purchaser, its successors and assigns, as applicable, in proportion to each party's ownership of the gas stored in the Federal Helium System or the Helium System, as applicable, as of the first day of the month in which the force majeure event occurs. Any such losses will be reduced by the same proportion of any recovery from any third party for causing a force majeure event. For losses only involving the pipeline, the Authorized Officer or Real Property Purchaser's Representative, as applicable, will determine each Party's proportional loss based on the Party's withdrawal of helium from the Federal Helium System or the Helium System, as applicable, during the previous 24 hours.

ARTICLE X
Termination

10.1    The United States or Real Property Purchaser, as applicable, may at their respective options terminate this Contract if Person continues to fail to comply with any provision of this Contract for a period of 60 days after receipt of notice of the non-compliance. The termination will be effective on the last day of the second month following the month in which Person receives notice of termination.

10.2    In the event of termination by the United States or Real Property Purchaser, as applicable, Person agrees:

(a)        Person may sell all of Helium Lot #1 above the volume referred to in paragraph (c) of this section to a third party who has a helium storage Contract with the United States or Real Property Purchaser, as applicable within 90 days after termination of this Contract. Person must inform the United States or Real Property Purchaser's Representative of the sale.

(b)        To the extent that Person fails to sell all of its remaining stored helium under paragraph (a) of this section, the United States or Real Property Purchaser, as applicable may, on behalf of Person, sell such helium. The United States or Real Property Purchaser, as applicable, will arrange for the purchaser to pay the purchase price directly to Person, and Person agrees that the United States and Real Property Purchaser bears no liability to Person for any part of the purchase price.

(c)        The United States or Real Property Purchaser, as applicable, may take title to and sell that portion of Person's stored helium in the Federal Helium System or the Helium System, as applicable, as is necessary to cover any unpaid amounts owed to the United States or Real Property Purchaser under this Contract. United States or Real Property Purchaser will inform Person of the sale price for the stored helium when obtaining reimbursement for any unpaid amounts.

10.3    Prior to the Conveyance, the United States may, at its option:

(a)        Terminate this Contract in the event that Congress amends, repeals or withdraws, in whole or in part the appropriations or authorities contained in 50 U.S.C. §§ 167-167q as they exist on

the date of execution of this Contract. Termination will be effective immediately upon Person's notice of termination.

(b)  In the event of termination by the United States under this section, the parties agree that Person retains ownership of its helium stored in the Federal Helium System, but Person is not required to pay any fees to the United States under this Contract.

10.4  Person may, at its sole option, terminate this Contract if—

(a)  Person has given the United States or Real Property Purchaser's Representative, as applicable, 90 days written notice of its election to terminate;

(b)  Person pays all applicable fees due through the end of the Contract Year; and

(c)  All of Purchaser's New Helium is removed or title thereto is transferred to a third party who has a storage Contract with the United States or Real Property Purchaser, as applicable by the proposed termination date.

ARTICLE XI
Disposal of Federal Helium System

11.1  The parties acknowledge that under applicable provisions of the Helium Act, as amended by the Helium Stewardship Act enacted on October 2, 2013, as they exist on the date of execution of this Contract, the United States designated as excess the remaining assets in the Federal Helium System to the GSA on September 24, 2021. The GSA will permit the continued operation of the Federal Helium System and delivery of privately owned helium stored or transported in the Federal Helium System while it conducts its disposal process on behalf of the United States in accordance with the provisions of subtitle I of Title 40 of the United States Code.

11.2  The Parties agree that if the United States sells or transfers ownership of the Federal Helium System to a non-federal entity, the United States will, subject to applicable law at the time of sale or transfer, including but not limited to subtitle I of Title 40 of the United States Code, require as a condition of sale or transfer, that (i) the Real Property Purchaser or transferee, its successors and assigns, will take the Federal Helium System subject to Person's ownership interest in Helium Lot #1 stored in the Federal Helium System; (ii) the Real Property Purchaser, its successors and assigns, will assume the obligations of the United States under this Contract to deliver Helium Lot #1 stored in the Federal Helium System; and (iii) the Real Property Purchaser, its successors and assigns, or transferee will allow Person to withdraw all of Helium Lot #1 stored in the Federal Helium System subject to the terms and conditions of this Contract.  Upon sale or transfer of ownership of the Federal Helium System to the Real Property Purchaser, this Contract will be assigned to the Real Property Purchaser subject to the terms and conditions of this Contract. Person agrees to release the United States from any and all performance obligations under the Contract upon Conveyance of the Contract to the Real Property Purchaser.

ARTICLE XII
Assignment of Contract

12.1     This Contract and all terms, conditions, and the covenants hereof, will be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. If a party makes an assignment, they must notify the other party in writing 30 days in advance.

12.2     Assignment of Contract by Person.

(a)          Person will have the right to transfer title to any part of Helium Lot #1 stored in the Federal Helium System or Helium System, as applicable as provided for in this Contract. Title may be transferred to any party that is in good standing and holds an equivalent helium storage Contract with the United States or Real Property Purchaser as applicable.

(b)          If Person is acquired by or merges with another entity holding a helium storage Contract with the United States or Real Property Purchaser, Person agrees that all fees under this Contract will continue until this Contract is terminated pursuant to Article X or the two Contracts are replaced by one Contract between the United States or Real Property Purchaser and the entity resulting from the merger. This clause does not require Real Property Purchaser to agree to merge the two contracts.

12.3     Assignment of Contract by United States

(a)          The United States will transfer this Contract to Real Property Purchaser upon Conveyance of the Federal Helium System and Real Property Purchaser shall fully assume and be responsible for delivery of Purchaser's New Helium as contemplated and provided for in this Contract during the term of this Contract.

ARTICLE XIII
Disputes

13.1     **This section only applies to disputes between the United States and Person**.  Any dispute concerning a question of fact or law arising under this Contract, while the United States is a party to the Contract, which is not disposed of by agreement will be decided by the Authorized Officer, who will render a decision and serve a copy thereof on Person. If Person disagrees with the Authorized Officer's decision, Person and the United States agree to incorporate the administrative review procedures of 43 C.F.R. 3165.3(b), and Person may appeal the Authorized Officer's decision to the State Director of the BLM State Office having jurisdiction over the Authorized Officer. Pending a final non-appealable decision of a dispute hereunder, both parties will proceed diligently with the performance of their obligations under this Contract and in accordance with the Authorized Officer's decision pursuant to this section 13.1.

13.2     **This section only applies to disputes between the Real Property Purchaser and Person**.  Any disputes that arise after the Government Assignment and Conveyance will be disposed of strictly between Real Property Purchaser and Person whether by mutual written agreement or by seeking legal redress in the appropriate federal or state judicial forum. Person understands, acknowledges, and agrees that the United States shall no longer be a responsible party to either Real Property Purchaser or Person after Government Assignment and Conveyance and shall not be made a party any dispute or judicial proceeding pursuant to this Section 13.2.

ARTICLE XIV
Section 889 Disclosure and Certification

Section 889(a)(1)(B), Prohibition of Certain Telecommunications and Video Surveillance Services or Equipment of the Fiscal Year 2019 National Defense Authorization Act (Pub. L. 115-232) ("Section 889 Part B"), prohibits Contracts on or after August 13, 2020, between the Federal Government and any entity that uses certain covered telecommunications and surveillance equipment from five (5) identified Chinese national corporations.

By signature of this Contract, Person hereby certifies that their entity is in compliance with Section 889, Prohibition of Certain Telecommunications and Video Surveillance Services or Equipment of the Fiscal Year 2019 National Defense Authorization Act (Pub. L. 115- 232). Person specifically represents that it does not use covered telecommunications equipment or services, or use any equipment, system or service that uses covered telecommunications equipment or services. The statute prohibits Contracting by the Government with an entity that uses certain telecommunications equipment or services produced by the below entities, companies, affiliates, or subsidiaries:

· Huawei Technologies Company · ZTE Corporation · Hytera Communications Corporation · Hangzhou Hikvision Digital Technology Company · Dahua Technology Company

The prohibition of use of these telecommunications equipment or services applies regardless of whether or not that usage is related to the terms and conditions of this Contract and the certification extends until closing of the transaction as specified herein. This section will no longer apply after the Conveyance to Real Property Purchaser.

ARTICLE XV
Complete Agreement

15.1    This Contract constitutes the complete agreement between the United States or Real Property Purchaser, as applicable, and Person, and there are no oral promises, prior agreements, understandings, obligations, warranties, or representations between the United States or Real Property Purchaser, as applicable and Person relating to this Contract other than those set forth herein or as amended.

ARTICLE XVI
Notices

16.1    Prior to the Conveyance, all notices required under this Contract will be served by certified mail, return receipt requested, at the following addresses:


United States:                                    Person: _____
Authorized Officer                                        _____
Field Manager–Amarillo Field Office                       _____
U.S. Bureau of Land Management                            _____
801 South Fillmore Street, Suite 500
Amarillo, Texas 79101-3545

16.2    After the Conveyance, all notices required under this Contract will be served by certified mail, return receipt requested to **Real Property Purchaser's Representative, address to be provided to Person before the Conveyance.**

Article XVII
Execution

17.1 This Contract may be executed in duplicate original counterparts, and it will not be necessary for each party hereto to execute the same counterpart.

EXECUTED as of the dates adjacent to the signature lines, but effective upon the BLM's receipt and confirmation of payment for Helium Lot #1.


United States:                                            Person: _____
Authorized Officer                                                 _____
Field Manager–Amarillo Field Office                               _____
U.S. Bureau of Land Management                                    _____
801 South Fillmore Street, Suite 500
Amarillo, Texas 79101-3545

### Attachment P2
#### ASSIGNMENT AND ASSUMPTION OF OBLIGATION
#### OF ONE BILLION CUBIC FEET (1 Bcf), MORE OR LESS,
#### 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM WITHOUT WARRANTY

**STATE OF TEXAS       )**

                                           **KNOW ALL BY THESE PRESENTS:**

**COUNTY OF POTTER )**

**THIS ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY,** (hereinafter referred to as the "Assignment of 2023-2027 Contract for the Storage and Delivery of Helium ") is made this ___ day of, _____, 2022, by and between the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management ("BLM") (hereinafter sometimes referred to as "Government"), under and pursuant to authority of 50 U.S.C. §167d, as amended and 40 U.S.C. § 541 et. seq, as amended, and all applicable rules, regulations and orders promulgated thereunder, and _____, a _____, (hereinafter referred to as "Assignee"). The terms used to designate any of the parties herein shall include their respective representatives, successors and assigns of said parties (the "Parties").

### I. STORAGE CONTRACT BEING ASSIGNED

The 2023-2027 Contract for the Storage and Delivery of Helium is attached hereto, marked "**Attachment 1,**" which is hereby incorporated and made a part hereof.

### II. CONSIDERATION

The consideration in favor of Government given by Assignee for this 2023-2027 Contract for the Storage and Delivery of Helium Assignment is the following:

1. All good and valuable consideration in the amount of _____ and no/100 Dollars ($___ .00), the receipt and sufficiency of which is hereby acknowledged by Government and Assignee; and,

2.  The specific covenants and agreements of the Grantee, for itself, and its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, and conditions, and agreements hereinafter set forth the Government's agreements, conveyances and grants to Grantee, its successors and assigns, as evidenced and identified by the following:

        (i) the four separate GAS GRANTS WITHOUT WARRANTY (Potter County, Texas); and,

        (ii) the QUITCLAIM DEED (Satanta, Kansas); and,

        (iii) ASSIGNMENT WITHOUT WARRANTY AND ASSUMPTION OF OBLIGATIONS OF CLIFFSIDE FIELD REAL ESTATE LEASE; and,

        (iv) the BILL OF SALE OF THE CLIFFSIDE FIELD RELATED PERSONAL PROPERTY WITHOUT WARRANTY; and,

        (v) the ASSIGNMENTS OF CRUDE HELIUM  RIGHT-OF-WAY PIPELINE EASEMENTS WITHOUT WARRANTY covering multiple counties in the State of Texas; and,

        (vi) the QUITCLAIM ASSIGNMENT OF CRUDE HELIUM RIGHT-OF-WAY PIPELINE EASEMENTS covering multiple counties in the States of Oklahoma and Kansas; and,

        (vii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF THE CONTRACTS FOR STORAGE AND DELIVERY OF HELIUM, WITHOUT WARRANTY; and,

(viii) the ASSIGNMENT AND ASSUMPTION OF OBLIGATIONS OF 1.0 Bcf, MORE OR LESS, OF 2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM WITHOUT WARRANTY; and,

3. The specific covenants and agreements of the Assignee, for itself, and on behalf of its successors and assigns, to abide by and take subject to all reservations, restrictions, covenants, encumbrances, exceptions, notifications, terms, conditions, and agreements hereinafter set forth in this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty.

## III. ASSIGNMENT WITHOUT WARRANTY

As a material part of the Consideration for this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, Assignee, for itself, and its successors and assigns, covenants, and agrees that Assignee is taking the 2023-2027 Contract for the  Storage and Delivery of Helium "AS IS" and "WHERE IS" with all latent and patent defects and that there is no warranty by Government, that the Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, do not have a particular financial value, nor is fit for a particular purpose. Assignee, for itself, and its successors and assigns, acknowledges, and stipulates that Assignee is not relying upon any representation, statement, or other assertion with respect to condition of the Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, but is relying upon Assignee's own examination of all identified Contracts for the Storage and Delivery of Helium. Assignee takes the 2023-2027 Contract for the Storage and Delivery of Helium with the express understanding and stipulation that there are no express or implied warranties of any nature whatsoever.

## IV.  ASSIGNEE ASSUMPTION OF ALL STORAGE CONTRACT OBLIGATIONS

Assignee, for itself, and its successors and assigns, assumes, and agrees to perform all Servicer's obligations described in this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, arising after this date.

## V.  ASSIGNEE INDEMNITY OF GOVERNMENT

Assignee, for itself, and its successors and assigns, will indemnify, defend, and hold Government harmless from any loss, attorney's fees, expenses, or claims arising out of or related to Assignee's failure to perform any of the obligations of the Government under this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, on and after this date.

## VI.  LIMITATIONS
Nothing in this 2023-2027 Contract for the Storage and Delivery of Helium Assignment is intended to conflict with current law, regulation, directive, or policy of any Party.  If any provision of this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, is  inconsistent with any such authority, then that provision is deemed to be invalid and subject to modification upon concurrence of the Parties and the remaining terms and conditions of this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, will continue in full force and effect. This Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the is not intended and should not be construed to this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, create any right or benefit, substantive or procedural, enforceable at law or in equity, by Assignee or any third-party against the United States of America, or any of its employees.
## VII.  SIGNATORIES
The Secretary of the Department of Interior, Bureau of Land Management, or another agency official with the appropriate delegated authority, must execute this  to be effective.  Assignee's signatory to this Purchased Storage Contract Assignment must have full authority to execute this Assignment and Assumption of Obligations of 1.0 Bcf, more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, Assignee, its successors and assigns, with regard to all matters relating to this Purchased Storage Contract Assignment. Government and Assignee may use an electronic signature or an electronic record, as those terms are defined in 15 U.S.C. § 7006, to assent to the terms of this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery

Of Helium, Without Warranty, and this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, may not be denied legal effect, validity, or enforceability solely because such an electronic signature or electronic record was used in its formation.

**VIII.  COUNTERPARTS**

ThisAssignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty,  may be executed in counterparts, each of which will be deemed to be a duplicate original, and which together will constitute one and the same instrument.

**IX. INTEGRATION AND MERGER**

This Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, sets out all the terms, conditions and agreements of the Parties and supersedes any previous understandings or agreements regarding the donation, whether oral or written.  No modification or amendment of this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, will be effective unless in writing and signed by all Parties.

**X.  VALIDITY OF PARTS**

If any provision of this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, is declared to be invalid by a federal court of competent jurisdiction, the remaining provisions will continue in full force.

**XI. NO PUBLIC OFFICIALS TO PARTICIPATE OR BENEFIT**

No member or delegate to the United States Congress, r officers or employees of the United States of America may be admitted to any share or part of this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, or to any benefit that may arise therefrom; provided, however, that this provision will not be construed as extending to any person who may be a shareholder or other beneficial owner of any publicly held corporation or other publicly held entity, if this Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty,  is for the general benefit of such corporation or other entity.

**XII.  EFFECTIVE DATE**

This Assignment and Assumption of Obligations of 1.0 Bcf , more or less, of the 2023-2027 Contract for the Storage and Delivery Of Helium, Without Warranty, will become effective when all the Parties have signed it as indicated by the date stated opposite that Party's signature) will be deemed to be the effective date of this Purchased Storage Contract Assignment.

**<u>ATTACHMENT 1</u>**

CONTRACT FOR THE STORAGE AND DELIVERY OF 1.0 Bcf OF
2023-2027 CONTRACT FOR THE STORAGE AND DELIVERY OF HELIUM

# Attachment Q
## REIMBURSABLE UTILITY AGREEMENT

Agreement No. 006222035

Dated: 4/_/22
Gray County Project: 50-35 KA 2383-01

NHPP-A238(301)

General Location: Section 7, Township 26 South, Range 27 West

**THIS AGREEMENT** is entered into between the Secretary of Transportation of the State of Kansas (KDOT Secretary), United States Department of Interior Bureau of Land Management (BLM), and NPL Construction Company (Pipeline Contractor).

**WHEREAS**, the KDOT Secretary proposes a highway improvement project on Highway No. US-50 described above by Project Number and Location and shown on the Project Plans, and

**WHEREAS**, the BLM is owner of a crude helium pipeline located between Highway Stations 110+47 to 111+20 as shown on the Project Plans (Pipeline) and this Pipeline was previously located on private right- of-way on which BLM has an existing permanent easement and is now located on public right-of-way acquired by the KDOT Secretary, subject to BLM's existing easement, and

**WHEREAS**, the BLM's Pipeline needs to be protected (Utility Protection) so the KDOT Secretary may construct the Project and the BLM may maintain its present services, and

**WHEREAS**, the BLM has the legal right to design, coordinate, and approve the Utility Protection but was unable to design and coordinate the Utility Protection to meet the KDOT Secretary's Project schedule and authorized the KDOT Secretary to arrange for the Utility Protection design and coordination provided the KDOT Secretary use the services of Jonathan Elder, P.E., a pipeline integrity expert (Pipeline Consultant), and

**WHEREAS**, 23 C.F.R. 645.109(a) allows either the Transportation Department or Utility to retain an engineer to design the Utility Protection, subject to the other entity's approval, and the KDOT Secretary approved the services of Jonathan Elder, P.E. and entered into an agreement with Mr. Elder to design and administer the Utility Protection, and

**WHEREAS**, Mr. Elder prepared plans and specifications for the Utility Protection (Pipeline Utility Conflict Plans) (Exhibit A), which were approved by BLM in final form on March 10, 2022, and

**WHEREAS**, 23 C.F.R. 645.115(a) allows the Utility Protection to be undertaken by a Contract awarded by the Transportation Department or Utility to the lowest qualified bidder based on appropriate solicitation and the KDOT Secretary solicited bids from entities the Pipeline Consultant reviewed and BLM approved as qualified to perform pipeline construction/reconstruction, and

**WHEREAS**, K.S.A. 68-407 authorizes the KDOT Secretary "to perform all Work, or to enter into, perform and require the performance of all contracts incident to the construction, improvement, reconstruction and maintenance of the state highway system."

**NOW THEREFORE**, in consideration of the mutual covenants contained herein, the Parties agree:

1.     Upon receipt of formal written authorization from the KDOT Secretary and Pipeline Consultant, the Pipeline Contractor will proceed without unnecessary delay to make the changes to BLM's Pipeline described in the Pipeline Utility Conflict Plans (Exhibit A) in accordance with Paragraph 9 of this Agreement. The Pipeline Consultant prepared Exhibit A, which was approved by BLM and which is attached to and incorporated into this Agreement.

2.     The Pipeline was located on private right-of-way and is now located upon newly-acquired highway right-of-way purchased by the KDOT Secretary by General Warranty Deed on November 11, 2020; however, the KDOT Secretary's acquisition of the land for highway right-of-way did not extinguish BLM's existing permanent easement on the highway right-of-way. The estimated costs of the Utility Protection will be listed in detail on the Pipeline Contractor's bid for the Utility Protection which will be attached later (as Exhibit B)), which includes direct labor, equipment, materials, consumables, overhead, profit, subcontractor work, and subcontractor markup. The Utility Protection has no BLM elected

betterments, salvaged materials, and extended service life for which a credit would be owed from BLM to the KDOT Secretary. The Pipeline Contractor prepared Exhibit B, which is attached to and incorporated into this Agreement.

3.        This Agreement is subject to and the Parties agree to comply with 23 C.F.R. Part 645 Subpart A ("Utility Relocations, Adjustments, and Reimbursement") (23 C.F.R. 645.101 *et seq.*), 23 C.F.R. Part 645 Subpart B ("Accommodation of Utilities")(23 C.F.R. 645.201 *et seq.*), and the current Kansas Department of Transportation Utility Accommodation Policy (UAP). The UAP is incorporated by reference into this Agreement.
This Agreement is subject to and the Parties agree to comply with 23 U.S.C. 313 ("Buy America") and 23 C.F.R 635.410 ("Buy America requirements") which require that all iron and steel permanently incorporated in the BLM's Pipeline that are relocated under this Agreement shall have been manufactured, produced, and processed in the United States. Manufacturing processes include any process which modifies the chemical content, the physical size or shape, or the final finish of the iron or steel. These processes include initial melting, mixing, rolling, machining, extruding, bending, grinding, drilling, and coatings applied to iron or steel (including epoxy coatings, galvanizing, painting, and any other coating that protects or enhances the value of the iron or steel used). Companies providing iron or steel or performing any manufacturing processes on the iron or steel shall include a "Buy America" statement on test reports and material certifications submitted to the KDOT Secretary. The "Buy America" statement shall identify the source of the iron or steel and the location(s) of the manufacturing processes. The statement shall certify that the Company issuing the test report or material certification complies with all provisions of the Buy America Act. Buy America requirements do not apply to temporary items (Example: temporary sheet piling, steel scaffolding, and falsework) on the contract, even if these items are left in place with the Engineer's approval. The Pipeline Contractor will include the test results and material certifications in its billing to the KDOT Secretary.

4.        The KDOT Secretary acquired the right-of-way for the Project, subject to BLM's permanent easement for the Pipeline. BLM has provided evidence showing the BLM has right of occupancy on private right-of-way by an Easement for Pipeline Right of Way, KSNM 122824, R/W No. 3-G-44, from R.L. Miller to the United States, dated Feb 27, 1952. Nothing in this Agreement modifies the BLM's easement right to locate and maintain its Pipeline upon highway right-of-way encompassed in this Project. BLM certifies that no law, agreement or other document requires BLM to relocate its Pipeline for public purposes at BLM's own expense.

5.        If future road work requires any changes to, protections, or adjustments of BLM's Pipeline, previously located on private right(s)-of-way but now located upon highway right-of-way as shown on Exhibit A, the KDOT Secretary will pay the cost of such changes, protections, or adjustments.

6.        The BLM's easement rights or other interests in the property included in the new highway right-of-way as shown on Exhibit A do not restrict the KDOT Secretary's use of such right-of-way for the construction, operation, and maintenance of the highway, provided the KDOT Secretary does not exercise such rights in a manner that damages or interferes with the Pipeline's continued operation and maintenance in violation of state law and/or as provided in a separate agreement between BLM and the KDOT Secretary. In exercising their rights, the BLM and KDOT Secretary shall conform to all federal and state law, statutes, and regulations.

7.        KDOT Secretary certifies that payment for the Utility Protection does not violate Kansas law or any existing contract between the BLM and the KDOT Secretary.

8.        The Pipeline Contractor shall notify the Kansas Department of Transportation's (KDOT's) District Six Project Development Engineer, the BLM Amarillo Field Office (AMFO), the Pipeline Consultant, and the Highway Contractor by phone, at least five days in advance of the time it expects to start work as well as when it discontinues work, when it resumes work, and when it has completed the work.
KDOT District Six Project Delivery Engineer: Gary Bennett, P.E., 620-765-7101; Gary.Bennett@ks.gov BLM AMFO: Mark Welch, 806-356-1051; MWelch@blm.gov
Pipeline Consultant: J.D. Engineering, LLC; Jonathan Elder, P.E., 806-543-3419; JElder@jdengr.com Highway Contractor: Koss Construction; Bryan Fox, 785-228-2928; bcf@kossconstruction.com Pipeline Contractor: NPL, Dave Berry; 785-640-0181; DBerry@gonpl.com; 785-640-0181

9.        Detailed Scope of Work and Schedule. Method of accomplishing the Utility Protection shall be by Contract/Pipeline Contractor as BLM is not adequately staffed or equipped to perform the Utility Protection. The Pipeline adjustments are needed to protect the Pipeline and clear the proposed highway construction as shown on Exhibit A Pipeline Utility Conflict Plans. The Pipeline Contractor shall perform all work with its own forces other than the casing wax fill and

asbestos removal work which shall be performed by subcontractors approved by BLM and the KDOT Secretary through the Pipeline Consultant.

    A.    Phase 1
1. General Description: Casing Extension, End Seals, and Test Station Installs on portions of Pipeline located at Hwy Sta 110+47, 255-ft Rt and between Hwy Sta 110+73, 26-Fft Rt and Sta 111+20, 132-ft Lt.
2. Time for Construction Completion: <u>May 1, 2022</u>

    B.    Phase 2

1. General Description: Sawcutting existing concrete pavement over Pipeline, Casing Replacement and Dielectric Fill between Hwy Sta 110+73, 26-ft Rt and Station 110+59, 154ft Rt.
2. Time for Construction Completion: <u>two weeks in calendar year 2024</u>.
The two-week period will not begin until the highway contractor has given Pipeline Contractor at least 4 months' notice before Pipeline Contractor is expected to start the work. Highway Contractor shall be responsible for disposing of removed pavement.

    C.    Permitted Time Extensions. Pipeline Contractor's timely performance may be extended for unusually severe weather or for other reasons beyond the Pipeline Contractor's control. This exception does not excuse Pipeline Contractor's obligation to act in good faith to minimize delays. Pipeline Contractor agrees to provide KDOT Secretary and Pipeline Consultant with written notice of any delays that would significantly impact completion of the work. KDOT Secretary may authorize acceleration to overcome delay and, after such authorization, KDOT Secretary will compensate Pipeline Contractor for reasonable acceleration costs agreed to between KDOT Secretary and Pipeline Contractor and approved by Pipeline Consultant.

    D.    Construction Specifications. The standards and specifications for the Pipeline Contractor's work are identified in Exhibit A (Pipeline Utility Conflict Plans). In addition to these Plans, the Pipeline Contractor shall ensure that "All backfill within the highway right-of-way limits is to be compacted to a density equal to or greater than the density of the surrounding soil" and that any traffic control devices and signing installed by the Pipeline Contractor follow the "Manual of Uniform Traffic Control Devices". It is anticipated that the highway contractor's existing traffic control will be sufficient for the Pipeline Contractor's work; however, notify the KDOT District Project Delivery Engineer and the Pipeline Consultant if the highway contractor's existing traffic control is insufficient.

10.    Costs. KDOT Secretary shall pay the Pipeline Contractor for the Utility Protection. KDOT Secretary is responsible for 100% of the actual Utility Protection costs and BLM is responsible for 0% of the actual Utility Protection costs. Estimated total cost of Utility Protection is $259,999 (not including 5% markups on materials and subcontractors' bids) as shown on the Pipeline Contractor's bid for the Utility Protection (Exhibit B).

    A.    Phase 1 Construction and all Materials. Estimated Price of $170,857 (not including 5% markups on materials and subcontractors' bids). This price shall include the following:
1. The Pipeline Contractor's directs costs for performing the work (labor, equipment, and consumables) and reasonable overhead and profit on work performed by the Pipeline Contractor.

2. Materials for both Phase 1 <u>and</u> Phase 2. Pipeline Consultant will coordinate the procurement of all pipe and fittings. Include the estimated unit costs of all pipe and fittings in the bid. Payment will be made at the actual unit costs for the quantities supplied plus 5% markup for handling. Include firm unit costs for other materials required for the Utility Protection. Payment for such other materials will be made at the bid unit costs for the quantities supplied. Phase 2 materials will be stockpiled at a location near the Project site. That site may be a KDOT facility, BLM facility, or highway contractor facility. The Pipeline Contractor will not have to pay storage charges for the stockpiled material.
3. Asbestos Subcontractor price which reflects the lowest bid obtained from the list of subcontractors approved by the Pipeline Consultant on behalf of BLM and that can meet the Project schedule.
4. Casing fill Subcontractor price which reflects the lowest bid obtained from the list of subcontractors approved by the Pipeline Consultant on behalf of BLM and that can meet the Project schedule.
5. A contractor markup of no more than 5% allowed on each subcontractor's bid.

    B.    Phase 2 (Construction w/out Materials). Estimated Non-binding Price of $ 89,142 (not including 5% markups on subcontractors' bids) followed by a Firm Fixed Price when Phase 2 work is performed in 2024.

1. The KDOT Secretary is asking for a non-binding estimate for Phase 2 Work for three reasons: the KDOT Secretary's desire to have an overall contract amount estimate at the time of initial contracting; the KDOT Secretary's ability to ensure that the overall contract amount will not be based on a mathematically unbalanced bid; and the KDOT Secretary's belief that it is not reasonable to expect the Pipeline Contractor to submit a firm bid for Phase 2 work considering the approximate 2-year delay in when this work will be performed.

2. Before the Pipeline Contractor begins Phase 2 work, the Pipeline Contractor will furnish the KDOT Secretary and Pipeline Consultant a bid for the Phase 2 work. The bid will include the Pipeline Contractor's directs costs for performing the work (labor, equipment, and consumables), reasonable overhead and profit on work performed by the Pipeline Contractor, subcontractor quotes, and contractor markup of 5% on subcontractor work. In reaching agreement on the Phase 2 price, the KDOT Secretary will evaluate the reasonableness of the Phase 2 price considering the following:

   a. The Pipeline Contractor's loaded hourly rate for direct labor costs using the then-current hourly rates for the classification of work involved and a reasonable profit markup.

   b. Then-current average equipment and consumables costs for the classification of work involved.

   c. For each subcontract, the lowest bid obtained from the list of subcontractors that the Pipeline Consultant approves on behalf of BLM and that can meet the Project schedule.

   d. A contractor markup of no more than 5% on each subcontractor's bids

11. The work required in this Agreement is being funded in whole or in part with federal funds. The Pipeline Contractor shall keep a detailed and accurate account of all labor, materials, supplies, incidentals, and all other costs involved in performing the work for three years after the date the Pipeline Contractor receives final payment. The Pipeline Contractor understands that the KDOT Secretary has three years to complete the final audit after final payment. Any authorized agent of KDOT, BLM, the Federal Highway Administration (FHWA), or other state or federal agency authorized to audit payments on behalf of the state or federal government shall have access to such records during reasonable business hours. The Pipeline Contractor will reimburse the KDOT Secretary any sums disallowed under 23 C.F.R. Part 645, 48 C.F.R. Part 31 ("Contract Cost Principles and Procedures") (48 C.F.R. 31.000 *et seq.*), and 2 C.F.R. Part 200 (Uniform Guidance).

12. At Pipeline Contractor's request and with Pipeline Consultant's approval, the KDOT Secretary will reimburse the Pipeline Contractor for 95% of the cost reflected on monthly progress statements for partially completed work. However, the Pipeline Contractor shall submit no monthly progress statement with an amount earned of less than $25,000. The Pipeline Contractor shall submit to the Pipeline Consultant supporting statements with the Pipeline's request for such intermediate progress payments.

After the Pipeline Contractor completes the Utility Protection, the Utility Protection is accepted as provided in Paragraph 14, and the KDOT Secretary receives a detailed final cost statement that complies with 23 C.F.R. 645 Subpart A, the KDOT Secretary will reimburse the Pipeline Contractor for the total amount of the final billing, including retainage but less intermediate progress payments already made. Upon completing the final audit, the KDOT Secretary may make audit adjustments to previous payments.

13. Changes. To be eligible for reimbursement, changes in the original scope of work or additional adjustments not covered in Paragraph 9 of this Agreement shall be submitted on a supplemental agreement (or change order) and approved by the Pipeline Contractor, Pipeline Consultant, BLM, and the KDOT Secretary before the Pipeline Contractor makes such changes or adjustments. Additional costs or revision in the ratio of cost/participation identified in Paragraph 10 resulting from such changes or adjustments will become effective with submission of a final change order prior to or concurrent with final billing. Approval of such change order and/or ratio of participation will place the billing in line for audit and payment.

14. Acceptance. BLM and the KDOT Secretary, each on their own behalf, will issue written notice of acceptance of the Utility Protection after all of the following have occurred: the Pipeline Contractor has completed the Utility Protection according to the Pipeline Utility Conflict Plans (Exhibit A), the Pipeline Contractor delivers to the Pipeline Consultant all documentation deliverables required by such Plans (Exhibit A), and the Pipeline Consultant certifies to BLM and the KDOT Secretary that the Pipeline Contractor has completed the Utility Protection according to such Plans (Exhibit A).

15.    Following Acceptance of the Utility Protection as provided in Paragraph 14, the BLM shall maintain and pay all expenses necessary to maintain the Pipeline located on the newly-acquired state highway right of way as shown on Exhibit A.

If BLM's maintenance obligation requires work within the highway right-of-way, the BLM shall first notify and obtain a written work permit from the proper authority. This permit shall contain reasonable regulations relating to such maintenance.
The BLM may open and disturb the surface of the highway right-of-way without a work permit if an emergency exists that endangers the public's safety and requires immediate preventive action or repair. Immediately upon discovering the emergency, the BLM shall notify the Kansas Highway Patrol and the KDOT Bureau of Construction and Materials. The BLM shall request a work permit from the proper authority no later than the second working day following the emergency.
The BLM shall not service its Pipeline from the highway, highway shoulder, or highway ramps. Exception: if an emergency exists that makes other ingress and egress temporarily impossible, the BLM may use the surfaced area of the highway right-of-way to approach the distressed lines or Pipeline and the BLM may use the surfaced shoulder for temporary parking.

16.    The Pipeline Contractor will be responsible to BLM and the KDOT Secretary for property damage to the helium pipeline and loss of helium (economic damages) caused by the highway contractor's operations. The Pipeline Contractor further agrees to hold the BLM and the KDOT Secretary and their authorized representatives harmless from and indemnify the BLM and KDOT Secretary for all claims, suits, damages (whether property damages, personal injury damages, or economic damages) and costs (reasonable attorney's fees and defense costs) resulting from the Pipeline Contractor's failure to comply with its contract obligations under this Agreement, resulting from the Pipeline Contractor's negligent acts, errors, or omissions in performing the Utility Protection, or all of the above.

17.    The KDOT Secretary agrees to hold the BLM and the Pipeline Contractor and their authorized representatives harmless from and indemnify the BLM and Pipeline Contractor for all claims, suits, damages (whether property damages, personal injury damages, or economic damages) and costs (reasonable attorney's fees and defense costs) resulting from the KDOT Secretary's failure to comply with its contract obligations under this Agreement. The KDOT Secretary's liability for personal injuries and property damage shall not exceed the liability limits in the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq*.

18.    To the extent authorized by applicable federal law, including the Federal Tort Claims Act, codified as amended primarily at 28 U.S.C. §§ 2671-80 (2018), the BLM will be liable for the negligent or wrongful acts or omissions of its officers or employees while acting within the scope of their office or employment. The BLM's commitment to pay any lawful obligation or liability incurred by the BLM under this agreement is backed by the full faith and credit of the United States.

19.    This Agreement shall be governed by and interpreted according to the laws of the Federal government of the United States where federal law controls the issue and according to the laws of the State of Kansas where state law controls the issue. The KDOT Secretary agrees to submit to the jurisdiction of the courts of the United States with respect to all disputes or matters between the United States and the KDOT Secretary or KDOT arising out of this Agreement. However, the KDOT Secretary does not waive the State of Kansas' immunity from suit in federal court by any entity other than the United States as provided in the 11th Amendment to the United States Constitution. Accordingly, nothing in this Agreement gives a non-federal government purchaser of the Pipeline the right to sue the KDOT Secretary, KDOT, or the State of Kansas in federal court for a dispute or matter arising out of this Agreement.

20.    Kansas law (K.S.A. 46-239(c)) requires this agency to report all contracts entered into with any legislator, or any member of a firm of which a legislator is a member, under which the legislator or member of the firm is to perform services for this agency for compensation. Consequently, please indicate below if this contract is being entered into with a legislator or a firm in which a legislator is a member.

For the Pipeline Contractor
Yes, this contract is with a legislator or a firm in which a legislator is a member.

_____

That legislator is: _____
Business Phone _____

Address (Street, City, State, Zip Code)

_____   X_____   No, this contract is not being entered into
with a legislator or a firm in which a legislator is a member.

21.          This Agreement creates no third-party beneficiaries and authorizes no third party to maintain a suit for damages under this Agreement as a third-party beneficiary or in any other capacity.

22.          This Agreement binds the Parties and the Parties' successors and assigns. The Parties understand that the United States plans on selling the Pipeline to a private entity(ies) in 2022, and any subsequent purchaser of the Pipeline will have the rights and obligations of BLM under this Agreement as BLM's successor. Any changes to the Pipeline Contractor's scope of work and schedule requested by BLM's successor would be subject to the agreement of both the KDOT Secretary and Pipeline Contractor and eligible for a change order under Paragraph 13 of this Agreement.

23.          In signing this Agreement, the Parties and the individual person signing represent that the person signing has the authority and capacity to execute and legally bind the respective entity to this Agreement.

24.          This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement.

Executed by the PIPELINE CONTRACTOR                Executed by the SECRETARY OF
this 7th  day of _April___ 2022 _____            TRANSPORTATION OF THE STATE
                                                     OF KANSAS this _____ day of _____ 2022
NPL CONSTRUCTION COMPANY
                                                     JULIE LORENZ
                                                     KDOT SECRETARY OF TRANSPORTATION

BY:_____                           BY:_____
DAVE BERRY                                           SCOTT W. KING, P.E., CHIEF
DIRECTOR OF CONSTRUCTION                              BUREAU OF ROAD DESIGN

                              FEIN # 88-6003998

            Send checks to:   19820 N. 7th AVE. 120, PHOENIX, AZ 85027

      Executed by the UNITED STATES DEPARTMENT OF
      INTERIOR BUREAU OF LAND MANAGEMENT this


                  _____ day of _____2022

            BY: _____

                  SAMUEL R.M. BURTON

                  BLM AMARILLO FIELD MANAGER

# Attachment R

SUPPLEMENTAL AGREEMENT NO. 1 to
Contract No. 14-09-0060-3013
For PROJECT NO. 50-35 KA 2383-01

WHEREAS, the United States Department of the Interior Bureau of Mines and the State of Kansas through the State Highway Commission entered into Contract No. 14-09-0060-3013 (Contract) for the purpose of conforming and protecting the United States' crude helium pipeline to the Commission's highway improvements on U.S. 50 designated Project 50-35-F050-2(24), and

WHEREAS, the United States (Grantee) obtained an "Easement for Pipeline Right of Way", (Easement) from R.L. Miller (Grantor) for an "exclusive right of-way and easement, fifty (50) feet in width" for its crude helium pipeline on Lots 5 and 6 and the SE ¼ of NE ¼ of Section 7, Township 26 South, Range 27 West) (Easement) and the Easement allows the Grantor continued use and enjoyment that does not conflict with the United States' rights while also providing that "no building, reservoir, or structure shall be constructed upon, under, or across said right-of-way without Grantee's written consent," and

WHEREAS, the Bureau of Mines did not object to the highway crossing its crude helium pipeline provided the Commission complied with certain conditions and stipulations in that Contract and the Commission complied with those conditions and constructed Project 50-35-F050-2(24), and

WHEREAS, ownership of the crude helium pipeline was transferred from the Bureau of Mines to the United States Department of Interior Bureau of Land Management (BLM), and

WHEREAS, the Secretary of Transportation for the State of Kansas (KDOT Secretary) is the successor to the State Highway Commission pursuant to K.S.A. 75-5004 and the Kansas Department of Transportation (KDOT) is the state transportation department under the KDOT Secretary's direction and supervision, and

WHEREAS, the KDOT Secretary is constructing further highway improvements on U.S. 50 designated as Project No. 50-35 KA 2383-01 (Federal Project No. NHPP-A238(301)) (Project) and this Project includes reconstruction of the existing U.S. 50 highway lanes over the crude helium pipeline undertaken with Project 50-35-F050-2(24) as well as construction of new U.S. 50 highway lanes over another portion of the crude helium pipeline, and

WHEREAS, by General Warranty Deed of November 11, 2020, the KDOT Secretary purchased right-of-way for the construction of a fully controlled access highway for the new U.S. 50 highway lanes from Transport Express, Inc., the current record owner of the NE ¼ of Section 7, Township 26 South, Range 27 West, but this purchase did not extinguish the BLM's Easement, and

WHEREAS, the Project requires modifications to the crude helium pipeline to protect the pipeline and preserve its continued operation and the KDOT Secretary acknowledges KDOT's obligations under 23 C.F.R. Part 645 Subpart A ("Utility Protections, Adjustments, and Reimbursement")(23 C.F.R. 645.101 *et seq*.) and  23 C.F.R. Part 645 Subpart B ("Accommodation

26 Utilities) 23 CFR. 645.201 et seq.) to protect the crude helium pipeline and preserve its continued operation, and

NOW THEREFORE, in consideration of the mutual covenants contained herein, the BLM and KDOT Secretary (collectively the "Parties") agree:

1. BLM consents to the construction of the new U.S. 50 lanes and reconstruction of the existing U.S. 50 lanes crossing its crude helium pipeline, provided the KDOT Secretary complies with the conditions and stipulations (paragraphs 2 through 10) in this Supplemental Agreement No.1.

2. At the KDOT Secretary's sole expense, the KDOT Secretary will arrange for the protection of such portions of BLM's crude helium pipeline located in the NE ¼ of Section 7, Township 26 South, Range 27 West, Gray County, Kansas, that the Parties determine are required for relocation and expansion of State Highway U.S. 50 approximately 1 mile east of Cimmaron, Kansas (Utility Protection). The KDOT Secretary will not be responsible for upgrades to the pipeline that are not caused by the highway construction, except to the extent such betterment is permitted in 23 C.F.R. 645.117(h)(3).

3. At the KDOT Secretary's sole expense, the KDOT Secretary retained Wilson and Company, a civil engineering firm with pipeline experience, to review KDOT roadway design plans for impact on the pipeline and civil infrastructure solutions that may be necessary to mitigate damage to the pipeline.

4. At the KDOT Secretary's sole expense, the KDOT Secretary retained Jonathan Elder, P.E., BLM's designated pipeline integrity/corrosion expert, to perform pre-construction, design, and construction contract administration services needed for the Utility Protection. Mr. Elder's services include the following activities:

   a. Inspect the pipeline to determine the current condition of the helium pipeline between the railroad to the south and the mainline valve north of the proposed highway expansion.
   b. Analyze how the proposed roadway design affects the helium pipeline.
   c. Report all identified mechanical integrity and corrosions risks to the pipeline resulting from the highway improvement.
   d. Review current roadway and pipeline alternatives for mitigating damage to the pipeline.
   e. Propose new alternatives if KDOT proposed mitigation suggestions are not adequate to BLM.
   f. Meet with the Parties' representatives to discuss proposed mitigation.
   g. Review KDOT roadway design plans for general conformance to the proposed mitigation recommendations.
   h. Review KDOT roadway design plans to identify restrictions on the highway contractor's work necessary to protect the pipeline, including weight limits on construction vehicles for inclusion in the roadway design plans.
   i. Obtain the Parties' approval of the proposed pipeline mitigation.

      j.   Prepare pipeline mitigation design plans and specifications for any pipeline solution approved by both Parties (Utility Protection).

      k.   Determine the qualified pipeline contractors and qualified subcontractors that are eligible to perform the Utility Protection and solicit bids from the qualified pipeline contractors.

      l.   After the Parties have contracted with the successful Pipeline Contractor, inspect the Pipeline Contractor's work for compliance with the plans and authorize the payments owed to the Pipeline Contractor by the KDOT Secretary.

      m.   Review the highway contractor's plan for controlling and monitoring the prevention of all construction activities within the pipeline Easement area and inspect the highway contractor's work for conformance to the contractor's plan and restrictions identified in the roadway design plans.

      n.   Prepare as-built plans for the BLM after the Pipeline Contractor has completed the Utility Protection and the Parties have accepted the Utility Protection.

5.   The mitigation will be performed according to the plans and specifications prepared by and signed and sealed by Jonathan Elder, P.E. (KDOT 50-35 KA 2383-01 Highway 50 Widening BLM Crude Helium Pipeline Utility Conflict Plans) and approved by BLM. The BLM must approve the sealed "Issue for Construction" plan set before any Utility Protection is undertaken (Utility Protection Plans).

6.   The Parties will enter into a three-party Reimbursable Utility Agreement (in a form approved by BLM) consisting of the KDOT Secretary, BLM, and the approved Pipeline Contractor for the Pipeline Contractor to perform the Utility Protection according to the Utility Protection Plans at the KDOT Secretary's sole expense. The Reimbursable Utility Agreement makes the Pipeline Contractor responsible to BLM and the KDOT Secretary for property damage to the helium pipeline and the loss of helium (economic damages) caused by the Pipeline Contractor's operations. The executed Reimbursable Utility Agreement will be attached to and incorporated into this Supplemental Agreement No. 1.

7.   The KDOT Secretary has included in the roadway design plans restrictions imposed on the highway contractor when working over the pipeline as provided by Mr. Elder. The KDOT Secretary has provisions in the highway construction contract making the highway contractor responsible to BLM and the KDOT Secretary for property damage to the helium pipeline and loss of helium (economic damages) caused by the highway contractor's operations.

8.   The KDOT Secretary will be responsible for coordinating with Burlington Northern Santa Fe Railroad (successor to The Atchison, Topeka and Santa Fe Railway Company) to perform the Relocation on railroad right-of-way as required by 23 C.F.R. Part 646 ("Railroads") and as required in the Pipe Line License of March 12, 1962, obtained by the United States from The Atchison, Topeka and Santa Fe Railway Company for this helium pipeline.

9.   The KDOT Secretary releases the United States, and its assigns from any and all damages which may result from the construction, operation, or maintenance of U.S. 50 upon or across the crude helium pipeline as conformed to the Project.

Supp. Agmt No. 1 to
Contract 14-09-0060-3013
for Project No. 50-35 KA 2383-01
Page 3 of 4
FB No. BLM-R-2044

Issue Date:July 26, 2023             Page 223

10. The KDOT Secretary will use, occupy and maintain the Project with all reasonable diligence and precaution to avoid damages to or interference with the crude helium pipeline or with the operation and maintenance of the crude helium pipeline.

11. This Supplemental Agreement No. 1 shall inure to the benefit of and be binding upon the Parties' successors and assigns.

12. All terms of the Original Agreement not modified directly by Supplemental Agreement No. 1 remain effective as originally written.

13. This Supplemental Agreement No. 1 shall become effective when either the KDOT Secretary or the KDOT Secretary's authorized representative signs the Supplemental Agreement and the BLM's authorized representative signs the Supplemental Agreement.

14. In signing Supplemental Agreement No. 1, the Parties and the individual person signing represent that the person signing has the authority and capacity to execute and legally bind the respective entity to the Supplemental Agreement and the modifications contained herein.

Executed by the UNITED STATES DEPT OF INTERIOR, BUREAU OF LAND MANAGEMENT this

_14_ day of _MARCH_ 2022

BY: _Samuel RM Burton_

NAME: _SAMUEL R.M. BURTON_

TITLE: _BLM FIELD MANAGER_

Executed by the SECRETARY of TRANSPORTION FOR THE STATE OF KANSAS this

_____ day of _____ 2022

BY: _____

BURT MOREY, P.E
DEPUTY SECRETARY AND
STATE TRANSPORTION ENGINEER

Supp. Agmt No. 1 to
Contract 14-09-0060-3013
for Project No. 50-35 KA 2383-01
Page 4 of 4

## Attachment S

Date Received: _____          BLM License No. _____

Time Received: _____          Number: _____

## TERM IRREVOCABLE LICENSE AGREEMENT

**THIS TERM IRREVOCABLE LICENSE AGREEMENT,** (the "License") is made and entered into by and between _____, a _____ (corporate status)(the "Licensor"), owner of the real property described in "Exhibit A", which is hereby incorporated and made a part hereof, (the "Property"), and the **UNITED STATES OF AMERICA**, acting by and through the U.S. Bureau of Land Management, through its duly authorized representatives pursuant to 550 U.S.C 167d, as amended, (the "Licensee").

### RECITALS

**WHEREAS** Licensor purchased the Property from the Licensee, and is the current owner of the Property situated in the Potter County, Texas as of the effective date of this License; and,

**WHEREAS** Licensee owns and maintains IT systems, briefly described in "Attachment B," that supports the operations of the Federal Helium Reserve System of the Property that must remain operational until the Licensee's final as owner of the Property to accommodate the obligations and duties of the Licensee under the terms and conditions of the Federal Helium Reserve Helium Storage and Delivery Contracts; and,

**WHEREAS** Licensee must remove said Government owned IT systems after the successful conveyance of the Property to the Licensor, post conveyance; and

**WHEREAS** Licensor desires and is willing to cooperate, work with, and grant to Licensee a term irrevocable license agreement to access the Property under the terms and conditions hereinafter as set forth in this Agreement.

**NOW, THEREFORE,** the Licensor and Licensee agree as follows:

### AGREEMENT

1.      Licensor, in consideration of the Government's conveyance of title to the Licensor of the Property, agrees to all terms and conditions hereinafter set forth.

2.      This license shall expire 45 days from the date of execution as evidenced by the date of the last signature shown below.

3.      All participation, cooperation, work, construction, maintenance, and operations performed by the Licensor and Licensee during Licensee's occupancy of the Property will be for the purpose to enable transition and continued operation of the Federal Helium Reserve System during the term of the License and Licensor, for itself and its assigns, agrees comply with all terms and conditions of this License.

4.      If any work, installation, reinstallation, relocation, repair, or regular maintenance of any existing or future improvements owned by or is constructed on the Property during the term of the License by or on behalf of Licensor or Licensee, Licensor shall be solely responsible for and shall pay for all actual costs incurred.

5.       Licensor agrees that Licensee, its employees, officers, agents, contractors, and subcontractors, may enter and utilize the Property at any time for the purpose of removing the Government owned personal property briefly described in Exhibit B. Licensee, its employees, officers, agents, contractors, and subcontractors, shall bear no responsibility or liability for any damage or disruption or other adverse consequences resulting from its work and operations performed by or on behalf of the Licensee, its employees, officers, agents, contractors, and subcontractors, during Licensee's occupancy of the Property.

6.       **LICENSOR COVENANTS AND AGREES TO INDEMNIFY, AND DOES HEREBY, HOLD HARMLESS, AND DEFEND LICENSEE, ITS OFFICERS, AGENTS, EMPLOYEES, AND ELECTED OFFICIALS FROM AND AGAINST ANY AND ALL CLAIMS OR SUITS FOR PROPERTY DAMAGE OR LOSS AND/OR PERSONAL INJURY, INCLUDING DEATH, TO ANY AND ALL PERSONS, OF WHATSOEVER KIND OR CHARACTER, WHETHER REAL OR ASSERTED, ARISING OUT OF OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY, LICENSOR'S PARTICIPATION, COOPERATION, WORK, CONSTRUCTION, MAINTENANCE, PROPERTY REMOVAL OPERATIONS, OCCUPANCY, USE, EXISTENCE, OR LOCATION OF THE PROPERTY, AND USES GRANTED HEREUNDER, WHETHER OR NOT CAUSED, IN WHOLE OR IN PART, BY THE ALLEGED NEGLIGENCE OF LICENSEE, ITS OFFICERS, AGENTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, OTHER LICENSEES (IF ANY), OR INVITEES OF THE LICENSEE.**

7.       Licensor and Licensee agree to comply fully with all applicable federal, State, and local laws, statutes, ordinances, codes, and regulations in connection with the operation, and maintenance of the Property and the associated Helium System and its uses.

8.       Licensee and Licensor agree not to assign all or any of its rights, privileges, or duties under this License without the written approval of the other party and any attempted assignment without such written approval shall be void.

9.       Any cause of action for breach of this License shall be brought in the United States District Court, Northern District of Texas, Amarillo Division.  This License shall be governed by federal law and the laws of the State of Texas.

10.     This License shall be binding upon the parties hereto and their successors and assigns.

11.     This License may be executed in multiple counterparts, each of which shall be considered an original, but all of which shall constitute one instrument.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

**TERM IRREVOCABLE LICENSE AGREEMENT**

**SIGNATURES**

**Licensor:**

_____, _____
(Name)                                                    (Date)

**Licensee:**

**By:** _____, _____
(Name)                                                    (Date)

U.S. Bureau of Land Management

## Exhibit A to Attachment S

### DESCRIPTION OF LOT #2
### FEDERAL HELIUM RESERVE PROPERTY

**GAS INTERESTS.**  38,254 acres, more or less, of helium and natural gas interests (no oil interests); including 13,914 acres of gas storage rights for the Bush Dome (for injection) including 60 acres, more or less, of oil and helium and natural gas interests  (Potter County, Texas) and concurrent with a portion of the 38,254 acres of helium and natural gas interests.

**FEE LAND.**  An improved 10.46 fee acre parcel of land, more or less, (Haskell County, Kansas).

**HELIUM PIPELINE EASEMENTS.**  423.24 miles, more or less of crude helium pipeline easements,more or less improved with 184.54 miles, more or less of 8 inch pipeline and approximately 166.9 miles, more or less of 4 inch pipeline easement, and 71.8 miles, more or less of additional smaller diameter spurs that distributes helium to certain identified locations in Texas, Oklahoma and Kansas.

**ASSOCIATED PERSONAL PROPERTY** - 23 government natural gas wells (see Exhibits 4 and 5) which include four high purity helium injection wells, and two monitoring wells, together with other associated machinery, parts, and equipment to be transferred by Bill of Sale, all as more specifically set forth below.

**ASSOCIATED CONTRACTS FOR THE STORAGE AND DELIVERY OF HELIUM**. All Contracts for the Storage and Delivery of Helium covering the Federal Helium Reserve System (see Attachment M) associated with the Property to be Assigned by the Government to the Purchaser, as well as a separate 2023-2027 Contract for the Storage and Delivery of Helium (see Attachment P1) in the Federally-Owned Crude Helium Only, Sale # BLM-R-2045 to be closed and conveyed prior to the closing of this sale as more specifically set forth below.

**INJECTED HELIUM.** This sale includes 800 million cubic feet (MMcf), more or less, of crude helium injected into the Cliffside Field by the Government and separate from the eleven  FY 22-2027 Contracts for the Storage and Delivery of Helium (also stated herein as "Original Storage Contracts" or "Contract(s) for the Storage and Delivery of Helium" or "2023-2027 Contract for the Storage and Delivery of Helium").

**NATIVE HELIUM.** This sale includes any native helium that remains after the final delivery of injected helium held in the 11 Associated Contracts for the Storage and Delivery of Helium as well as final delivery of approximately one Billion cubic feet (1 Bcf) of the injected helium sold in the "Federally Owned Crude Helium Only" sale, in a separate IFB from this Real Property IFB.

**NATIVE GASSES.** This sale includes any native gasses other than helium subject to the terms, conditions, reservations, and restrictions contained in the four separate Gas Grants conveyed with this sale.

# Exhibit B to Attachment S

## TERM IRREVOCABLE LICENSE AGREEMENT LIST OF GOVERNMENT OWNED PERSONAL PROPERTY TO BE REMOVED FROM SITE

**Brief description of Government owned personal property to be removed the Property**

1. IT hardware, software, and related system equipment, racks, cabling, power supplies, and other items including but not limited to the following:

**Cliffside Gas Fields Office**

- Vendor-owned data circuit (Lumen/Verizon) (Quantity: 1 data circuit set)
- Vendor-owned Cisco 1941 router (Lumen/Verizon) (Quantity: 1)
- Riverbed SteelFusion appliance (Quantity: 1)
- Network switches (Quantity: 5)
  - Cisco WS-C3650 (Quantity: 3)
  - Cisco 9300 (Quantity: 1)
- Cisco voice gateway routers (Quantity: 1)
  - Cisco 2591 (Quantity: 1)
- Cisco desk phones (Quantity: 29)
- Aruba 225 access points (Quantity:4)
- Uninterruptible power supply (Quantity: 1)
- Printers (Quantity: 8)
  - Xerox Workcentre 7855 (Quantity: 2 (Property #L0560251, #L0560253))
  - Xerox Workcentre 6655 (Quantity: 3 (Property #L0560248, #L0560249. #L0560260))
  - Xerox VersaLink B400DN (Quantity: 3 (Property #L0560257, #L0560258, #L0560259))
- BLM Dell workstations

**Satanta Office**

- Vendor-owned data circuit (Pioneer Communications) (Quantity: 1 data circuit set)
- Network switches (Quantity: 1)
  - Cisco WS-C3560 (Quantity: 1)
- Cisco ASA 5505 (Quantity: 1)
- Cisco desk phones (Quantity: 3)
- Aruba access point (model number is likely Aruba 225) (Quantity: 1)
- Security camera, electric gate (Quantity: 1 security system, including up to 10 security cameras)
- Printers (Quantity: 2)
  - Xerox WorkCentre 6655 (Property #L0560247)
  - Xerox VersaLink C400 (Property #L0560250)
- BLM Dell workstations (Quantity: 2 (BLM hostnames / property numbers: ILMNMAC50601289 (Steve Maturey), ILMNMAC50560281 (Robert Windham)))

## Attachment T - Wired Funds Instructions

| Type/Subtype Code (entered by sender) | | | | |
|---|---|---|---|---|
| | | | | |

| Amount | Sender Financial Institution (9 digit routing number and short name) |
|---|---|
| $5,000,000 | |

| Sender Institution Reference Information |
|---|
| |

| Receiver Bank Name | Receiver ABA/Routing Number |
|---|---|
| NYC Treasury | 021030004 |

| Beneficiary Account Name | Beneficiary Account Number |
|---|---|
| General Services Administration | 47000016 |

| Beneficiary Account Address |
|---|
| 2300 Main Street |
| Kansas City, MO 64108 |

| Project Number | Project Name | Reason for Deposit |
|---|---|---|
| TX1181AB | Cliffside Helium System Real Property Purchase | Earnest Money |

| DDA Number | Deposit Account Number |
|---|---|
| 540012 | 199X |

| Contact Name | Attention | Phone Number |
|---|---|---|
| Kristy Daniells | RPUDD | (817) 978-2331 |

| Bank Address |
|---|
| Federal Reserve Bank New York |
| Attn: Lock Box 73221 |
| 33 Liberty Street |
| New York, NY 10045 |

Attachment U

# ELECTRONIC FUNDS TRANSFER (EFT) ENROLLMENT FORM

Privacy Act Statement. Collection of this information is authorized by 31 U.S.C. 3332(g), 3325(d) and 7701(c). The information will be used by the Government to make payments by EFT to a vendor. This information may also be used for income reporting and for collecting and reporting on any delinquent amounts arising out of a vendor's relationship with the Government. Disclosure of the information by the vendor is mandatory. Failure to provide the requested information may result in the delay or withholding of payment to the vendor.

**Use this form to enroll in Direct Deposit of your federal payment from the General Services Administration**

| Last Name | First Name | M.I. |
|---|---|---|
| Company Name | | |
| Home/Business Address | | |

| City | State | Zip |
|---|---|---|

| Social Security Number/Individual Taxpayer Identification Number/Employer Identification Number |
|---|

| Financial Institution Name | Financial Institution Routing Transit Number (9 digits) |
|---|---|

| Depositor Account Number | Account Type<br><br>[  ] Checking<br><br>[  ] Savings |
|---|---|

| Payee email |
|---|
| Phone            (        ) |
| Signature of Authorized Party |

## Email the completed form to: fwrealestatesales@gsa.gov