## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| AIR PRODUCTS AND CHEMICALS, INC., and AIR PRODUCTS LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| GENERAL SERVICES ADMINISTRATION; ROBIN CARNAHAN, in her official capacity as Administrator of the General Services Administration; UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA HAALAND, in her official capacity as Secretary of the United States Department of the Interior; BUREAU OF LAND MANAGEMENT; and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 23-cv-147 |
| Defendants. | ) ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Andrew LeGrand
Texas Bar No. 24070132
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2976
ALeGrand@gibsondunn.com

Helgi C. Walker  (*pro hac vice* forthcoming)
M. Kendall Day  (*pro hac vice* forthcoming)
David Schnitzer  (*pro hac vice* forthcoming)
Aaron Smith  (*pro hac vice* forthcoming)
Nathaniel Tisa  (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
HWalker@gibsondunn.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    A.    The Federal Helium System is a vital and unique national resource. ........ 3

    B.    Congress enacts the Helium Stewardship Act of 2013. ............................ 4

    C.    The BLM states that it will operate the System until all private helium is produced from the field. ................................................................. 5

    D.    Despite prolonged supply interruptions, Defendants proceed with the sale. ............................................................................................................. 7

    E.    Defendants issue the challenged Invitation For Bid. ................................. 8

ARGUMENT ............................................................................................................. 8

    I.    Plaintiffs are likely to succeed on the merits. ......................................... 9

        A.    The Invitation For Bid violates the Helium Stewardship Act. .................. 9

            1.    The Helium Stewardship Act prohibits selling the System in a manner that disrupts the domestic supply of helium. .............. 9

            2.    Defendants' planned sale and conveyance of the Federal Helium System will create a national helium supply crisis. ........ 11

                a.    The sale does not include the CHEU. ............................. 11

                b.    The Invitation For Bid does not secure regulatory compliance. .................................................................... 13

                c.    The Invitation For Bid does not secure pipeline rights-of-way. ................................................................. 15

        B.    The Invitation For Bid is arbitrary and capricious. .................................. 15

            1.    Defendants unreasonably ignored risks to the national helium supply. .............................................................................. 16

            2.    Defendants failed to account for reliance interests in the sale occurring after delivery of purchased helium. ...................... 19

            3.    Defendants failed to account for reasonable alternative means of selling the System while protecting the national helium supply. .............................................................................. 20

    II.    Plaintiffs will suffer irreparable harm. ................................................... 21

        A.    Plaintiffs' ability to use its valuable asset will be harmed. ...................... 21

        B.    Plaintiffs will suffer irreparable losses of customer goodwill. ................ 23

        C.    Plaintiffs cannot seek damages relief from Defendants. ........................... 24

i

**TABLE OF CONTENTS**
(*continued*)

Page

III.     The balance of equities and public interest strongly favor preliminary
         relief. ................................................................................................................. 24

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
  878 F.2d 806 (5th Cir. 1989) ....................................................................................24

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
  509 F. Supp. 3d 482 (D. Md. 2020) ...........................................................................23

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ...............................................................................................20

*Bittner v. United States*,
  143 S. Ct. 713 (2023) .................................................................................................19

*Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder*,
  332 F. Supp. 2d 43 (D.D.C. 2004) ................................................................16, 17, 21

*Continental Oil Co. v. Crutcher*,
  434 F. Supp. 464 (E.D. La. 1977) ..............................................................................22

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
  138 S. Ct. 1061 (2018) .................................................................................................9

*DHS v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) .........................................................................................19, 20

*Dist. Hosp. Partners v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ......................................................................................17

*Dubin v. United States*,
  143 S. Ct. 1557 (2023) .................................................................................................9

*In re En Re, LP*,
  222 F. App'x 348 (5th Cir. 2007) ...............................................................................12

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ....................................................................................................19

*Ensco Offshore Co. v. Salazar*,
  781 F. Supp. 2d 332 (E.D. La. 2011) ..........................................................................22

*Florida v. Georgia*,
  138 S. Ct. 2502 (2018) ................................................................................................16

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Franco v. Mabe Trucking Co.,*
    3 F.4th 788 (5th Cir. 2021) ............................................................................10

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
    968 F.3d 454 (5th Cir. 2020) ........................................................................10

*Gulf Restoration Network v. Haaland,*
    47 F.4th 795 (D.C. Cir. 2022) .......................................................................14

*Hornbeck Offshore Servs. v. Salazar,*
    696 F. Supp. 2d 627 (E.D. La. 2010) ......................................................22, 23

*Lakedreams v. Taylor,*
    932 F.2d 1103 (5th Cir. 1991) .......................................................................23

*Lance v. Robinson,*
    543 S.W.3d 723 (Tex. 2018) ..........................................................................15

*Louisiana v. Biden,*
    622 F. Supp. 3d 267 (W.D. La. 2022) .....................................................23, 25

*McDonald v. Longley,*
    4 F.4th 229 (5th Cir. 2021) ..............................................................................9

*Minard Run Oil Co. v. U.S. Forest Serv.,*
    670 F.3d 236 (3d Cir. 2011) ...........................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...........................................................................16, 20, 21

*Nat'l Coal. for Homeless v. U.S. Veterans' Admin.,*
    695 F. Supp. 1226 (D.D.C. 1988) ..................................................................12

*NFIB v. Perez,*
    2016 WL 3766121 (N.D. Tex. June 27, 2016) ...............................................16

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................................24

*R.J. Reynolds Vapor Co. v. FDA,*
    65 F.4th 182 (5th Cir. 2023) .....................................................................20, 24

*Tex. Power & Light Co. v. FCC,*
    784 F.2d 1265 (5th Cir. 1986) .......................................................................16

*Tex. Oil & Gas Ass'n v. EPA,*
    161 F.3d 923 (5th Cir. 1998) .........................................................................17

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Texas v. Becerra*,
  575 F. Supp. 3d 701 (N.D. Tex. 2021) ...................................................................18

*Texas v. Becerra*,
  577 F. Supp. 3d 527 (N.D. Tex. 2021) ...................................................................20

*Texas v. Brooks-LaSure*,
  2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ......................................................21

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ..........................................................................18, 25

*Texas v. Seatrain Int'l*,
  518 F.2d 175 (5th Cir. 1975) ..................................................................................23

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..................................................................................25

*Union Nat'l Life Ins. v. Tillman*,
  143 F. Supp. 2d 638 (N.D. Miss. 2000).............................................................23, 24

*Univ. of Tex. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) ................................................................................9, 13

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ................................................................................20

**Statutes**

5 U.S.C. § 706............................................................................................................9

40 U.S.C. § 541............................................................................................................5

40 U.S.C. § 545....................................................................................................17, 18

49 U.S.C. § 15301......................................................................................................14

50 U.S.C. § 167......................................................................................................3, 12

50 U.S.C. § 167b........................................................................................................18

50 U.S.C. § 167d....................................................................5, 9, 10, 11, 12, 18, 25

50 U.S.C. § 167q........................................................................................................10

Pub. L. No. 104-273, 110 Stat. 3315 (1996)..............................................................4

Pub. L. No. 113-40, 127 Stat. 534 (2013)................................................5, 9, 24, 25

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

**Regulations**

49 C.F.R. §§ 190.1–199.245 ...........................................................................................14

87 Fed. Reg. 57,166 (Sept. 19, 2022) ...........................................................................25

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)........................................................................10

H.R. Rep. No. 113-42 (Apr. 18, 2013) ...................................................3, 4, 5, 10, 17

Scalia & Garner, Reading Law (2012) ...........................................................................9

## INTRODUCTION

The General Services Administration, the Department of the Interior, the Bureau of Land Management, and their respective heads ("Defendants") are poised to sell the Federal Helium System ("System")—a vital and unique federal asset that powers MRI machines, border-patrol aerial surveillance, nuclear reactors, LCD screens, and more—to a private entity in about two months. Grave public and private harms that can never be undone will result if Defendants are allowed to press ahead without taking reasonable steps to ensure a safe and orderly transition of the System. This Court's intervention is needed to avert the resulting disruption of the national helium supply.

Based 16 miles away from this Court in Cliffside, Texas, the one-of-a-kind System is the most important source of helium in the United States.  It is composed of a vast underground reservoir of crude helium; a network of buildings, equipment, and other infrastructure that extracts and enriches helium; and a 423-mile pipeline that delivers helium to private refiners in Texas, Oklahoma, and Kansas, who then purify and deliver refined helium to customers.  Plaintiffs Air Products and Chemicals, Inc. and Air Products LLC (collectively, "Air Products") help meet these vital needs: they bought from the Government 2 billion cubic feet and now own about 800 million cubic feet of helium stored in the System's reservoir; refine helium at a plant on the System's pipeline; and supply refined helium to customers across the United States and around the globe.

The viability of the System is at a critical juncture.  Defendants have issued an Invitation For Bid that solicits bids to sell the System to a private party.  App. 22.  That the System will be sold is not the issue—in 2013, Congress directed the Government in the Helium Stewardship Act to designate the System as excess property in 2021 and sell it thereafter.  The problem is *how* and *when* Defendants *are discharging* that directive.  Under the Act and basic administrative law principles, they have a duty to do so in a way that maintains a stable helium supply, honors their role as stewards of this important federal asset, and is reasonable in light of the asset's unique nature.

1

Yet Defendants are approaching the sale as if the System were an empty warehouse. Although Defendants previously recognized the need to transfer a "fully functional" System, their plan will leave the purchaser without (1) guaranteed rights to use an enrichment unit necessary to produce helium, (2) assurances that the System complies with myriad regulatory requirements, or (3) secured rights-of-way to use the System's pipeline. If the System shuts down for even a few weeks, Air Products' stored helium will be inaccessible, and the broader helium shortage will be crippling.

Moreover, Defendants' present rush to get rid of the System undermines reliance interests engendered by earlier, official representations that Defendants would continue to operate the System until they delivered to Air Products all of its helium. Defendants initially predicted that process would take until at least 2023, but due to System interruptions, it will take until the end of 2026, if not longer. App. 5, 274. Yet Defendants have changed positions, and will now convey the System with Air Products' helium still in the System's underground reservoir. Defendants, with Air Products' money in their coffers, have not offered *any* reason why the sale is proceeding before Defendants have fulfilled their promise, much less a sufficient explanation for their change in position. Indeed, the "global helium business is in the middle of the longest helium shortage" ever, App. 303, and the System is currently producing helium at maximum rates; it is especially irrational to change course now. Finally, Defendants failed to consider reasonable alternatives that would have at least mitigated the problems with selling and conveying the System as now planned.

The Court should preliminarily enjoin Defendants from implementing or enforcing the Invitation For Bid, including unsealing or opening any submitted bids, to maintain the status quo and avoid the irreparable private and public harms that a helium supply crisis would inflict. The Government will open bids on November 15, 2023. To ensure adequate opportunity for effective appellate relief, Air Products respectfully requests a ruling on this motion by **November 3, 2023**.

2

## BACKGROUND

**A.     The Federal Helium System is a vital and unique national resource.**

Helium is a critical gas.  The national-defense, medical, technology, and scientific sectors all rely on helium, which is used in MRI machines, rocket fuel, LCD screens, border-patrol aerial surveillance, and more.  H.R. Rep. No. 113-42 at 9 (Apr. 18, 2013); App. 308.  But helium is also scarce.  Generated deep underground, helium rises through Earth's crust and escapes into space unless it is trapped in pockets of natural gas.  Because it is a byproduct of natural gas production, it is a limited natural resource.  Moreover, there are limited reserves of helium worldwide.  Only a few facilities around the globe produce significant volumes of helium.  App. 312.

The System is one of those key facilities.  It is located in Amarillo, Texas, and supplies 20 percent of the domestic demand for helium.  App. 314.  The Department of the Interior and its Bureau of Land Management ("BLM") operate the System's complex and vast network of: underground helium storage; 30 buildings, ranging from 1,000 to 5,000 square feet, of varying uses; plants; a 10-acre maintenance station; 23 gas wells and equipment; machinery; and other physical infrastructure.  App. 314.  By statute, the System includes: (1) the Cliffside Field, also known as the Bush Dome, an underground storage reservoir that holds both privately owned and federally owned helium; (2) the Federal Helium Pipeline, which carries helium from the Amarillo facility to plants and refineries in Texas, Oklahoma, and Kansas; and (3) "all other infrastructure owned, leased, or managed under contract by the Secretary for the storage, transportation, withdrawal, enrichment, purification, or management of helium."  50 U.S.C. § 167(4)(D).

One essential piece of the statutorily defined "infrastructure" is the Crude Helium Enrichment Unit (the "CHEU"), a helium processing facility.  No helium can be produced from the Cliffside Field without it.  A private partnership that includes Air Products, L.P. built the CHEU in 2003 and still owns it, but the Government has always leased the CHEU from the partnership.

3

App. 325.  The BLM entered into the current lease in 2018; in May and June 2023, BLM exercised options extending the lease through September 2024, and affirmatively modified the lease to allow for a *further* extension through September 2025.  App. 335–36.  Despite that arrangement, the General Services Administration ("GSA") has stated that Defendants' "contract to lease the CHEU terminates prior to the conveyance" of the System, App. 341, and that "[a]ny future owner of the Federal Helium System will need to make their own arrangements regarding" the CHEU, App. 28.

All parts of the System thus must work together seamlessly to: (1) extract crude helium from the Field; (2) process and enrich that crude helium with on-site equipment, including the CHEU; and (3) deliver produced helium through the Pipeline to private facilities, which then refine the delivered helium into "pure" helium for end users.  Air Products plays a crucial part in this ecosystem.  Air Products previously purchased about 2 billion cubic feet of helium from the United States for about $250 million.  App. 4 ¶ 6.  Now, Air Products owns more than 800 million cubic feet of helium that is stored at the System, and its value far exceeds the amount that Air Products paid for it.  App. 5 ¶ 11.  Air Products also owns a facility in Liberal, Kansas on the System's pipeline, where Air Products purifies the crude helium delivered from the System, and then transports and delivers the purified helium to its customers in dozens of industries, including aerospace, chemicals, electronics, metals, and manufacturing.  App. 2 ¶¶ 2–3.

### B.     Congress enacts the Helium Stewardship Act of 2013.

From the 1920s to the 1990s, the demand for helium at the System waxed and waned.  *See* H.R. Rep. No. 113-42 at 8–9.  But in 1996, Congress instructed the BLM to sell enough helium to recoup certain government debt and then cease producing helium at the System.  *See* Helium Privatization Act, Pub. L. No. 104-273, 110 Stat. 3315 (1996).  There was a huge practical problem with that plan.  By 2013, as a helium supply shortage loomed, the BLM was about to pay off the debt and cease operations *without* selling all the helium contained at the System, or even delivering

all of the already purchased helium.  H.R. Rep. No. 113-42 at 10.  Helium refiners and users thus would be forced to look overseas to other, unreliable sources in Algeria, Qatar, and Russia.  *Id.*

Lessons learned, Congress intervened by enacting the Helium Stewardship Act of 2013. This time, Congress directed Defendants to "complete the privatization of the Federal helium reserve in a competitive market fashion that *ensures stability in the helium markets* while protecting the interests of American taxpayers."  Pub. L. No. 113-40, 127 Stat. 534, 534 (2013) (emphasis added).  To accomplish that goal, it created a process that phased out helium sales over time, *see* 50 U.S.C. § 167d(a)–(c), and then, in the last phase—"Phase D"—provided for the privatization of the System.  In particular, Congress provided that "not later than *September 30, 2021*, the Secretary [of Interior] shall designate as excess property and dispose of all facilities, equipment, and other real and personal property, and all interests in the same, held by the United States in the Federal Helium System."  *Id.* § 167d(d)(1) (emphasis added).  Congress further instructed that after the Secretary (acting through BLM) designated the System as excess property by September 2021, the GSA would manage the sale and conveyance "in accordance with subtitle I of title 40," *id.* § 167d(d)(2), which is that agency's general authority for the management of surplus government property, *see* 40 U.S.C. § 541.  Neither the Helium Stewardship Act nor Title 40 impose a deadline by which the GSA must complete that process.

By providing for an orderly sale and disposal process, the Act "ensure[d] a consistent supply of helium for U.S. manufacturers, consumers, and researchers."  H.R. Rep. No. 113-42 at 11. If the Government "fail[ed]" to keep the System operational, the inevitable and undesired result would be "disruption of the helium markets and additional unnecessary costs to helium users."  *Id.*

### C.  The BLM states that it will operate the System until all private helium is produced from the field.

The first three phases of the Act proceeded smoothly.  The BLM sold about 4.8 billion

cubic feet of helium between 2014 and 2019 for more than $500 million.  App. 344–51.  Air Products purchased its helium from the BLM during this time.  App. 3 ¶ 6; App. 345–51.

As the final phase of the Helium Stewardship Act drew closer, Defendants recognized the "many . . . issues" that would "require deliberation and [a] path-forward strategy" to address as they "plan[ned] for disposal of" the System.  App. 326 (Dep't of Interior 2017 Report).  Among those issues: the CHEU was privately owned, so the agencies would need to sort out how a private System purchaser and operator could use it; the Government enjoyed significant advantages in operating the System due to "inherently government roles that may not be transferable to a third party" purchaser, such as the power to "condem[n] rights of way" and to invoke "exemptions" from onerous regulations; and the Government had contractual "obligations to deliver helium that has been sold."  App. 326.  An overarching, "major concern" was "sell[ing]" the System "as a fully functioning system" in order "to deliver [any] remaining privately owned helium."  App. 326.

In later years, Defendants represented four times that the System's sale and conveyance would not occur until Defendants delivered all privately owned helium, and Air Products and the industry relied on these representations.  App. 4–7 ¶¶ 9, 15; *see also* App. 405–08.  *First*, the BLM announced in April 2020 the intended "process and timeline" for the System's sale and convey-ance.  App. 353 (BLM press release).  The BLM stated that, "while the GSA completes their dis-posal process" after September 30, 2021, "*the BLM*"—and not a private purchaser—would "con-tinue operations *until such time as all privately owned helium is produced* from the field (about 2023)."  App. 353 (emphases added).

*Second*, when Air Products contracted to continue storing and delivering already purchased private helium in 2021, the United States specifically provided for the Government to accept, store, and deliver helium "*after* October 1, 2022."  App. 362; *see also* App. 361, 363.

*Third*, the Department told Congress in November 2021 that GSA's disposal process would "take one to two years" to complete—*i.e.*, between November 2022 and November 2023—and confirmed that the BLM "will continue to deliver privately owned helium also stored in the Federal Helium System until the final disposal of the Federal Helium System."  App. 387.  The Department did not offer an updated or different date in its subsequent annual report to Congress.  App. 396.

*Fourth*, the BLM brought its representations full circle in 2022.  When the BLM certified why it was contracting a private party to operate the CHEU, the BLM reiterated the statement in its 2020 press release that the BLM would "continue operations *until such time as all privately owned helium is produced* from the field (about 2023)."  App. 400 (emphasis added).

### D.   Despite prolonged supply interruptions, Defendants proceed with the sale.

Shutdowns and workplace-safety findings hobbled the System in the run-up to the proposed sale and conveyance, suspending the System's helium deliveries throughout 2021 and 2022.  *See* App. 260, 272.  Most recently, in January 2022, a leak caused an unplanned shutdown that was not resolved until June 2022.  App. 413.  Before that, in July 2021, the BLM shut down the System for four months due to safety issues.  App. 416.  The Occupational Safety and Health Administration ("OSHA") investigated and eventually issued "21 notices of unsafe working conditions" at the CHEU.  App. 419.  In May 2022, the BLM subcontracted operations of the CHEU to an industrial gas company that partially owns the CHEU.  App. 399.  Since June 2022, plant operations have been stable and the System is producing crude helium at maximum rates.

Nevertheless, Defendants *accelerated* their plans to sell and convey the System, without ever explaining *why*.  On May 12, 2022, the GSA issued an "FAQ" document summarily announcing that the System was "being sold as is . . . in August 2022."  App. 339–40.  Air Products and eight of the other ten helium storage contract holders, the Compressed Gas Association ("CGA"), and three senior members of the U.S. House Committee on Natural Resources wrote to Defendants,

urging them to delay the planned sale and conveyance until operational concerns could be adequately addressed.  App. 423–33 (Air Products), 435–37 (Contract Holders), 410–11 (CGA), 439–41 (House Committee).  Defendants brushed aside all of those concerns in terse letters, but did not proceed with the sale in August 2022.  *See* App. 450–56 (Response to Contract Holders Letter), 443–48 (Response to Air Products Letter).  For a moment, it appeared Defendants had internalized the criticism and delayed the sale until they delivered all remaining helium, as promised.

But Defendants soon returned to their plan.  In June 2023, GSA confirmed that Defendants intended to restart the sale process the next month.  App. 461–62 (June 22, 2023 Press Release).

### E.     Defendants issue the challenged Invitation For Bid.

On July 26, 2023, Defendants issued the challenged Invitation For Bid ("IFB"), formally putting the System up for sale.  App. 22.  The IFB confirmed that:  (1) rights to use the CHEU would not be included in the sale and conveyance; (2) Defendants would not bring the System into full compliance with regulatory obligations that will encumber a private purchaser, instead placing responsibility solely on the purchaser; and (3) at least some pipeline rights of way were missing documentation.  App. 28, 32, 52–54.

Air Products again wrote to Defendants to explain these concerns and urge Defendants to delay the sale, App. 464–66, and the CGA again raised similar concerns, App. 479–80.  But Defendants shrugged off the potential problems and committed to proceed as planned.  App. 584.  Defendants will close bidding on November 15, 2023, select a winning bid thereafter, and convey the property to the new owner within 120 days of the winning bid's selection.  App. 23, 37.

### ARGUMENT

Plaintiffs are entitled to a preliminary injunction because "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an injunction is in the public interest."  *McDonald*

*v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (quotation marks omitted).

**I.      Plaintiffs are likely to succeed on the merits.**

Under the APA, this Court "shall" hold unlawful and set aside agency action that is contrary to law or arbitrary and capricious.  5 U.S.C. § 706(2)(A).  The Invitation For Bid violates the Helium Stewardship Act and is arbitrary and capricious.

**A.      The Invitation For Bid violates the Helium Stewardship Act.**

An agency acts "contrary to law" in violation of the APA when it "disregard[s] Congress's statutes."  *Univ. of Tex. v. HHS*, 985 F.3d 472, 480–81 (5th Cir. 2021).  Under the Act, Defendants must sell and convey the System in a manner that ensures an uninterrupted supply of helium, consistent with their fundamental duty of stewardship.  By failing to take steps to ensure supply during and after the sale, Defendants violated the statute's text and stated purpose.

**1.      The Helium Stewardship Act prohibits selling the System in a manner that disrupts the domestic supply of helium.**

The starting point for construing the Act's standard for disposing of property is the Act's preamble, which "highlights [Congress'] aim" and illustrates the statute's meaning.  *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1072 (2018).  The Act was enacted to privatize the System—but not at all costs.  Instead, "privatization" must occur in a "fashion *that ensures stability in the helium markets*."  Pub. L. No. 113-40, 127 Stat. at 534 (emphasis added).  Accordingly, when Defendants "dispose[] of" the System, 50 U.S.C. § 167d(d)(1)—*i.e.*, "complete[s] the privatization" of the System, 127 Stat. at 534—they must do so in a way that protects the larger national interest in market stability, not just purely commercial interests.

That special purpose is reflected in the title of the law itself—the Helium *Stewardship* Act.  A statutory "title" is a "permissible indicator[] of meaning."  Scalia & Garner, Reading Law 221 (2012); *see, e.g.*, *Dubin v. United States*, 143 S. Ct. 1557, 1567 (2023).  Acting as steward means

acting in the public's interests.  *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (a "steward" is one appointed "to manage the affairs of another").  As stewards of this precious federal asset upon which so many mission-critical national interests depend, Defendants bear an obligation to act in way that ensures stability in the helium markets.

The "design and structure of the statute as a whole" reinforce that the Secretary must secure a continued supply of helium.  *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020).  In the first two phases of the transition, for example, the Secretary was told to sell helium "with minimum market disruption" in quantities that would "not cause a disruption in the supply of helium."  50 U.S.C. § 167d(a)(1), (b)(1), (b)(12)(A).  Consistent with the aim of securing long-term helium access, Congress directed the Secretary to determine the date "for the implementation of Phase D"—*i.e.*, the final phase involving surplus designation, sale, and conveyance of the System—"that minimizes any potential supply disruptions for Federal users," and to generate a "20-year Federal strategy for securing access to helium."  *Id.* § 167q(2), (3).  Finally, Congress instructed the Secretary to designate the System for disposal as an integrated whole containing all components necessary to maintain operations.  *Id.* § 167d(d)(1).

The "historical context of the [Act's] enactment also suggests that it was intended" to secure the continued supply of helium after the System's sale to a private party.  *Franco v. Mabe Trucking Co.*, 3 F.4th 788, 793 (5th Cir. 2021).  Efforts to sell off the Government's helium reserve led to crises in 2006, 2007, and 2013, when unexpected supply gaps led to helium shortages and increased prices.  Congress enacted the Act to avoid repeating that crisis: the System was about to "close with helium still remaining . . . and no way to access it," forcing U.S. industries to "look overseas" to less reliable sources in Qatar, Russia, and Algeria.  H.R. Rep. No. 113-42 at 10.  To avoid the "disruption of the helium markets and additional unnecessary costs to helium users" that

10

closing the System would cause, Congress acted to protect the "continued operation" of the System and a "consistent supply of helium." *Id.* at 8, 11. Congress was prescient: International events such as the Russia–Ukraine war have recently "stressed the helium market," causing supply issues for scientific researchers and others. App. 483. If Defendants did *not* have to avoid disrupting the helium supply while selling and conveying the System, they could undo Congress's years-long effort to stabilize the helium market with the stroke of a pen.

> **2.    Defendants' planned sale and conveyance of the Federal Helium System will create a national helium supply crisis.**

The Invitation For Bid proposes a sale that will interrupt the helium supply, and thus violate the Helium Stewardship Act, because it does not: (1) include the CHEU, which is necessary to operate the System; (2) address the many compliance issues, including safety concerns, that the Government itself has been unable to meet; or (3) document all necessary pipeline rights-of-way.

> **a.    The sale does not include the CHEU.**

The IFB does not include any rights to use the CHEU, the enrichment unit that is necessary to produce helium at the System. *See* App. 28. That omission violates the Act in two ways.

*First*, under the Act's plain text, the CHEU is part of the System and thus any interests in the CHEU must be conveyed with the rest of the System. Section 167d governs disposal of the System, which is defined as including "all other infrastructure owned, leased, or managed under contract by the Secretary for the storage, transportation, withdrawal, enrichment, purification, or management of helium." 50 U.S.C. § 167(4)(D). The Act further directs the Secretary to "designate as excess property and dispose of all facilities, equipment, and other real and personal property"—including "all interests" therein—"held by the United States in the Federal Helium System." *Id.* § 167d(d)(1). The CHEU is infrastructure that is "lease[d]" by the Secretary to, as its name suggests, "enrich[]," process, and purify helium. *Id.* § 167d(4)(D); *see* App. 399, 401 (BLM

has a "contract . . . to lease" the "enrichment plant"). And "lease" rights are well-recognized prop-

erty "interests." *In re En Re, LP*, 222 F. App'x 348, 349 (5th Cir. 2007). Accordingly, when the

Secretary declared the System excess property in September 2021, the BLM's lease to use the

CHEU was an "interes[t]" in "equipment" held by the United States in the System that must be

designated and disposed. 50 U.S.C. § 167d(d)(1). The same is true today and will remain true

after November 15, when the bidding closes and the selection process begins, because the BLM's

CHEU lease extends through September 2024. App. 335–36. Indeed, GSA recognizes in the

challenged IFB that the CHEU "is integrated into the real property portions of the Federal Helium

System for sale in this IFB." App. 28. Yet the CHEU is "not included in this sale." App. 28.

Without the CHEU, no helium can be produced or extracted. Congress did not authorize a

pointless sale that would threaten production. Defendants should be "enjoined from selling or

otherwise disposing of" the System "until they have complied with the terms" of the Act and in-

cluded the CHEU lease as part of the System sale. *Nat'l Coal. for Homeless v. U.S. Veterans'*

*Admin.*, 695 F. Supp. 1226, 1234 (D.D.C. 1988) (enjoining agency from selling property).

*Second*, the Invitation For Bid's omission of any CHEU lease right also violates the Act

because its omission guarantees a supply interruption. Defendants recognized the "[u]nusual and

compelling urgency" of a nonfunctioning CHEU last year. App. 401. In March 2022, the BLM

contracted out CHEU operations to a private party (that partly owns the CHEU) in an effort to end

extended shutdowns. App. 400. The BLM, however, recognized that it was "not possible" for a

private party to operate the CHEU if that party did "not already have agreements, understanding,

and access to" the CHEU. App. 401. And "[e]ven if a new contractor could obtain agreements"

to use the CHEU and "learn to operate" it, "the time to accomplish these tasks would cause serious

financial harm" to both the Government and "small businesses in the helium industry" who would

be "unable to get helium."  App. 401–02; *see also* App. 325 (Dep't of Interior 2017 Report).

Now, Defendants' plan would produce the very outcome the BLM recently cited to justify an unusual sole-source contract: a non-operational CHEU and disruption to the helium supply. When Defendants sell the System, the purchaser will not have any rights to use the CHEU, and instead "will need to make [its] own arrangements."  App. 28.  Without such rights, helium cannot be produced and extracted from the System.  Although Defendants tout the 120-day closing period as a chance for the winning bidder to *try* to secure rights to use the CHEU, App. 584, there is no guarantee that an agreement can be reached.  Defendants had easy ways to avoid this problem. They could have transferred with the System the CHEU lease, which Defendants only months ago extended *through September 2024 and* affirmatively modified to allow for a *further* extension through September 2025.  Or they could have conditioned the System's conveyance on the winning bidder *actually* securing an agreement to use the CHEU.  But they inexplicably took the path that will disrupt the helium market.  That result is contrary to the Act.  *Univ. of Tex.*, 985 F.3d at 480.

### b.    The Invitation For Bid does not secure regulatory compliance.

Running the System implicates a mix of complicated safety, pipeline, and environmental regulations.  Defendants, as federal government actors, have been largely exempt from these requirements—but a private purchaser would be obligated to comply with them all.  Defendants' failure to address that reality will threaten to disrupt the continued helium supply that Congress demanded.

Three compliance issues illuminate the problem.  *First*, OSHA enforces certain safety standards at the facilities.  Indeed, OSHA issued 21 notices of unsafe working conditions at the Federal Helium Facility in 2022.  App. 419.  Although the BLM was exempt from monetary penalties, the same violations would have cost a private operator more than $1 million.  App. 419. *Second*, the Surface Transportation Board regulates rates charged by pipelines carrying products

other than gas, oil, or water, *see* 49 U.S.C. § 15301(a), and the Pipeline and Hazardous Materials Safety Administration regulates pipeline safety, *see* 49 C.F.R. §§ 190.1–199.245.  The Government is "exemp[t]" from these requirements—but a private owner would not be.  App. 325.  At a minimum, jurisdictional and licensing questions would result in operational delays until they are resolved.  *Third*, the Texas Railroad Commission is responsible for and has not issued permits necessary to operate wells.  Defendants initially disclaimed any concerns because the Texas Railroad Commission purportedly lacks jurisdiction over *purely* helium wells, App. 268, but the CHEU processes gas from wells that also contain methane and nitrogen, App. 487, and the Commission's jurisdiction *does* extend to "natural gas . . . processing plants," App. 495.  Defendants have now walked back their initial disclaimer, informing Air Products that Defendants have "been advised" that the Texas Railroad Commission is "only willing to discuss possible regulatory consequences with the ultimate purchaser."  App. 583.  Defendants' brisk retreat not only illustrates the slapdash and unreliable nature of their diligence process, but also confirms that Defendants lack the authority to resolve meaningful concerns that industry participants have repeatedly raised.

All of these "official" findings "undercut the assumption" underlying the sale, and are "credible evidence" that Defendants should have, but did not, confront.  *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803–04 (D.C. Cir. 2022).  Defendants have even recognized the potential problem that "inherently government[al]" advantages that saved the System from regulatory consequences "may not be transferable to a third party."  App. 325.  Nevertheless, Defendants have refused to certify the System's compliance with applicable laws (because "the government cannot provide legal advice") and instead shifted responsibility to the private purchaser to comply with them without disrupting the System's operations (because the purchaser "should employ their own legal counsel").  App. 451.  Thus, Defendants are putting up for sale the System "AS IS . . . without

14

representation or warranty," App. 34, 54, while the purchaser bears the burden "to identify and fully comply with all applicable Federal, State, and local laws, rules and regulations covering the ownership, operation, and maintenance of the Helium Pipeline System," App. 52.

That eyes-closed approach is no way to run a railroad, much less a complex, one-of-a-kind helium facility relied upon by the entire country.

### c.   The Invitation For Bid does not secure pipeline rights-of-way.

The System's 423-mile pipeline traverses privately owned land using hundreds of 50-foot-wide easements reportedly acquired by the United States in 1962 "through purchase and condemnation." App. 504–05; *see also* App. 32, 36–37.  But for some of these essential rights-of-way, legally adequate records are incomplete or missing.  The challenged IFB includes, by the Government's admission, three parcels with deeds without warranty and six parcels lacking any record of the purported property right.  *See* App. 32, 88, 108, 115, 126–27, 137, 166, 172.

Rather than secure all rights-of-way to preserve a steady helium supply during and after sale, Defendants offloaded their statutory duties without explaining why concerns about the uncertainty of title were misplaced:  The Invitation For Bid proclaims that "***NO WARRANTY IS MADE AS TO QUALITY OF THE TITLE WHICH IS THE RESPONSIBILITY OF BIDDER to establish through their own due diligence***."  App. 32; *see also* App. 584.  Whoever purchases the System will thus have to choose between shutting down the pipeline, delaying operations while it spends time to confirm it has the necessary property rights, or risking legal disputes over the pipeline's usage.  *E.g.*, *Lance v. Robinson*, 543 S.W.3d 723 (Tex. 2018) (litigation over ownership of and easement interests in property covered by deed without warranty).  Either way, the missing rights-of-way will disrupt the helium markets, contrary to the Act.

### B.   The Invitation For Bid is arbitrary and capricious.

Even setting aside the violations of the Act, Defendants' approach is independently

arbitrary and capricious because it fails to safeguard the continued supply of helium, ignores reliance on their previous representations, and fails to consider alternatives.

### 1.   Defendants unreasonably ignored risks to the national helium supply.

When implementing a statute, the APA "requires the [agency] to make decisions that are reasonable." *Florida v. Georgia*, 138 S. Ct. 2502, 2526 (2018). An agency's "approach" cannot be "inconsistent with the intent of Congress," *Tex. Power & Light Co. v. FCC*, 784 F.2d 1265, 1272 (5th Cir. 1986), and must appropriately account for the "important aspect[s] of the problem" before the agency, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard applies equally to the disposition of government property. When Congress authorized an agency to "relinquish its supply of quebracho" tree extract, for example, the agency acted unreasonably by selling large quantities at low prices without "a rational basis for concluding that its sales would not create undue disruption in the market." *Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder*, 332 F. Supp. 2d 43, 45, 49–50 & n.1 (D.D.C. 2004).

Here, Defendants' planned sale will disrupt the helium market. *See supra*, at 11–15. Defendants "structured [their] decision-making in such a way that [they] entirely failed" their basic duty to match the disposal process with the nature of the property at issue and the interests at stake. *NFIB v. Perez*, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016). The System is a special federal asset, and its sale requires special safeguards; it is not reasonable to auction the System as if it were just another widget. Indeed, another federal agency warned in response to GSA's sale plan that "shifts in . . . national reserve policy" were driving "supply issues" and that, because helium is "essential, expensive and non-renewable, proper stewardship of this limited resource is critical." App. 518–20. And a report that GSA presented to potential bidders warns that recent "unplanned outages" at the System "constrained supply," that the unplanned outage caused "prices [to] dramatically increase[] 20-50%" in 2021 and 2022 with expected increases of "10-22% until

16

2025," and that the "global helium business is in the middle of the longest helium shortage" in history.  App. 283, 299, 301–303.  Defendants' single-minded and rushed focus on selling the System, without "consider[ing] the impact on the [helium] market" or the soundest method of doing so, is arbitrary and capricious.  *Chamber*, 332 F. Supp. 2d at 49–50.

Not that long ago, Defendants recognized "the need to sell the Federal Helium System *as a fully functioning system* . . . in order to deliver the remaining privately owned helium."  App. 326 (emphasis added) (Dep't of Interior 2017 Report).  Maintaining the "continued operation" of the System and a "consistent supply of helium" was the reason Congress enacted the Act.  H.R. Rep. No. 113-42 at 8, 11.  But the Invitation For Bid irrationally decreases the System's ability to maintain functionality and, in turn, increases the likelihood that Air Products (and others) have "no way to access" their crude helium in the reservoir, *id.* at 10—even though Air Products already paid the Government for that helium.  Indeed, the System cannot extract, produce, and deliver helium *at all* without the rights to use the CHEU or all pipeline easements.  *See supra*, at 11–13, 15; App. 325.  A reasonable agency does not take action that creates the very problem "that Congress sought to avoid."  *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 939 (5th Cir. 1998) (rejecting arguments that would recreate the "administrative headache[s]" Congress remedied).

The Invitation For Bid's problems are exacerbated given the property's unique nature and the high-level interests at stake.  Under the APA, what is reasonable depends on "context."  *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015).  Indeed, the GSA must conduct public sales in a way that promotes competition "consistent with the *value and nature of the property involved*."  40 U.S.C. § 545(a)(2) (emphasis added).  And Defendants previously acknowledged that careful "deliberation" was needed to address the "many issues" involved in selling and conveying the System.  App. 326.  The System includes a 12,000-acre reservoir, 432 miles of pipeline,

30 buildings, the CHEU, and 23 gas wells.  App. 314–15.  There is literally nothing like the System; it is "much larger than any other known helium storage facility in the world."  App. 303.  It is far more complex than other real property that the GSA sells and conveys, such as a 1.46-acre undeveloped residential lot (App. 523), and unlike such property implicates sensitive policy questions—but you would never know that from the way GSA approached the sale:

 

App. 523, 525.  The Invitation For Bid's failure to even acknowledge the difference is arbitrary and capricious, *cf.* 40 U.S.C. § 545(a)(4) (requiring GSA to account for "the public interest" even in garden-variety real-estate sales), particularly given Defendants' duty to act as System stewards.

Moreover, there is no need to sell and convey the System at this time.  Congress set a September *2021* deadline for the "Secretary" to declare the System excess property and transfer it to the GSA, 50 U.S.C. § 167d(d), but the GSA faces no deadline to sell and convey the System.  Indeed, historical practice cuts against the GSA's current rush:  When Congress in the Helium Privatization Act of 1996 directed the Secretary to "designate as excess property and dispose of" helium-related property *other* than the System by April 2000, *see id.* § 167b(b), (c)(1), the Government was still putting *defunct* helium facilities in Amarillo and Exell "on the [auction] block" as much as *ten years* after that date.  App. 532, 539.  Aware of this history, Congress could have instructed the GSA to sell and convey the System more quickly; it did not.  "Given the absence of a regulation or statute requiring" a sale by 2023, Air Products has a "strong likelihood of success in showing that" Defendants' sell-now-no-matter-the-consequences approach is "arbitrary and capricious."  *Texas v. EPA*, 829 F.3d 405, 429 (5th Cir. 2016); *see Texas v. Becerra*, 575 F. Supp. 3d 701, 723 (N.D. Tex. 2021) (holding agency action "arbitrary and capricious" in part because

agency "applied an inflexible deadline period").[1]

### 2. Defendants failed to account for reliance interests in the sale occurring after delivery of purchased helium.

When an agency changes its existing policy, "the agency must at least 'display awareness that it *is* changing position,'" "'show that there are good reasons for the new policy,'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted), and "account" for any "'legitimate reliance'" on its prior policy, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913, 1915 (2020) (citation omitted); *see also Bittner v. United States*, 143 S. Ct. 713, 722 (2023) (courts have "reason to question" an agency's current view when contradicted by the agency's previous "guidance to the public"). Defendants failed to even acknowledge their about-face on the sale's timing, let alone explain why their new position is good policy.

Defendants repeatedly represented that they would not sell and convey the System before "all privately owned helium is produced from the [Cliffside] field," App. 353 (2020 press release), 400 (2022 publication), in recognition of the United States' contractual "obligations to deliver helium that has been sold," App. 326 (Dep't of Interior 2017 Report). Air Products relied on those representations, believing that the Government—which, unlike a future private purchaser, received Air Products' money for the helium that must now be delivered and cannot become insolvent—would fulfill its promises. App. 4–7 ¶¶ 9, 15. At the time, the BLM expected it could deliver all private helium in "2023." App. 353. But intervening, unplanned System outages suspended helium deliveries—and pushed back by three years the date by which Defendants could, as promised, deliver Air Products' helium from the Cliffside Field. *See supra*, at 2, 7; App. 5 ¶ 10.

---

[1] Nor is there any pressing *financial* need to sell and convey the System. In 2013, the Congressional Budget Office predicted that both helium *and asset* sales would earn $500 million; turns out, helium sales *alone* exceeded that mark without the sale of the infrastructure. *Compare* App. 542 (CBO estimate), *with* App. 345–51, 430 (BLM records of helium sales).

Nevertheless, Defendants "'pulled a surprise switcheroo' by doing the opposite of what [they] had proposed." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) (citation omitted); *see also R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 & n.6 (5th Cir. 2023).  Rather than extending the time that BLM would operate the System to account for System shutdowns, Defendants are on the verge of unsealing bids, selecting a winner, and releasing the United States from contractual performance obligations, App. 23, 51, guaranteeing the System's conveyance *before* Defendants delivers Air Products' helium, App. 5 ¶ 10.  Defendants' new position is even more perplexing because the status quo is promising—the System is stable and has been producing helium at maximum rates for about a year.  It is especially irrational to change course now.

Defendants did not even acknowledge that they were walking back previously announced plans, much less explain why.  *See, e.g.*, App. 443–48 (Response to Air Products), 450–56 (Response to Contract Holders).  Nor did Defendants "assess whether there were reliance interests" based on their previous statements.  *Regents*, 140 S. Ct. at 1914–15.  Defendants' failure to do either is likely arbitrary and capricious.  *See R.J. Reynolds*, 65 F.4th at 189 (granting stay); *Texas v. Becerra*, 577 F. Supp. 3d 527, 553 (N.D. Tex. 2021) (granting preliminary injunction where agency's "prior flexibility engendered serious reliance interests" that were undermined when agency later adopted a "one-size-fits-all" approach).

### 3. Defendants failed to account for reasonable alternative means of selling the System while protecting the national helium supply.

Agencies are required to consider "alternative way[s] of achieving" their chosen policy preferences.  *State Farm*, 463 U.S. at 48.  "[T]he failure of an agency to consider obvious alternatives has led uniformly to reversal."  *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).  Here, Defendants failed to consider two perfectly reasonable alternatives, each of which would have privatized the System without destabilizing the helium market.

As an initial matter, selling and conveying the System at a later date—one that provides Defendants enough time to sell the property responsibly—is an obvious alternative that Defendants previously embraced and that is not foreclosed by statute.  *See supra*, at 6–7, 18.  Defendants have not explained why a sale now is necessary.  *Supra*, at 7–8, 19–20.

Even if conveying the System later were not a viable option, Defendants "could have considered . . . leaving the" sale and conveyance dates "in place while pursuing less-restrictive alternatives to vindicate [their] concerns."  *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *11 (E.D. Tex. Aug. 20, 2021) (granting preliminary injunction).  For example, Defendants could have guaranteed compensation in the event a buyer fails to deliver helium.  Given the "numerous letters from" Air Products and others recommending these alternatives, Defendants have long "been aware of [industry] concerns," making their decision even more irrational.  *Chamber*, 332 F. Supp. 2d at 54 (enjoining government sale); *see* App. 464–65.  The Act's "mandate"—to privatize the System *and* secure the stability of the helium market—"would suggest that the logical response to the faults" of the proposed plan would have been to consider, and adopt, reasonable alternative "way[s] of achieving the objectives of the Act."  *State Farm*, 463 U.S. at 48.

## II.    Plaintiffs will suffer irreparable harm.

Defendants' violations of the Helium Stewardship Act and the APA threaten irreparable harm that cannot be remedied if the Federal Helium System is sold after November 15, 2023.

### A.    Plaintiffs' ability to use its valuable asset will be harmed.

Air Products will suffer irreparable harm to its property and contract rights in bought-and-paid-for helium if Defendants' proposed sale is allowed to proceed.  The System's technical limitations prevent Air Products from receiving all of its purchased helium—the current value of which far exceeds the hundreds of millions of dollars that Air Products paid for it—before Defendants' accelerated sale date.  App. 4 ¶¶ 7, 10–11.  But when the System is sold, delays and interruptions

are almost certain to follow.  *See supra*, at 11–15; App. 6 ¶¶ 14–16.  Selling the System as-is will thus prevent Air Products from using the helium stored in the System and inflict irreparable harm.

Unlike natural gas, for example, helium is not a commodity that "may be and is continually purchased on the open market" such that demand is "satisfied readily."  *Continental Oil Co. v. Crutcher*, 434 F. Supp. 464, 471 (E.D. La. 1977).  Repeated supply crises (including the current one) mean that the nearly four billion cubic feet of helium stored at and delivered through the System is an irreplaceable good and that timely access is an irreplaceable business opportunity.  App. 6, 8 ¶¶ 12–14, 17–18; *see also* App. 302–03 (noting that helium often "ha[s] no substitut[e]").  Alternative sources fall well short of meeting this demand, as evidenced by the ongoing supply crash that began when the System stopped producing for several months, *see supra*, at 7, 16–17; App. 6 ¶¶ 12–13.  Air Products' large volume of helium stored in the System is a "unique" commodity presenting "unique . . . opportunities" to fulfill contracts in a struggling industry.  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011) (irreparable harm where drilling moratorium deprived rightsholders of "unique oil and gas extraction opportunities"); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 340 (E.D. La. 2011) (irreparable harm where drilling moratorium threatened "the plaintiff's operations . . . with endless disability").

The gravity of harm posed to the hundreds of workers employed in the helium industry (including at the Cliffside facilities), the thousands of refined helium users engaged in critical medical, aerospace, manufacturing, and national defense activities, and the public at large that benefits from these activities is staggering.  Courts regularly consider "both harm to the parties and to the general public" when evaluating irreparable harm.  *Hornbeck Offshore Servs. v. Salazar*, 696 F. Supp. 2d 627, 638 (E.D. La. 2010) (granting preliminary injunction and noting the loss of "employment, jobs, [and] . . . domestic energy supplies").  In the end, the cascading harms at issue

22

here are too interconnected and too broad to remedy through damages or post hoc judicial decree. *See Texas v. Seatrain Int'l*, 518 F.2d 175, 179 (5th Cir. 1975) (irreparable harm where loss of traffic to Texas ports harmed "their citizens and the longshoremen"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (irreparable harm where moratorium threatened "loss of jobs in the oil and gas sector, higher gas prices . . . as well as damage to Plaintiff States' economy").[2]

### B.   Plaintiffs will suffer irreparable losses of customer goodwill.

Defendants' unlawful actions also threaten lasting harms to Air Products' customer base and goodwill. "[A]lthough obvious and doubtless very large," these harms are "not susceptible of [the] specific proof" required for a damages award. *Seatrain Int'l*, 518 F.2d at 179. And it is well-established that when "economic rights are especially difficult to calculate," they are "irreparable." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991).

Defendants' actions threaten to drive marginal helium consumers from the market altogether. Helium refiners, including Air Products, are *already* facing crude helium shortages traceable to the System's unexpected shutdown. App. 6, 303. Defendants' sale will further constrict supply by jeopardizing the largest domestic helium source and freezing hundreds of millions of cubic feet of stored helium out of the marketplace. In turn, Air Products' customers will be forced to reduce consumption, pursue alternatives, or even eliminate their helium-related projects altogether. App. 8 ¶ 19, 544–48. That injury is irreparable because the "loss of a [business's] customers" is "incapable of ascertainment in monetary terms." *Union Nat'l Life Ins. v. Tillman*, 143 F. Supp. 2d 638, 645 (N.D. Miss. 2000); *see Hornbeck*, 696 F. Supp. 2d at 638 (irreparable harm where moratorium affected plaintiffs' contracts and threatened harm to the energy market).

---

[2]   Defendants' violation of statutory and procedural rights under the Act, which was meant to protect Air Products' "concrete interest[s]" as a helium market participant, is an additional irreparable harm. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020).

Similarly, Defendants' actions will harm Air Products' hard-won goodwill among those customers who stay in the market by frustrating its ability to fulfill existing and repeat orders. App. 7–8 ¶¶ 17–18.  Each of Air Products' four major competitors has *already* been forced to ration the sale of refined helium to as low as 45-60% of the quantity contracted.  App. 548.  If Air Products likewise has to ration or delay helium deliveries—through no fault of its own—its reputation would be harmed and intangible goodwill lost.  App. 8 ¶ 18.  Such "damage to the goodwill of [a business'] customers" is irreparable because it cannot be reversed by court order and is "incapable of calculation" for monetary remedies.  *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989); *see also Union Nat'l Life Ins.*, 143 F. Supp. 2d at 645 (granting preliminary injunction and finding irreparable harm from "damage to [business's] goodwill").

### C.      Plaintiffs cannot seek damages relief from Defendants.

Finally, all of Air Products' harms are irreparable because even if they were ascertainable and could be adequately compensated—which they are not—Air Products would never see a dime in damages from the Defendants.  Sovereign immunity bars Air Products from seeking money damages against the federal government.  For Air Products, preliminary injunctive relief is the only option.  *Louisiana*, 543 F. Supp. 3d at 417 (finding irreparable injury for this reason).

### III.    The balance of equities and public interest strongly favor preliminary relief.

The balance of equities and public interest—which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—are conclusive: the public harms that would flow from a national helium supply shortage are overwhelming.  To start, any "perpetuation of unlawful agency action" contravenes the public interest and favors an injunction.  *R.J. Reynolds*, 65 F.4th at 195 (quotation marks omitted).  But here, there is so much more.  The public interest calls for vindicating the Helium Stewardship Act's specific goal of "ensur[ing] stability in the helium markets"—a public interest specifically prioritized by Congress.  Pub. L. No. 113-40, 127

24

Stat. at 534.  Market stability benefits the public by ensuring the "ready access" of "affordable" helium needed in a variety of applications, like MRI machines that diagnose cancer and other potentially fatal diseases.  *Texas v. EPA*, 829 F.3d at 435.  Further, the Government itself must now rely upon the open market to procure helium for critical national defense, aerospace, and research activities everywhere from the patrols at the Southern Border of Texas to the earth's stratosphere, *see* 87 Fed. Reg. 57166, 57166 (Sept. 19, 2022), and the Act is replete with provisions reflecting those federal interests, *see, e.g.*, 50 U.S.C. § 167d(b)(D) (authorizing "priority" for federal users), (c) ("Continued Access for Federal Users").  The proposed sale and conveyance, however, will result in a System that cannot function, and a System that is inoperable for "even . . . a few weeks" would result in massive harm to "small businesses" and the Government.  App. 402; *see also* App. 518 (agency letter calling helium supply issues a "threat to" scientific research).

Conversely, Defendants have no interest to balance against market stability.  The "interests of American taxpayers," Pub. L. No. 113-40, 127 Stat. at 534, are served no matter when the sale occurs because the Helium Production Fund, and ultimately the Treasury, will receive the proceeds regardless.  *See* 50 U.S.C. § 167d(e)(2).  The statutory deadline of September 30, 2021, has already passed and applies only to the designation of surplus status, not the sale and conveyance.  *See supra*, at 18.  Having taken their time to sell far less important facilities, *see supra*, at 18, Defendants are hard pressed to contend they would suffer any prejudice from a pause in this hasty, ill-planned sale and conveyance.  Given the "difficulty of restoring the status quo" if the sale proceeds, an injunction is warranted.  *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015); *see Louisiana*, 622 F. Supp. 3d at 298 (enjoining federal government where plaintiffs had billions at stake).

## CONCLUSION

The Court should grant Air Products' motion for a preliminary injunction and enjoin Defendants from implementing or enforcing the Invitation For Bid.

Dated:  September 11, 2023                Respectfully submitted,

                                          */s/ Andrew LeGrand*

                                          Andrew LeGrand
                                             State Bar of Texas No. 24070132
                                             alegrand@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          2001 Ross Avenue, Suite 2100
                                          Dallas, TX  75201
                                          Telephone: (214) 698-3405
                                          Facsimile: (214) 571-2960

                                          Helgi C. Walker (*pro hac vice* forthcoming)
                                             hwalker@gibsondunn.com
                                          M. Kendall Day  (*pro hac vice* forthcoming)
                                             kday@gibsondunn.com
                                          David Schnitzer  (*pro hac vice* forthcoming)
                                             dschnitzer@gibsondunn.com
                                          Aaron Smith  (*pro hac vice* forthcoming)
                                             asmith3@gibsondunn.com
                                          Nathaniel Tisa  (*pro hac vice* forthcoming)
                                             ntisa@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, D.C.  20036
                                          Telephone: (202) 955-8500
                                          Facsimile: (202) 467-0539

                                          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2023, the foregoing document was filed through the Court's ECF system.  I further certify that the foregoing document was served pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) by sending it by electronic mail to counsel for Defendants identified below, who consented in writing to service by electronic mail:

Liam Holland
U.S. Department of Justice, Civil Division
Federal Programs Branch
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
Liam.C.Holland@usdoj.gov

*/s/ Andrew LeGrand*
Andrew LeGrand